UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

|  |  |  |
|---|---|---|
| DOORDASH, INC., GRUBHUB INC., and PORTIER, LLC, | : | |
| | : | No. 21-cv-7564 (GHW) |
| Plaintiffs, | : | **FIRST AMENDED COMPLAINT** |
| -against- | : | **JURY TRIAL DEMANDED** |
| CITY OF NEW YORK, | : | |
| Defendant. | : | |

------------------------------------------------------------x

Plaintiffs DOORDASH, INC., GRUBHUB INC., and PORTIER, LLC (collectively, "Plaintiffs") by and through their attorneys, Gibson, Dunn & Crutcher LLP, allege for their first amended complaint against Defendant CITY OF NEW YORK, as follows:

<u>**NATURE OF THE ACTION**</u>

1.    Plaintiffs operate the popular food ordering and delivery platforms DoorDash, Caviar, Grubhub, Seamless, Postmates, and Uber Eats, which connect restaurants, consumers, and independent delivery couriers.  Throughout the COVID-19 pandemic, third-party platforms like Plaintiffs have been instrumental in keeping restaurants afloat and food industry workers employed, including by investing millions of dollars in COVID-relief efforts specifically for local restaurants.  *See infra* ¶¶ 57–61.  This remains true today, as restaurants respond to yet another COVID-19 wave fueled by the Omicron variant:  Plaintiffs remain committed to maintaining and restoring the vibrancy of New York City's local restaurants.  This is so despite the City of New York (the "City") interfering with Plaintiffs' freely negotiated contracts with restaurants and imposing *permanent* price controls on a private and highly competitive industry—the facilitation of food ordering and delivery through third-party platforms.  Those permanent price controls will

1

harm not only Plaintiffs, but also the revitalization of the very local restaurants that the City claims to serve.

2.      In May 2020, purportedly in response to the COVID-19 pandemic, the City enacted unconstitutional—though ostensibly temporary—price controls that impaired existing agreements and prevented restaurants and third-party platforms from freely negotiating the prices that platforms may charge restaurants for their services within the City, primarily by capping the rate that third-party platforms could charge restaurants at 15% of an online order for delivery services and 5% for all other services, including marketing.  That law originally was scheduled to expire 90 days after a declared public-health emergency that prohibits *any* on-premises dining due to the COVID-19 pandemic.  The City Council then moved the goalposts three times:  first it amended the sunset date to be 90 days after a declared emergency that prohibits restaurants from operating at *maximum* indoor occupancy; then it extended the applicability of the price controls until the arbitrary date of February 17, 2022 (the "Temporary Ordinance");[1] and most recently, it removed the law's sunset date altogether, thus making it permanent (the "Permanent Ordinance").[2]

3.      This now-indefinite legislation bears no relationship to any public-health emergency, and qualifies as nothing more than unconstitutional, harmful, and unnecessary government overreach that should be struck down.  The Ordinance is *unconstitutional* because, among other things, it interferes with freely negotiated contracts between platforms and restaurants by changing and dictating the economic terms on which a dynamic industry operates.

---

[1]      As relevant here, NYC Int. No. 2359-A, Local Law 2021/094 (amending Section 20-846 of the New York City Administrative Code).  Ex. A.

[2]      As relevant here, NYC Int. No. 2390, Local Law 2021/103, which became effective today, January 24, 2022.  Ex. B.  Plaintiffs challenge the constitutionality of both the Temporary Ordinance and the Permanent Ordinance (which also includes Int. No. 1897-A, Local Law 2021/100, discussed *infra*), which are collectively referred to as the "Ordinance" unless otherwise noted.

4.      The United States and New York Constitutions prohibit such government overreach by safeguarding the terms of freely negotiated contracts, protecting property rights and the right to pursue legitimate business enterprises, and providing for due process and equal protection under the law.  Left unchecked, the Ordinance sets a dangerous precedent.  Indeed, in refusing to sign a similar price control measure into law, Mayor London Breed of San Francisco described the bill as "unnecessarily prescriptive in limiting the business models of the third-party organizations, and overstep[ping] what is necessary for the public good."[3]  The same is true here.

5.      The Ordinance is also **_harmful_**.  The costs to Plaintiffs of providing the suite of services subject to the Ordinance (*see infra* ¶ 42) exceeds what Plaintiffs are now able to recoup in commissions due to the Ordinance's caps, and the Ordinance does not offer any way for Plaintiffs to offset the losses it inflicts.  If Plaintiffs increase their consumer-facing fees in an attempt to cover the losses caused by the Ordinance, basic economic principles dictate that order amounts and order volume will decrease.  If so, both Plaintiffs' and restaurants' revenues will decrease, earning opportunities for delivery couriers will decrease, and the City will realize less tax revenue.  In sum, the Ordinance leaves all stakeholders worse off than they were prior to regulation.

6.      Additionally, there is no evidence that the City Council solicited or reviewed any data to understand the impact of this extended price-fixing regime, including the relationship between third-party platform commissions and restaurant profitability, or the negative externalities the Ordinance will impose on New York City restaurants, couriers, and consumers.  Indeed, the City appears to have ignored the negative externalities various advocacy organizations and trade associations pointedly raised at multiple committee hearings (*see infra* ¶ 94), and those that many

---

[3]      Letter from Mayor London Breed to Shamann Walton re File 210492 (July 9, 2021).  Ex. C.

couriers described in their submitted testimony (*see infra* ¶¶ 96, 114).   Hundreds of delivery couriers who use Plaintiffs' platforms to earn a living—single parents, primary caretakers, and single-income families—objected to the Ordinance as detrimental to their earning opportunities and harmful to the restaurant industry.   For example, as one courier explained:

> I'm worried that this bill will have negative effects on people like myself who work on these platforms.   A permanent price control would directly hurt delivery workers' ability to make money.   Restaurants pay app-based delivery companies for a variety of services through commissions, one of these being delivery services. Capping these commissions means less earnings for people like me.   A commission cap could also mean delivery services get more expensive for the customers I deliver to, which ultimately means less orders for me.

And, as another courier told the City Council, "I'm writing to tell you that I hope you will listen to people like me who are scared that [the Ordinance] will actually reduce work opportunities for people like me."   But the City did not listen.   Instead, as part of its "legislate first, study second" approach, the City postponed analyzing the impact of permanent price controls until 2023, at which point a report will be authorized examining the Ordinance's impact.

7.   The Ordinance is also ***unnecessary***.   Restaurants need not partner with third-party platforms.   Restaurants have an array of options for receiving orders and providing delivery, including providing delivery services themselves (and thereby incurring the costs associated with hiring, insuring, and screening their own delivery staff), as well as third-party options well below the price control established by the City (including delivery options where restaurants pay no fees or little more than credit card processing fees, *see infra* ¶¶ 47–49).   Indeed, Plaintiffs have developed new pricing structures that make working with third-party platforms even more accessible.   Likewise, restaurants have access to many marketing options (within and apart from third-party platforms) to attract customers and promote their businesses, including online advertising channels—such as building their own websites, e-mail marketing campaigns, and using

sites like Google and Facebook, among many others—and offline advertising mediums, such as printing flyers, handing out menus, or using billboards.

8.       Furthermore, if the City's goal is to improve the profitability of local restaurants, then the City—which projected a budget surplus for Fiscal Year 2021 of $3.4 billion[4]—has other, lawful means to aid restaurants, such as tax breaks or grants.[5]  But rather than exercise one of those lawful options, the City chose instead to outsource this burden onto a discrete group of private actors, adopting an irrational law, driven by naked and express animosity towards third-party platforms and unlawful economic protectionism, in violation of the United States and New York Constitutions and beyond the scope of New York City's limited police power.

9.       That the Ordinance was driven by such animosity is evident from lawmakers' many public statements.  For example, in February 2020—prior to the announcement of any public state of emergency in New York City—one of the Ordinance's sponsors, Council Member Francisco Moya, introduced a 10% commission cap bill;[6] months later, after the state of emergency began, and using that emergency as pretext to revive his inert legislative proposal, he tweeted, "NYC local restaurants needed a 10% cap on delivery fees from third party services like GrubHub long before #COVID19 hit us.  They damn sure need it now."[7]

---

[4]      *DeNapoli: Some Bright Spots for NYC Finances in FY21, but Long-Term Challenges Looming*, OFFICE OF THE N.Y. STATE COMPTROLLER (Feb. 23, 2021), https://bit.ly/3mlcWCe (last visited Jan. 23, 2022).

[5]      Indeed, last year, the National Restaurant Association issued an 11-point blueprint for state and local policymakers for restaurant recovery.  This blueprint included policies like tax breaks and grants but did not state or even suggest that commission caps were necessary for restaurant recovery.  *See* Letter from Nat'l Rest. Ass'n to Governor Andrew Cuomo (Feb. 18, 2021), https://bit.ly/3jXEIls (last visited Dec. 28, 2021).

[6]      On information and belief, this was the first time any legislative action was introduced in New York City contemplating price controls on third-party platforms. At that time, no other legislature in the United States had passed such price control legislation. The City Council referred the bill to committee, and did not take any action on this bill or begin to seriously entertain commission caps for several more months.

[7]      Francisco Moya (@FranciscoMoyaNY), TWITTER (Apr. 14, 2020), https://bit.ly/3CBqsaA (last visited Jan. 23, 2022).

10.     In advocating for permanent price controls on platforms, Council Member Moya made clear that the City's motivation was not a legitimate use of its legislative power for purposes of serving the general welfare, as is required by law, but rather to pick favorites among private market actors.  In a July 1, 2021 meeting of the Committee on Small Business, Council Member Moya explained that because New York restaurants pay New York taxes, "it's more important that we protect them instead of . . . Grubhub or the other providers, ***I would hate [the] scenario of where a percentage of the sales transaction is leaving our city and going to a different state and not contributing to our tax base***."  Based on this and similar statements in the legislative record, it is clear that the City acted out of an irrational hostility towards Plaintiffs and without supporting data to justify their actions.  Moreover, the City is wrong and its blatant hostility misplaced:  each transaction made in New York on Plaintiffs' platforms generates tax revenue for New York.

11.     The Temporary Ordinance's text itself clearly targets certain large, out-of-state third-party platforms, and for the purported purpose of favoring certain local private businesses. And notably, the Ordinance does not regulate the prices of other businesses with which restaurants regularly contract, such as wholesale food and supply companies (even though the cost of ingredients has substantially increased), point-of-sale vendors, order management platforms, online reservation platforms, credit card processing companies, or other marketing companies. The City has not offered any justification for this disparate and arbitrary treatment.

12.     Indeed, the Ordinance irrationally limits third-party platforms like Plaintiffs to charging 15% per order for delivery services and 5% per order for other services that third-party platforms currently offer restaurants and might seek to offer in the future, including order processing, point-of-sale systems and tablets, marketing and advertising services, sales and consumer analytics, driver status and support technology, brand management and menu consulting

(*e.g.*, food photography and menu design), website design, social media integration, and raw ingredient sourcing, among many others.  Moreover, these are services that other companies provide to the very same restaurants at an unregulated price.  For example, the *New York Times* and Google can charge an unlimited price for their advertising services, and a restaurant can freely choose whether or not to accept that price.  In contrast, third-party platforms like Plaintiffs—and only these platforms—are completely barred from charging even a penny for services impacted by the Ordinance if they have already reached its artificially capped fee.

13.    These arbitrary caps imposed by the Ordinance do not permit Plaintiffs to cover the costs of operating the many services they provide in New York City for the benefit of restaurants, and the City made no formal legislative findings to the contrary in enacting these intrusive and unwarranted price controls.  The City has not offered any reasonable explanation for why it randomly selected a 15% cap for delivery services, nor why it selected an arbitrarily restrictive 5% cap for other services performed on behalf of restaurants, including pickup-order facilitation and marketing services, which are costly to operate and very valuable to restaurants.  Nor can it. Nothing in the Ordinance, legislative history, or public record explains why the City chose these arbitrary figures, much less how they are reasonably related (which they are not) to the public-health emergency that purportedly prompted their imposition in the first place.

14.    Nor is there any justification for imposing such a restrictive cap (or any cap at all), a total of 5% per order, on the other services that Plaintiffs either currently offer restaurants or may seek to offer restaurants in the future, as described above.  For instance, this 5% cap applies to advertising services offered by food-delivery companies, but does not apply to other providers of advertising services to restaurants with which Plaintiffs compete, such as Google, Facebook,

Twitter, Yellow Pages, Groupon,[8] website consultants, radio, billboards, and more.  The legislative record includes no explanation for this discriminatory treatment of platforms for the same services as these other marketing providers.

15.    Additionally, many platforms offer restaurants services beyond marketing and advertising, such as order processing, point-of-sale systems and tablets, sales and consumer analytics, driver status and support technology, brand management and menu consulting (*e.g.*, food photography and menu design), website design, and social media integration, among many others. Companies that offer the same services but that do not offer food delivery are completely unrestricted.

16.    The City made no effort to study the economic impact and sustainability of the cap on third-party platforms, including whether they can even provide the same services and operate profitably at that level; instead, it expressly opted to not undertake any analysis until 2023.

17.    The City's unconstitutional and irrational motivations are made all the more obvious by the slew of other laws, alongside the Ordinance, that the City recently passed that target third-party platforms.   These include, among others:   (1) Int. No. 1897-A (also part of the Permanent Ordinance), requiring third-party platforms to obtain licenses from the Department of Consumer and Worker Protection ("DCWP") every two years in order to conduct business in New York City, and which licenses the DCWP could deny or revoke upon the occurrence of just two technical violations of a whole host of various City regulations over the course of a period of two years; and (2) Int. No. 2311, requiring that third-party platforms share their customers' personally

---

8        Upon information and belief, Groupon takes up to a 50% commission as its fee for marketing restaurants to consumers, whereas Plaintiffs' marketing and advertising services are commonly baked into the commissions paid by restaurants, which cover a whole host of other benefits they provide to restaurants, *see supra* ¶ 12.

identifying and sensitive data with a requesting restaurant.[9]   Each of these laws places undue burdens on third-party platforms without consideration of the many impracticalities, including significant privacy challenges, they pose.   The City's hostility to Plaintiffs is both blatant and unwarranted.

18.   For at least the last century, courts in New York and elsewhere have consistently held that federal and state constitutions prohibit local governments from engaging in economic protectionism and fixing prices to benefit only a segment of the public—such as one industry or group of businesses.   *See People v. Cohen*, 272 N.Y. 319, 322 (1936) (holding that an ordinance banning certain Broadway markets from selling food from their windows to protect the real estate value of nearby properties bore "no relation to the welfare of the public but [was] designed for the convenience and interest of a special class"); *see also Melendez v. City of New York*, 16 F.4th 992, 1042 (2d Cir. 2021) (finding that "the Guaranty Law's allocation of its economic burden," aggravated the court's concerns that the law was not reasonably drawn, because "[p]ermanently excusing guarantors from pandemic-accrued rent liabilities comes not at City expense (or, more precisely, that of the public that benefits from functioning neighborhoods) but, rather, at the expense of a discrete group of private persons:  commercial landlords"); *Great Atl. & Pac. Tea Co. v. Town of E. Hampton*, 997 F. Supp. 340, 347–48 (E.D.N.Y. 1998) (denying motion to dismiss where the complaint alleged the challenged laws bore no "reasonable relationship either to the ends sought . . . or to the public health, safety, morals, or welfare," but rather were "designed to protect the economic interests of the owners and operators of existing retail stores by protecting them from the competition of large retailers"); *State Bd. of Dry Cleaners v. Thrift-D-Lux Cleaners,*

---

[9]      Plaintiffs have separately filed legal challenges in this Court to Int. No. 2311.  The cases have been consolidated, and the City has agreed to stay enforcement of that law pending the final resolution of the matter.  *See DoorDash, Inc. v. City of New York*, No. 21-cv-7695 (S.D.N.Y.), ECF No. 29.

*Inc.*, 40 Cal. 2d 436, 447 (1953) (holding that a minimum dry cleaning price-setting ordinance was unconstitutional because it "protect[s] the industry" which is "only a small segment of the general public"); *In re Kazas*, 22 Cal. App. 2d 161, 178 (1937) (holding that a municipality could not legislate minimum barbershop prices to protect barbers).   In the years since these cases unequivocally held that price-fixing laws seeking to protect favored industries are unconstitutional, no legislature has enacted price-fixing legislation comparable to the Ordinance.

19.     The only types of price controls that typically survive constitutional scrutiny are those applicable to public utilities of civic necessities (*e.g.*, electricity, gas, and water).   Unlike these public utilities—which are often granted geographic monopolies in exchange for regulated prices—Plaintiffs compete vigorously with each other and with other companies to provide restaurants with the services subject to the Ordinance's price caps.   And many restaurants have opted to partner with Plaintiffs to grow their businesses.   This choice and the competition it drives is the hallmark of our economic system.   Undeniably, Plaintiffs and those who provide similar services to restaurants are not (nor do they resemble) public utilities.   Food delivery is not a recent phenomenon and the industry has historically been unregulated.   There was no reason to regulate third-party platforms like public utilities even during the state of emergency, let alone now and when New York has long lifted its on-premises capacity restrictions.

20.     In light of this significant competition, Plaintiffs have always strived for fair contracts that properly value the services that their platforms offer to restaurants.   For example, as part of that ongoing commitment, in April 2021, DoorDash introduced new Partnership Plans that provide restaurants with even greater transparency and choice.   Different plans entail different services and costs.   Restaurants voluntarily select which packages of services they wish to contract for and the accompanying commission structure, including a Basic Partnership Plan where

DoorDash facilitates delivery of online orders for a flat commission rate of 15% (including payment processing costs).  Most restaurants want the services Plaintiffs offer, and enter into contracts by which they agree to pay for those services rendered.  Indeed, the vast majority of New York City-based restaurants that opted into a new Partnership Plan voluntarily selected plans with commission rates above 15%, despite the freedom to select the Basic Partnership Plan where DoorDash facilitates delivery of online orders for a flat commission rate of 15%.  These restaurants decided for themselves that the best way to boost their sales and revenues was to contract with DoorDash for the enhanced services it offers, in exchange for higher contracted commission rates of 25% or 30%.

21.     Similarly, Grubhub's commission structure is also negotiable, with restaurants having the choice to select between plans at commission rates of 15%, 20%, 25%, or 30% as best reflects their desired level of marketing and visibility on the Grubhub Marketplace.  Likewise, Uber Eats (operated by Plaintiff Portier, LLC), also allows restaurants to choose among pricing packages and suites of services that are more tailored to their needs, including options at commission rates of 15%, 25%, and 30% for delivery orders (along with commission rates of 6% for pickup orders if the merchant also has a delivery package).  Many restaurants find third-party platforms' various one-stop-shop suite of services to be an advantage compared to offering their own delivery services (and thereby incurring the substantial costs associated with hiring, insuring, and screening their own delivery staff) or using multiple vendors for web development, online ordering, sales analytics, advertising, and marketing, the costs of which restaurants will have to bear regardless of whether their order volumes justify the expenses.

22.     Plaintiffs spend hundreds of millions of dollars annually in marketing, which enables restaurants on their platforms to reach new and existing consumers for incremental orders,

because when restaurants survive and succeed, so do Plaintiffs.  As a result, restaurants have had meaningful choice in whether and how they use Plaintiffs' services to grow their businesses.  For example, restaurants can:

    a.  Choose whether to offer delivery at all;

    b.  Choose to directly receive and process orders and/or facilitate delivery themselves without using any third-party companies, such as by having customers call the restaurants directly to place an order to be filled by the restaurants' own delivery staff, and/or operating their own website;

    c.  Choose which, if any, third-party platform to use, or choose any combination of platforms;

    d.  Choose a third-party delivery option that charges nothing more than credit card fees;

    e.  Choose a third-party delivery option that charges a flat fee per delivery instead of a commission; or

    f.  Choose from a range of commission-based third-party delivery and marketing packages at different price points, depending on the products and services that are best suited to their needs.

23.    And due to the intense competition in this market, absent government intrusion, third-party delivery services are likely to continue to provide new services and package options in the future.  But this innovation will be hampered by the City's latest overreach.  New York City's permanent price control puts restaurants' choices in jeopardy because it will limit the services and package options Plaintiffs can offer going forward.  In addition, consumers will likely have to bear increased costs, which will drive down orders and further limit the services Plaintiffs will be able

to provide, constricting future revenues of both restaurants and Plaintiffs.  Accordingly, through this First Amended Complaint, Plaintiffs seek declaratory relief, injunctive relief, and damages on the grounds that the Ordinance violates:

    a.   The Contract Clause of the United States Constitution;

    b.   The Takings Clauses of the Fifth Amendment to the United States Constitution (incorporated by the Fourteenth Amendment) and Article I, Section 7 of the New York Constitution;

    c.   Article IX, Section 2(c) of the New York Constitution and related statutes (Police Power);

    d.   The Fourteenth Amendment to the United States Constitution and Article I, Section 6 of the New York Constitution (Due Process);

    e.   The Fourteenth Amendment to the United States Constitution and Article I, Section 11 of the New York Constitution (Equal Protection); and

    f.   The Dormant Commerce Clause of the United States Constitution.

24.    In pursuing this action, Plaintiffs seek to vindicate the deprivation of their federal constitutional rights under color of state statute, ordinance, regulation, custom, and/or usage.  Thus, Plaintiffs seek damages and other relief under 42 U.S.C. § 1983.  Plaintiffs are also entitled to attorneys' fees and expert fees if they prevail on any of their Section 1983 claims.  42 U.S.C. § 1988.

## PARTIES

25.    Plaintiff DoorDash, Inc. ("DoorDash") is a Delaware corporation founded in 2013 and headquartered in San Francisco, California.  Since day one, DoorDash's mission has been to empower local businesses by providing access to e-commerce.  Its platforms (including the DoorDash and Caviar platforms) connect consumers, a broad array of restaurants, and in some

cases, delivery couriers, each of which is affected by the Ordinance.  DoorDash offers several options to restaurants, including Marketplace (DoorDash's web- and app-based platform that facilitates food pickup and delivery), Storefront (an application that enables restaurants to create a branded online store to facilitate pickup and delivery from their own websites, in exchange for payment of credit card processing fees of 2.9%, plus $0.30 per order), and Drive (a platform that facilitates delivery of orders originating outside the Marketplace in exchange for a flat fee).  As such, DoorDash has a beneficial interest in the relief sought herein.

26.     Plaintiff Grubhub Inc. ("Grubhub") is a Delaware corporation founded in 2004 and headquartered in Chicago, Illinois.  Grubhub's long-standing priority has been to serve restaurants. Grubhub's online food ordering and delivery marketplace (operating under the Grubhub and Seamless brands) connects consumers with a broad array of local takeout and delivery restaurants, and in a minority of cases, independent-contractor couriers.  Grubhub elevates food ordering through innovative restaurant technology, easy-to-use platforms, and an improved delivery experience, which includes the Grubhub Guarantee[10] to facilitate diner satisfaction and protect restaurants' reputations.  Grubhub drives orders to restaurants through its Marketplace, while also offering restaurants tools to grow their own digital businesses.  These tools include Grubhub Direct, which gives restaurants customized ordering websites along with loyalty and customer data tools, enabling them to market directly to their consumers without paying any marketing commissions.  Grubhub has a beneficial interest in the relief sought herein.

27.     Plaintiff Portier, LLC ("Uber Eats") is a Delaware company founded in 2014 and headquartered in San Francisco, California.  Uber Eats is a wholly owned subsidiary of Uber

---

[10]     The Grubhub Guarantee ensures that consumers receive the best price for their order.  More specifically, consumers who find a better price through one of Grubhub's competitors are eligible to receive the difference in price plus $5 off their next order.  *What Is the Grubhub Guarantee?*, GRUBHUB, https://bit.ly/3AIxybS (last visited Sept. 8, 2021).

Technologies, Inc.  It contracts with merchants in New York City to grant them access to the Uber

Eats online platform.  Postmates, which was acquired by Uber Technologies, Inc., assigned its

rights in merchant agreements to Uber Eats.  Uber Eats's online marketplace platforms (operating

under the Uber Eats and Postmates brands) connect restaurants and other merchants to consumers

and a network of independent delivery people in their communities.  Consumers can access the

Uber Eats platforms via websites or mobile applications on a smartphone.  Restaurants can access

the Uber Eats platforms through pricing packages that vary based on their individual needs, with

some restaurants opting for services priced below the Ordinance's commission caps, and some for

services priced above.  Restaurants can also contract with Uber Eats to optimize their sales through

Webshop, an end-to-end solution for restaurants' websites that includes menu management, order

facilitation, and analysis services, as well as through Uber Direct, which allows restaurants to use

Uber's technology to facilitate orders placed on existing online stores.  Uber Eats facilitates these

services between merchants and consumers that are affected by the Ordinance.  As such, Uber Eats

has a beneficial interest in the relief sought herein.

28.    Defendant City of New York (the "City" or "New York City") is a municipal

corporation organized and existing under and by virtue of the laws of the State of New York.

### JURISDICTION AND VENUE

29.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983 over

Plaintiffs' federal constitutional claims, and has supplemental jurisdiction pursuant to 28 U.S.C.

§ 1367 over the remaining claims.  This Court also has jurisdiction over the claims and relief

sought pursuant to 28 U.S.C. §§ 1332, 1343(a), 2201, and 2202.

30.    Plaintiffs bring this action as both a facial challenge and "as-applied" challenges to

the Ordinance, and are excused from exhausting any administrative remedy before the City.

Plaintiffs allege that the Ordinance is invalid:  (1) on its face, (2) as applied to Plaintiffs, and (3) as applied to certain of Plaintiffs' contracts with New York City restaurants.

31.     Venue is proper in this Court because the Ordinance was enacted by the New York City Council, and the violations of Plaintiffs' rights occurred in this judicial district.

## FACTUAL ALLEGATIONS

**A.    The Services Third-Party Platforms Provide and the Commissions Restaurants Agree to Pay**

32.     Plaintiffs operate third-party platforms in New York City and elsewhere that connect restaurants with couriers and consumers who wish to purchase food and have it delivered to them or be ready for pickup.  Consumers can access the platforms via Plaintiffs' websites or applications on a smartphone.

33.     Other platforms operating in New York City and elsewhere in the United States that provide similar services to restaurants include Delivery.com, Slice, Toast, and Ritual, among others.  The third-party platform industry is dynamic, competitive, and constantly evolving in ways that benefit restaurants and consumers.  But it is not new:  internet-based food delivery has been around since the mid-1990s, and Plaintiffs have been operating in the industry for many years. See *supra*, ¶¶ 25–27.  Until now, this dynamic competition has occurred largely free of government regulation, and completely free of regulations setting price controls on the fees that restaurants can agree to pay third-party platforms in exchange for the services provided.

34.     The services offered by third-party platforms are good for New York City restaurants.  The emergence of third-party platforms has resulted in the expansion of restaurants' consumer bases.  Consumers, who otherwise would not have patronized a restaurant in person or would not have discovered a restaurant but for Plaintiffs' platforms, use the platforms to purchase food from that restaurant to be delivered or picked up.  One study reported that delivery sales

through third-party platforms are approximately 80% incremental—meaning 80% of the orders placed to restaurants through platforms would not have otherwise been placed by an eat-in diner or a takeout customer.  Platforms thus provide substantial new business for restaurants that they would not otherwise secure.

35.     Plaintiffs' platforms have allowed restaurants that struggle to attract dine-in customers (well before the COVID-19 pandemic) to boost their revenue through delivery and pickup orders.  Indeed, the benefits afforded are compounded because consumers who order from a restaurant for delivery or pickup are more likely to later select the same restaurant to dine in.  Thus, the services Plaintiffs and other platforms offer (even at commissions exceeding a total of 20%) have helped prevent restaurant closures that may have occurred, with or without the pandemic, to the benefit of many local neighborhoods.

36.     For example, in a national survey conducted by independent research firm Quadrant Strategies of single, local, independently owned businesses, between 80% and 95% report (depending on the question) that Uber Eats made them more profitable, increased their revenue, helped expose them to new customers, and has been beneficial to their bottom line.

37.     In general, the restaurant industry has been growing in the years since Plaintiffs and other third-party platforms have begun offering their services and has been in a near-constant state of expansion since 2013.  Data for 2021 shows that restaurant sales are trending upwards.  The Bureau of Labor Statistics estimates the restaurant "job outlook" to grow 17% by 2030, which it labels "much faster than average."   Another report highlighted the "pent-up demand" for restaurants after the COVID-19 pandemic.  According to the report, data shows that consumers wanted to increase their rate of on-premises dining.

38.     This upward trend in the restaurant industry comes despite large rent hikes, a shortage of workers, and increasing wholesale food prices (all of which persist in New York and are completely unrelated to the third-party platforms).[11]   Rather than exacerbate these cost increases, Plaintiffs have helped mitigate these burdens for restaurants by expanding restaurants' customer base and increasing order volume and revenue.  And instead of tackling any of the other challenges that restaurants face, the City has chosen to singularly target Plaintiffs and transfer to them the burden of providing relief to all New York City restaurants, regardless of need.

39.     But Plaintiffs are not the problem; restaurants that used Plaintiffs' platforms were more likely to stay in business throughout the pandemic.  For example, the odds of staying in business during the pandemic were eight times better for restaurants on DoorDash compared to all U.S. restaurants.  And 95% of small businesses nationwide reported that working with Uber Eats has had a positive impact on their business during the pandemic, and nearly 90% of independent restaurant operators agreed that Grubhub increases the volume of takeout and delivery orders.  The pandemic also did not affect the basic economics of restaurants' use of Plaintiffs' platforms. Before the pandemic, restaurants grew their revenue through Plaintiffs' platforms; if they had not, they would have stopped using the platforms.

40.     On most third-party platforms, including Plaintiffs', couriers are available to deliver food from restaurants to consumers.  Some restaurants, however, choose to provide their own delivery services (and thereby incur the costs associated with hiring, insuring, and screening

---

[11]     In fact, leading lobbyists for the restaurant industry do not even list third-party platform commissions in their top three factors impacting restaurant viability.  In a recent interview, Sean Kennedy, EVP of Public Affairs at the National Restaurant Association, emphasized that these top three elements are "customer demand, a workforce to meet that demand, and [] rational and steady wholesale food prices," and that, currently, restaurants were operating without any of those factors.  *Restaurant Industry First to Shut Down, Last to Fully Recover From COVID: National Restaurant Association*, FOX NEWS (Dec. 29, 2021), https://video.foxnews.com/v/6289199765001#sp=show-clips (last accessed Jan. 23, 2022).

their own delivery staff).  Restaurants may also choose to self-perform other services that platforms offer, such as marketing and advertising, sales and consumer analytics, customer support, and technology and product development.  Indeed, thousands of restaurants in New York City do not use any third-party platform at all.  And, of course, no restaurant is compelled to use any third-party platform.

41.     Plaintiffs generate revenue to help cover their costs for the services provided to restaurants by collecting commissions from restaurants pursuant to agreed-upon contractual terms. These commissions represent a substantial part of Plaintiffs' revenue streams and are necessary for Plaintiffs to offer services that drive revenue for restaurants, provide meaningful earning opportunities for couriers, and delight consumers.

42.     The operational costs that Plaintiffs incur to drive demand to and facilitate ordering and delivery on behalf of restaurants include (but are not limited to):

    a.  Marketing local restaurants to consumers, which can include promotions, advertising to drive demand to local restaurants, and brand management (e.g., food photography and menu development);

    b.  Platform development, maintenance, and operation;

    c.  Procurement and development of technology, including for payment processing, order management, sales analytics, point-of-sale systems, and dispatching;

    d.  Procurement and development of restaurant-dedicated products to manage promotions, order volume, and menus;

    e.  Onboarding delivery couriers, including background checks for every courier on Plaintiffs' platforms;

     f.   Compensating delivery couriers for their work;

     g.   Safety of delivery couriers, including auto insurance costs and personal protective equipment; and

     h.   Dedicated customer service specialists to provide support to restaurants, couriers, and consumers for orders placed through Plaintiffs' platforms.

43.    Plaintiffs compete with each other and with many other companies in the markets for food delivery, pickup, order and payment processing, marketing, and other services (*see supra* ¶ 12), and thus have powerful market-based incentives to offer the best overall value to restaurants. This intense market competition acts to constrain the pricing and other terms that Plaintiffs can offer to restaurants.

44.    Restaurants have significant choice in the type of contract they enter into with Plaintiffs. A typical contract between Plaintiffs and a restaurant includes a commission where the restaurant agrees to pay Plaintiff a fixed percentage of the price of the consumer's order in exchange for certain services. Plaintiffs have used this type of percentage commission structure with thousands of New York City restaurants for many years. But restaurant commissions are not one-size-fits-all. Plaintiffs offer suites of services at different price points to meet restaurants' differing needs. These contractual terms benefit restaurants—overwhelmingly, restaurants see increased revenues when they join one or more of Plaintiffs' platforms. For instance, nearly two-thirds of restaurants surveyed say they were able to increase their profits during COVID-19 because of DoorDash. And 86% of small businesses surveyed said that Uber Eats has been beneficial to their bottom line.

45.    Even though DoorDash's and Grubhub's contracts with restaurants are terminable at will, and most of Uber Eats's contracts with restaurants are likewise terminable at will,

restaurants choose to maintain these contracts—including the percentage commission structures contained therein—typically for several years because restaurants recognize the value that Plaintiffs provide.  Indeed, the vast majority of restaurants in New York City that enter into contracts with Plaintiffs opt not to terminate but remain in multi-year contractual relationships, and a substantial number of these restaurants first joined Plaintiffs' platforms prior to the imposition of the temporary caps.  A large number of restaurants voluntarily enter into contracts with Plaintiffs with commissions greater than what the Ordinance allows so as to gain access to a broader suite of services, which can include, for example, increased delivery radius or access to customer subscription services.

46.     Restaurants have significant flexibility in how they partner with DoorDash to facilitate delivery.  Restaurants can partner with DoorDash to facilitate delivery via Marketplace, Storefront, and Drive.  *See supra* ¶ 25.  A restaurant that selects Marketplace as the means to facilitate delivery can opt in to one of three Partnership Plans at different price points depending on the products and services that are best suited to its needs, including a Basic Partnership Plan where DoorDash facilitates the delivery of online orders for a commission rate of 15%.  But, overwhelmingly, restaurants do not choose this option.[12]  Of those restaurants that have opted into a Partnership Plan, most choose enhanced services by opting into the Plus or Premium Packages in exchange for higher commission rates of 25% and 30%, respectively.

47.     DoorDash has used a percentage commission structure with many restaurants for many years, whereby restaurants only pay DoorDash for orders received through the DoorDash website or mobile application.  DoorDash's contracts with restaurants—including the percentage

---

[12]     While DoorDash offers a Basic Plan limited to a 15% commission fee, the vast majority of NYC-based restaurants that have opted into a Partnership Plan selected plans with 25% and 30% commissions; moreover, the vast majority of NYC-based restaurants agreed to contractual commission rates in excess of 20%.

commission structures contained therein—often last multiple years.  DoorDash has contracts with thousands of restaurants in New York City.  A substantial number of these contracts were signed before even temporary commission caps were implemented and certainly before there was any indication that the City would impose permanent commission caps.  And the vast majority of contracts contain a fixed-percentage commission structure greater than 20%.  These commission rates have not increased since the pandemic began.  Because of the Ordinance's artificial commission cap, DoorDash cannot actually charge what it is contractually entitled to and what the competitive market allows.  Likewise, but for the Ordinance, DoorDash would, in the future, enter into agreements with restaurants for various packages of service levels, at per-order percentages in excess of those allowed by the Ordinance.  As such, DoorDash is inhibited from innovating new combinations of services and benefits for restaurants that have per-order value over and above the limits set by the Ordinance.

48.    Grubhub has also used a percentage commission structure with many restaurants for many years.  Grubhub's contracts vary restaurant by restaurant, depending on the suite of services each restaurant decides is best for its business.  Restaurants that use products like Grubhub's Direct Order Toolkit or Grubhub Direct do not pay any marketing fees.  Restaurants that opt to use the Grubhub Marketplace to generate orders from the Grubhub network of more than 30 million diners select a negotiable marketing package that typically ranges from 5%–20% per order, based on the restaurant's desired level of marketing support and visibility.  Grubhub's contracts and the percentage commission structures contained therein, although technically terminable with notice, in reality, often last several years because restaurants recognize the value that Grubhub provides.  Grubhub has contracts with thousands of restaurants in New York City. The vast majority of these contracts were signed before commission caps were implemented,

contain a fixed-percentage commission structure, and have been in effect for long-term durations, with no party exercising its right to terminate.  For contracts between Grubhub and restaurants that include delivery facilitation, the total commission rate is generally greater than 20% (largely as a pass-through charge to cover Grubhub's costs), and the commission rates have not increased since the pandemic began.  Because of the Ordinance's artificial commission cap, Grubhub cannot actually charge what it is contractually entitled to and what the competitive market allows. Likewise, but for the Ordinance, Grubhub would enter into future agreements with restaurants for various packages of service levels, at per-order percentages in excess of those allowed by the Ordinance.  As such, Grubhub is inhibited from innovating new combinations of services and benefits for restaurants that have per-order value over and above the limits set by the Ordinance.

49.     For the Uber Eats platforms, Uber Eats has used contracts with a fixed-percentage commission structure with many restaurants for many years.  Uber Eats's contracts with restaurants—including the percentage commission structures contained therein—often last several years, even though many of those contracts are terminable with notice.  Pricing packages agreed to by Uber Eats's restaurant partners vary based on their individual businesses' needs—with some percentages below and others above the current caps set by the City—and can include marketing and advertising services, payment and order processing, customer support services, data and insights to inform their operations, as well as the facilitation of order delivery.  Restaurants that choose to use their own couriers for some or all delivery orders, but still rely on Uber Eats's platforms to reach customers and for order and payment processing, may select reduced pricing on a per-order basis when the restaurants' couriers are used.  In addition, in 2020, Uber Eats introduced the option for restaurants to partner with it to add online ordering directly to their own websites to facilitate pickup and delivery orders—this option is currently available to restaurants

for only the cost of payment processing.  Uber Eats's offerings also include commission percentages that exceed the amounts permitted by the Ordinance.  Because of the Ordinance's artificial commission cap, Uber Eats cannot actually charge what it is contractually entitled to and what the competitive market allows.  Likewise, but for the Ordinance, Uber Eats would, in the future, enter into agreements with restaurants for various packages of service levels, at per-order percentages in excess of those allowed by the Ordinance.  As such, Uber Eats is inhibited from innovating new combinations of services and benefits for restaurants that have per-order value over and above the limits set by the Ordinance.

50.     Third-party facilitation of food delivery is not new and has, in fact, existed for decades without any government-imposed price controls.  Likewise, the relationship between restaurants and third-party platforms historically has not been subject to government regulation. Plaintiffs have operated without price controls or similar government intrusion for many years, and without any expectation that that dynamic would suddenly change.  In fact, Plaintiff Grubhub has been operating for almost 20 years without being subject to the type of government restrictions imposed by the Ordinance.  Like nearly all other types of businesses that contract with restaurants—including other marketing, delivery, analytics, web development, and point-of-sale or payment processing technology businesses—restaurants and third-party platforms have been permitted to agree to whatever terms they thought best for their respective businesses.  Restaurants and third-party platforms have been able to negotiate their contracts freely, and many New York City restaurants have been able to select from among different tiers of services offered at different commission rates with third-party platforms to meet their particular needs.

51.     Prior to the outbreak of COVID-19, no federal, state, or local government had instituted price controls or any other regulations on the commissions that third-party platforms

could charge restaurants (or the fees that third-party platforms could charge consumers).  Plaintiffs have been operating third-party platforms for years, and had entered into tens of thousands of contracts with restaurants in New York before any legislation was introduced in New York City (or elsewhere) concerning the amount of commissions.  Plaintiffs (and restaurants) reasonably relied on the law as it existed at the time of contracting when they entered into their contracts.  The law at that time was devoid of any government price-fixing, just as it is for almost every business-to-business relationship in other industries.  When they entered into these contracts with New York City restaurants, the City had not so much as entertained any legislation that would impose these commission caps, and Plaintiffs had no reason to expect that the City would discard long-standing practice and move to institute permanent price controls between private businesses in a historically unregulated market.

52.     Originally, the City passed the commission caps as a temporary emergency measure expressly tied to the COVID-19 pandemic.  But it is clear now that the New York City lawmakers who support commission caps have not viewed such measures as limited to COVID-19 emergency relief.  Council Member Moya, who first introduced a permanent 10% commission cap before any COVID-19 state of emergency was declared, stated that permanent caps are necessary to protect "small businesses."[13]  And Council Member Gjonaj claimed that his "mandate" is to step in to "level [the] playing field," which he inaccurately frames as a "David versus Goliath relationship" between "mom-and-pop eateries," that the City must protect, and "venture capital backed food delivery platforms."[14]  But no restaurant is forced to use DoorDash, Grubhub, or Uber Eats's

---

[13]     Richard Calder, *Permanent Cap on Delivery-App Fees Proposed for New York City*, WALL ST. J. (June 24, 2021), https://on.wsj.com/2X4cy0q (last visited Jan. 23, 2022).

[14]     Robbie Sequeira, *Capped 3rd-Party Food Delivery Service Fee Could Affect NYC Restaurant Industry*, BRONX TIMES (July 2, 2021), https://bit.ly/3jE6XFU (last visited Jan. 23, 2022).

platforms, or any other third-party platform (or to even offer delivery and/or takeout options at all).  Restaurants can, among other things, opt to hire their own delivery drivers (and thereby incur the costs associated with insuring, and screening their own delivery staff), field customer calls directly, create their own websites, design their own menus, run analytics on their orders, and develop their own marketing and advertising solutions.  Moreover, the Ordinance leaves totally untouched all other companies, apart from third-party platforms, that transact with restaurants for similar services.  And contrary to lawmakers' assertions, third-party platforms *support* small businesses.  As just two examples, 65% of restaurants say they were able to increase their profits during COVID-19 because of DoorDash, and, in a survey, nearly nine out of ten independent restaurant operators agreed that Grubhub increases the volume of takeout and delivery orders.  The commissions that restaurants pay in exchange for the services they select from Plaintiffs' platforms pay in part for the costs of operating these platforms, *see supra* ¶ 42, which ultimately benefit restaurants.

53.     Nonetheless, the New York City Council cited the COVID-19 pandemic as its purported justification to pass a law that has now been extended past the expiration of the state of emergency, and well past the date when restaurants were allowed to open at 100% capacity, with the express (and later, successful) aim of converting this once-temporary measure into permanent legislation and with no connection to public health or safety.[15]

---

[15]     Indeed, interest groups that have advocated for such legislation do not pretend that it is tied in any way to the COVID-19 pandemic.  For example, Kathleen Reilly, the government affairs coordinator for the New York City Restaurant Association stated:  "Today, the City Council is taking the bold opportunity to consider making the fee caps permanent and we are fully supportive of this move."  *See supra* note 14.  Similarly, Randy Peers, Brooklyn Chamber of Commerce President and CEO, stated:  "We applaud the City Council for passing legislation that caps third party platform delivery fees and protects restaurants from predatory practices.  The next step is enacting these protections on a permanent basis, and ensuring that all small businesses across the city have resources and support the[y] need to reopen."  Jason Rogovich, *New York City Council Approves Two Bills Limiting Third-Party Delivery Service Fees*, CITYLAND (May 19, 2020), https://bit.ly/3jFCF5B (last visited Jan. 23, 2022).

**B.     The City Announces an Emergency Temporary Cap on Third-Party Delivery and Other Commissions Purportedly in Response to the COVID-19 Pandemic**

54.     COVID-19 is a novel virus that began spreading across the United States in early 2020.  In March 2020, then-Mayor Bill de Blasio declared a state of emergency in the City of New York due to COVID-19.

55.     Also in March 2020, then-Governor Andrew Cuomo declared a disaster emergency for the State of New York due to COVID-19.  Governor Cuomo signed an executive order entitled New York State on PAUSE (Policies Assure Uniform Safety for Everyone) ("PAUSE"), ordering all nonessential businesses and retailers statewide to close and banning all nonessential gatherings of any size, for any reason.  The executive order also encouraged New York residents to stay home as much as possible, and required anyone who did go outside to maintain at least six feet of space from any other person.  That order was subsequently extended several times.

56.     In or around March and April of 2020, the New York State Department of Economic Development issued updated guidance categorizing dine-in restaurants as "non-essential" but excluding take-out or delivery options.  Thus, seated dining in restaurants was suspended in New York.

57.     Beginning in March 2020, Plaintiffs made significant financial investments to support restaurants, at great cost, during the public health emergency.

58.     Between March and May 2020, DoorDash relief programs saved restaurants more than $120 million, as DoorDash undertook significant measures to protect and support consumers and couriers, and also made significant investments to support local restaurants.  For instance, DoorDash provided a 30-day, commission-free trial to approximately 9,000 restaurants in New York City that joined its platform during the pandemic; voluntarily reduced commissions for existing restaurants by half from April 9, 2020 to May 31, 2020; further invested millions of dollars

to reduce or eliminate consumer fees and generate more orders for restaurants, which helped restaurants keep their doors open for delivery; and built a new product to enable every independent restaurant or franchise to receive daily payouts to ease cash flow concerns.  In addition, DoorDash granted $500,000 to help New York City restaurants make preparations for a winter of outdoor dining, with 100 restaurants receiving $5,000 each, in partnership with the New York Hospitality Alliance.  It then granted $20,000 each to 20 New York City restaurants as part of the Main Street Strong Accelerator, which, in addition to the grant, gave participating restaurants access to an eight-week, hands-on restaurant operator course that involved small business advising and mentorship and one-on-one financial, legal, and technological expert advice, as well as free marketing and merchandising from DoorDash.  And it granted another $250,000 to ROAR's NYC Employee Relief Fund, in partnership with the Robin Hood foundation, which provided $500 one-time grants to the City's restaurant workers.

59.    Likewise, Grubhub dedicated hundreds of millions of dollars to support restaurants directly.  Specifically, rather than retaining revenue it would have generated during the pandemic, Grubhub reinvested its revenue to support restaurants, including deferred and waived commissions for independent restaurants to provide much-needed cash flow relief and Grubhub-funded diner promotions on behalf of restaurants, as well as platform improvements.  Grubhub's Community Relief Fund collected more than $30 million, which was used to directly support restaurants, workers, couriers, first responders, and others impacted by the crisis.  Grubhub also provided hundreds of grants to small restaurants in New York City through the Restaurant Strong Fund to assist with restaurant relief, employee support, and post-pandemic re-openings.  In addition, Grubhub invested in procedures to help keep consumers, restaurants, and couriers safe.  During

the pandemic, Grubhub provided more than $2.4 million in charitable contributions to New York City restaurants and organizations supporting restaurants and restaurant workers.

60.     Similarly, Uber Eats acted quickly when the pandemic hit, waiving consumer-facing delivery fees for all orders from small business restaurants and commissions on all pickup orders, and launching a first-of-its kind feature allowing Uber Eats consumers to contribute directly to restaurants in-app, and a commitment from Uber to match with donations to the Restaurant Employee Relief Fund.  More than $20 million was put directly into the hands of restaurants as a result of this initiative.  Uber Eats also launched a daily payout feature to remit payouts quickly and ease cash flow concerns for restaurants, provided $4.5 million in grants to restaurants as part of its $20 million Eat Local Support Initiative, and made payments to facilitate outdoor dining infrastructure for Black-owned restaurants—among the hardest hit by the pandemic—in Harlem in partnership with Harlem Park to Park.

61.     Plaintiffs' actions helped many restaurants keep their doors open during the pandemic, pay bills, and retain and hire additional staff.  Plaintiffs' platforms also created earning opportunities for residents of New York City, who either became unemployed in the midst of the pandemic or required supplemental income, but found work as delivery couriers, as described by many couriers in their testimony submitted to the City Council in opposition to the Ordinance.

62.     During the COVID-19 pandemic and PAUSE orders, many New York City consumers chose to rely on third-party platforms to facilitate delivery of food to their homes. Similarly, many New York City restaurants chose to rely on platforms to facilitate the sale and delivery of their food.  Accordingly, during the COVID-19 pandemic, restaurant demand for use of Plaintiffs' platforms generally increased.  However many restaurants chose to not use any third-party platform at all.

63.     In addition to the costly investments Plaintiffs made in supporting restaurants during the public emergency (*see supra* ¶¶ 57–60), the COVID-19 pandemic also caused many of Plaintiffs' costs to greatly increase.  For example, to ensure that delivery couriers could remain active and earning, DoorDash provided free personal protective equipment and highly subsidized on-demand healthcare to couriers, and provided financial assistance to couriers who tested positive for COVID-19 and those in certain other high-risk categories.  Likewise, Grubhub paid considerably more to delivery couriers on a per-order basis, provided them with personal protective equipment at no cost, and also provided couriers with COVID-19 sick pay.  And Uber Eats also helped couriers with personal protective equipment and direct financial payments.  Despite increased demand for Plaintiffs' platforms and, in many cases, increased costs to meet that demand, Plaintiffs temporarily lowered and/or eliminated some of their fees to provide even more aid to restaurants at great costs to themselves.

64.     Nevertheless, on May 13, 2020, the New York City Council approved Int. No. 1908-B, which temporarily restricted the commissions charged by so-called "third-party delivery services," like Plaintiffs, "during, and for 90 days after, a declared emergency that prohibits on-premises dining."[16]  The bill capped commissions that third-party food delivery services can charge a restaurant for providing delivery services at 15% per order and 5% per order for all other services,[17] including the expansive list of services noted *supra*, though other businesses that provide similar services to restaurants remained unrestricted.

65.     Int. No. 1908 was co-sponsored by Council Members Mark Gjonaj and Francisco Moya, among others, and was first introduced to the City Council by Council Member Moya on

---

[16]     All legislative materials for Int. No. 1908-B, Local Law 2020/052, are available at https://on.nyc.gov/3yUxa8A, unless otherwise noted.

[17]     The bill excluded from the definition of "other services" credit card processing fees.

February 27, 2020—well before New York State or New York City announced any state of emergency or restricted restaurant occupancy.

66.    When it was first introduced, Int. No. 1908's title was "A Local Law to amend the administrative code of the city of New York, in relation to per-order fees charged by third-party food delivery services."  That bill would have made it "unlawful for third-party food delivery services to charge covered establishments a fee per online order for the use of their services that totals more than 10% of the purchase price of such online order."  There was no time limit to the commission cap or distinction between delivery and other charges, and the bill made no mention of any emergency or temporary measures.

67.    When the original bill came out of the Committee on Small Business, on or around February 27, 2020—notably, before the spread of the COVID-19 pandemic and before any declared state of emergency in New York—its proposed 10% cap was justified as a lifeline to local restaurants.  But the Council Members cited no empirical evidence substantiating the fact that "local restaurants" (however defined) needed a lifeline, nor that a 10% commission cap would provide such a lifeline.  Nor did the record provide any rationale for the selection of the 10% figure or any study as to how that figure would impact platforms.  In introducing the bill on February 27, Council Member Moya argued, incorrectly, and with no evidence, that "restaurants across the city and across the country [are] at the mercy of third party food delivery services like Grub Hub [sic] and Uber Eats," and that restaurants need "these food delivery apps to reach customers and stay in business," but that government intervention was necessary for restaurants' "survival."

68.    The original bill was not introduced as an emergency and temporary COVID-19 response, but rather as part of a targeted campaign against third-party platforms.[18]  Indeed, Council

---

[18]    For example, also introduced on February 27, 2020 were bills:  (1) prohibiting third-party platforms from limiting the purchase price of menu items (Int. No. 1907); (2) requiring third-party platforms to disclose to

Member Moya made that clear on April 14, 2020, after the State and City had declared a state of emergency and indoor dining was suspended, when he tweeted "NYC local restaurants needed a 10% cap on delivery fees from third party services like GrubHub long before #COVID19 hit us. They damn sure need it now."[19]

69.     Once the pandemic spread, a state of emergency was declared, and restrictions were placed on on-premises dining, the stated rationale for the commission cap bill shifted to providing temporary relief to restaurants during the pandemic, and the bill was amended to reflect that shift.

70.     The amended commission cap bill, Int. No. 1908-B, was expressly described as a temporary measure tied to the duration of the emergency capacity restrictions placed on restaurants.  But on May 13, 2020, the day the bill was passed, Council Member Gjonaj said that he "remain[ed] confident that we will pass the full set of bills that were introduced earlier this year on the primary relief to small mom and pop shops just looking for their fair playing field and use the service of these venture capital backed Silicon Valley Tech behemoths."

71.     During the session in which the Council passed Int. No. 1908-B, Council members offered only vague rhetoric in support of their "yes" votes, without any real data to substantiate these positions.  Council Member Moya stated, again incorrectly, that the "relationship" between "[m]om and pop restaurants across New York City" and "billion-dollar tech companies . . . isn't unique to the pandemic.  Exorbitant fees from third-party food delivery services threatened restaurants before the COVID-19 outbreak but like so many other issues, this crisis has amplified and expanded that inequity to devastating effects. . . .  By capping the fees third-party food apps can charge restaurants during declared states of emergency, restaurants can continue providing

---

consumers any fees paid by participating restaurants (Int. No. 1896); and (3) requiring third-party platforms to obtain a license every two years to operate in New York City (Int. No. 1897).

[19]     *See supra* note 7.

essential services while not putting themselves out of business in the process."[20]   Similarly, Council Member Gjonaj stated that "the New York City Council took a historic step in standing up for locally owned restaurants that are struggling to stay afloat during the COVID-19 public health crisis.   By capping the sky-high commissions charged by third-party food delivery platforms . . . the City of New York has taken decisive action to stand up for small businesses who only ask for a fair shot."[21]

72.     Neither Council Member Moya nor Gjonaj—the two main sponsors of and driving force behind the Ordinance—cited any studies, data, or other analyses supporting their claims that the commissions freely negotiated between restaurants and platforms were "exorbitant" or "sky-high"; nor did they cite any data supporting their determination of what fees would be reasonable; nor did they cite any data supporting their position that commission caps would save otherwise purportedly shuttered restaurants.

73.     On May 26, 2020, Mayor de Blasio signed Int. No. 1908-B into law, enacting Local Law 2020/052, which added Subchapter 22 to Title 20, Chapter 5 of the Administrative Code of New York City, codified at N.Y.C. Admin. Code §§ 20-845–848 (the "Local Law").  Ex. D.

74.     Subchapter 22 was entitled "Third-Party Food Delivery Services."  Section 20-846, as originally enacted, provided:

> (a) It shall be unlawful for a third-party food delivery service to charge a food service establishment a delivery fee that totals more than 15% of the purchase price of each online order.
>
> (b) It shall be unlawful for a third-party food delivery service to charge a food service establishment any fee or fees other than a delivery fee for the use of their service greater than 5% of the purchase price of each online order. Any fees or other charges from a third-party food delivery service to

---

[20]     *Council Votes to Provide Relief to Small Businesses and Restaurants Impacted by COVID-19 Pandemic*, N.Y.C. COUNCIL (May 13, 2020), https://on.nyc.gov/37sNySA (last visited Jan. 23, 2022).

[21]     Rogovich, *supra* note 15.

a food service establishment beyond such maximum 5% fee per order, and a delivery fee collected pursuant to subdivision a of this section, are unlawful.

(c) The requirements of this section apply only during a declared emergency and for a period of 90 days after the end of a declared emergency.

75.    Each violation of Section 20-846 is subject to a $1,000 fine per day, in addition to injunctive relief, restitution, and other costs.

76.    As originally enacted, the Local Law defined "declared emergency" as "the period during which a state disaster emergency has been declared by the governor of the state of New York or a state of emergency has been declared by the mayor, such declaration is in effect in the city, and all food service establishments in the city are prohibited from providing food for consumption on-premises."

77.    But in August 2020, the City Council moved the goalposts by extending the Local Law until 90 days after *full-capacity* indoor dining resumed in restaurants when it passed Int. No. 2054-A.[22] Ex. E.  The prohibition on indoor dining was lifted months before restaurants were permitted to return to maximum capacity, with a gradual phasing of capacity restrictions over time.

78.    The Local Law (like the Temporary Ordinance that later followed it) applies only to "third-party food delivery service[s]," defined as "any website, mobile application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, no fewer than 20 food service establishments located in the city that are owned and operated by different persons."  N.Y.C. Admin. Code § 20-845.  The term "food service establishment" is defined by Section 81.03 of the New York City Health Code as "a place where food is provided for individual portion service

---

[22]    All legislative materials for Int. No. 2054-A, Local Law 2020/088, are available at https://on.nyc.gov/3zZvRXi, unless otherwise noted.

directly to the consumer whether such food is provided free of charge or sold, and whether consumption occurs on or off the premises or is provided from a pushcart, stand or vehicle."

79.     This wildly over-inclusive definition is not conditioned on need in any way.  It is not tailored to "locally owned restaurants struggling to stay afloat," but sweeps broadly, allowing even large chain restaurants and restaurants that are part of multinational conglomerates to take advantage of the commission cap.  Of course, even if the definition accounted for these wide discrepancies, the Ordinance would still represent a dramatic overreach beyond the City's power to regulate and constitute an illegitimate wealth transfer from one group of private actors to another.  And, notwithstanding their statements about protecting "mom and pop shops," Council Members Moya and Gjonaj, along with the rest of the Council, glossed over this overbroad application in passing the law.  The Local Law and Ordinance were also not tailored to restaurants that were actually struggling, much less struggling due to "high" commission rates, and did not condition relief from preexisting commission rates on any demonstration of financial need.

80.     The Local Law and Ordinance define "delivery fee" as "a fee charged by a third-party food delivery service for providing a food service establishment with a service that delivers food from such establishment to customers."  N.Y.C. Admin. Code § 20-845.  Such fees are arbitrarily capped at 15% of the purchase price of an order.

81.     Under the Local Law and Ordinance, "delivery fee" "does not include any other fee that may be charged by a third-party food delivery service to a food service establishment, such as fees for listing or advertising the food service establishment on the third-party food delivery service platform or fees related to processing the online order."  All such other fees (apart from credit card processing fees)—such as those for point-of-sale systems and tablets, marketing and promotional services, sales and consumer analytics, driver status and support technology, brand

management and menu consulting (e.g., food photography and menu design), and pickup facilitation, among many others—are arbitrarily capped at 5% of the order's purchase price.

82.     The Local Law and Ordinance do not account for the differences between the various plans offered by Plaintiffs and other platforms.  Different platforms offer different plans with different suites of services, and all are subject to the Ordinance's commission caps, despite offering a myriad of costly and beneficial services to restaurants.  In sweeping so broadly, the Ordinance is not tailored to advance any public benefit or to ensure that the burdens imposed are at all feasible or sustainable for the platforms swept in.

83.     Neither the Local Law nor the Ordinance fixes the price of any goods or services provided to restaurants by businesses that fall outside the definition of "third-party food delivery services," such as raw ingredient or equipment suppliers, point-of-sale vendors, or online reservation platforms—such as Sysco, Resy, TapMango, Incentivo, and Otter—though, upon information and belief, such vendors account for a large portion of restaurants' operating costs. This is despite the fact that other companies with which restaurants frequently contract have seen their stock prices soar recently:  Sysco's stock has risen by 71% since the state of emergency began in New York City, while US Foods's stock has risen 88%.[23]  Neither the Local Law nor the Ordinance acknowledges the increasing costs of raw ingredients or supplies to restaurants or takes any steps to cap their prices.

84.     Similarly, neither the Local Law nor the Ordinance fixes the price of any other advertising businesses that provide similar marketing services to those that third-party platforms offer, such as media placement agencies, classified advertisers, Google, Facebook, ratings and

---

[23]     *Stock Chart*, SYSCO, https://bit.ly/3g56uLP (last visited Jan. 14, 2022); *USFD Historical Data*, NASDAQ, https://bit.ly/3z0yIix (last visited Jan. 14, 2022).

review websites, reservation platforms, delivery logistics providers, and brand consultants.  For example, Google charges restaurants to appear in search results, but the City has taken no steps to limit the amount of Google's fees.  Nor has the City attempted to fix the prices of more traditional advertising that a restaurant may employ, even for advertisers with market dominance and superior negotiating power over restaurants.  New York City real estate prices are also notoriously high, but the City has not capped the costs of billboards that restaurants may choose to rent for advertising purposes.  Yet, inexplicably and arbitrarily, the City has severely capped the commissions that restaurants choose to pay to advertise and promote their business on Plaintiffs' platforms and receive additional services.

85.     The specific limits imposed by the Local Law and Ordinance, bifurcated between 15% for delivery services and 5% for all other services (except credit card processing), have no rational basis.  The City Council has not offered any (let alone a rational) explanation for these specific figures or their bifurcation.  Upon information and belief, the City Council did not solicit or review any studies or data to understand the impact of these particular caps on New York City restaurants, couriers, and consumers.  Nothing in the legislative history for the Ordinance demonstrates that the City Council considered any alternatives that might have been less burdensome or more tailored.  Nor, upon information and belief, did the City Council solicit or review any studies or data to understand the relationship between what platforms charge restaurants and restaurant profitability.  Indeed, the City expressly plans to conduct the first such review in 2023.

## C.     New York Ends All Capacity Restrictions on Restaurants Imposed Due to the COVID-19 Pandemic

86.     On or about May 19, 2021, then-Governor Cuomo ended capacity restrictions on most businesses, including restaurants, which could resume 100% full-capacity indoor dining.  *See*

Executive Order 202.108, Ex. F.  On or about June 15, 2021, any remaining restrictions on indoor dining, such as social distancing, were lifted.

87.     On or about June 24, 2021, the state of emergency declared in New York on March 7, 2020 expired.

88.     Pursuant to the Local Law's express terms, the commission cap was applicable only for the duration, plus 90 days, of a state of emergency that prohibits restaurants from operating at full capacity.  All capacity restrictions were lifted on May 19, 2021, and the commission cap was therefore set to expire on August 17, 2021.

**D.     The City Council Extends Commission Caps**

89.     On or about June 30, 2021, Council Members Moya and Gjonaj introduced Int. No. 2359, a bill amending the Local Law to make ***permanent*** the previously temporary commission caps imposed on third-party platforms.  The proposed bill would omit subsection (c) from the Local Law, *see supra* ¶ 74, which tied the commission cap to the COVID-19 state of emergency and state-mandated capacity restrictions.

90.     The plain-language summary of the bill stated:

This bill would amend an existing law that prohibits third-party food delivery services - entities that provide restaurants with online order and delivery services - from charging any food service establishment more than 15% per order for delivery and more than 5% per order for all other fees only during certain time periods. ***This bill would instead prohibit such fees at all times***.[24]

The summary made no reference to COVID-19, state-mandated capacity restrictions, or any emergency measures, marking a departure from the previous pretextual justifications for the imposition of commission caps.  Instead, this bill targets out-of-state third-party platforms for

---

[24]     All legislative materials for Int. No. 2359 are available at https://on.nyc.gov/3A0cnCa, unless otherwise noted.

permanent price controls regardless of the costs those platforms incur for the services provided to restaurants under the terms of private contracts, irrespective of the financial state of particular restaurants, and untethered to any justifying rationale.

91.     The bill was referred to the Committee on Small Business.  On or around July 1, 2021, the Committee issued a report stating that "[e]ven though COVID-19 restrictions have been lifted in New York and City residents are able to dine-in at restaurants, the shift in consumer behavior may remain," which includes increased takeout and delivery consumption.  The July 1 report focuses on the increased revenues that third-party platforms purportedly incurred from increased consumer use during the COVID-19 pandemic lockdown, contrasted with the restaurant industry, which the report acknowledges was struggling well before the pandemic due, in part, to rent, labor, and inventory costs.  The report explains that the City Council passed the Local Law and other bills in response to the "financial devastation" to the restaurant industry that the pandemic had exacerbated.  The report also claims that "[w]hile third-party delivery platforms provide restaurants a unique marketing and delivery service, small businesses have accused these platforms of acting in a predatory manner," and concludes by stating that the Council "seeks to gain a better understanding of the impact" that the proposed permanent cap and other measures "will have on the restaurant industry and third-party platforms."

92.     On July 1, 2021, the Committee on Small Business debated Int. No. 2359, the proposed permanent commission cap.  That hearing confirmed that the commission caps imposed by the Ordinance are not and were not intended to address a temporary state of emergency, but rather to economically benefit one group of businesses at the expense of another.  During the July 1 hearing, Council Member Moya, who sponsored the Ordinance, explained its purpose as follows:

> For far too long, these third-party food delivery services knowingly and willingly took advantage of small business, and the pandemic highlighted this abuse.  As one

of the greatest cities in the world, we need to stand by our small business owners every single day. ***We cannot allow these companies to choose their profit margins over those of mom-and-pop shops*** and especially struggling by charging them fees for services they may not even be providing.  As our small businesses begin to recover, we must prevent abuse like this from happening again.  These companies from the onset had the opportunity to do what is right, so here's their chance. ***We need to do everything we can to protect our mom-and-pop shops, the workers they employ, and our local economy***.  For these companies, it's just another restaurant, but for us, in our neighborhoods, these restaurants are an integral part of the character of our community, and ***that's why I introduced Intro 2359 to make these caps permanent.  I will always stand by my small business owners over a billionaire-owned company any given day of the week*** . . . .

93.    At the same meeting, Committee Chairman Mark Gjonaj attempted to focus on the

purported relative profits and wealth of local restaurants and third-party platforms:

> The rise of third-party platforms is also apparent from their corporate strategies. Uber acquired delivery service Postmates in November 2020, and December 2020, Door Dash made its public market debut.  Door Dash stock rose 86% during its initial public offering, one of the biggest IPOs of 2020 at a time when over [] 110,000 [restaurants] were closing across the country, including over 5000 in New York City.  The platforms were experiencing a dramatic increase in business, while the restaurants were seeing a depletion of their business.

Chairman Gjonaj noted that the Ordinance "will ensure that restaurants have the tools that they

need to succeed and survive the post-COVID world."

94.    The Council members in support of the Ordinance were indifferent to the many

objections to the bill posed by representatives of the Department of Consumer and Worker

Protection ("DCWP"), the Office of Special Enforcement ("OSE"), and business experts, among

others:

> a.   Christian Klossner, Executive Director of OSE stated:   "[T]his is a very
>
> challenging law and it has potential for a number of unintended consequences."
>
> b.   DCWP stated:  "[T]here is a potential concern certainly from DCWP's end,
>
> we're always very sensitive to this issue of the unintended consequence of when

you cap profit margins for a particular business or entity, some of those cost[s] flowing down to consumers invariably, that's a concern."

c.  Ike Brannon, Senior Fellow at the Jack Kemp Foundation, explained that the "perspective that during the pandemic, to help restaurant[s], we had to cap these fees that food service companies were charging and this was somehow the best . . . is mistaken," and warned of the impact.  "In such situations as other witnesses have already said, platform companies often reduce their service . . . [in the] food delivery marketplace resulting in fewer opportunities for work, delivery drivers no[t] earning for those who rely on this business for a sizeable share of their income.  That's the research that[] I've done.  ***It is a mistake to think that th[ese] caps help restaurants***. . . . [T]hey don't need a government to do this for them.  They can increase prices on take out food on their own if they want. . . . ***[T]here are multiple competitors in the food delivery market . . . restaurants are [not] forced to participate [in] this market.  They can decline to participate or do this on their own***."

d.  Ryan Naples, Deputy Director of Tech NYC, an advocacy group representing more than 800 companies and organizations, also opposed the Ordinance as misguided, ineffective, and likely to be counterproductive.  With the commission cap, the City was "***attempting a silver bullet solution to a complex problem that is greatly affected by many issues such as commercial rent, increasing labor costs, and city fines and penalties***," and where "***delivery platform fees [] are relatively minor***" in comparison and would do nothing to address the larger areas of concern for restaurants.  Mr. Naples explained that

imposing "an artificial price cap[] will raise prices for customers ordering food . . . and as a result, will reduce the amount that customers order over time." He warned that the commission cap "*will have an effect on the ability of lower income New Yorkers to access food from home*," and "*will [have a] negative impact [on] delivery platforms['] ability to provide these services*." Ultimately, the commission cap "will not enable more restaurants to survive which is an important goal that we support. *Instead, this short[sighted] solution will make ordering food more expensive for New Yorkers which will lead to an even greater contraction of the food delivery market*."

e.  Lisa Sorin, President of the Bronx Chamber of Commerce, noted that her organization represents "over 23,000 Bronx businesses ranging from micro and small business to large industry employers," and expressed their opposition to a permanent commission cap law. Ms. Sorin warned that "we cannot continue to overstep and over legislate business without a proper understand[ing] of our intended consequences." "Mandating price caps of private industry is a very slippery slope. If this Bill goes through, what will stop the members from going through a list of private businesses and determining what they should and should not charge[?] Allowing this Bill to go through is another notice that New York City remains anti-business, that the city will mandate how businesses run and what pricing businesses can charge."

95.     In response to Ms. Sorin's concerns about the negative impact of a commission cap, Chairman Gjonaj stated that "the reason we were looking [at] caps . . . is because there was a need to protect a very vital industry to this city."

96.     Also by July 1, 2021, the City Council had received written testimony from nearly 100 delivery couriers in New York City who use Plaintiffs' platforms to earn their livelihoods, and who objected to the Ordinance as detrimental to their profession and counterproductive to the purported aim of the law to assist the restaurant industry.  As one courier explained:

> The fees that companies like DoorDash charge restaurants go toward things like marketing and premium services for restaurants and go directly toward paying delivery couriers like myself and provide us with more support and safety protections.  *A permanent price control like this would have a direct, negative impact on my ability to earn money.  Price controls will lead to higher prices for customers in New York City, and as prices rise, demand for restaurants and for the delivery services that I provide will go down.  This is not something that I, or a lot of the people delivering on these platforms, can afford*.

Testimonials like these, including from single parents, primary caretakers, and single-income families who urged the City to find ways to support restaurants that do not also diminish their ability to earn incomes, were ignored.  In pursuing these commission caps, the City Council ignored the workers.  Delivery couriers are entitled to payment for their work, whether restaurants pay those workers themselves for delivering their goods or opt to use a third-party platform and pay the workers through the accompanying commissions charged, which the platforms use to compensate couriers.  The Ordinance does not account for that dynamic.  Moreover, the City Council failed to acknowledge the vital work that Plaintiffs' platforms provide to thousands of New York City residents as delivery couriers and the increase in pay that couriers have experienced without any corresponding impact on the costs to restaurants, and also failed to address the plight facing these couriers should these platforms reduce or cease operations as a result of the commission cap imposed by the City.

97.     When Amy Healy, Head of Government Affairs at Grubhub, explained that the Ordinance's commission caps would force the company to "operate at a loss," as it did in the previous quarter, Chairman Gjonaj openly justified the Ordinance as a measure to side with the

local restaurants at the expense of out-of-state service providers:  "The restaurant and eatery industry is a very vital part of this city, not only for the cuisine and it's part of our actual culture, but they are actually a tax block, *they contribute to the tax base of this city and [are a] huge employer for New Yorkers, and they're an industry that we want to preserve and protect and ensure that they continue to thrive*."

98.     Chairman Gjonaj then emphasized that Grubhub's headquarters are in Chicago, Illinois, and asked Ms. Healy whether Grubhub paid New York taxes.  He elaborated on the Ordinance's openly discriminatory and unconstitutional basis:  because New York restaurants pay New York taxes, "*it's more important that we protect them instead of . . . Grubhub or the other providers*, *I would hate [the] scenario of where a percentage of the sales transaction is leaving our city and going to a different state and not contributing to our tax base*."

99.     On or around July 22, 2021, the goalposts moved yet again when the Committee proposed the Temporary Ordinance, a revision to Int. No. 2359 that extended the Local Law until February 17, 2022.  This date has no stated or conceivable rational relationship to any public-health emergency and does not even purport to address public health concerns.

100.    On or about July 29, 2021, the New York City Council voted in favor of the Temporary Ordinance, Int. No. 2359-A, to extend the Local Law until February 17, 2022.  *See* Ex. A.  Whereas the duration of the original Local Law's price-fixing provision was expressly tied to the declared COVID-19 state of emergency and accompanying state-mandated capacity restrictions, the Temporary Ordinance omits all such references.

101.    The Temporary Ordinance amended the Local Law by, among other things: (1) changing the name of Section 20-846 from "Fee limits during declared emergencies" to just "Fees"; and (2) swapping the duration of the law from "the period in which a state disaster

44

emergency has been declared by the governor of the state of New York or a state of emergency has been declared by the mayor, such declaration is in effect in the city, and all food service establishments in the city are prohibited from operating at the maximum indoor occupancy and for a period of 90 days thereafter" to "until February 17, 2022"—an arbitrary date wholly divorced from the original pretextual justification for the law.

102.    Both the Committee Report issued on July 29, 2021 and a hearing held on the same day confirm that the Ordinance is entirely untethered from the original pretextual emergency justification for the law.  Like the July 1 report, the July 29 report makes broad statements about how consumer preferences may harm restaurants in the long term and therefore governmental intervention and protection are required.  Citing to a 2019 pre-pandemic article, the July 29 report speculates that increased consumer use of delivery platforms may lead to shifts in consumer behavior, which could mean that "the platforms may take the business of existing dine-in customers."  The report notes that the City Council conducted three oversight hearings "on the rise of third-party delivery platforms in the City," two of which were pre-pandemic, during which it heard from small businesses and advocates who highlighted nonemergency-related concerns with platforms that allegedly existed long before the COVID-19 pandemic.  The report makes no mention of public health or safety.

103.    Although the Temporary Ordinance was amended to purportedly expire on a random date in February 2022, the clear intent of the Ordinance's creators, Council Members Moya and Gjonaj, was to make the commission caps permanent (and they succeeded, *see infra*).  And, according to these sponsors, the express justification for these caps is to favor local businesses at the expense of third-party (and out-of-state) delivery services like Plaintiffs—an unconstitutional motive.

104.    During the July 29, 2021 Small Business Committee hearing, Council Member Moya continued to emphasize the purported profits of third-party platforms and reiterated that the City has "the opportunity and the responsibility to protect our mom-and-pop shops and ensure that they can survive, and not enable billion-dollar companies and their investors to continue getting richer at the expense of our restaurants."  Council Member Moya urged the City Council to "save [local restaurants] by permanently capping third-party delivery fees" and to not allow the Local Law's temporary caps to expire.

105.    At the same hearing, Chairman Gjonaj reiterated that even though restaurants now face fewer obstacles due to COVID-19, the City Council should intervene to protect the restaurant industry from changing consumer habits, *i.e.*, their use of third-party delivery services:

> As the city has reopened and the dark days of the pandemic are hopefully behind us, the restaurant industry will begin to recover.  Certain consumer habits may remain, however, that will make it more difficult for restaurants to succeed.  Mainly consumers who become accustomed to ordering on third-party platforms that charge a substantial fee per order for the marketing and delivery service they provide, may continue to use these platforms. . . .   The package of Bill[s] we're voting on today will ensure that restaurants have the tools that they need to succeed in the post-COVID world. . . .  As the Chair of this committee, it has been my top priority to ensure that mom and pop shops, our micro-businesses remain the backbone of the city's economy.

106.    At the July 29 meeting, the Small Business Committee voted in favor of the Temporary Ordinance.  On the same day, the full City Council voted to adopt the Temporary Ordinance.

107.    In voting against the Temporary Ordinance, Council Member Kalman Yeger explained that the justification for the original commission caps no longer applied—those caps "were for purposes of saving restaurants from the pandemic."  Instead, the Ordinance "interfere[s] with the constitutional obligations [and] contractual obligations of [ ] parties that have entered into arm's length transactions."

108.    The City Council passed the Ordinance without any of the research or analysis required and necessary for such sweeping legislation.  Upon information and belief, the City Council did not conduct (or ask anyone else to conduct) research or analysis regarding the potential effects of continued commission caps on consumers, restaurants, delivery couriers, third-party platforms generally or DoorDash's, Grubhub's, or Uber Eats's platforms specifically, the local economy, or the relationship between the commissions paid by restaurants to third-party platforms and those restaurants' revenues or profitability.  Moreover, upon information and belief, the City Council did not conduct (or ask anyone else to conduct) research or analysis that would support a uniform, industry-wide cap or the arbitrary bifurcation of fees that the Ordinance provides. Similarly, upon information and belief, the City Council did not conduct (or ask anyone else to conduct) research or analysis regarding differences between third-party platforms that serve 20 or more restaurants and third-party platforms that serve fewer than 20 restaurants that would justify treating the two types of platforms differently.

109.    Mayor de Blasio did not sign the Temporary Ordinance within 30 days of its passage, meaning that it became law on August 29, 2021 as Local Law 2021/094, and made retroactively effective as of August 17, 2021.

**E.    The City Council Makes Commission Caps Permanent**

110.    On August 26, 2021, three days before the Temporary Ordinance became law, the Committee on Small Business held a meeting during which it passed the Permanent Ordinance, including Int. No. 2390, which removes the Ordinance's sunset date altogether and makes it permanent, as its sponsors had long indicated they intended to do.  *See* Ex. B.  The law also requires the Commissioner of Consumer and Worker Protection to conduct and issue a report, for the first time in 2023, describing the effects of the Ordinance, and make "recommendations related to either the maintenance or adjustment of the [Ordinance]."  During the August 26 meeting, the Committee

47

also passed Int. No. 1897-A, which requires third-party platforms like Plaintiffs to comply with a robust licensing and record-keeping scheme complete with harsh penalties, including the possibility of a complete ban for platforms that commit merely two violations of any of the many provisions of the new regulatory scheme (and any rules promulgated thereunder) within two years. *See* Ex. G.   Int. No. 1897-A also transfers provisions regarding the regulation of third-party platforms (like the permanent commission caps in Int. No. 2390) to newly adopted Admin. Code § 20-563 *et seq.*

111.   The August 26 Committee Report betrays the unconstitutionality and irrationality behind the Permanent Ordinance.[25]   This report repeats much of the same content as the earlier July reports on the Temporary Ordinance, including those discussed *supra*, such as noting that "[e]ven before the pandemic, the costs to operate a restaurant in the City, including rent, labor and inventory, were high, leaving little room for added costs like platform commission fees."   And again, the report cites to pre-pandemic articles and reports, such as a 2017 report claiming that increased online delivery orders "pose[] the risk of cannibalization of dine-in customers."   But the August 26 report also reflects the sponsors' animus towards large out-of-state businesses, expressly taking issue with "venture capital firms [that] invested huge sums of money in food delivery companies."   Once again, the report makes no mention of the public health or safety, because the express intent of the Ordinance is to favor local businesses, ostensibly since a small number of them have complained that delivery orders are not as profitable as dine-in orders (and without an even pretextual connection to marketing commissions).

---

[25]     All legislative materials for Int. No. 2390 are available at https://on.nyc.gov/2VsiyzR, unless otherwise noted. All legislative materials for Int. No. 1897 are available at https://on.nyc.gov/2WZa1VT, unless otherwise noted.

112.   The report also cites to the Small Business Administration's recognition of the benefits that third-party platforms provide, such as helping restaurants "stay relevant, stay noticeable, and be accessible to patrons."  The report provides no justification for why a 15% cap on delivery fees and a 5% cap on all other fees are reasonable, connected to the public health or safety, would accomplish the Ordinance's purpose, and are targeted to achieve that purpose.  The report cites no studies showing that commission caps of any kind will prevent restaurants from going out of business.  The report also does not explain why it is reasonable for the City to mandate that platforms subsidize other private businesses.

113.   During the mere eight minutes it took the Committee on Small Business to pass the Permanent Ordinance (both Int. No. 2390 and Int. No. 1897-A), only Chairman Gjonaj spoke.  He justified placing these burdensome regulations on third-party platforms by claiming, "[w]ith competition from larger chains and other small businesses to the high cost of a modest pay in rent, labor, and inventory costs in government regulations, consumer behavior changes in e-commerce, operating a restaurant at a profit is extremely challenging in this city."  Chairman Gjonaj continued to defend the City's targeting of Plaintiffs for special government intervention by pointing to a 2016 pre-pandemic analysis by an online media company that claimed that the food delivery marketplace would be a profitable business.  He then specifically singled out by name Plaintiffs DoorDash and Uber (both out-of-state businesses), noting that the former raised venture capital before going public, and lamented that delivery companies were "subsidized by Silicon Valley money."  Chairman Gjonaj falsely asserted that "restaurants were being forced onto the platforms," when, in fact, restaurants are fully free to contract with platforms, manage their delivery and marketing services themselves, or opt not to offer delivery services or engage in marketing campaigns at all, as they had done well before the emergence of online platforms like Plaintiffs'.

After expressly noting that the Committee held multiple hearings on food platform delivery services *before* the pandemic, Chairman Gjonaj claimed that the Permanent Ordinance will "provide restaurants with the necessary protections."  He did not mention public health or safety, and he mentioned the pandemic only in passing, claiming that the perceived problems in the restaurant industry existed before COVID-19, that the pandemic "[im]proved the success of the delivery platforms," and that consumers were likely to continue using the platforms in the future.

114.    The Committee appears to have also ignored the April 29, 2020 written testimony submitted at an earlier Council meeting on commission caps, including testimony not only from the platforms, but from numerous platform delivery couriers who touted the benefits of the platforms and warned that the caps would ultimately reduce their earnings.  For example, single mothers and other primary caretakers who make deliveries through Plaintiffs' platforms praised the "flexibility" that delivery driving provided them, calling the freedom it afforded "critical" and "a blessing."  These delivery couriers stated that they would be "lost without these apps."  Other couriers praised the opportunities to earn a living that these delivery platforms provide to people of color and non-native English speakers.  They urged the Committee to not pass the "arbitrary commission cap[s]," which would "make the cost of delivery go up in New York City," and "have a direct and detrimental impact on [a courier's] ability to earn income making deliveries."

115.    As had been the plan all along, on August 26, 2021, the full City Council moved the goalposts a third time when it passed the Permanent Ordinance (both Int. No. 2390 and Int. No. 1897-A).  Under these bills, the permanent fee caps and overall licensing regime will be codified at N.Y.C. Admin. Code § 20-563 *et seq*., rather than the Temporary Ordinance's placement at Section 20-845 *et seq*.  In justifying the Permanent Ordinance at the August 26 Council meeting, Council Member Moya said, "[w]e are not here to enable billion dollar

companies and their investors to get rich at the expense of restaurants."  In keeping with the sponsors' theme and flawed logic, he explained, "I'm proud . . . to protect the restaurant industry and its workers" by "ensuring that mom and pop shops have a real opportunity to . . . recover from this pandemic" through "limiting without expiration the fees charged to food service establishments by third-party food delivery services."  Council Member Moya further postured that "[b]usinesses also should not be pressured into accepting exorbitant fees in order to remain viable and competitive."

116.    But Council Member Moya made that statement with no substantiation, and ignored the fact that restaurants face no such external pressure, are entirely free to transact or not with any platform they wish, can opt to forgo any delivery and marketing services, can choose to operate those services themselves, or may select from any number of other purveyors for such services.  If they choose to try out Plaintiffs' services, they can choose among a variety of platform offerings to fit the services to their needs, as well as opt out of the contracts.

117.    Mayor de Blasio returned Int. No. 1897-A and Int. No. 2390 unsigned, meaning that they have become law, and they took effect on January 24, 2022.

118.    Based on the complete legislative history of the Ordinance, including the sponsors' attempts to pass a permanent cap before the COVID-19 pandemic, it is clear that the pandemic-related justifications were mere pretext; the law was always intended to permanently harm out-of-state, large delivery platforms like Plaintiffs.  However, the Ordinance will harm not only Plaintiffs, but restaurants, consumers, and workers as well.

**F.    The Ordinance Targets and Irreparably Harms Plaintiffs, and Will Likely Harm Restaurants, Consumers, and Delivery Couriers Alike**

119.    Plaintiffs' contracts with restaurants are a substantial source of revenue and a central piece of their business operations.  Plaintiffs rely on these contracts with restaurants in

order to offer services to consumers, and provide tens of thousands of couriers in New York with work opportunities.

120.    Plaintiffs' contracts with restaurants, including their fixed-percentage commission structures, have benefited restaurants before, during, and after the COVID-19 pandemic by streamlining their operations and enlarging their consumer bases to include consumers who: (1) never would have known about or chosen the restaurant but for Plaintiffs' platforms and marketing efforts; (2) otherwise would have eaten at the restaurant in person but could not do so under PAUSE orders; and (3) would not have eaten at the restaurant in person but choose to purchase food for delivery or takeout.

121.    Although third-party platform costs are just one of the many costs incurred by restaurants, the Ordinance does not set prices or otherwise limit any other vendor's pricing despite these vendors being similarly situated to Plaintiffs and competing in the same markets.   For example, the Ordinance does not provide restaurants any relief from prices charged by online reservation services, point-of-sale hardware and software, or other advertising or marketing services providers, which, upon information and belief, make up a significant portion of restaurants' overhead.  Instead, the Ordinance regulates just a small subset of the third parties with which restaurants contract, even though Plaintiffs are the vendors that actually help restaurants increase their sales volume and customer base.

122.    The Ordinance does not offer any way for Plaintiffs to recover any of the lost revenue from the substantial impairment of their contracts, which has forced Plaintiffs to operate at a loss, and lose hundreds of millions of dollars in revenue.  The Ordinance contains no provision that allows for Plaintiffs to offset the sustained revenue losses it creates.  And relying on Plaintiffs to simply raise consumer fees does not offer a solution.  Under the basic law of supply and demand,

higher consumer fees will lead to fewer orders, thereby harming Plaintiffs and the restaurants and couriers who depend on Plaintiffs' platforms. In light of decreased consumer demand, and injury to goodwill and reputation, Plaintiffs would likely not recoup the losses that result from the Ordinance. And Plaintiffs could be forced to reduce the scope of the services provided to restaurants and consumers. As described below, continued compliance with the Ordinance would irreparably harm New York City restaurants, delivery couriers, and consumers, as well as Plaintiffs.

123.    The Ordinance has had the perverse result of harming the businesses (and related local neighborhoods) that it purportedly intends to help, as was argued by numerous interested and impartial parties during the hearings debating the Ordinance and in written testimony submitted to the City Council. Plaintiffs' experience during the pandemic bears this out—platforms that had increased consumer-facing costs facilitated fewer orders than they otherwise would have. The Ordinance also threatens to restrict third-party platforms' ability to offer the full suite of services they provide at higher commissions, taking away valuable services restaurants have overwhelmingly selected when given a choice.

124.    Moreover, the Ordinance will irreparably harm Plaintiffs and other third-party platforms. The City's commission caps have cost Plaintiffs hundreds of millions of dollars through December 2021. And hard-working delivery couriers have also been made worse off under the Ordinance. The ongoing violation of Plaintiffs' constitutional rights constitutes irreparable harm, as does the Ordinance's deleterious effect on Plaintiffs' reputations, goodwill, and business models. For example:

> a.    Despite an increase in demand for Plaintiffs' services since the Ordinance went into effect in New York City, Plaintiffs have been operating at a loss in New

York City and have not recovered the revenue lost due to the commission cap. As a result of the Ordinance, Plaintiffs have permanently lost revenue from commission fees they were entitled to based on their freely negotiated contracts.

b. The Ordinance will likely require Plaintiffs to renegotiate contracts with many restaurants (or be forced to abandon their rights under those contracts), because many existing contracts contemplate prices for delivery services or marketing and other services that exceed the amounts permitted by the Ordinance, and for which the caps will not allow Plaintiffs to even be able to cover their costs.

c. The Ordinance will also likely require Plaintiffs to scale back certain services, including marketing and promotional services in the City, resulting in fewer earning opportunities for delivery couriers and eliminating the benefits such as innovation and tailored service packages that competition in the platform market previously provided for restaurants and consumers.

d. The Ordinance will also likely require Plaintiffs to terminate contracts with existing restaurant partners, decline to enter into new contracts with prospective restaurant partners, and/or place limits on consumer order size or location.

e. In the absence of any provision in the Ordinance allowing for platforms to offset their imposed losses, the Ordinance has forced Plaintiffs to seek out alternative revenue streams to try and cover their operating costs including, for some Plaintiffs, increasing consumer fees, which has caused further harm to those Plaintiffs' reputations and goodwill in the City. Raising consumer fees will not allow Plaintiffs to recover their lost commissions to which they are contractually entitled. Basic economics dictates that any higher consumer fees

will result in fewer orders placed through Plaintiffs' platforms. And fewer orders means additional revenue losses for not only Plaintiffs, but for restaurants and couriers who depend on Plaintiffs' platforms, not to mention reduced tax revenue for the City. Finally, Plaintiffs' platforms were designed primarily to provide logistical support for food service establishments, consumers, and couriers, and there are no viable alternative, profitable uses of Plaintiffs' property subject to the regulation.

## FIRST CAUSE OF ACTION

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Contract Clause of the United States Constitution (42 U.S.C. § 1983))**

125.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 124 above.

126.    The Ordinance violates Article I, Section 10 of the United States Constitution, which prohibits state and local governments from "pass[ing] any . . . Law impairing the Obligation of Contracts." The Contract Clause "limits . . . the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power." *See Allied Structure Steel Co. v. Spannaus*, 438 U.S. 234, 242 (1978). This is because "[c]ontracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them." *Id.* at 245.

127.    The Ordinance operates as a substantial impairment of Plaintiffs' contractual relationships with restaurants. Facilitating food delivery is a well-established industry, historically free from government regulation. Long ago, before the City Council began debating the imposition of commission caps, Plaintiffs entered into voluntary contractual relationships with

thousands of New York City restaurants.  Those contracts included fixed-percentage commissions on which both parties relied, and both parties planned their expenditures accordingly.  Such reliance on the commission rate was vital to the contracting parties.  Plaintiffs' compliance with the City's *temporary* commission cap, the duration of which was ***tied to emergency public health measures*** (at extraordinary cost to Plaintiffs), does not undermine their expectation that their original bargained-for commission rates with restaurants would return after the end of the public-health emergency.

128.    Plaintiffs reasonably expected long-term revenue streams from their contracts that included total commission rates above 20%.  Prior to the COVID-19 pandemic and any price-fixing regulations, many restaurants joined one or more of Plaintiffs' platforms at commission rates greater than the amounts permitted by the Ordinance.  Until the Ordinance, the vast majority of those restaurants chose to continue their contracts with Plaintiffs at commission rates greater than the amounts permitted by the Ordinance.  *See supra* ¶¶ 45–49.  The Ordinance has impaired such choices by restaurants.  These reasonably expected revenue streams are important because Plaintiffs make significant up-front investments in their platforms, relying on long-term recoupment of those investments through commission fees.  For example, Plaintiffs have spent tens of millions of dollars on marketing to enable New York City restaurants to expand the reach of their menus to new customers.  That investment will pay off (both for Plaintiffs and for restaurants) only if Plaintiffs generate enough long-term revenue to cover their costs.  Under the Ordinance, Plaintiffs will not.

129.    The Ordinance, which restricts the material terms of freely negotiated contracts in an industry in which such agreements were historically unregulated, was unforeseeable at the time Plaintiffs entered into those contracts with restaurants.

130.    The Ordinance is intended to favor one subset of the public—restaurant owners—rather than the public at large.  The reality, however, is that restaurants and the public will be harmed if third-party platforms like Plaintiffs modify their operations in New York City in compliance with the Ordinance.  Restaurants and the public have already been harmed by the additional or higher fees some platforms have collected from consumers in an attempt to partially counteract the decrease in commissions allowed to be charged to restaurants under the Ordinance. But, as discussed above, the Ordinance makes no provision to offset the damages it imposes, and basic economic principles dictate that Plaintiffs cannot be made whole by increasing consumer fees.

131.    The Ordinance does not advance a significant or legitimate public purpose.  It does not further the public health or safety.  It does not respond to an ongoing public-health threat.  And far from promoting the general welfare, it engages in ill-conceived economic protectionism that is counterproductive to achieving its stated, illegitimate purpose.

132.    The adjustment of the rights and responsibilities of the contracting parties is neither based upon reasonable conditions nor of a character appropriate to the public purpose allegedly justifying the legislation's adoption.  It is not reasonable to continue to interfere with the ability of third-party platforms like Plaintiffs to charge the rates to which both the platforms and restaurants freely agreed—especially when the express purpose of such interference is economic protectionism of one party at the other's expense.  Nor is it reasonable to continually extend the duration of this price-fixing law (now made **_permanent_**), especially beyond the expiration of any public-health emergency and accompanying restrictions.

133.    The Ordinance has permanently undermined the benefit of the bargain for third-party platforms like Plaintiffs, interfered with the parties' reasonable expectations, and prevented

third-party platforms like Plaintiffs from safeguarding their rights. Restaurants have a choice in whether to enter into contracts with third-party platforms at all, and if they do, with which platforms specifically. Many restaurants facilitate their own delivery to customers using their own couriers, including by operating their own websites and taking orders by telephone. Providing these services directly to customers entails costs and inconveniences to both restaurants and customers. Restaurants would likely have to pay additional delivery staff, devote staff to manage telephone orders, and pay to develop their own comprehensive website and sales analytics as well as marketing campaigns. Restaurants that choose to use third-party platforms have decided that the relationship is mutually beneficial and valuable to their customers.

134.   The unreasonableness of the government's interference is magnified by the City's recent budget surplus and the availability of other lawful governmental methods to aid restaurants.

135.   The City, as a municipality, may be held liable for this violation of the United States Constitution under 42 U.S.C. § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (establishing that municipal liability under Section 1983 arises where the municipality has undertaken an official policy or custom which causes an unconstitutional deprivation of the plaintiff's rights).

136.   In enacting the Ordinance, the City acted under color of state law and pursuant to an official policy or custom.

137.   The City's unconstitutional conduct proximately caused Plaintiffs' injuries.

138.   A bona fide and actual controversy exists between Plaintiffs and the City in that Plaintiffs allege, and the City denies, that the enactment of the Ordinance violated the Contract Clause of the United States Constitution.

139.    Plaintiffs desire a judicial determination of the validity of the Ordinance to save themselves from the harm caused by the enactment of the Ordinance, which deprives Plaintiffs of the benefit of their existing contracts with restaurants.  The enactment of the Ordinance results in substantial hardship to Plaintiffs.

140.    A judicial determination of the invalidity of the Ordinance is necessary and appropriate to avoid the deprivation of federal constitutional rights that results from applying the Ordinance to Plaintiffs and other third-party platforms.

141.    In light of the violation of the Contract Clause of the United States Constitution, Plaintiffs further seek injunctive relief against enforcement of the Permanent Ordinance.

142.    In light of the violation of the Contract Clause of the United States Constitution, Plaintiffs further seek monetary damages.

## SECOND CAUSE OF ACTION

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution (42 U.S.C. § 1983); Declaratory and Injunctive Relief for Violation of Article I, Section 7 of the New York Constitution (Takings))**

143.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 142 above.

144.    The federal and state Constitutions prohibit the government from taking private property "without just compensation."  U.S. Const. amend. V; N.Y. Const. art. I, § 7.  Contracts constitute property within the meaning of the Fifth Amendment and are susceptible to a "taking" within the meaning of the Takings Clause.  *See Lynch v. United States*, 292 U.S. 571, 579 (1934); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984).  Thus, the City may not deprive Plaintiffs of the benefits of their contractual property rights without prior and just compensation.

145.    The Ordinance substantially impairs Plaintiffs' fundamental property rights in their contracts with restaurants without prior and just compensation to Plaintiffs.  A typical contract between Plaintiffs and a restaurant includes a commission whereby the restaurant agrees to pay Plaintiffs a certain percentage of the price of the consumer's order.  Plaintiffs have contracts with thousands of restaurants in New York City, a substantial number of which were executed before commission caps were in place.  Plaintiffs' contracts often continue for multiple years.

146.    The Temporary Ordinance extended (and now has made permanent through the Permanent Ordinance) the 15% cap on delivery commissions that third-party platforms can charge restaurants, and the 5% cap on other commissions except credit card processing, including for marketing services, order processing hardware and software, and brand management.  Most of Plaintiffs' contracts with restaurants include commission rates greater than what the Ordinance allows.  When the City initially capped commissions in May 2020, Plaintiffs temporarily reduced those commissions in the spirit of comity during the public-health emergency (despite believing that even the temporary commission cap was unconstitutional).  The Ordinance now permanently extends the already-unconstitutional cap, continues to substantially diminish the economic value of Plaintiffs' contracts, and continues to prevent Plaintiffs from obtaining reasonable returns on their investments and the agreed-upon revenues that they otherwise would obtain in a competitive industry.

147.    Plaintiffs' property has been taken, but not for any valid public purpose, as the Ordinance does not substantially advance a closely and legitimately connected government interest.  The Ordinance singles out Plaintiffs and caps the prices they can charge for services such as marketing and payment processing, among others, while allowing other providers of those services to charge restaurants whatever they like.

148.    The Ordinance prevents Plaintiffs from obtaining reasonable returns on their investments and may force the companies to modify their operations in New York City.  This is because the Ordinance does not merely diminish Plaintiffs' revenues; instead, it eliminates Plaintiffs' profits under the contracts.  Plaintiffs' previous commission rates were designed to allow Plaintiffs to cover the costs of providing their services; however they cannot cover their costs at the rates allowed by the Ordinance.  Also, as a result of the Ordinance, Plaintiffs will be required to renegotiate or terminate certain contracts with restaurants completely.  Therefore, the Ordinance permanently disrupts the expected benefits of Plaintiffs' contracts.  Moreover, Plaintiffs' platforms were designed primarily to provide logistical support for food service establishments, consumers, and couriers, and there are no viable alternative, profitable uses of Plaintiffs' property subject to the regulation.

149.    The Ordinance goes too far in its regulation of Plaintiffs' property rights, and the economic harm it causes should be compensated by the government rather than remain disproportionately borne by Plaintiffs without just compensation.  The City has interfered with Plaintiffs' legitimate and reasonable investment-backed expectations in their contracts with restaurants to such a degree that the Ordinance is the functional equivalent of government appropriation without just compensation.

150.    The City may be held liable for this violation of the United States Constitution under 42 U.S.C. § 1983.

151.    In enacting the Ordinance, the City acted under color of state law and pursuant to an official policy or custom.

152.    The City's unconstitutional conduct proximately caused Plaintiffs' injuries.

153.    A bona fide and actual controversy exists between Plaintiffs and the City in that Plaintiffs allege, and the City denies, that the enactment of the Ordinance violated Article I, Section 7 of the New York Constitution and the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution.

154.    Plaintiffs desire a judicial determination of the validity of the Ordinance to save themselves from the harm caused by the enactment of the Ordinance, which deprives Plaintiffs of the benefit of their longstanding contracts with restaurants.  The enactment of the Ordinance results in substantial hardship to Plaintiffs.

155.    A judicial determination of the invalidity of the Ordinance is necessary and appropriate to avoid the deprivation of federal and state constitutional rights that results from applying the Ordinance to Plaintiffs and other third-party platforms.

156.    In light of the violation of Article I, Section 7 of the New York Constitution and the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution, Plaintiffs further seek injunctive relief against enforcement of the Permanent Ordinance.  The ongoing violation of Plaintiffs' constitutional rights constitutes irreparable harm, as does the long-term deleterious effect on Plaintiffs' reputations, goodwill, and business models.

157.    In light of the violation of the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution, Plaintiffs further seek monetary damages.

## THIRD CAUSE OF ACTION

**(Declaratory and Injunctive Relief for Violation of Article IX, Section 2(c) of the New York Constitution, New York Municipal Home Rule Law Section 10(ii)(a)(12), and New York General City Law Section 20(13) (Police Power))**

158.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 157 above.

159.    Contained within the New York Constitution and state statutes are limitations on the City's right to exercise police power, *i.e.*, to enact laws for the safety, health, well-being, and welfare of its residents.  A City exceeds its police power where an ordinance "bears no relation to the welfare of the public, but is designed for the convenience and interest of a special class." *Cohen*, 272 N.Y. at 322.

160.    The Ordinance exceeds the City's police power because it does not promote the public health, safety, or general welfare of the public at large.  It does not seek to benefit all New York City workers or businesses.  Nor is the Ordinance directed at any form of price gouging. Instead, the Ordinance aims to advance the narrow interests of certain restaurants—those with contracts with Plaintiffs and other platforms where the restaurants freely agreed to pay commissions greater than what the Ordinance allows—at the expense of others, including consumers who may be adversely affected by higher charges, restaurants that may lose the option of using Plaintiffs' services, and couriers who may lose out on delivery opportunities.

161.    Prior to the Local Law and Ordinance, Plaintiffs' contracts with restaurants across the City routinely entailed total commissions greater than what the Ordinance allows in order to cover the costs of their services and to help restaurants meet the demand for such services across the City.  Those costs extend well beyond facilitating delivery services, and include things like marketing, order-taking, technology and product development, and customer service, which the Ordinance caps at a 5% commission rate.

162.    The Ordinance harms the general public by making food ordering and delivery platform services less economically viable, thereby reducing or eliminating the availability of food delivery services in New York City, or forcing an increase in the fees that Plaintiffs and other food delivery services must charge consumers.  Such price increases would not offset the losses from

the Ordinance, because they will result in fewer orders on Plaintiffs' platforms, and also serve to reduce income to restaurants and couriers who depend on Plaintiffs' platforms.

163.    Third-party platforms are not so essential to the public health or safety that they should be treated akin to public utilities, and there is no legitimate reason for the City to impose an industry-wide price control.  Further, the Ordinance does not provide a method by which Plaintiffs can be guaranteed a fair return on their investments going forward, such as an upward adjustment procedure, as is the case with utilities (which also have geographic monopolies, unlike Plaintiffs).

164.    There is no justification for a price-fixing ordinance that does not benefit the public health, safety, or general welfare.  What is worse, the Ordinance's price fixing cannot even purportedly be justified as a response to the COVID-19 (or any other) emergency.

165.    The Ordinance's attempt at economic protectionism would not be justified even if the City had engaged in studies about the Ordinance's likely effects.  But the City did not engage in any type of analysis that would be expected of similar price-fixing legislation, such as in the utility context.  Upon information and belief, the City has not conducted (or asked anyone else to conduct) research or analysis regarding:  (1) an extended commission cap's potential effect on consumers, restaurants, third-party platforms, or the local economy; (2) why any cap should be uniform industry-wide or set at these levels; (3) any differences between third-party platforms that serve 20 or more restaurants and third-party platforms that serve fewer than 20 restaurants that would justify treating the two types of platforms differently; or (4) the impact third-party platforms have had on the restaurant industry compared to other similar external factors.

166.    The Ordinance does not cap prices on any other goods or services restaurants utilize that make up a large percentage of restaurants' overhead and are similarly situated to Plaintiffs,

such as supply and equipment providers, point-of-sale vendors, online reservation services, or other marketing services like Google, Facebook, or Twitter.  Rather, it caps only commissions charged by certain large third-party platforms.  There is no permissible justification for singling out third-party platforms, especially when the price fixing is not related to the public health, safety, or welfare.

167.    A bona fide and actual controversy exists between Plaintiffs and the City in that Plaintiffs allege, and the City denies, that the enactment of the Ordinance violated Article IX, Section 2(c) of the New York Constitution and related statutes that set the limits of municipal police power.

168.    Plaintiffs desire a judicial determination of the validity of the Ordinance to save themselves from the harm caused by the enactment of the Ordinance, which deprives Plaintiffs of the benefit of their longstanding contracts with restaurants.  The enactment of the Ordinance results in substantial hardship to Plaintiffs.

169.    A judicial determination of the invalidity of the Ordinance is necessary and appropriate to avoid the deprivation of state constitutional and statutory rights that results from applying the Ordinance to Plaintiffs and other third-party platforms.

170.    In light of the violation of Article IX, Section 2(c) of the New York Constitution and related statutes, Plaintiffs further seek injunctive relief against enforcement of the Permanent Ordinance.  The ongoing violation of Plaintiffs' constitutional rights constitutes irreparable harm, as does the Ordinance's long-term deleterious effect on Plaintiffs' reputations, goodwill, and business models.

## FOURTH CAUSE OF ACTION

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Due Process Clause of the United States Constitution (42 U.S.C. § 1983); Declaratory and Injunctive Relief for Violation of Article I, Section 6 of the New York Constitution (Due Process))**

171.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 170 above.

172.    The Ordinance violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Due Process Clause of Article I, Section 6 of the New York Constitution because it imposes an irrational and arbitrary direct and permanent cap on third-party platforms' ability to generate the revenue needed to cover their expenses, and instead provides preferential economic treatment to certain restaurants at the direct expense of these platforms.

173.    Businesses have a constitutionally protected interest in operating free from unreasonable governmental interference, and are also protected from excessive and unreasonable government conduct intentionally directed toward them.  The Ordinance lacks a reasonable and nondiscriminatory legislative purpose.  It has no (let alone a substantial) relation to the public health, safety, or general welfare.  The continued cap cannot be justified as an emergency response (nor does it purport to be any longer).  Favoring a specific industry or subset of an industry at the expense of another is not a legitimate legislative purpose.

174.    There is also no rational basis for capping commissions without adequately compensating third-party delivery services.  *See N.Y. State Land Title Ass'n v. N.Y. State Dep't of Fin. Servs.*, 169 A.D.3d 18, 32 (1st Dep't 2019) (finding no rational basis for capping fees at an "arbitrary, across-the-board percentage figure" where the government's argument that regulated parties would "be adequately compensated" was "conclusory" and lacked "empirical documentation, assessment and evaluation").

175.    Both the content and context of the Ordinance demonstrate that it is confiscatory in nature and intended to harm third-party platforms like Plaintiffs, essentially forcing them to subsidize certain restaurants' profit margins by continuing to cap their ability to charge reasonable and competitive commissions for their services—a cap now rendered permanent.

176.    Moreover, any invocation of the COVID-19 emergency is clearly pretext.  New York City lawmakers who sponsored the Ordinance have stated that a commission cap was necessary prior to the pandemic:  Council Member Moya introduced permanent commission cap legislation before any state of emergency was declared.  And the City has extended the commission cap despite the end of the COVID-19 state of emergency.  The repeal of the COVID-19-based sunset provision (and any sunset provision at all under the Permanent Ordinance) underscores the lack of any connection between a commission cap and any public-health emergency, exacerbating the due process violation.

177.    The unreasonable interference with Plaintiffs' businesses that the Ordinance imposes, coupled with the pretext under which it was enacted and the negative effects on the restaurant industry and customers that will result from the Ordinance, demonstrates that the Ordinance is arbitrary and irrational, without any conceivable legitimate rational basis, and was enacted in violation of due process.  Indeed, the Ordinance will undermine the City's own supposed purpose of assisting restaurants because it will likely drive up consumer costs, drive down deliveries, and thus negatively impact consumers, couriers, and restaurants.

178.    The City may be held liable for this violation of the United States Constitution under 42 U.S.C. § 1983.

179.    In enacting the Ordinance, the City acted under color of state law and pursuant to an official policy or custom.

180.     The City's unconstitutional conduct proximately caused Plaintiffs' injuries.

181.     A bona fide and actual controversy exists between Plaintiffs and the City in that Plaintiffs allege, and the City denies, that the enactment of the Ordinance violated Article I, Section 6 of the New York Constitution and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

182.     Plaintiffs desire a judicial determination of the validity of the Ordinance to save themselves from the harm caused by the enactment of the Ordinance, which deprives Plaintiffs of the benefit of their longstanding contracts with restaurants that existed prior to any commission caps.  The enactment of the Ordinance results in substantial hardship to Plaintiffs.

183.     A judicial determination of the invalidity of the Ordinance is necessary and appropriate to avoid the deprivation of federal and state constitutional rights that results from applying the Ordinance to Plaintiffs and other third-party platforms.

184.     In light of the violation of Article I, Section 6 of the New York Constitution and the Fourteenth Amendment to the United States Constitution, Plaintiffs further seek injunctive relief against enforcement of the Permanent Ordinance.  The ongoing violation of Plaintiffs' constitutional rights constitutes irreparable harm, as does the Ordinance's long-term deleterious effect on Plaintiffs' reputations, goodwill, and business models.

185.     In light of the violation of the Fourteenth Amendment to the United States Constitution, Plaintiffs further seek monetary damages.

**FIFTH CAUSE OF ACTION**

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Equal Protection Clause of the United States Constitution (42 U.S.C. § 1983); Declaratory and Injunctive Relief for Violation of Article I, Section 11 of the New York Constitution (Equal Protection))**

186.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 185 above.

187.    The Ordinance violates the Equal Protection Clause of the Fourteenth Amendment, which requires that the reason for treating two groups differently be rationally related to a legitimate government interest.

188.    The Ordinance imposes an irrational and arbitrary direct permanent cap on Plaintiffs' and certain third-party platforms' ability to generate the revenue needed to cover their expenses, and instead provides preferential economic treatment to certain restaurants at the direct expense of third-party platforms, which is not a reasonable and nondiscriminatory legislative purpose.

189.    Third-party platforms and other businesses operating in the City are similarly situated, yet the Ordinance prohibits the ability of one class (third-party delivery platforms) to freely contract with restaurants with regard to facilitating the order and delivery of food and beverages from restaurants to consumers and providing marketing and other services, while it does not fix the prices of any other similarly situated businesses with which restaurants transact that offer the same services, such as raw ingredient suppliers, equipment suppliers, point-of-sale system vendors, online reservation platforms, or other advertising providers.

190.    The Temporary Ordinance was irrational, arbitrary, and discriminatory for a second reason:  it capped the commissions of third-party platforms that serve "no fewer than 20 food service establishments located in the city that are owned and operated by different persons," but

not those that serve fewer than 20 such establishments.  N.Y.C. Admin. Code § 20-845.  The City

has not provided any (let alone a rational) basis for this distinction other than naked animus against

larger, out-of-state businesses.  Small third-party platforms were permitted to charge whatever

commission they want under the Temporary Ordinance, though they are similarly situated and

provide similar services as the larger platforms.  The Temporary Ordinance specifically intended

to carve out such groups and provide them with a competitive advantage to the detriment of larger

businesses like Plaintiffs.  Even though the City Council removed this facially discriminatory

language from the Permanent Ordinance in an attempt to disguise its intent, the legislative history

shows that this animus drove the City Council's entire commission cap regime.

191.    Moreover, the Ordinance will undermine the City's own supposed purpose of

assisting restaurants because it will drive up consumer costs, drive down deliveries, and thus

negatively impact consumers, couriers, and restaurants.

192.    For substantially the same reasons, the Ordinance violates Article I, Section 11 of

the New York Constitution.

193.    The City may be held liable for this violation of the United States Constitution

under 42 U.S.C. § 1983.

194.    In enacting the Ordinance, the City acted under color of state law and pursuant to

an official policy or custom.

195.    The City's unconstitutional conduct proximately caused Plaintiffs' injuries.

196.    A bona fide and actual controversy exists between Plaintiffs and the City in that

Plaintiffs allege, and the City denies, that the enactment of the Ordinance violated the Equal

Protection Clauses of the United States and New York Constitutions.

197.    Plaintiffs desire a judicial determination of the validity of the Ordinance to save themselves from the harm caused by the enactment of the Ordinance, which deprives Plaintiffs of the benefit of their longstanding contracts with restaurants.  The enactment of the Ordinance results in substantial hardship to Plaintiffs.

198.    A judicial determination of the invalidity of the Ordinance is necessary and appropriate to avoid the deprivation of federal and state constitutional rights that results from applying the Ordinance to Plaintiffs and other third-party platforms.

199.    In light of the violation of Equal Protection Clauses of the United States and New York Constitutions, Plaintiffs further seek injunctive relief against enforcement of the Permanent Ordinance.  The ongoing violation of Plaintiffs' constitutional rights constitutes irreparable harm, as does the Ordinance's long-term deleterious effect on Plaintiffs' reputations, goodwill, and business models.

200.    In light of the violation of the Fourteenth Amendment to the United States Constitution, Plaintiffs further seek monetary damages.

## SIXTH CAUSE OF ACTION

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Dormant Commerce Clause of the United States Constitution (42 U.S.C. § 1983))**

201.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 200 above.

202.    The Temporary Ordinance discriminates against interstate commerce on its face.

203.    The Temporary Ordinance and the Permanent Ordinance both have the purpose and effect of discriminating against, and imposing a substantial burden on, interstate commerce.

204.    DoorDash, Grubhub, and Uber Eats are all incorporated and headquartered outside of New York, yet they fall within the Ordinance's definition of "third-party food delivery service."

205.    Smaller local third-party delivery companies serving 20 or fewer restaurants were free to charge whatever commissions they wished under the Temporary Ordinance.   On information and belief, the small platforms exempt from the Temporary Ordinance are local platforms based in New York (in contrast to Plaintiffs, all of which are out-of-state platforms). Thus, the Temporary Ordinance creates a discriminatory market, enabling local services to gain a larger share of the total sales in the market than that of larger out-of-state service providers that comprise the entire, or nearly entire, class of entities subject to the Temporary Ordinance's regulation.  The Temporary Ordinance is a "straightforward attempt[] to discriminate in favor of local" businesses prohibited by the Dormant Commerce Clause doctrine.  *Granholm v. Heald*, 544 U.S. 460, 489 (2005).

206.    The City Council has admitted its unconstitutional motive.  Indeed, Chairman Gjonaj, one of the main sponsors of the Ordinance, asked a Grubhub representative whether Grubhub paid New York taxes, and explained that because New York restaurants pay New York taxes "***it's more important that we protect them instead of . . . Grubhub or the other providers***, ***I would hate [the] scenario of where a percentage of the sales transaction is leaving our city and going to a different state and not contributing to our tax base***."  And Council Member Gjonaj has made clear that the Ordinance and its prior variants were precursors to "pass[ing] the full set of bills that were introduced earlier this year on the primary relief to small mom and pop shops just looking for their fair playing field and use the service of these venture capital backed ***Silicon Valley Tech behemoths***."  The City Council followed through on that promise in passing the Permanent Ordinance.

207.    The Temporary Ordinance facially discriminates against out-of-state industry actors by shifting the costs of regulation onto them, thus favoring local interests—which is a per

se violation of the Dormant Commerce Clause doctrine.  The City Council later removed the facially discriminatory exception for smaller platforms from the text of the Permanent Ordinance. But in both iterations, the Ordinance places a burden on interstate commerce that clearly outweighs the minimal, if any, local benefits, as, upon information and belief, the vast majority of online delivery orders are placed through third-party food delivery platforms located out-of-state.  *See Am. Booksellers Found. v. Dean*, 342 F.3d 96, 102 (2d Cir. 2003).  And the Ordinance harms, not helps, the local restaurants and communities it purports to aid.  *See supra*, ¶ 123.

208.    The City had "other means to advance" its "local interest," *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392 (1994), but chose not to use those other nondiscriminatory means, which could have included workable alternatives such as a loan program, tax breaks, rental assistance, or other economic interventions.

209.    The City may be held liable for this violation of the United States Constitution under 42 U.S.C. § 1983.

210.    In enacting the Ordinance, the City acted under color of state law and pursuant to an official policy or custom.

211.    The City's unconstitutional conduct proximately caused Plaintiffs' injuries.

212.    A bona fide and actual controversy exists between Plaintiffs and the City in that Plaintiffs allege, and the City denies, that the enactment of the Ordinance violates the Dormant Commerce Clause of the United States Constitution.

213.    Plaintiffs desire a judicial determination of the validity of the Ordinance to save themselves from the harm caused by the enactment of the Ordinance, which deprives Plaintiffs of the benefit of their longstanding contracts with restaurants.  The enactment of the Ordinance results in substantial hardship to Plaintiffs.

214.    A judicial determination of the invalidity of the Ordinance is necessary and appropriate to avoid the deprivation of federal constitutional rights that results from applying the Ordinance to Plaintiffs and other third-party platforms.

215.    In light of the violation of the Dormant Commerce Clause of the United States Constitution, Plaintiffs further seek injunctive relief against enforcement of the Permanent Ordinance.  The ongoing violation of Plaintiffs' constitutional rights constitutes irreparable harm, as does the Ordinance's long-term deleterious effect on Plaintiffs' reputations, goodwill, and business models.

216.    In light of the violation of the Dormant Commerce Clause of the United States Constitution, Plaintiffs further seek monetary damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor and grant the following relief:

1.    A declaration that the Temporary Ordinance and the Permanent Ordinance violate provisions of the United States Constitution and the New York Constitution;

2.    Just compensation, according to proof, for taking of property;

3.    An award of damages against the City according to proof;

4.    A permanent injunction enjoining the City from enforcing the Permanent Ordinance facially or as applied against Plaintiffs;

5.    An award of fees, costs, expenses, and disbursements, including attorneys' fees to which Plaintiffs are entitled pursuant to 42 U.S.C. § 1988 and other applicable law; and

6.    Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury in this action of all issues so triable.

Dated: New York, New York
       January 24, 2022

                        GIBSON, DUNN & CRUTCHER LLP

                        By: */s/ Anne Champion*
                        Anne Champion
                        Esther Lifshitz
                        Andrew C. Bernstein
                        200 Park Avenue, 47th Floor
                        New York, NY 10166-0193
                        Telephone:  (212) 351-4000
                        AChampion@gibsondunn.com
                        ELifshitz@gibsondunn.com
                        ABernstein@gibsondunn.com

                        Joshua S. Lipshutz (*pro hac vice*)
                        1050 Connecticut Ave. NW
                        Washington, DC 20036-5306
                        Telephone:  (202) 955-8500
                        JLipshutz@gibsondunn.com

                        *Attorneys for Plaintiffs DoorDash, Inc.,*
                        *Grubhub Inc., and Portier, LLC*