UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
DOORDASH, INC., GRUBHUB INC., and
PORTIER, LLC,

                                                            21-cv-7564 (GHW)
                                        Plaintiffs,

      - against -


CITY OF NEW YORK,

                                        Defendant(s).

------------------------------------------------------------------------X


**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**



                                  HON. SYLVIA HINDS-RADIX
                                  Corporation Counsel of the
                                  City of New York
                                  Attorney for Defendant
                                  100 Church Street
                                  New York, New York 10007
                                  Tel: (212) 356-1662


Michelle Goldberg-Cahn
Darren Trotter
Kevin Collins,
          *of Counsel.*

Jessica Katzen,
          *on the brief*

March 7, 2022

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ............................................................................................................................... 2

STANDARD OF REVIEW ......................................................................................................... 2

    A.    THE FAC FAILS TO PLAUSIBLY ALLEGE A CONTRACTS CLAUSE VIOLATION ...................................................................... 3

        i.   The Ordinance Does Not Substantially Impair Plaintiffs' Contracts ............................................................................................... 4

        ii.  The City Had a Significant and Legitimate Public Interest in Enacting the Ordnance ............................................................... 6

        iii. The Ordinance is a Reasonable and Appropriate Means to Achieve the City's Significant and Legitimate Public Interest ................................................................................................. 8

    B.    PLAINTIFFS' REGULATORY TAKINGS CLAIM FAILS ................................. 12

        i.   Plaintiffs' Contracts Do Not Give Rise to a Claim Under the Takings Clause ....................................................................... 12

        ii.  The FAC Fails to Establish a Regulatory Taking ........................... 13

    C.    THE ENACTMENT OF THE ORDINANCE DOES NOT EXCEED THE CITY'S POLICE POWER ............................................................ 16

    D.    THE FAC FAILS TO PLAUSIBLY ALLEGE A PROCEDURAL DUE PROCESS CLAIM ............................................................ 18

    E.    THE FAC FAILS TO PLAUSIBLY ALLEGE A EQUAL PROTECTION VIOLATION ................................................................ 19

    F.    THE FAC FAILS TO PLAUSIBLY ALLEGE A DORMANT COMMERCE CLAUSE VIOLATION ............................................ 22

CONCLUSION .......................................................................................................................... 26

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

1256 Hertel Avenue Assocs., LLC v. Calloway,
   761 F.3d 252 (2d Cir. 2014) ................................................................ 15

Allied Structural Steel Co. v. Spannaus,
   438 U.S. 234 (1978) .............................................................................. 6

Ashcroft v. Iqbal,
   556 U.S. 662 (2009) .............................................................................. 2

Ass'n of Surrogates & Supreme Court Reporters v. New York,
   940 F.2d 766 (2d Cir. 1991) .................................................................. 8

Bell Atlantic v. Twombly,
   550 U.S. 544 (2007) .............................................................................. 2

Big Apple Food Vendors' Ass'n v. City of New York,
   168 Misc. 2d 483 (Sup. Ct. N.Y. Cty. 1995), aff'd ............................. 17

Buffalo Teachers Fed'n v. Tobe,
   464 F.3d 362 (2d Cir. 2006) ........................................................ *passim*

Casciani v. Nesbitt,
   659 F. Supp. 2d 427 (W.D.N.Y. 2009).................................................. 17

CCA Assocs. v. United States,
   667 F.3d 1239 (Fed. Cir. 2011) ............................................................ 14

Chambers v. Time Warner,
   282 F.3d 147 (2d Cir. 2002) .................................................................. 3

Concrete Pipe & Prods. of Cal. v. Constr. Laborers Pensions Trust for S. Cal.,
   508 U.S. 602 (1993) .............................................................................. 14

Connolly v. Pension Benefit Guaranty Corp.,
   475 U.S. 211 (1986) ........................................................................ 12, 13

Cortec Indus. v. Sum Holding L.P.,
   949 F.2d 42 (2d Cir. 1991) .................................................................... 3

CTS Corp. v. Dynamics Corp. of America,
   481 U.S. 69 (1987) ................................................................................ 25

D'Amico v. Crosson,
   93 N.Y.2d 29 (1999)............................................................................. 20

Dandridge v. Williams,
    390 U.S. 471 (1970) ................................................................................................ 22

DJL Rest. Corp. v. City of New York,
    96 N.Y.2d 91 (2001) ........................................................................................ 16, 17

Energy Reserves Grp., Inc. v. Kansas Power & Light Co.,
    459 U.S. 400 (1982) ...................................................................................... *passim*

F.C.C. v. Beach Commc'ns, Inc.,
    508 U.S. 307 (1993) ................................................................................................ 20

Fitzgerald v. Racing Ass'n of Cent. Iowa,
    539 U.S. 103 (2003) ................................................................................................ 21

Freedom Holdings, Inc. v. Spitzer,
    357 F.3d 205 (2d Cir. 2004) ................................................................................... 22

GMC v. Tracy,
    519 U.S. 278 (1997) .......................................................................................... 22, 23

Grand River Enters. Six Nations, Ltd. v. Pryor,
    425 F.3d 158 (2d Cir. 2005) ................................................................................... 25

Healy v. Beer Inst.,
    491 U.S. 324 (1989) ................................................................................................ 23

Heidel v. Hochul,
    2021 U.S. Dist. LEXIS 203572 (S.D.N.Y. Oct. 21, 2021) .................................... 12

Heller v. Doe,
    509 U.S. 312 (1993) ................................................................................................ 20

Hernandez v. United States,
    939 F.3d 191 (2d Cir. 2019) ................................................................................... 18

Joglo Realties, Inc. v. Seggos,
    229 F. Supp. 3d 146 (E.D.N.Y. 2017) ..................................................................... 3

Jones v. Schneiderman,
    974 F. Supp. 2d 322 (S.D.N.Y. 2013) .................................................................... 23

Lefrancois v. Rhode Island,
    669 F. Supp 1204 (D.R.I. 1987) ........................................................................... 4, 5

Martin v. Town of Simsbury,
    505 F. Supp. 3d 116 (2d Cir. 2020) ....................................................................... 15

Matusovsky v. Merrill Lynch,
    186 F. Supp. 2d 397 (S.D.N.Y. 2002) ..................................................................... 3

Melendez v. City of New York,
    2021 U.S. App. LEXIS 32327 (2d Cir. 2021) .................................................................. 5, 10, 11, 12

MHC Fin. L.P. v. City of San Rafael,
    714 F.3d 1118 (9th Cir. 2013) ......................................................................................... 14

Norfolk Southern Corp. v. Oberly,
    822 F.2d 388 (3d Cir. 1987) ............................................................................................ 25

Or. Waste Sys. v. Dep't of Envtl. Quality,
    511 U.S. 93 (1994) .......................................................................................................... 24

Penn Central Transp. Co. v. New York City,
    438 U.S. 104 (1978) ................................................................................................... 13, 16

Pennell v. City of San Jose,
    485 U.S. 1 (1988) ............................................................................................................ 18

People v. DeJesus,
    54 N.Y.2d 465 (1981) ...................................................................................................... 16

People v. Lewis,
    295 N.Y. 42 (1945) .......................................................................................................... 17

Pike v. Bruce Church, Inc.
    397 U.S. 137 (1970) ........................................................................................................ 25

Ruckelshaus v. Monsanto Co.,
    467 U.S. 986 (1984) ........................................................................................................ 15

Sanitation and Recycling Indus., Inc. v. City of New York,
    107 F.3d 985 (2d Cir. 1997) .......................................................................... 3, 4, 5, 6, 7, 15

Sazerac Co. v. Falk,
    861 F. Supp. 253 (S.D.N.Y. 1994) .................................................................................... 3

Sensational Smiles, LLC v. Mullen,
    793 F.3d 281 (2d Cir. 2015) ............................................................................................ 20

Shumway v. UPS,
    118 F.3d 60 (1997) .......................................................................................................... 20

Sullivan v. Nassau Cty. Interim Fin. Auth.,
    959 F.3d 54 (2d Cir. 2020) ....................................................................................... passim

Taylor v. United States,
    959 F.3d 1081 (Fed. Cir. 2020) ...................................................................................... 15

TCF Nat. Bank v. Bernanke,
    643 F.3d 1158 (8th Cir. 2001) ........................................................................................ 19

Tinnerello & Sons, Inc. v. Stonington,
141 F.3d 46 (2d Cir. 1998) ................................................................................. 3, 10

Town of Southold v. Town of E. Hampton,
477 F.3d 38 (2d Cir. 2007) .................................................................................... 24

U.S. Tr. Co. v. New Jersey,
431 U.S. 1 (1977) ............................................................................................... 3, 8

United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.,
261 F.3d 245 (2d Cir. 2001) .................................................................................. 24

Williams v. Citibank, N.A.,
565 F. Supp. 2d 523 (S.D.N.Y. 2008) ..................................................................... 3

Winston v. City of Syracuse,
887 F.3d 553 (2018) ............................................................................................. 19

Wright v. Incline Vill. Gen. Improvement Dist.,
665 F.3d 1128 (9th Cir. 2011) .............................................................................. 21

## Statutes

General City Law §§ 20(13), 21 .............................................................................17

Municipal Home Rule Law § 10(1)(ii)(a)(12) ...................................................16, 17

New York City Administrative Code §§ 20-563.3(a) and (b) ........................................1

## Other Authorities

Federal Rule of Civil Procedure 12(b)(6) ..................................................................2

U.S. Const. Art. I, § 10 ..........................................................................................2

## PRELIMINARY STATEMENT

This case stems from plaintiffs' challenge to New York City Administrative Code ("Admin. Code") §§ 20-563.3(a) and (b) ("Ordinance"), which deems it unlawful for a third-party food delivery platform ("TPP") to: (1) charge a restaurant a fee in excess of fifteen percent of each online order; and (2) charge a "food service establishment any fee or fees, other than a delivery fee and a transaction fee, for the use of their service that totals more than five percent of the purchase price of each online order."[1] The New York City Council ("City Council") passed the Ordinance to address the threats posed to City restaurants by the exponential increase in the use of TPPs to place online orders. Between 2013 and 2017, online restaurant orders grew twenty-three percent annually. Despite these increases in online orders, restaurants' profit margins continued to diminish as each online order placed through plaintiffs' platforms—which as of July of 2021 were collectively responsible for ninety-nine percent of online food orders in the City—is accompanied by an excessively high commission. During the COVID-19 pandemic, the impact of excessively high commissions became even more severe. In passing the Ordinance, the City Council did not act hastily. Rather, the Ordinance was preceded by temporary commission caps, which were in place for over a year at the time of the Ordinance's passage. Under the temporary caps, TPP profits actually increased. With knowledge that fee caps would not have a detrimental effect on TPPs, it was reasonable for the City Council to modify and permanently implement the same commission caps to ensure the survival of restaurants, which are crucial to the economic and social vitality of the City as cornerstones of communities and employers of over 300,000 New Yorkers.

---

[1] The First Amended Complaint purports to challenge the permanent imposition of a commission cap for services rendered by TPPs set forth in Administrative Code §§ 20-563.3(a) and (b) as well as prior temporary commission caps, which exempted from the commission caps TPPs serving 20 or fewer restaurants. On January 24, 2022, the permanent commission caps went into effect, superseding any prior iterations. The permanent commission caps are applicable to all TPPs irrespective of their size.

In this action, plaintiffs assert six causes of action. Each claim fails. Plaintiffs' Contracts Clause claim fails as the First Amended Complaint ("FAC") fails to plausibly allege substantial impairment of existing contracts and because the Ordinance is appropriately drawn to advance a significant public purpose. Plaintiffs' takings claim fails as: (1) plaintiffs' contracts do not give rise to a takings claim; and (2) mere diminution in value is insufficient to constitute a regulatory taking. Plaintiffs' third claim fails as the Ordinance is an appropriate exercise of the City's police power as the protection of restaurants advances the general welfare of City residents. Plaintiffs' due process claim fails as the FAC fails to plausibly allege that the Ordinance is arbitrary or discriminatory. Plaintiffs' equal protection claim fails as the FAC fails to plausibly allege that plaintiffs are similarly situated to other industries with which the restaurant industry transacts and as any purported distinction was rational. Finally, plaintiffs' Commerce Clause claim fails as the Ordinance does not discriminate against interstate commerce in favor of intrastate commerce.

## ARGUMENT

## STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, a pleading must contain sufficient factual matter, accepted as true, so as to make a claim plausible on its face. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009); <u>Bell Atlantic v. Twombly</u>, 550 U.S. 544, 570 (2007). To meet the "facial plausibility" standard, a pleading must set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id</u>. This requires a court to reject "threadbare recitals" of the elements of a claim "supported by mere conclusory statements," and requires "more than a sheer possibility that a defendant has acted unlawfully." <u>Id.</u>

In assessing a motion to dismiss under Rule 12(b)(6), a court may look to the facts alleged in the Complaint, documents attached thereto or incorporated by reference, documents that are

"integral" to a plaintiff's claims, even if not expressly incorporated by reference, as well as matters of public record, documents in plaintiff's possession, or documents that the plaintiff knew of or relied upon in bringing suit. Chambers v. Time Warner, 282 F.3d 147, 152–53 (2d Cir. 2002); Cortec Indus. v. Sum Holding L.P., 949 F.2d 42, 46–48 (2d Cir. 1991); Joglo Realties, Inc. v. Seggos, 229 F. Supp. 3d 146, 148 n.3 (E.D.N.Y. 2017). Moreover, "if the allegations of a complaint are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the complaint." Sazerac Co. v. Falk, 861 F. Supp. 253, 257 (S.D.N.Y. 1994). Such contradicted allegations are "insufficient to defeat a motion to dismiss." Matusovsky v. Merrill Lynch, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002); Williams v. Citibank, N.A., 565 F. Supp. 2d 523, 527 (S.D.N.Y. 2008). Here, relying solely on the facts presented in the FAC and documents referred to or incorporated by reference therein, all claims against defendant must be dismissed.

## A.     The FAC Fails to Plausibly Allege a Contracts Clause Violation

The Contract Clause provides that "[n]o State shall pass any . . . Law . . . impairing the Obligation of Contracts."  While "phrased in absolute terms, the Supreme Court has not interpreted the Clause absolutely to prohibit the impairment of either private or government contracts." Tinnerello & Sons, Inc. v. Stonington, 141 F.3d 46, 52 (2d Cir. 1998) (citing U.S. Tr. Co. v. New Jersey, 431 U.S. 1, 21 (1977)); Sanitation and Recycling Indus., Inc. v. City of New York, 107 F.3d 985, 993 (2d Cir. 1997) ("Sanitation"). Rather, legislatures retain "broad power" to adopt generally applicable laws "without being concerned that private contracts will be impaired, or even destroyed, as a result."  U.S. Tr. Co., 431 U.S. at 22. The extent to which States may exercise police powers to the detriment of contracts is determined by applying the three-part test in Energy Reserves Grp., Inc. v. Kansas Power & Light Co., 459 U.S. 400 (1982) ("Energy Reserves"). See

Sullivan v. Nassau Cty. Interim Fin. Auth., 959 F.3d 54, 64 (2d Cir. 2020); Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362, 368 (2d Cir. 2006) ("Buffalo Teachers").

<blockquote>i.    The Ordinance Does Not Substantially Impair Plaintiffs' Contracts</blockquote>

The first—and threshold—inquiry is whether the law "has, in fact, operated as a substantial impairment of a contractual relationship." Energy Reserves, 459 U.S. at 411. Whether a law operates as a substantial impairment "depends upon 'the extent to which reasonable expectations under the contract have been disrupted.'" Sullivan, 959 F.3d at 64 (quoting Sanitation, 107 F.3d at 993). Such reasonableness depends on a number of factors, such as: (i) "the extent to which the challenged provision provides for 'gradual applicability or grace periods,'" id. (quoting Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 245 (1978)); and (ii) "the extent to which the law . . . prevents the party from safeguarding or reinstating his rights," Elmsford Apartment Assocs., LLC, 2020 U.S. Dist. LEXIS 115354 at *37.

Plaintiffs fail to plausibly allege that the Ordinance results in substantial impairment. First, there can be no substantial impairment where contracts are terminable at-will as these contracts do not provide a guaranteed revenue stream or protection from future regulation. See Lefrancois v. Rhode Island, 669 F. Supp 1204, 1215 (D.R.I. 1987) (assuming a substantial impairment "in the interest of expedient resolution of this controversy," but nonetheless finding "much force to defendant's contention" that the state law prohibiting a landfill from accepting out-of-state waste resulted in no substantial impairment as plaintiff's contract was terminable at-will). Here, despite plaintiffs' contentions that the Ordinance has impaired their "reasonably expected revenue streams," FAC ¶ 128, restaurants may terminate their contracts at-will.  This militates against a finding of substantial impairment because "the extent to which [plaintiffs'] reasonable expectations under the contract have been disrupted," is necessarily lower than contracts where

4

terms are fixed. Id.; cf. Melendez v. City of New York, 2021 U.S. App. LEXIS 32327 *1, *77–*84 (2d Cir. 2021) (law rendering personal guaranties of rent permanently unenforceable resulted in substantial impairment).

Second, there is no substantial impairment where the challenged law was "foreseeable as the type of law that would alter contract obligations." Energy Reserves, 459 U.S. at 416. While foreseeability arises "at the time of the execution of the contracts," id. at 415, and plaintiffs were not previously bound by the Ordinance, plaintiffs cannot reasonably maintain such regulation was entirely unforeseen. Significantly, plaintiffs admit that the TPP industry "is dynamic, competitive, and constantly evolving," FAC ¶ 33. Plaintiffs were also aware that future regulation was likely. Indeed, representatives from plaintiffs' companies attended a June 27, 2019 City Council Oversight Hearing entitled, "The Changing Market for Food Delivery," where commission caps were discussed. See Trotter Decl. Ex. A at 53–62 (Uber Eats), 62–137 (Grubhub). Moreover, plaintiffs have recognized that they operate in an evolving industry where regulation of commission rates is unsettled and developing.[2] Accordingly, contrary to plaintiffs' contentions, the Ordinance was not "wholly unexpected," further undermining any claims of substantial impairment. Sanitation, 107 F.3d at 993.

ii.    The City Had a Significant and Legitimate Public Interest in Enacting the Ordinance

---

[2] For example, in its April 7, 2014 IPO prospectus, Grubhub noted that it was subject to "evolving" laws governing the Internet and e-commerce, including those that "may cover . . . pricing" as well as other issues. Id. Ex. B at 22 [26/183]. Similarly, in a draft registration statement that DoorDash submitted to the SEC on February 13, 2020, DoorDash stated that "[r]egulatory and administrative bodies may enact new laws or promulgate new regulations that are adverse to our business . . . including . . . by attempting to regulate the commissions businesses like ours agree to with merchants." Id. Ex. C at 36 [40/266]. In its December 2020 IPO prospectus, DoorDash further noted that "[o]ur business is subject to a variety of U.S. and international laws and regulations, including those related to . . . pricing and commissions, many of which are unsettled and still developing," and acknowledged that commission caps could be "retained after the COVID-19 pandemic subsides." Id. Ex. D at 58–59 [72–73/282]. In its 2020 Annual SEC report, Uber Eats noted that "we may be subject to pricing regulations, as well as related litigation or regulatory inquires." Id. Ex. E at 42 [84/277]. These documents may appropriately be considered as they are publicly filed documents.

Since Plaintiffs failed to plausibly allege that there is no substantial impairment, this Court's inquiry should end without the need to address the remaining prongs. See Allied Structural Steel Co., 438 U.S. at 245.  However, if this Court were to find that plaintiffs plausibly alleged a substantial impairment, the second prong requires consideration of whether the government had a "significant and legitimate public purpose behind the regulation . . . such as the remedying of a broad and general social or economic problem." Energy Reserves, 459 U.S. at 411–12. "A legitimate public purpose is one 'aimed at remedying an important general social or economic problem rather than providing a benefit to special interests.'" Buffalo Teachers, 464 F.3d at 368 (quoting Sanitation, 107 F.3d at 993). As restaurants are critical to the economic and social vitality of the City, the Ordinance clearly meets this standard.

It is undisputed that the "restaurant industry is [] a vital source of employment and key contributor" to the City's economy as well as an "essential component of the City's identity, to New Yorkers and visitors alike." See Trotter Decl. Ex. G, at 4–5. It is also undisputed that between 2015 and 2016, prior to the COVID-19 pandemic, the number of independent restaurants in the City fell at a rate greater than the national average. Id. at 9. As evidenced by the measures purportedly taken by plaintiffs to assist restaurants, FAC ¶¶ 57–61, the onset of the pandemic exacerbated the economic hurdles faced by restaurants struggling to remain in business. Id. (committee report noting that as of July of 2021 five thousand City eateries had closed).

Moreover, the pre and post-pandemic onset decline in the restaurant industry coincided with an unbridled growth in use of TPPs to place online orders at local restaurants. Id. at 5 (committee report noting that online restaurant orders grew twenty three percent annually from 2013 to 2017). As noted by the City Council, the exclusive use of TPPs during the COVID-19 pandemic only highlighted the challenges faced by restaurants as TPPs become increasingly more

popular—accounting for even larger percentages of restaurants' business. Id. at 10. Significantly, despite increases in online orders, restaurants' profit margins nevertheless continued to shrink as each online order placed through a TPP, as opposed to in-person dining, is accompanied by a commission. In March of 2021, "among restaurant owners in New York whose off-premises business increased compared to pre-COVID levels," sixty-five percent "said higher off-premises sales made up less than 30 percent of their lost on-premises sales." Id.

Indeed, even before the pandemic, the effect of excessive commissions was apparent. See Trotter Decl. Ex. A at 153:10–18  (U.S. Small Business Administration ("SBA") representative testifying that "fees charged by food delivery apps are akin to predatory lending more often than not" and that "these fees prey on small business owners seeking to expand their restaurant's reach and add to the daily cost of doing business."). Faced with these troubling statistics, the City Council reasonably concluded that the Ordinance was necessary to aid struggling restaurants serving a vital role in the City as cornerstones of communities and engines of local economies.[3] As such, despite the fact that the Ordinance provides immediate benefits to restaurants, its primary purpose is to prevent the social and economic devastation communities would experience if employment opportunities in the restaurant industry decline as restaurants are forced to pay unreasonably high commissions on a rapidly increasing portion of their orders.[4]

While not disputing the existence of an economic emergency for restaurants, FAC ¶¶ 57–61, plaintiffs argue that the Ordinance  "engages in ill-conceived economic protectionism" for the benefit of restaurants alone. See, e.g., FAC ¶ 131. But, any implication that restaurants represent

---

[3] In 2019, the restaurant industry accounted for one in every twelve private sector employment positions, supporting approximately 317,800 jobs in total. Trotter Decl. Ex. G at 3–4.

[4] See Sanitation, 107 F.3d at 993 (public purpose inquiry "must be approached on a provision-by-provision basis" because "statutes aimed at solving broad societal problems may contain language whose only purpose is to benefit a small interest group.").

a special interest because they directly benefit from the Ordinance's commission caps is misplaced. Almost every legislative enactment will benefit some at the expense of others. Whether or not a law transfers burdens is not the applicable test for determining a public purpose; rather, the test is whether the law seeks to remedy "an important general social or economic problem." <u>Buffalo Teachers</u>, 464 F.3d at 368. That the Ordinance may provide immediate relief to restaurants does not detract from its primary purpose: preventing the social and economic problems that would follow if restaurants were forced to close, and, further, to promote the welfare of communities and local economies.

### iii. <u>The Ordinance is a Reasonable and Appropriate Means to Achieve the City's Significant and Legitimate Public Interest</u>

The final inquiry is "whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." <u>Energy Reserves</u>, 459 U.S. at 412 (quotes omitted); <u>Sullivan</u>, 959 F.3d at 64 (interpreting inquiry as "whether the means chosen to accomplish th[e] purpose are reasonable and necessary"); <u>see also</u> <u>Ass'n of Surrogates & Supreme Court Reporters v. New York</u>, 940 F.2d 766, 771 (2d Cir. 1991). "As is customary in reviewing economic and social regulation, . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a [] measure." <u>U.S. Tr. Co. v. New Jersey</u>, 431 U.S. 1, 22–23 (1977).

Plaintiffs maintain that the Ordinance is unreasonable as: (1) it is permanent and "does not respond to an on-going public-health threat," FAC ¶ 131, (2) the City has failed to proffer an explanation for its commission caps, <u>Id.</u> ¶ 13, (3) the City has failed to tether the Ordinance to a restaurant's demonstration of financial need, <u>Id.</u> ¶ 79, and (4) "other lawful governmental methods to aid restaurants" are available. <u>Id.</u> ¶ 135. Each of these arguments fails.

First, the permanent nature of the Ordinance has no bearing on its reasonableness as it promotes a significant and legitimate purpose. See Buffalo Teachers, 464 F.3d at 367; see also Sullivan, 959 F.3d at 59 (permanent impairment of contracts linked to a public purpose—addressing a fiscal emergency—deemed reasonable). Furthermore, whether the Ordinance is reasonable does not turn on whether it is designed to respond to an "emergency or temporary situation." Energy Reserves, 459 U.S. at 412.

Second, despite plaintiffs' contention that the cap percentages are unsupported and unreasonable, the caps are directly tied to data the City Council had regarding rates charged by TPPs prior to passage of the Ordinance. Specifically, Grubhub charged a thirty percent commission per order consisting of a twenty percent marketing commission and a ten percent delivery commission. Trotter Decl. Ex. G at 5–6. Uber Eats charged a thirty percent commission for orders delivered by Uber delivery workers and a fifteen percent commission for orders placed through Uber Eats but delivered by a restaurant's own worker.[5] Id. at 6. In testimony offered at the July 1, 2021 City Council hearing, DoorDash's Head of Government Relations stated that commissions ranged from fifteen to twenty percent per order.[6] Id. at Ex. H at 121:10–11. As such, contrary to plaintiffs' claims, the commission cap was grounded in and informed by the commissions TPPs were already charging. Furthermore, the Ordinance was preceded by temporary caps, which set the same commission caps, that were in place for over a year at the time of the Ordinance's passage. With knowledge that fee caps would not have a significantly detrimental effect on TPPs, it was reasonable for the City Council to permanently implement the same commission caps.

Third, that the Ordinance applies to all restaurants, regardless of financial need, does not render the Ordinance unreasonable. "[I]t does not matter that there are, or may be, individual cases

---

[5] Uber Eats did not provide the City Council with its marketing commission rates.
[6] DoorDash did not provide the City Council with its marketing commission rates.

of another aspect. [City Council] was entitled to deal with the general or typical situation." <u>Home Bldg. & Loan Asso. v. Blaisdell</u>, 290 U.S. 398, 446 (1934); <u>cf.</u> <u>Melendez</u>, 2021 U.S. App. LEXIS 32327 at *102 (law rendering personal guaranties of rent permanently unenforceable was unreasonable where, among other things, it was not conditioned on the guarantor's financial need and the City "point[ed] to nothing in the record to compel a conclusion that commercial landlords are better positioned financially than guarantors to absorb the economic blows of the pandemic on commercial real estate."). To the contrary, the record here is replete with evidence that plaintiffs are better positioned financially than restaurants. <u>See</u> Trotter Decl. Ex. G at 4-11.

Fourth, the fact that alternatives to the Ordinance may exist does not render the Ordinance unreasonable or unnecessary. <u>Buffalo Teachers</u>, 464 F.3d at 372 ("[W]e find no need to second-guess the wisdom of picking the wage freeze over other policy alternatives, especially those that appear more Draconian, such as further layoffs or elimination of essential services."); <u>see also</u> <u>Blaisdell</u>, 290 U.S. at 447–48 ("Whether the legislation is wise or unwise as a matter of policy is a question with which we are not concerned."); <u>Sal Tinnerello & Sons</u>, 141 F.3d at 54 ("[I]t is not the province of this Court to substitute its judgement for that of . . . a legislative body.").

Recently, notwithstanding the long-settled, highly deferential approach to evaluating legislative enactments impairing private contracts, <u>see, e.g.</u>, <u>DeBenedictis</u>, 480 U.S at 497 (so long as the government is not a contracting party, courts should "defer to legislative judgment as to the necessity and reasonableness of a particular measure"), a Second Circuit panel, in <u>Melendez v. City of New York</u>, for the first time implemented a sliding-scale approach linking the level of scrutiny applied at the third step of a Contracts Clause analysis to the severity of the impairment at the first step. 2021 U.S. App. LEXIS 32327 at *92. This newfound approach clashes with binding Supreme Court precedent. <u>See, e.g.</u>, <u>DeBenedictis</u>, 480 U.S. at 497. In <u>DeBenedictis</u>, the

Supreme Court assumed the challenged law effected a "total impairment" of valuable liability waivers in mining contracts, but did not vary its level of scrutiny at step three. 480 U.S. at 504–06. As such, this Court should conduct its analysis of step three utilizing the deferential standard set forth by the Supreme Court.

In any event, the Ordinance is distinguishable from the law at issue in <u>Melendez</u> and passes constitutional muster under the sliding-scale approach articulated therein. At issue in <u>Melendez</u> was a City law ("Guaranty Law") that rendered personal guaranties for commercial leases unenforceable if: (1) the tenant was forced to close or cease in-person services under certain executive orders responding to the COVID-19 pandemic; and (2) the tenant default triggering the guaranty arose between March 7, 2020 and June 30, 2021. 2021 U.S. App. LEXIS 32327 at *92. In assessing the degree of impairment, the <u>Melendez</u> court emphasized the permanent nature of the deprivation effected by the Guaranty Law as justification for heightening its scrutiny at step three. <u>Id.</u> However, the majority made clear that it was not holding that "a permanent impairment of contract can never be deemed reasonable or appropriate." <u>Id.</u> Rather, it held that "a permanent and complete impairment of contract, by contrast to a temporary and limited one, will weigh heavily against a finding of reasonableness." <u>Id.</u> (cites omitted). In reaching this conclusion, the Court distinguished <u>Sullivan</u>, 959 F.3d at 64, a case involving the permanent impairment of a contractual wage increase, stating that in <u>Sullivan</u>, "the employees continued to be paid for their services rendered, albeit at the frozen rates, and they remained free to seek better-paying employment elsewhere. Thus, the impairments, although permanent, do not weigh as heavily against the reasonableness as the Guaranty Law…[which], [i]nstead, [] forever denies the landlord the full guarantied amount" as provided for under the contract. <u>Id.</u> at *93. Here, the contractual impairment is far less substantial as: (1) unlike <u>Melendez</u>, plaintiffs' contracts with restaurants are

11

at-will and a commission reduction does not permanently deprive plaintiffs of a benefit of their

contracts; and (2) as in <u>Sullivan</u>, the Ordinance merely "reduces" the rates plaintiffs may charge—

it does not forever deny plaintiffs the ability to collect commissions. Accordingly, even if the

<u>Melendez</u> framework were to be applied, the absence of any comparable impairment entitles the

City to substantial deference as to the reasonableness and appropriateness of the Ordinance.

**B.      Plaintiffs' Regulatory Takings Claim Fails**

Plaintiffs argue that, to the extent their existing contracts with restaurants provide for a

commission rate of more than fifteen percent, the Ordinance constitutes an unconstitutional taking.

<u>See</u> FAC ¶148. Such allegations fail to plausibly allege a valid taking claim under the federal and

state constitutions. <u>See</u> <u>Heidel v. Hochul</u>, 2021 U.S. Dist. LEXIS 203572, *22 (S.D.N.Y. Oct. 21,

2021) ("The guarantee against Takings provided by the New York Constitution is generally treated

as coextensive to that of the U.S. Constitution.") (citing <u>Am. Econ. Ins. Co. v. State</u>, 30 N.Y.3d

136, 155 (2017)).

i.      <u>Plaintiffs' Contracts Do Not Give Rise to a Claim Under the Takings Clause</u>

In <u>Connolly v. Pension Benefit Guaranty Corp.</u>, 475 U.S. 211, 223-24 (1986), the

Supreme Court held that:

> If the regulatory statute is otherwise within the powers of Congress . . . its
> application may not be defeated by private contractual provisions. For the same
> reason, the fact that legislation disregards or destroys existing contractual rights
> does not always transform the regulation into an illegal taking . . . This is not to say
> that contractual rights are never property rights or that the Government may always
> take them for its own benefit without compensation. But here, the United States has
> taken nothing for its own use, and only has nullified a contractual provision limiting
> liability by imposing an additional obligation that is otherwise within the power of
> Congress to impose.

<u>See also</u> <u>Buffalo Teachers Fed'n v. Tobe</u>, 464 F.3d 362, 374 (2d Cir, 2006) ("Although the

Supreme Court has held that valid contracts constituted property under the Takings Clause this is

neither a blanket nor absolute rule and further it is a rule that has been called into question.") (cites and quotes omitted)). For the reasons set forth herein, <u>infra</u>, the Ordinance clearly constitutes a lawful exercise of the City's police powers. Moreover, as in <u>Connolly</u>, the City has taken nothing for its own use. Accordingly, plaintiffs' regulatory taking claim necessarily fails.

    ii.  <u>The FAC Fails to Establish a Regulatory Taking</u>

   Even if plaintiffs' contracts could support a takings claim, the claim nevertheless fails. Eschewing any "set formula" for judging regulatory takings claims, the Supreme Court articulated three guideposts for evaluating whether a regulation amounts to the functional equivalent of a physical appropriation: (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) the "character of the governmental action," in particular "whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.'" <u>Penn Central Transp. Co. v. New York City</u>, 438 U.S. 104, 124 (1978). Applying the <u>Penn Central</u> factors here, Plaintiffs have not plausibly alleged that the Ordinance inflicts "any deprivation significant enough to satisfy the heavy burden placed upon one alleging a regulatory taking." <u>Elmsford,</u> 2020 U.S. Dist. LEXIS 115354, at *27 <u>quoting</u> <u>DeBenedicitis</u>, 480 U.S. at 497.

   As to the first factor—the economic impact of the regulation—plaintiffs claim that the Ordinance "substantially impairs Plaintiffs' fundamental property rights in their contracts" as "[m]ost of Plaintiffs' contracts with restaurants include commission rates greater than what the Ordinance allows" thereby preventing "Plaintiffs from obtaining reasonable returns on their investments…" FAC ¶¶ 145-145. Such claims are insufficient to plausibly allege a taking. In considering the economic impact of a regulation, courts "compare the value that has been taken

from the property with the value that remains in the property." <u>DeBenedictis</u>, 480 U.S. at 497. But plaintiffs' threadbare claims of reduced profits—absent any discussion of what percentages are charged to how many restaurants—do not constitute specific allegations about the economic impact of the Ordinance. In any event, a "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking" as a matter of law. <u>Concrete Pipe & Prods. of Cal. v. Constr. Laborers Pensions Trust for S. Cal.</u>, 508 U.S. 602, 645 (1993); <u>MHC Fin. L.P. v. City of San Rafael</u>, 714 F.3d 1118, 1127 (9th Cir. 2013) (eighty-one percent diminution in value of the plaintiff's mobile home park was not sufficient to show a taking); <u>CCA Assocs. v. United States</u>, 667 F.3d 1239, 1246 (Fed. Cir. 2011) (noting that the court was "aware of no case in which a court has found a taking where diminution in value was less than 50 percent").

Additionally, plaintiffs fail to plausibly allege that the Ordinance "effectively prevent[s] [Plaintiffs] from making any economic use of [their property]." <u>Elmsford</u>, 2020 U.S. Dist. LEXIS 115354, at *27 <u>quoting</u> <u>Sherman v. Town of Chester</u>, 752 F.3d 554, 565 (2d Cir. 2014). Significantly, plaintiffs do not—and cannot—claim that, following implementation of the commission cap, their contracts are valueless. Even if a fifteen percent commission cap reduces TPP profit margins, plaintiffs have the ability to offset any such purported loss by increasing consumer fees and/or reducing the scope of services. FAC ¶ 5.[7] Moreover, plaintiffs acknowledge that the contracts they enter into are at-will. <u>See, e.g.</u>, FAC. ¶ 45. The absence of a fixed contractual period undercuts any claims of economic impact the Ordinance may have on plaintiffs. For instance, in <u>Chang v. United States</u>, no taking was found where sanctions imposed on Libya caused

---

[7] The FAC claims, absent any support, that "basic economic principles dictate" that if fees are increased, "order amounts and order volume will decrease." FAC. ¶ 5. Such a speculative claim cannot save plaintiffs' regulatory taking claim from dismissal. <u>Twombly</u>, 550 U.S. at 555 (a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."). Notwithstanding, even if plaintiffs had endeavored to support this claim, plaintiffs still cannot demonstrate that the commission caps deprive them of the ability to make any economically viable use of their contracts.

petroleum engineers a complete loss of their employment contracts with a Libyan company that, like plaintiffs' contracts, were terminable at-will. 859 F.2d 893, 896 (Fed. Cir. 1988) ("Furthermore, the contracts were not for a fixed period, and each contract could be terminated at the option of the employee or upon the failure or inability to maintain the necessary Libyan work or residence visas."); see also Taylor v. United States, 959 F.3d 1081, 1087 (Fed. Cir. 2020) (plaintiffs "have not identified any takings law that treats as a protected form of 'property' a person's interest in the benefits of a contract that the counterparty may freely terminate").[8]

As to the second factor, the FAC does not plausibly allege interference with distinct investment-backed expectations. A reasonable investment-backed expectation "must be more than a unilateral expectation or an abstract need." Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005 (1984). Plaintiffs allege that, despite the at-will nature of their contracts, "restaurants choose to maintain these contracts—including the percentage commission structures contained therein—typically for several years…" FAC ¶ 45. However, plaintiffs' hope that restaurants will remain in contracts for years despite their freedom to leave at any time, does not constitute a reasonable investment-backed expectation. Rather, it is the very type of unilateral expectation repeatedly deemed insufficient for purposes of a takings claim. See Martin v. Town of Simsbury, 505 F. Supp. 3d 116, 132 (2d Cir. 2020) (citing Ruckelshaus, 467 U.S. at 1005). Finally, as to the third prong—the character of the regulation—the Ordinance does not unfairly single out plaintiffs but rather "affects property interests through [a] public program adjusting the benefits and burdens of economic life to promote the common good." 1256 Hertel Avenue Assocs., LLC v. Calloway,

---

[8] At best, plaintiffs allege speculative damages as to future profits, which "do not form the basis for a successful Takings Clause Claim." Sanitation, 928 F. Supp. at 417 (citing Chang, 859 F.2d at 898)); see also 335-7 LLC v. City of New York, 524 F. Supp. 3d 316, 332 (S.D.N.Y. 2021) ("However, the Second Circuit has 'rejected the notion that loss of profit—much less loss of a reasonable return—alone could constitute a taking.'")(citing Park Ave. Tower Assocs. v. City of New York, 746 F.2d 135, 139–40 (2d Cir. 1984)).

761 F.3d 252, 264 (2d Cir. 2014) (internal quotation marks omitted). The Ordinance's explicit purpose is to ameliorate harm to restaurants—which for the reasons set forth herein, supra, serve a significant local purpose—in the form of excessive commission rates charged by TPPs with disproportionate leverage. Moreover, the Ordinance is a broadly applicable law governing the terms and conditions of all contracts between TPPs and restaurants in the City; its generality weighs against a taking. See Penn Central, 438 U.S. at 132 (rejecting takings challenge where the "law embodies a comprehensive plan," and does not impermissibly single out selected parcels).

## C.   The Enactment of the Ordinance Does Not Exceed the City's Police Power

In general, the power of local governments to enact laws is derived from the State Legislature. See DJL Rest. Corp. v. City of New York, 96 N.Y.2d 91, 94 (2001); People v. DeJesus, 54 N.Y.2d 465, 468 (1981). N.Y. Const. art. IX, § 2(c)(i) provides local governments with the "power to adopt and amend local laws not inconsistent with the provisions of this constitution or any general law relating to its property, affairs or government . . . ." In addition, the New York Constitution permits local governments "to adopt and amend local laws not inconsistent with the provisions of this constitution or any general law relating to" ten enumerated subject matter areas, including "government, protection, order, conduct, safety, health and well-being of persons or property therein . . . ." Art. IX, § 2(c)(ii)(10). This latter clause amounts to a broad conveyance of police powers.

To implement Art. IX, the Legislature enacted the Municipal Home Rule Law ("MHRL"), which gives local governments power to adopt and amend local laws—to the extent they are not inconsistent with provisions of the New York Constitution or any general law—for "[t]he government, protection, order, conduct, safety, health and well-being of persons or property therein. This provision shall include but not be limited to the power to adopt local laws providing

for the regulation or licensing of occupations or businesses . . . ." MHRL § 10(1)(ii)(a)(12); <u>DJL Rest. Corp.</u>, 96 N.Y.2d at 94. In addition, the General City Law ("GCL") specifically grants cities with the power to "preserve and care for the safety, health, comfort and general welfare of the inhabitants of the city and visitors thereto; and for any of said purposes to regulate and license occupations and businesses." GCL § 20(13). GCL § 21, in turn, defines the "general welfare" that may be protected and preserved to include "the promotion, creation, development or expansion of business, commerce, industry or job opportunities." Accordingly, the City is vested with broad police power to protect the public welfare, which necessarily includes the City's authority to enact local laws to protect the City's jobs, economy, and residents.

Plaintiffs claim that the Ordinance exceeds the City's police power as it seeks to advance the narrow interests of certain restaurants at the expense of others. FAC. ¶ 160. However, a court will uphold a law as a valid exercise of the City's police power "[i]f such laws have substantial relation to matters over which legislative power is vested in the local legislative body of the city and are not inconsistent with laws of the state . . . ." <u>People v. Lewis</u>, 295 N.Y. 42, 49 (1945). Moreover, the standard is a deferential one as "legislative enactments in furtherance of the police power of a municipality are presumed to be constitutional and . . . judicially unassailable if they are not arbitrary and bear a rational relationship to the end sought to be achieved." <u>Big Apple Food Vendors' Ass'n v. City of New York</u>, 168 Misc. 2d 483, 488 (Sup. Ct. N.Y. Cty. 1995), <u>aff'd</u> 228 A.D.2d 282 (1st Dep't 1996) ("there is a further presumption that the Legislature has investigated and found facts necessary to support the legislation as well as the existence of a situation showing or indicating its need or desirability").[9]

---

[9] <u>See also</u> <u>Casciani v. Nesbitt</u>, 659 F. Supp. 2d 427, 436 (W.D.N.Y. 2009) (court must uphold aircraft ordinance enacted by town under the police power as long as "its wisdom is at least fairly debatable and it bears a rational relationship to a permissible state objective").

As discussed herein, supra, the Ordinance has a legitimate objective and is reasonably and substantially related to that objective. Based on the legislative record before it, the City Council determined that capping commission rates was necessary to protect restaurants and, by extension, the communities they serve. See Trotter Decl. Exs. A, F, G, H. Additionally, the City Council heard testimony that due to the increasingly widespread use of TPPs, restaurants are forced to utilize plaintiffs' platforms to stay relevant, noticeable, and accessible despite the fact that TPP commission rates were severely impacting restaurants' profits. Id. Ex. A at 151:17–25, 152:2–3. It was clearly rational for the City Council to conclude that the public benefits more from restaurants' long-term survival than it does from using delivery services offered under an economic model that may put restaurants out of business. City Council may also rationally conclude that the general welfare ultimately suffers when TPPs like plaintiffs dominate the lion's share of the market and, absent fear of meaningful competition, charge excessive commissions. For these reasons, the City Council may rationally conclude that price regulation is an appropriate response, even if the shifting of additional costs to the consumers who use these services results in some reduction in the demand for them.

### D.      The FAC Fails to Plausibly Allege a Procedural Due Process Claim

"The standard for determining whether a state price-control regulation is constitutional under the Due Process Clause is well established: 'Price control is unconstitutional . . . if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt . . . .'" Pennell v. City of San Jose, 485 U.S. 1, 11 (1988) (quoting Permian Basin Area Rate Cases, 390 U.S. 747, 769–70 (1968)).[10]

---

[10] "'New York courts have interpreted the due-process guarantees of the New York Constitution and the United States Constitution to be coextensive…'" Hernandez v. United States, 939 F.3d 191, 205 (2d Cir. 2019) (quoting Oneida Indian Nation of N.Y. v. Madison Cty., 665 F.3d 408, 427 n.13 (2d Cir. 2011)).

Plaintiffs allege that the Ordinance "lacks a reasonable and nondiscriminatory legislative purpose." FAC ¶ 173. However, for the reasons set forth herein, supra, this claim lacks merit. Plaintiffs' allegations that the Ordinance is confiscatory are similarly without merit. FAC ¶ 175. As with the FAC's takings claim, plaintiffs do not indicate what reduction in commissions, if any, the Ordinance caused and the FAC is devoid of any facts indicating how many of plaintiffs' contracts set commission rates over fifteen percent. In the absence of this information, plaintiffs fail to plausibly allege that the Ordinance is confiscatory. Plaintiffs also maintain that commission caps prohibit them from charging "reasonable and competitive" commissions for their services. Id. at ¶ 175. However, any purported loss in profits plaintiffs may incur as a result of compliance with the Ordinance can, as plaintiffs freely acknowledge, be offset with alternative income streams; namely, the fees plaintiffs charge users of their platforms. Plaintiffs' ability to recoup their losses in this manner is fatal to their due process claim. See, e.g., TCF Nat. Bank v. Bernanke, 643 F.3d 1158, 1164 (8th Cir. 2001) (law limiting how much financial institutions could charge for processing debit card transaction did not violate due process and was not confiscatory as financial institutions were free to offset any losses by charging customers for use of debit card services). Finally, plaintiffs acknowledge that commission rates of fifteen percent or less were in fact offered prior to the enactment of any commission cap, undercutting any claims that such a rate is confiscatory. FAC ¶ 21. Accordingly, plaintiffs fail to state a due process claim.

**E.    The FAC Fails to Plausibly Allege an Equal Protection Violation**

As plaintiffs do not allege that they are members of a protected class or that the Ordinance implicates a fundamental right, the Ordinance is constitutional if it satisfies the highly deferential rational basis standard of review. See Winston v. City of Syracuse, 887 F.3d 553, 560 (2018).  "In areas of social and economic policy, a statutory classification that neither proceeds along suspect

lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993). Further, "rational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." Heller v. Doe, 509 U.S. 312, 319 (1993) (cites omitted).[11]

Plaintiffs claim that the Ordinance makes an arbitrary classification by capping the rate plaintiffs can charge for their entire suite of services while failing to regulate what other companies—that do not provide delivery services—can charge restaurants for services such as marketing, technology, product development, customer support, and payment processing. See FAC ¶ 188. Plaintiffs allege that they are similarly situated to other businesses such as raw ingredient suppliers, equipment suppliers, point-of-sale system vendors, online reservation platforms, or other advertising providers because they offer the same services and transact with restaurants. See id. ¶ 189. To be similarly situated for the purposes of an equal protection analysis, businesses must be similar "in all material respects." Shumway v. UPS, 118 F.3d 60, 64 (1997). Even where other businesses may offer similar services as plaintiffs, the FAC fails to allege that these other businesses servicing restaurants are similarly organized in that they utilize a commission-based structure that takes a fixed percentage of each online order a restaurant receives nor that other restaurant-related industries can shift costs directly to consumers. Even if they are similarly situated, courts have consistently upheld regulations aimed at protecting a particular industry. See Sensational Smiles, LLC v. Mullen, 793 F.3d 281, 285–286 (2d Cir. 2015) (upholding a state rule restricting the use of certain teeth-whitening procedures to licensed dentists, over challenges that the regulation was "nothing but naked economic protectionism" of licensed

---

[11] The same standards apply to equal protection claims under the federal and state constitutions. See D'Amico v. Crosson, 93 N.Y.2d 29, 31–32 (1999).

dentists, because "economic favoritism is rational for purposes of our review of state action under the Fourteenth Amendment."); Fitzgerald v. Racing Ass'n of Cent. Iowa, 539 U.S. 103, 110 (2003) (finding that differential tax rates within Iowa did not violate the Equal Protection Clause because supporting the riverboat industry was a plausible policy purpose).

Plaintiffs also claim that an exemption for TPPs serving fewer than 20 restaurants in the Temporary Ordinance violates equal protection principles because the City has not provided any basis for this distinction other than animus against larger, out-of-state businesses. See FAC ¶ 190. For the reasons above, this argument fails. Specifically, beyond a fleeting comment that small TPPs "provide similar services as the larger platforms," the FAC is devoid of discussion of how TPPs that serve fewer than 20 restaurants are similarly situated to plaintiffs who are collectively responsible for ninety-nine percent of all food delivery sales in the City of New York. Id. Nor do plaintiffs claim that TPPs serving fewer than 20 restaurants utilize similar commission-based pricing such that application of the temporary rule would be appropriate. In any event, even if the FAC plausibly alleged that plaintiffs were similarly situated to TPPs serving fewer than 20 restaurants, the City has provided a rational basis for this distinction: Large TPPs like plaintiffs control the lion's share of the City food delivery market and, as such, possess disproportionate leverage over restaurants when it comes to charging excessive commission rates.

Finally, plaintiffs' contention that the Ordinance will not achieve its stated purposes is irrelevant because rational basis review for an equal protection claim does not require that the government's action actually advance its stated purposes, but merely that the government could have had a legitimate reason for acting as it did. See Wright v. Incline Vill. Gen. Improvement Dist., 665 F.3d 1128, 1141 (9th Cir. 2011). In fact, fee cap percentages need not have been determined based on statistical calculations to survive rational basis review. "If the classification

has some 'reasonable basis,' it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality." Dandridge v. Williams, 390 U.S. 471, 485 (1970). Here, the fifteen percent fee cap on delivery and five percent cap on marketing were chosen, among other reasons, because they were consistent with what TPPs had previously charged restaurants and would prioritize delivery and access to food. Trotter Decl. Ex. G at 5–6, Ex. H at 121:10–11. Because there is a reasonable basis for the fee caps, plaintiffs' equal protection claim must be dismissed.

**F.      The FAC Fails to Plausibly Allege a Dormant Commerce Clause Violation**

Plaintiffs allege that the Ordinance discriminates against and imposes a substantial burden on interstate commerce. Plaintiffs' Commerce Clause claim is predicated on the exemption from fee caps for third-party delivery companies serving 20 or fewer restaurants, which, as discussed above, was included only in the prior, temporary versions of the Ordinance and is not part of the final law. See FAC ¶ 204–05. Thus, to the extent that plaintiffs allege that the Permanent Ordinance violates the Commerce Clause, the claim fails.

As applied to the temporary law, the claim also fails. The "dormant" Commerce Clause limits a state's power to take actions impacting interstate commerce. See Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 216 (2d Cir. 2004). "The negative or dormant implication of the Commerce Clause prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace." GMC v. Tracy, 519 U.S. 278, 287 (1997) (cites omitted).

The FAC argues that the temporary law creates a discriminatory market favoring local businesses as, based on information and belief, plaintiffs are headquartered outside New York while smaller, exempt TPPs are local. See FAC ¶ 204–05. This claim is speculative as the FAC is

devoid of any facts corroborating plaintiffs' claim that exempt TPPs are overwhelmingly headquartered in New York. In any event, as with plaintiffs' equal protection claim, the FAC fails the threshold inquiry in a dormant Commerce Clause analysis: namely, whether the allegedly competing entities are similarly situated. See GMC, 519 U.S. at 299. Since "any notion of discrimination assumes a comparison of substantially similar entities," if entities offer different products or serve different markets "and would continue to do so even if the supposedly discriminatory burden were removed, . . . eliminating the tax or other regulatory differential would not serve the dormant Commerce Clause's fundamental objective of preserving a national market for competition undisturbed by preferential advantages conferred by a State." Id.  As such, for the reasons set forth herein, the FAC's failure to plausibly allege that plaintiffs are similarly situated to exempt TPPs is fatal to this claim.

Moreover, even if plaintiffs are similarly situated to exempt TPPs, the claim still fails. To establish a violation of the dormant Commerce Clause, plaintiffs must plausibly allege that the law at issue: (1) "has the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question," (2) "clearly discriminates against interstate commerce in favor of intrastate commerce," or (3) "imposes a burden on interstate commerce incommensurate with the local benefits secured." Jones v. Schneiderman, 974 F. Supp. 2d 322, 349 (S.D.N.Y. 2013) (quotes and cites omitted).

With regard to the extraterritorial prong, the critical inquiry is "whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." Healy v. Beer Inst., 491 U.S. 324, 336 (1989). In Healy, the Supreme Court struck down a Connecticut beer-pricing statute because its interaction with Massachusetts law had the practical effect of setting

beer prices in Massachusetts. Id. at 338. Here, there is no such parallel. Indeed, plaintiffs do not allege that the temporary law affects their businesses outside the City in any way.

As to the second prong, a law or regulation may discriminate against interstate commerce "(1) by discriminating against interstate commerce on its face . . . (2) by harboring a discriminatory purpose . . . or (3) by discriminating in effect." Town of Southold v. Town of E. Hampton, 477 F.3d 38, 48 (2d Cir. 2007).[12] As to the first consideration, a regulation is "virtually per se invalid" if it treats in-state and out-of-state economics differently in order to favor in-state parties at the expense of out-of-state counterparts. Or. Waste Sys. v. Dep't of Envtl. Quality, 511 U.S. 93, 99 (1994); see also United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth., 261 F.3d 245, 255–56 (2d Cir. 2001). Here, the temporary law does not facially discriminate against interstate commerce because it does not set different criteria for in- and out-of-state platforms. Plaintiffs' argument that the temporary order is a per se violation of the Commerce Clause because it shifts the costs of regulation onto out-of-state industry actors fails because regardless of whether TPPs are incorporated and headquartered in the City, they are all subject to the same fee caps.

The FAC similarly fails to plausibly allege a discriminatory purpose. In attempting to demonstrate discriminatory intent, the FAC relies upon statements critical of TPPs made by a single City Council member, who was only one of three Council Members who sponsored the bill. As set forth herein, supra, such reliance fails to account for ample evidence of the law's policy objectives elsewhere in the legislative record, and nothing in the record reflects any discriminatory purpose. See Town of Southhold, 477 F.3d at 48 (2d Cir. 2007) (reviewing entire legislative record when determining if a law was motivated by discriminatory animus or by a legitimate public

---

[12] It should be noted that the FAC makes conclusory allegations that the temporary law discriminates against interstate commerce on its face, in purpose, and in effect, but provides no factual allegations to support these claims.

purpose). Additionally, that the Ordinance is indifferent to the location of TPPs illustrates no discriminatory animus against out of City interests, in prior, temporary versions of the Ordinance or the permanent law. Id. at 48–49.

Finally, the FAC fails to plausibly allege that the temporary law discriminates against interstate commerce in practical effect. Significantly, plaintiffs do not provide a factual basis for their claim that the temporary law regulates more out-of-state than in-state entities. Even if out-of-state companies were more likely to be affected by the temporary order, courts have rejected the contention that a disproportionate impact on out-of-state entities renders a law discriminatory when nothing in the law burdens out-of-state parties greater than it does similarly situated local parties. See, e.g., CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69 (1987);[13] see also Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 159 (2d Cir. 2005).

As to the third prong, a law "will be upheld unless the burden imposed on such commerce is clearly excessive in relation to putative local benefits." Pike v. Bruce Church, Inc. 397 U.S. 137, 142 (1970). Plaintiffs' claim that the temporary law's burden on interstate commerce outweighs its local benefits is without merit. As discussed above, plaintiffs' claim that the temporary law results in regulation of more out-of-state than in-state entities is entirely speculative. In any event, even if this is the case, the temporary order applies equally to all TPPs. As such, its "burden" is on commerce, not interstate commerce, and there is no Commerce Clause violation. See Norfolk Southern Corp. v. Oberly, 822 F.2d 388, 406 (3d Cir. 1987).[14]

---

[13] In CTS, the Court found that an Indiana takeover act that applied only to corporations chartered in Indiana with a threshold number of Indiana shares or shareholders did not discriminate based on residency of offerors, even though the law would mostly apply to out-of-state entities, because the act did not impose a greater burden on out-of-state offerors than similarly situated in-state entities. 481 U.S. at 88.

[14] To the extent the temporary law creates an incidental effect on interstate commerce, the FAC fails to plausibly allege that it is "clearly excessive" in comparison to the putative local benefits derived from the order. An incidental burden on interstate commerce may be tolerated "depend[ing] on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." Pike, 397 U.S. at 142. The local benefits of

## **CONCLUSION**

For the reasons set forth above, plaintiffs DoorDash et al., fail to state a cause of action and the Court should dismiss this action in its entirety, together with such other and further relief as the Court deems just and proper.

Dated: New York, New York
        March 7, 2022

                                       HON. SYLVIA HINDS-RADIX
                                       Corporation Counsel of the City of New York
                                       Attorney for Defendant
                                       100 Church Street
                                       New York, New York 10007

                                       /s/

                                       Darren Trotter
                                       Kevin Collins
                                       Assistant Corporation Counsels

---

the temporary order, including supporting City restaurants as well as ensuring access to food and promoting social distancing during the peak of the COVID-19 pandemic, are legitimate and important local interests. Finally, plaintiffs have not shown that the other means they suggest—loan programs, tax breaks, or rental assistance—would actually have advanced the significant interest of curbing excessive delivery fees. See FAC ¶ 208.