UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x
                                :

DOORDASH, INC., GRUBHUB INC., and
PORTIER, LLC,
                                :

                    Plaintiffs,      :    No. 21-cv-7564 (GHW)

                                :

       -against-               :

CITY OF NEW YORK,
                                :

                   Defendant.     :

--------------------------------------------------------x

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

---

GIBSON, DUNN & CRUTCHER LLP
Anne Champion
Esther Lifshitz
Andrew C. Bernstein
200 Park Avenue, 47th Floor
New York, NY 10166-0193
Telephone:  (212) 351-4000
AChampion@gibsondunn.com

Joshua S. Lipshutz (*pro hac vice*)
1050 Connecticut Ave. NW
Washington, DC 20036-5306
Telephone:  (202) 955-8500
JLipshutz@gibsondunn.com

*Attorneys for Plaintiffs DoorDash, Inc.,
Grubhub Inc., and Portier, LLC*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND......................................................................................................1

LEGAL STANDARD ...................................................................................................................4

ARGUMENT...................................................................................................................................4

    I.    Plaintiffs State a Claim for Violation of the Contract Clause ...................................4

        A.    The Ordinance Substantially Impairs Plaintiffs' Contracts ..........................5

        B.    The Ordinance Does Not Appropriately or Reasonably Advance a
            Significant and Legitimate Public Purpose......................................................8

            1.    The City Cannot Show a Significant and Legitimate Public
                Purpose .........................................................................................................8

            2.    The City Cannot Show That a Permanent Price Cap on TPPs
                Is a Reasonable and Appropriate Means to Advance Its
                Purpose .......................................................................................................11

    II.    Plaintiffs Have Adequately Alleged an Uncompensated Taking of Private
        Property......................................................................................................................14

    III.    The City Enacted the Ordinance in Excess of Limitations on Its Police
        Power ........................................................................................................................17

    IV.    The Ordinance Is Arbitrary and Confiscatory in Violation of Due Process............21

    V.    The Ordinance Discriminates Against Plaintiffs in Violation of Equal
        Protection .................................................................................................................22

    VI.    Plaintiffs State a Claim for Violation of the Dormant Commerce Clause .............23

CONCLUSION.............................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Albany Area Builders Ass'n v. Town of Guilderland,*
    141 A.D.2d 293 (N.Y. App. Div. 1988) .................................................................17

*Allied Structural Steel Co. v. Spannaus,*
    438 U.S. 234 (1978)..........................................................................................*passim*

*Am. Booksellers Found. v. Dean,*
    342 F.3d 96 (2d Cir. 2003)............................................................................23–24

*Appolo Fuels, Inc. v. United States,*
    381 F.3d 1338 (Fed. Cir. 2004).........................................................................15

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..............................................................................................4

*Ass'n of Equip. Mfrs. v. Burgum,*
    932 F.3d 727 (8th Cir. 2019) ....................................................................8–11, 19

*Bacchus Imports, Ltd. v. Dias,*
    468 U.S. 263 (1984)............................................................................................24

*Bertoldi v. State of New York,*
    275 A.D.2d 227 (N.Y. App. Div. 2000) ...........................................................22

*Big Apple Food Vendors' Ass'n v. City of New York,*
    168 Misc. 2d 483 (Sup. Ct. N.Y. Cnty. 1995) .................................................18

*Brown-Forman Distillers Corp. v. N.Y.S. Liquor Auth.,*
    476 U.S. 573 (1986)............................................................................................24

*Buffalo Tchrs. Fed'n v. Tobe,*
    464 F.3d 362 (2d Cir. 2006).......................................................................5, 8, 11, 15

*C&A Carbone, Inc. v. Town of Clarkstown,*
    511 U.S. 383 (1994)............................................................................................24

*Casciani v. Nesbitt,*
    659 F. Supp. 2d 427 (W.D.N.Y. 2009) .............................................................18

*CCA Assocs. v. United States,*
    667 F.3d 1239 (Fed. Cir. 2011).........................................................................15

*Cedar Point Nursery v. Hassid,*
    141 S. Ct. 2063 (2021)........................................................................................15

## TABLE OF AUTHORITIES
### (continued)

Page

*Cienega Gardens v. United States*,
  331 F.3d 1319 (Fed. Cir. 2003)........................................................................17

*Cmty. Hous. Improvement Program v. City of New York*,
  492 F. Supp. 3d 33 (E.D.N.Y. 2020) ..........................................................15–16

*Consol. Edison Co. of New York v. Pataki*,
  117 F. Supp. 2d 257 (N.D.N.Y. 2000), *aff'd on other grounds*,
  292 F.3d 338 (2d Cir. 2002)............................................................................23

*Donohue v. Mangano*,
  886 F. Supp. 2d 126 (E.D.N.Y. 2012) ...............................................................7

*Donohue v. Paterson*,
  715 F. Supp. 2d 306 (N.D.N.Y. 2010) ......................................................10, 12

*DoorDash, Inc. v. City of San Francisco*,
  2022 WL 867254 (N.D. Cal. Mar. 23, 2022)..............................................*passim*

*Elmsford Apartment Assocs., LLC v. Cuomo*,
  2020 WL 3498456 (S.D.N.Y. June 29, 2020) ...................................................15

*Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*,
  459 U.S. 400 (1983)........................................................................................4, 6

*Fed. Power Comm'n v. Nat. Gas Pipeline Co.*,
  315 U.S. 575 (1942)..........................................................................................21

*Good Humor Corp. v. City of New York*,
  290 N.Y. 312 (1943) ...............................................................................17–18, 21

*Granholm v. Heald*,
  544 U.S. 460 (2005)....................................................................................24–25

*Great Atl. & Pac. Tea Co. v. Town of E. Hampton*,
  997 F. Supp. 340 (E.D.N.Y. 1998) ..............................................................18, 20

*Hawaii Hous. Auth. v. Midkiff*,
  467 U.S. 229 (1984)..........................................................................................17

*Home Bldg. & Loan Ass'n v. Blaisdell*,
  290 U.S. 398 (1934)..........................................................................................12

## TABLE OF AUTHORITIES
### (continued)

Page

*HRPT Props. Tr. v. Lingle*,
715 F. Supp. 2d 1115 (D. Haw. 2010) ....................................................................9

*Keiler v. Harlequin Enters., Ltd.*,
751 F.3d 64 (2d Cir. 2014).....................................................................................4

*Lefrancois v. Rhode Island*,
669 F. Supp. 1204 (D.R.I. 1987) ...........................................................................7

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005)..........................................................................................16–17

*Littlejohn v. City of New York*,
795 F.3d 297 (2d Cir. 2015)...................................................................................4

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) ............................................................................................14

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992) ..........................................................................................16

*Lynch v. United States*,
292 U.S. 571 (1934)............................................................................................14

*Maine v. Taylor*,
477 U.S. 131 (1986).............................................................................................24

*Melendez v. City of New York*,
16 F.4th 992 (2d Cir. 2021) .......................................................................*passim*

*Metro. Life Ins. Co. v. Ward*,
470 U.S. 869 (1985)............................................................................................18

*MHC Fin. Ltd. P'ship v. City of San Rafael*,
714 F.3d 1118 (9th Cir. 2013) .............................................................................15

*Moskowitz v. Jenkins*,
94 N.E. 1065 (N.Y. 1911)....................................................................................19

*N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*,
669 F.3d 374 (3d Cir. 2012).................................................................................5

*N.Y.S. Ass'n of Cntys. v. Axelrod*,
78 N.Y.2d 158 (1991) ..........................................................................................19

**TABLE OF AUTHORITIES**
(continued)

Page

*N.Y.S. Land Tit. Ass'n, Inc. v. N.Y.S. Dep't of Fin. Servs.*,
    169 A.D.3d 18 (N.Y. App. Div. 2019) ..................................................................20

*Nat'l Wildlife Fed'n v. ICC*,
    850 F.2d 694 (D.C. Cir. 1988) ..........................................................................21

*Palazzolo v. Rhode Island*,
    533 U.S. 606 (2001) ...............................................................................14, 16

*Park Ave. Tower Assocs. v. City of New York*,
    746 F.2d 135 (2d Cir. 1984) ...........................................................................16

*Penn Central Trans. Co. v. City of New York*,
    438 U.S. 104 (1978) ..............................................................................15–17

*Pennell v. City of San Jose*,
    485 U.S. 1 (1988) ....................................................................................21

*People v. Cohen*,
    5 N.E.2d 835 (N.Y. 1936) ........................................................................18, 21

*Petworth Holdings, LLC v. Bowser*,
    308 F. Supp. 3d 347 (D.D.C. 2018) ....................................................................16

*Pulte Home Corp. v. Montgomery Cty.*,
    909 F.3d 685 (4th Cir. 2018) ..........................................................................15

*Romer v. Evans*,
    517 U.S. 620 (1996) ..................................................................................22

*Ross v. City of Berkeley*,
    655 F. Supp. 820 (N.D. Cal. 1987) .....................................................................7

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984) ..................................................................................14

*Sanitation & Recycling Indus., Inc. v. City of New York*,
    107 F.3d 985 (2d Cir. 1997) ............................................................................7

*Selevan v. N.Y. Thruway Auth.*,
    584 F.3d 82 (2d Cir. 2009) ........................................................................24–25

*Sensational Smiles, LLC v. Mullen*,
    793 F.3d 281 (2d Cir. 2015) .......................................................................23–24

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Sherman v. Town of Chester*,
   752 F.3d 554 (2d Cir. 2014)............................................................15

*Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v.*
   *Morgan Stanley Inv. Mgmt. Inc.*,
   712 F.3d 705 (2d Cir. 2013)..............................................................4

*Sullivan v. Nassau Cnty. Interim Fin. Auth.*,
   959 F.3d 54 (2d Cir. 2020)................................................................6

*Tri-M Grp., LLC v. Sharp*,
   638 F.3d 406 (3d Cir. 2011)............................................................25

*U.S. Dep't of Agric. v. Moreno*,
   413 U.S. 528 (1973).......................................................................23

*United Healthcare Ins. Co. v. Davis*,
   602 F.3d 618 (5th Cir. 2010) ......................................................7, 16

*Windsor v. United States*,
   699 F.3d 169 (2d Cir. 2012)...........................................................21

*Winston v. City of Syracuse*,
   887 F.3d 553 (2d Cir. 2018)...........................................................21

*Wolff v. McDonnell*,
   418 U.S. 539 (1974).......................................................................21

**STATUTES**

N.Y. Mun. Home Rule Law § 10.....................................................17

**RULES**

Fed. R. Civ. P. 15(a)(2)...................................................................25

**CONSTITUTIONAL PROVISIONS**

N.Y. Const. art. IX, § 2(c)(ii)(10)...................................................17

## PRELIMINARY STATEMENT

In May 2020, New York City capped the prices that Third-Party Platforms ("TPPs") like Plaintiffs could charge restaurants for their services, including the facilitation of ordering, delivery, and marketing services.  The City claimed that COVID-19 dining restrictions compelled this unprecedented price control, which forced Plaintiffs to operate at a loss and subsidize restaurants during the pandemic.  The law was set to expire when these restrictions lifted.  But when that happened, the City made the price caps *permanent* and divorced from any COVID-19 pretext.

The price caps substantially interfere with thousands of Plaintiffs' contracts with restaurants, permanently depriving Plaintiffs of payments they are contractually owed and expected to receive.  The Second Circuit recently allowed a Contract Clause claim to proceed in similar circumstances in *Melendez v. City of New York*, 16 F.4th 992, 1047 (2d Cir. 2021).  There, the City sought to aid one group by extinguishing another group's contractual right to payment, offering similar justifications for the law as it does here.  But the court allowed plaintiffs to pursue their claim that a law that provided financial relief to some by destroying the contractual expectations of others was not a reasonable and appropriate means to advance public welfare.  The same holds true here.  Plaintiffs' detailed 216-paragraph complaint more than sufficiently states claims under the Contract, Takings, Due Process, Equal Protection, and dormant Commerce Clauses, as well as under New York's police power limitations.  And just last week, a court held that DoorDash and Grubhub stated Takings Clause and Due Process claims against San Francisco regarding a similar price cap.  *DoorDash, Inc. v. City of San Francisco*, 2022 WL 867254 (N.D. Cal. Mar. 23, 2022).  Here, the Court should deny the City's motion to dismiss in its entirety.

## FACTUAL BACKGROUND

Plaintiffs operate TPPs in New York City that offer restaurants services such as marketing

and advertising, sales analytics, brand management, technology solutions, order and payment processing, and facilitating delivery to consumers.   ¶¶ 1, 12, 32.[1]   This industry is highly competitive; Plaintiffs compete with each other and other TPPs, as well as with companies that provide one or more of these services, *e.g.*, Groupon (marketing), Google (marketing), TapMango (marketing, analytics), Otter (menu and order management), Incentivo (ordering, marketing, analytics), and Resy (analytics, ratings).   ¶¶ 14, 19, 83-84.   This industry has been historically unregulated, and participants have been free to negotiate their contracts without government-imposed price controls.   ¶ 50.   Restaurants have benefited from this free market, reporting that TPPs help them reach more consumers and increase their profits.   ¶¶ 34-36, 39.   While some restaurants use TPPs for delivery only, many opt to pay more for services like enhanced marketing, technology, and product development.   ¶¶ 20-22.   Restaurants are free to perform these tasks on their own, contract with separate vendors, or forego such services entirely, but thousands of restaurants choose to contract with TPPs for the many benefits they provide.   ¶¶ 34-36, 39, 113. Plaintiffs attempt to cover the costs of these services by collecting commissions under contracts that typically last several years.   ¶¶ 41-44.   As the market is highly competitive, Plaintiffs have powerful incentives to offer restaurants the best overall value proposition, and restaurants have significant flexibility in partnering with Plaintiffs and selecting commission tiers that fit their needs.   ¶¶ 40, 43, 46-49.   When selecting among pricing packages, most restaurants choose packages at commission rates greater than the price caps the City has imposed.   ¶¶ 20-21.

In March 2020, both the City and State declared states of emergency due to COVID-19 and restricted in-person dining.   ¶¶ 54-55, 62.   In May 2020, the City Council temporarily capped

---

[1]    All references to "¶ _" are to the First Amended Complaint ("FAC") (Dkt. 34), unless otherwise noted, and all capitalized terms not otherwise defined in this memorandum have the definitions set forth in the FAC.

the rate that TPPs could charge restaurants at 15% for delivery services and 5% for all other services.[2]   ¶ 2.   These price controls were set to expire 90 days after *any* indoor dining was permitted to resume, but the City extended the law until after *full*-capacity dining resumed, and then extended it again—even after capacity restrictions ended—until February 2022.   ¶¶ 2, 77, 86, 100.   This Temporary Ordinance applied only to TPPs that served 20 or more restaurants, which had the practical effect of exempting local, small TPPs.   ¶ 78.   In August 2021, despite the end of restaurant dining-capacity restrictions, the City made its commission caps *permanent* and removed any references to its original purported emergency justification.   ¶ 115.   It did so despite data showing that restaurants on Plaintiffs' platforms were more likely to stay in business throughout the pandemic than those that were not.   ¶ 39.

At no point did the City offer any explanation for the specific cap rates, nor did it solicit or review any studies or data to understand their potential impact.   ¶ 85.   In fact, the Ordinance delays the first study on these price controls until 2023.   *Id.*   The law also does not account for the differences between the various plans offered by TPPs or cap the prices of any other businesses that compete with TPPs to offer the *same or similar services* to restaurants, such as payment processing, marketing, and rating-review services.   ¶¶ 14, 82-84.   The record also demonstrates indifference to the Ordinance's efficacy and impact on the public.   Rather than describe how these price controls would serve the public, the Ordinance's sponsors focused on the *assumed* high profits of TPPs and low profits of restaurants (as a whole), ignoring objections by various knowledgeable parties on the likely harmful consequences of the Ordinance on restaurants, consumers, and delivery couriers.   ¶¶ 93-94.   In fact, Grubhub's representative told the City that

---

[2]      Plaintiffs challenge both the Temporary Ordinance and the Permanent Ordinance, ¶ 2 & n.2, distinguishing between the two where appropriate, but otherwise referring to both collectively as the "Ordinance."

the commission caps would force the company to "operate at a loss," but Chairman Gjonaj nonetheless justified the caps as a measure to side with local restaurants at the direct expense of "out-of-state" TPPs.  ¶ 97.  The City forced TPPs to subsidize the entire restaurant industry regardless of need, even if it causes TPPs substantial, unsustainable losses.

## LEGAL STANDARD

To survive a motion to dismiss, Plaintiffs need only allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).  The plausibility standard is "context-specific, and requires assessing the allegations of the complaint as a whole." *Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013) (cleaned up).  It does not require "detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." *Keiler v. Harlequin Enters., Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted).  Here, "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015).

## ARGUMENT

### I.    Plaintiffs State a Claim for Violation of the Contract Clause

The Contract Clause limits the City's power to impair "existing contractual relationships, even in the exercise of its otherwise legitimate police power." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242 (1978).  A law violates the Contract Clause when it: (1) substantially impairs a contract, and (2) is not drawn in an "appropriate" and "reasonable" way to advance "a significant and legitimate public purpose," but rather provides "a benefit to special interests." *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411-12 (1983).  Plaintiffs allege facts sufficient to satisfy both prongs.

4

A.       **The Ordinance Substantially Impairs Plaintiffs' Contracts**

The City concedes that the Ordinance impairs existing contracts, disputing only whether the impairment is "substantial," Dkt. 40 ("Mot.") at 4, which Plaintiffs plainly allege.  A law substantially impairs contracts when it "works a severe, permanent, and immediate change" to contractual rights.  *Spannaus*, 438 U.S. at 250.  To assess the degree of impairment, courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding . . . his rights," *Melendez*, 16 F.4th at 1033, and whether the law "invade[s] an area never before subject to regulation by the State," and allows for "gradual applicability." *Spannaus*, 438 U.S. at 247, 250.  The analysis must account for the "high value" the Constitution places on private contractual rights.  *Id*. at 245.

Here, the Ordinance substantially impairs Plaintiffs' contracts.  *First*, the Ordinance "disrupts" Plaintiffs' "reasonable expectations under the contract[s]" by rewriting "the central provision upon which . . . they reasonably rely"—the payment terms.  *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006).  *Second*, it "works a severe, permanent, and immediate change" to Plaintiffs' contractual rights.  *Spannaus*, 438 U.S. at 250.  By permanently capping commissions, the Ordinance prevents Plaintiffs from ever recovering the full compensation they are contractually owed such that Plaintiffs are now operating at a loss.  ¶¶ 45, 47-49.  *Third*, given the absence of prior price controls on TPPs in New York, the Ordinance imposes "unexpected obligations in an area where reliance was vital."  *N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 387 (3d Cir. 2012); *see also Spannaus*, 438 U.S. at 250; ¶¶ 33, 50-51.

The outcome here is dictated by *Melendez*, in which the Second Circuit reversed dismissal of a Contract Clause claim and held that landlords had plausibly pled their contracts were substantially impaired when the City enacted a law (in response to COVID-19) "permanently and unexpectedly" rendering unenforceable certain guaranty obligations that arose during a 16-month

period.  16 F.4th at 1035.  Like the *Melendez* landlords, Plaintiffs here can "never seek to recover" lost revenue from their counterparties, and the Ordinance "substantially undermines [their] contractual bargain, interferes with [their] reasonable expectations, and prevents [them] from safeguarding or ever reinstating rights to which [they were] entitled."  *Id.* at 1033.  Indeed, the facts here weigh even more heavily against the City.  The law in *Melendez* only canceled rent obligations that arose during a specified 16-month period, whereas the Ordinance *forever* restricts the compensation Plaintiffs can receive from restaurants.

Last week, the court in *DoorDash* agreed that DoorDash and Grubhub adequately pled that San Francisco's 15% commission cap substantially impaired their contracts.  2022 WL 867254, at *8.  The court pointed to plaintiffs' allegations that the commission rate is core to their contracts, they could not increase consumer prices without causing fewer orders, and they may have to discontinue services if the caps persist.  *Id*.  Plaintiffs alleged similar facts here.  *E.g.*, ¶¶ 125-42.

The City insists that its price cap was "foreseeable" (Mot. 5)—another argument that was rejected in *DoorDash*, 2022 WL 867254, at *7 (finding that TPPs' "relationship with merchants have hereto been *entirely unregulated* without price caps") (emphasis added).  Foreseeability turns on "whether the relevant party operates in a heavily regulated industry."  *Sullivan v. Nassau Cnty. Interim Fin. Auth.*, 959 F.3d 54, 64 (2d Cir. 2020).  As in *Spannaus*, *Melendez*, and *DoorDash*, the Ordinance here "invaded an area never before subject to regulation," *Spannaus*, 438 U.S. at 250, rather than building upon a pre-existing price-control regime, *see Energy Rsrvs.*, 459 U.S. at 416.  Most of Plaintiffs' contracts were executed before any permanent price control was even contemplated in New York.  ¶¶ 47-51, 129.  Indeed, the City does not dispute that TPPs have historically been free from price controls, and concedes that "foreseeability arises at the time of

the execution of the contracts." Mot. 5; ¶¶ 19, 50-51, 129.[3]  Nonetheless, the City contends that Plaintiffs should have foreseen the Ordinance in June 2019 because certain Plaintiffs attended a hearing "where commission caps were discussed." Mot. 5.  But that is false.  Although commission structures were discussed at that hearing, commission *caps* were not.  Trotter Decl. Ex. A at 8:12-23.  In any event, no law was introduced at that time, and discussing a general industry topic at one hearing cannot make permanent price controls foreseeable. *See DoorDash*, 2022 WL 867254, at \*7; *Ross v. City of Berkeley*, 655 F. Supp. 820, 829-32 (N.D. Cal. 1987) (law not foreseeable because legislation on the "specific topic" was never previously *enacted*).  Even if Plaintiffs could have suspected some regulation—which is true in any industry and thus part of standard corporate disclosures[4]—they could not have foreseen that the City would "unilaterally modify the terms of negotiated written contract[s]," much less with arbitrary price caps. *Donohue v. Mangano*, 886 F. Supp. 2d 126, 157 (E.D.N.Y. 2012) (substantial impairment where plaintiffs could not have foreseen law that allowed the government to modify their employment contracts).

The City also argues that "there can be no substantial impairment where contracts are terminable at-will." Mot. 4.  But the Contract Clause protects at-will contracts.  The City does not cite a single case holding to the contrary, and, in fact, courts have expressly rejected this same argument.[5] *See United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 628 (5th Cir. 2010) (finding

---

3    The City misstates the foreseeability standard as requiring the Ordinance not be "wholly unexpected."  In *Sanitation & Recycling Industry, Inc. v. City of New York*, 107 F.3d 985, 994 (2d Cir. 1997), the court did not "decide the precise degree" of the impairment where plaintiffs had "been for decades subject to the City's regulations."

4    The City cites Plaintiffs' SEC filings (which are outside the pleadings) to argue Plaintiffs "have recognized that they operate in an evolving industry where regulation of commission rates is unsettled."  Mot. 5 & n.2.  But those statements were made *after* the City already imposed price caps, or merely refer to the general possibility of regulation covering a myriad of Plaintiffs' operations.  Trotter Decl. Ex. B at 22; *id.* Ex. C at 36; *id.* Ex. E at 42.  Plaintiffs did not forfeit their right to challenge unlawful legislation by disclosing, as required, a general "risk" of future regulation.

5    The City's sole citation is dicta and does not support its position.  In *Lefrancois v. Rhode Island*, 669 F. Supp. 1204, 1215 (D.R.I. 1987), the court *assumed* plaintiff's contract was impaired, even where state law rendered the contract terminable at-will, and focused instead on whether there was a legitimate public purpose.

Contract Clause violation of at-will contract); *DoorDash*, 2022 WL 867254, at *8 (at-will contract does not preclude substantial impairment). Moreover, the supposedly "at-will" nature of Plaintiffs' contracts is a disputed factual question (*see id.*)—as Plaintiffs allege, they expect their contracts to remain in place for several years, and most of them do. ¶¶ 45-49, 145.

### B.     The Ordinance Does Not Appropriately or Reasonably Advance a Significant and Legitimate Public Purpose

Where, as here, a law substantially impairs contracts, the *City* has the burden to "show a significant and legitimate public purpose behind the law," *Buffalo Tchrs.*, 464 F.3d at 368, and that the law is a "reasonable and appropriate means" to achieve that public purpose, *Melendez*, 16 F.4th at 1046. This test is "more demanding than" the rational-basis review discussed *infra*—it is "searching" and "discerning." *Id.* at 1032; *Ass'n of Equip. Mfrs. v. Burgum*, 932 F.3d 727, 731, 734 (8th Cir. 2019) ("*AEM*").[6] The Ordinance must satisfy both tests, but here it satisfies neither.

### 1.     The City Cannot Show a Significant and Legitimate Public Purpose

Laws lack a significant and legitimate public purpose when they are not "necessary" to "deal with a broad, generalized economic or social problem," and/or when they only target a "narrow class" of businesses to benefit only a "favored group." *Spannaus*, 438 U.S. at 242-50. The legislative history shows that the Ordinance was not enacted to serve any broad or general public purpose (much less a "significant" or "necessary" one), but to favor certain private businesses (restaurants) to the detriment of others (Plaintiffs), by taking profits from one contracting party and shifting them to another, ¶¶ 9-10, 52, 92-93, 97-98.

In *Melendez*, the Second Circuit held that "the question of legitimate public purpose cannot

---

[6]     The City's critique of *Melendez* as a "newfound approach" is both wrong and irrelevant. Mot. 10. *Melendez* simply confirmed existing law that the Contract Clause analysis is "more demanding than rational basis review." 16 F.4th at 1016-32. Moreover, on January 19, 2022, the Second Circuit denied the City's *en banc* petition that argued, much like the City does here, that *Melendez* departs from Supreme Court and Second Circuit precedent. *See Melendez v. City of New York*, No. 20-4238 (2d Cir.), ECF Nos. 149, 155. The *Melendez* standard is binding on this Court.

now be decided as a matter of law for either party and would benefit from further record development." 16 F.4th at 1037.  There, the City contended that a contract-impairing law was necessary to "help shuttered small businesses survive the pandemic . . . [and] ensur[e] functioning neighborhoods throughout the City." *Id.* at 1040.  But the Second Circuit highlighted the plaintiffs' factual allegations suggesting that this was pretense, such as City Council hearing statements indicating "a certain hostility to landlords and sympathy for small business owners." *Id*. at 1037. The same is true here, where Plaintiffs have plausibly alleged that the Ordinance lacks any connection to "functioning neighborhoods" and is aimed at transferring money from a group of disfavored businesses to a more-favored group.  ¶¶ 18, 35, 38, 79, 97-98, 123, 173.  Further, the only "plausible" public purpose identified in *Melendez*—"mitigation of economic emergencies" due to COVID-19—is absent here: the caps are not tied to the pandemic or any temporary duration.

The City argues that forcing TPPs to subsidize restaurants is justified because the City perceived a decline in restaurants that "coincided" with the rise of TPPs.  Mot. 6.  But that does not create a legitimate public purpose as a matter of law: the Contract Clause prohibits a city from impairing contracts simply because it finds that one industry is in decline and wishes to reverse that trend.  *See AEM*, 932 F.3d at 734 (finding no public purpose where "law primarily benefits a particular economic actor in the farm economy" even if it indirectly benefits rural communities); *HRPT Props. Tr. v. Lingle*, 715 F. Supp. 2d 1115, 1139 (D. Haw. 2010) (finding that, although the official purpose of stabilizing the economy was legitimate, the admitted "subpurpose" of "adjust[ing] the balance of power between the lessor and lessee . . . is not a legitimate aim of any statute that substantially impairs an existing contract" and "does not address any broad societal purpose").  A law enacted not to "protect a basic societal interest," but "a favored group" does not serve a legitimate purpose.  *Spannaus*, 438 U.S. at 242.  The City next claims the law might

"prevent the social and economic devastation communities would experience if employment opportunities in the restaurant industry decline." Mot. 7. But that alleged purpose would justify economic protectionism of *any* industry that employs many people, and the City cites no authority holding that it can favor one group over another because the first group employs more local workers. Further, the City's theory is nonsensical because it requires the Court accept that TPPs aim to charge their own customers out of business, but TPPs only succeed when restaurants do.

Even if the City had offered a legitimate public purpose (it has not), the Court is required to scrutinize that claim in light of legislative history suggesting a *different* purpose. *See Spannaus*, 438 U.S. at 245 (requiring "careful examination of the nature and purpose of the state legislation" where it appeared directed at a narrow class); *Melendez*, 16 F.4th at 1037-38 (examining record for legislative purpose and noting conflicting evidence prevents conclusion on the pleadings); *AEM*, 932 F.3d at 733 (defendant's stated purpose of helping rural communities lacked support in the law's text and history, which focused on restricting manufacturers to benefit dealers); *Donohue v. Paterson*, 715 F. Supp. 2d 306, 320-21 (N.D.N.Y. 2010) (questioning, based on conflicting record, defendant's claim that the law addressed a "fiscal emergency"). Where the record "reveal[s] something other than a facially legitimate government plan," the City's bare assertions that helping restaurants helps the public is not enough, especially where the record "raise[s] some doubt" as to the stated purpose. *Donohue*, 715 F. Supp. 2d at 320. Here, the record shows the City was hostile towards TPPs, speculated on their purported wealth, and accused TPPs of "getting richer at the expense of restaurants," often on the say-so of special interest groups. ¶¶ 9, 68, 71, 92 104, 115; *see also* Trotter Decl. Ex. H at 139:6-148:12, 165:20-183:21, 185:23-191:3, 195:5-218:4; Trotter Decl. Ex. A at 27:15-49:8. But the City cannot rely solely on statements from "[s]pecial-interest groups" to establish a legitimate public purpose. *AEM*, 932 F.3d at 733.

*DoorDash* held that San Francisco stated a legitimate purpose for its price cap, but relied on a unique Ninth Circuit rule, inapplicable here, whereby "a law [that] appears to target one business group over another is not *a priori* suspect," and relied on cases "show[ing] that the California Supreme Court and Ninth Circuit have recognized that 'the preservation of a municipality's downtown business district'. . . and the intent to 'mitigate the fallout for those most affected by a shift in the market' are examples of permissible legislative purposes."  2022 WL 867254, at *10-11 & n.2 (citations omitted).  Outside the Ninth Circuit, a law targeting one group to benefit another (or even an entire business district) *is* suspect and at least raises a factual dispute as to whether the law serves a legitimate purpose.  *Melendez*, 16 F.4th at 1037-38 (evidence that law was driven by "certain hostility to landlords and sympathy for small business owners" shows "that the question of legitimate public purpose cannot now be decided as a matter of law"); *AEM*, 932 F.3d at 733.  Here, the FAC raises such factual disputes, precluding dismissal.

### 2. The City Cannot Show That a Permanent Price Cap on TPPs Is a Reasonable and Appropriate Means to Advance Its Purpose

Even if the Court were to find that the City has stated a legitimate public interest, the Ordinance does not reasonably or appropriately advance that interest as a matter of law.  Again, *Melendez* is binding here.  There, the Second Circuit identified five features of the law that "weigh[ed] heavily against determining the law was a reasonable and appropriate means."  16 F.4th at 1038, 1046.  All five features are present here.  *First*, as in *Melendez*, the Ordinance "permanently" impairs Plaintiffs' contracts by making it impossible for them to ever collect the commissions they freely bargained for with restaurants, which "weigh[s] heavily against a finding of reasonableness, particularly at the pleadings stage."[7]  *Id.* at 1039-40.  *Second*, the law's aim in

---

[7]     The City relies on *Buffalo Teachers* to argue that "the permanent nature of the Ordinance has no bearing on its reasonableness," but that case, in fact, found the opposite: "In sum, the prospective and temporary quality of the wage freeze convinces us of its reasonableness."  464 F.3d at 372.

*Melendez* was to save shuttered small businesses so they can reopen after the pandemic, but it did not limit relief to owners of shuttered businesses or require that they reopen. *Id.* at 1040-41. Here, a similar disconnect exists between the stated public interest and the Ordinance, which benefits not just *all restaurants*—regardless of their financial stability or location in neighborhood centers—but also all *other* businesses that offer food to individuals. *See* ¶¶ 12, 78, 83, 91, 94, 111. *Third*, the "allocation of [the] economic burden"—placing the cost of supporting restaurants entirely on Plaintiffs' shoulders instead of the public at large—weighs against the Ordinance. *Melendez*, 16 F.4th at 1042. A law cannot meet its purported "neighborhood-preserving purpose" when it "provid[es] financial relief to certain persons not through public funds but by destroying the contract expectations of other persons." *Id. Fourth*, the Ordinance does not condition relief on need, nor is it otherwise structured "to ensure that public benefits are responsibly distributed to serve their public purpose." *Id.* at 1043.[8] *Fifth*, the Ordinance does not allow for Plaintiffs "to be compensated for damages or losses sustained as part of their [contracts'] impairment." *Id.* at 1045.

The City has failed to show that the Ordinance is "specifically tailored to meet the societal ill it is supposedly designed to ameliorate"—purportedly ensuring public welfare by preventing restaurant closures. *Donohue*, 715 F. Supp. 2d at 322. As Plaintiffs allege, no data supported the City's apparent belief that the Ordinance would benefit the public or even the restaurant industry. ¶¶ 6, 10, 72. Although it relies on one commentator's rhetoric that TPP fees are supracompetitive or "predatory," Mot. 7, the evidence demonstrates the opposite: TPPs fiercely compete with each

---

[8]     The City's attempt to make "need" irrelevant is unsuccessful. Mot. 9-10. It cites *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 444-47 (1934), but that case involved an "emergency" law that was "temporary in operation," "was not for the mere advantage of particular individuals," and which provided for the mortgage moratorium period to be reduced when circumstances changed. Nor is the City's baseless claim that TPPs are "better positioned financially than restaurants" effective at distinguishing *Melendez*, Mot. 10, which dismissed a similar theory, 16 F.4th at 1043-44. Regardless, the City's outside-the-pleadings exhibits do not even claim that TPPs are profitable. Trotter Decl. Ex. G at 4-11.

other (and other companies offering similar services), and restaurants can choose which (if any) TPPs to contract with.  ¶¶ 14, 19, 22, 43.  Restaurants can also handle delivery on their own, as they have for decades (and many still do).  If they can arrange their own delivery at a lower cost, nothing stops them from avoiding delivery commissions by using TPPs' consumer bases for pickup orders.  ¶¶ 7, 22, 52, 113, 116.  The City's claim that TPPs' fees are supracompetitive or predatory is speculative and belied by the evidence.

The City's own enforcement personnel also conceded that the caps could have "unintended consequences" that will hurt restaurants, consumers, and couriers, *see* ¶ 94; *see also* ¶¶ 96, 114, 118, 123-24.  As in *Melendez*, the City Council did not review any "empirical evidence" or consider public assistance alternatives available to small businesses.  16 F.4th at 1044.  Moreover, the City ignored the many other forces impacting the restaurant industry, and to far greater effect, such as soaring wholesale prices, regulation by "[o]verzealous local governments," and sky-high rents.  ¶ 38; Trotter Decl. Ex. A at 152:3-17.  While the City argues that restaurants "are crucial to the economic and social vitality of the City," Mot. 1, it does not state how many restaurants are in danger of closing, what portion (if any) is at risk due to TPPs, or whether the Ordinance could save them.  And it disregards record evidence that TPPs are also integral to the City's vitality, not only in their critical support of restaurants but in the thousands of New Yorkers they serve.  ¶¶ 96, 119.

*DoorDash* shows why the Second Circuit correctly held that the Contract Clause requires more than rational-basis review.  There, the court had to "reject" *Melendez* and "follow the binding approach by the Ninth Circuit," whereby "courts must refuse to second-guess the legislature's identification of the most appropriate ways of dealing with the problem."  2022 WL 867254, at *13 & n.3 (cleaned up).  Indeed, plaintiffs pled that the city relied on proven falsehoods—such as that TPPs regularly charge commissions as low as 10% but still had high profits.  *Id.* at *14.  But

the court found that, under the Ninth Circuit's rational-basis test, it was "irrelevant" whether the city relied on fiction because the court could not even review the evidence.  The court also found that a mere "coincide[nce]" between the rise of TPPs and decline in restaurants provided a sufficient basis to rewrite their contracts.  But under *Melendez*, this Court's review is not so toothless.  Rather, the Court should analyze the "assumptions informing the City's enactment," require the City to provide "some record basis to link purpose and means," reject "anecdotal or conclusory statements by Council members," and scrutinize whether the City's findings are supported by "empirical evidence."  *Melendez*, 16 F.4th at 1040, 1044-45.  Because Plaintiffs plausibly allege that the Ordinance is not reasonable or necessary, the Court should allow them to "develop supporting evidence" and not decide these issues in an evidentiary vacuum.  *Id*. at 1033.

## II.    Plaintiffs Have Adequately Alleged an Uncompensated Taking of Private Property

The Takings Clause prevents the government from taking private property without just compensation and "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  *Palazzolo v. Rhode Island*, 533 U.S. 606, 617-18 (2001) (cleaned up).  The City admits that contracts constitute property under this Clause.  Mot. 12-13; *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984); *Lynch v. United States*, 292 U.S. 571, 579 (1934).  *DoorDash* upheld a Takings claim brought by two of the Plaintiffs here under nearly identical circumstances.  2022 WL 867254, at *19.

The City argues that its police power precludes Plaintiffs' takings claim.  Mot. 12-13.  But, as discussed *infra* Pt. III, the Ordinance falls outside that power.  Regardless, the police power does not allow the City to nullify contracts.  *See Lynch*, 292 U.S. at 580.  As the City concedes, there is no "set formula for identifying" when a contract-impairing law effects a taking, because the Takings Clause requires "essentially ad hoc, factual inquiries" that are not well suited to a motion to dismiss, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982).

Instead, when the government "imposes regulations that restrict a property owner's ability to use his own property," courts turn to the fact-based regulatory takings analysis.  *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021).  Three factors have "particular significance": (1) the "economic impact" on the property owner; (2) the extent of government interference with "investment-backed expectations"; and (3) the character of the government action.  *Penn Central Trans. Co. v. City of New York*, 438 U.S. 104, 124 (1978).  Although Plaintiffs need not show that each factor independently favors them, and no factor is dispositive, their allegations support each. *See Sherman v. Town of Chester*, 752 F.3d 554, 566 (2d Cir. 2014); ¶¶ 143-49.  Plausible allegations on any factor precludes dismissal.[9]  *See DoorDash*, 2022 WL 867254, at *19.

**Economic Impact**.  The Ordinance harms Plaintiffs by undermining their ability to enforce their contracts, forcing them to operate at a loss, and damaging their goodwill.  ¶¶ 5, 13, 42, 97, 122-24, 128, 146, 148.  The City argues that "mere diminution" in value is "insufficient to demonstrate a taking."  Mot. 14.[10]  But operating "at a loss" is not "mere diminution;" regardless, Plaintiffs plausibly allege that the City's effort to favor one industry over another has caused them significant other economic harm and injury to the public.  ¶¶ 5, 13, 42, 94, 96, 114, 118-19, 122-23, 148.  Specifically, the Ordinance will likely force Plaintiffs to, *inter alia*: (1) "renegotiate contracts with many restaurants" or "abandon their rights," as the Ordinance does not allow them

---

[9]     The City relies on *Buffalo Teachers*, 464 F.3d at 375, and *Elmsford Apartment Associates, LLC v. Cuomo*, 2020 WL 3498456 (S.D.N.Y. June 29, 2020), but each were decided on summary judgment.  *Buffalo Teachers* analyzed the *Penn Central* factors on the merits and was silent on pleading standards, while *Elmsford* turned on lack of evidence.

[10]     The law is actually that "mere diminution" ***alone*** is insufficient, as no *one* factor is dispositive.  *Sherman*, 752 F.3d at 566; *Cmty. Hous. Improvement Program v. City of New York*, 492 F. Supp. 3d 33, 49-50 (E.D.N.Y. 2020) ("*CHIP*").  The City relies on inapposite out-of-circuit cases resolved on a full record.  *See Pulte Home Corp. v. Montgomery Cty.*, 909 F.3d 685, 696 (4th Cir. 2018) (all factors favored county); *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013) (failed on all factors after trial); *CCA Assocs. v. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011) (after full record held 18% impact insufficient "[i]n light of the facts of this case"); *Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1348 (Fed. Cir. 2004) (summary judgment decision *crediting* economic impact factor but not others).

to "cover their costs"; (2) "scale back certain services, including marketing and promotional services," which will harm their "goodwill"; (3) "terminate" contracts or "decline to enter into new contracts"; and (4) ultimately "rais[e] consumer fees," which will cause fewer orders and will further "irreparab[ly] harm" their goodwill. ¶ 124. *DoorDash* upheld this claim on substantially identical allegations of harm, and *Penn Central* does not require more at the pleading stage.[11] 2022 WL 867254, at *18; *Palazzolo*, 533 U.S. at 632 (remanding for *Penn Central* analysis even though it was "undisputed" plaintiff's parcel retained "significant worth"); *Petworth Holdings, LLC v. Bowser*, 308 F. Supp. 3d 347, 357-58 (D.D.C. 2018) (claim survived even though plaintiffs did "not allege[] any quantifiable economic harm"). The economic impact here is "not so minimal to compel dismissal of the complaint at this stage." *CHIP*, 492 F. Supp. 3d at 49-50.

**Investment-Backed Expectations**. The Ordinance severely interferes with Plaintiffs' reasonable investment-backed expectations: third-party food delivery services existed for decades without price controls, and Plaintiffs invested millions into their businesses without any expectation of the type of restrictions the Ordinance imposes, relying on contracts executed before the Ordinance that are designed to allow them to cover their costs. *E.g.*, ¶¶ 1, 19, 45-51, 57-60, 127-29, 145, 148. The City argues the Constitution does not protect at-will contracts, Mot. 14-15, but that is wrong, *United Healthcare*, 602 F.3d at 628, and Plaintiffs allege that their contracts typically last for years, ¶ 45.[12] Plaintiffs present factual issues that must proceed. *DoorDash*, 2022 WL 867254, at *19 (rejecting city's identical arguments); *CHIP*, 492 F. Supp. 3d at 50.

**Character of Government Action**. The Constitution prohibits the taking of property "for

---

[11]   *Park Avenue Tower Associates v. City of New York*, 746 F.2d 135 (2d Cir. 1984), lends the City no support because it used the *per se* takings analysis (now controlled by *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992)), whereas Plaintiffs allege a *Penn Central* taking, which uses a holistic approach and does not turn on whether plaintiffs allege an inadequate return. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).

[12]   The City's cases either involve no government action, or employment contracts where plaintiffs could readily find other work.

no reason other than to confer a private benefit on a particular private party." *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 245 (1984). When a law "fails to meet the 'public use' requirement or is so arbitrary as to violate due process," the inquiry ends. *Lingle*, 544 U.S. at 543. The Ordinance intentionally benefits restaurants at the expense of Plaintiffs without any compensation, ¶¶ 8, 92, 165, a point the City concedes, Mot. 16. This factor weighs in favor of a taking. *See Cienega Gardens v. United States*, 331 F.3d 1319, 1338 (Fed. Cir. 2003) (law designed to "benefit a certain group of people" by shifting burdens to a few amounted to a taking). The City incorrectly cites *Penn Central* to try to justify the Ordinance as part of a "comprehensive plan." Mot. 16. But *Penn Central* was decided on a full trial record and appellants did not dispute the facts. 438 U.S. at 129. Whereas the law in *Penn Central* allowed for judicial review to ensure that landmark designations did not arbitrarily "singl[e] out individual landowners for disparate and unfair treatment," *id.* at 132, the Ordinance thrusts the burden of permanent price caps onto only a few companies, *i.e.*, Plaintiffs, ¶¶ 12, 14, 84, 91, 94(d), 111, 113.[13] Because every *Penn Central* factor favors a finding of a taking (though not all three are needed), the City must provide just compensation to Plaintiffs, which it has not. ¶ 149. Plaintiffs have adequately stated a Takings claim.

## III.    The City Enacted the Ordinance in Excess of Limitations on Its Police Power

The City is a government of limited powers. Local laws must promote the "health," "safety," and "well-being" of the general public, N.Y. Const. art. IX, § 2(c)(ii)(10); N.Y. Mun. Home Rule Law § 10, and "bear a reasonable relationship to the objective sought to be promoted." *Albany Area Builders Ass'n v. Town of Guilderland*, 141 A.D.2d 293, 298 (N.Y. App. Div. 1988); *Good Humor Corp. v. City of New York*, 290 N.Y. 312, 317 (1943). Here, Plaintiffs plausibly

---

[13]    *DoorDash* incorrectly found this factor favored the city because there is nothing unusual about a "public program adjusting the benefits and burdens of economic life." 2022 WL 867254, at *19. But the Ordinance is not a typical "public program"—rather, it fixes the prices that a private business can charge for its services, and it is completely without precedent outside the public utilities context. The extraordinary character of the law favors Plaintiffs.

allege that the Ordinance is not designed to benefit the general public and imposes arbitrary and unreasonable restrictions on Plaintiffs.  The inquiry is fact-specific; any disputes should proceed to discovery.  *Great Atl. & Pac. Tea Co. v. Town of E. Hampton*, 997 F. Supp. 340, 347-48 (E.D.N.Y. 1998).  Accordingly, the Court should deny dismissal of Plaintiffs' police power claim.

*First*, the Ordinance lacks a legitimate public purpose.  The City claims it serves the general welfare, but the legislative record confirms that its aim is to shift TPP revenues to restaurants, release all restaurants (regardless of need) from their contractual obligation to pay for the services they freely bargained for, and penalize Plaintiffs.  ¶¶ 97-98; *see supra* Pt. I.B.  For decades, New York courts have struck down laws that are "designed for the convenience and interest of a special class" as beyond the police power.[14]  *See, e.g.*, *People v. Cohen*, 5 N.E.2d 835, 835 (N.Y. 1936).  For example, courts have struck down laws designed "to favor real estate values" for certain neighborhoods, street-vendor laws with "no reasonable relation to the public health," and zoning laws designed to protect small stores from the competition of larger retailers.  *Id.*; *Good Humor*, 290 N.Y. at 320; *Great Atl.*, 997 F. Supp. at 347-48.

Here, the Ordinance is designed to economically benefit local restaurants to the detriment of TPPs (even the pretextual COVID-19 justification was removed) and thus lacks a legitimate public purpose.  *See supra* Pt. I.B.; *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 883 (1985) (not a legitimate purpose to put out-of-state companies at a competitive disadvantage to favor local industry).  The City claims the law's purpose is "to prevent the social and economic devastation communities would experience if employment opportunities in the restaurant industry decline."

---

[14]    The City's police power cases are inapposite.  *Big Apple Food Vendors' Ass'n v. City of New York*, 168 Misc. 2d 483, 488 (Sup. Ct. N.Y. Cnty. 1995), involved restricting the number of *city-issued* vendor permits to prevent illegal trafficking of a "City-conferred privilege."  In *Casciani v. Nesbitt*, 659 F. Supp. 2d 427 (W.D.N.Y. 2009), a regulation that restricted landing a helicopter in a backyard was "quite plainly, rationally related to the protection of the health, safety and welfare of [the town's] residents."  *Id.* at 439.  Here, the City's arbitrary price controls are not rationally related to any long-standing permit regime, illegal activity, or to the safety of any residents.

Mot. 7.  But that does not justify price controls; if it could, then a city could always force companies with fewer local employees to subsidize companies with more.  *Supra* p.10.  Further, the Court cannot accept the City's stated rationale for the law when the legislative history shows something different.  *Moskowitz v. Jenkins*, 94 N.E. 1065, 1067 (N.Y. 1911) (law violated police power where its features showed its true purpose was to protect "local shopkeepers from competition"); *AEM*, 932 F.3d at 733.  Plaintiffs plausibly allege that the Ordinance's purpose is not to benefit communities, but to transfer money from out-of-state "venture capital backed" companies to local businesses.  ¶¶ 52, 111.  That is not a legitimate public purpose.

*Second*, even if the City had stated a legitimate public purpose, the Ordinance is not reasonably related to that objective.  As discussed *supra* Part I.B., Plaintiffs allege that the Ordinance is irrational and not reasonably designed to meet even the post-hoc justifications the City now advances.  The City's motion relies on baseless assumptions that are contrary to real-world facts and Plaintiffs' allegations.  *See N.Y.S. Ass'n of Cntys. v. Axelrod*, 78 N.Y.2d 158, 167-68 (1991) (state regulation that reduced Medicare reimbursement rates without record evidence to support the state's suppositions lacked rational basis).  For example, the City claims that "restaurants are forced to utilize plaintiffs' platforms to stay relevant, noticeable, and accessible." Mot. 18.  But the record contradicts this assumption.  *See* Trotter Decl. Ex. H at 137:13.  Testimony proved that restaurants are *not* "forced to participate [in] this market" and can "decline to participate or [provide the same services] on their own."  ¶ 94.  In fact, thousands of local restaurants do not use Plaintiffs' services.  ¶¶ 40, 62.

But even if the City could legitimately cap the commissions that restaurants and TPPs freely contracted for, the City's decision to cap delivery services at 15% and all other services at 5% is arbitrary and unreasonable.  ¶¶ 13, 80, 85, 112.  There is no "rational basis for capping fees"

if the regulated entities will not "be adequately compensated" for their services. *N.Y.S. Land Tit. Ass'n v. N.Y.S. Dep't of Fin. Servs.*, 169 A.D.3d 18, 32 (N.Y. App. Div. 2019) ("*NYSLTA*"). Plaintiffs each offer a suite of services at various commissions that provide restaurants tremendous benefit but at a substantial cost to Plaintiffs.  ¶¶ 42-49.  The 15% and 5% caps do not allow Plaintiffs to cover their costs, are arbitrary, and do not reflect market realities.  ¶¶ 13, 121, 124, 161.  The City cannot reasonably require Plaintiffs to operate at a loss.

The City insists its 15% delivery cap was "grounded in and informed by the commissions TPPs were already charging" before the Ordinance, but cites documents dated over one year *after* the City selected the cap rates. Mot. 9 (citing July 2021 materials).[15]  Plaintiffs allege that most of their contracts include commissions above 15% and that they need to charge above 15% for certain plans to cover their costs.  ¶¶ 45, 47-49, 124.  Even if some Plaintiffs offered 15% commissions for basic delivery before the pandemic, it is unreasonable to assume Plaintiffs can cover their costs at that rate for *all* of their plans.  Further, the City offers *no support at all* for randomly selecting a 5% cap for all of Plaintiffs' other services.  Indeed, there is no record evidence that the City had any understanding of what those additional services are and what costs TPPs incur to provide such services.  ¶ 85.  Without "further 'empirical documentation, assessment and evaluation,'" absent here, the cap is "based on an 'arbitrary, across-the-board percentage figure' . . . 'so lacking in reason . . . that it is essentially arbitrary.'"  *NYSLTA*, 169 A.D.3d at 32; *see also* ¶ 165.[16]

---

[15]    The record shows that TPPs' rates were well above the caps, including testimony that TPPs charge 15% to 30%. *See, e.g.*, Trotter Decl. Ex. A at 17:22-18:9, 49:22-33.  The City ignores that evidence in favor of a single reference from one person who misstated that commission rates "ranged from fifteen to twenty percent per order," while testimony from both before and after this reference clarify that even a 20% cap is insufficient to cover all costs. Mot. 9.  The City also claims that the permanent caps are reasonable because they use the same rates as the temporary caps. *Id.*  That is nonsensical. Plaintiffs allege that *both* caps are unreasonable.  And Plaintiffs' representatives testified in July 2021 that they lost money under the temporary caps.  Trotter Decl. Ex. H at 63:10-12, 125:2-4, 149:13-17.

[16]    *DoorDash* held that San Francisco acted within its police power under California law and refused to consider whether the city's findings were based on evidence or speculation.  2022 WL 867254, at *19-20.  But New York courts have held that the police power does not extend to protecting a "special class" of interests, and courts must consider whether *evidence* supports the city's action. *See Great Atl.*, 997 F. Supp. at 347-48 (police power claim

## IV.    The Ordinance Is Arbitrary and Confiscatory in Violation of Due Process

Due Process requires that laws rationally relate to a legitimate legislative purpose.  *Winston v. City of Syracuse*, 887 F.3d 553, 566 (2d Cir. 2018).  The Ordinance fails both prongs of this test, which generally cannot be resolved on the pleadings, *id*. at 561 n.4, and is not "toothless," *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012).  *See supra* Pts. I.B., III.  Due process further prohibits the City's arbitrary action and guarantees a "fair return on investment."  *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974); *Pennell v. City of San Jose*, 485 U.S. 1, 11 (1988) (no violation where, unlike here, law "guaranteed a fair return on [] investment").

In addition to its other debunked theories discussed above, the City assumes that its price caps will simply shift costs to consumers, thereby avoiding injury to Plaintiffs, so "price regulation is an appropriate response" and not "confiscatory."  Mot. 18-19.  But the City's speculation is unsupported by the record and irrelevant; it cannot force a company to operate one part of its business "at a loss" simply because it might have other revenue streams.  *Pennell*, 485 U.S. at 11; *Fed. Power Comm'n v. Nat. Gas Pipeline Co.*, 315 U.S. 575, 585 (1942) (even where price controls are permissible for *public utilities*, the rate must not be "confiscatory in the constitutional sense"); *Nat'l Wildlife Fed'n v. ICC*, 850 F.2d 694, 707 (D.C. Cir. 1988) (even regulated companies that owe a public duty "cannot be compelled to carry on even a branch of business at a loss").  Indeed, *DoorDash*, applying *Pennell*, found plaintiffs alleged that a similar price cap was "confiscatory" in violation of due process.  2022 WL 867254, at *21.  In any event, Plaintiffs allege they cannot effectively pass the cost of the Ordinance onto consumers because doing so would substantially reduce demand for Plaintiffs' services (*further* injuring Plaintiffs *and* restaurants).  ¶¶ 5, 122, 124,

---

raised "fact-based inquiry" that required denying motion to dismiss); *Cohen*, 5 N.E.2d at 835 (evidence *at trial* showed that the "real reason behind this ordinance" was to benefit a special class); *Good Humor*, 290 N.Y. at 320 (holding that law's stated purpose "is not conclusive," and "important facts" showed that the law served only special interests).

130, 148, 160, 162. Plaintiffs also plausibly allege that price caps will *hurt* consumers, restaurants, and Plaintiffs—meaning that the Ordinance is not reasonably drawn to meet any legitimate end. ¶¶ 119-24, 130, 162. The Court must accept Plaintiffs' allegations at this stage.[17]

## V. The Ordinance Discriminates Against Plaintiffs in Violation of Equal Protection

Laws that treat groups differently must bear a rational relation to some legitimate end, to "ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Romer v. Evans*, 517 U.S. 620, 633 (1996); *Bertoldi v. State of New York*, 275 A.D.2d 227, 229 (N.Y. App. Div. 2000). The 15% price cap on delivery services is irrational and unfairly disadvantages Plaintiffs, as explained *supra* Parts I.B., III.-IV. But the 5% cap violates the Equal Protection Clause for an additional reason: it applies to TPPs but not to competitors offering the *same services*. Plaintiffs allege that they offer many services between them, such as order processing, technology systems, marketing and advertising services, sales and consumer analytics, driver status and support technology, and brand management and menu consulting—which can be handled by restaurants themselves, TPPs, or other businesses not regulated by the Ordinance. ¶¶ 11-12, 22, 52, 64, 189. Yet, the Ordinance imposes a 5% price cap for non-delivery services *only* on companies that also facilitate food delivery. Other companies that offer the same or similar services, including those that use commission fees (though the City ignores this point, Mot. 20), remain unaffected. ¶¶ 14, 52, 83-84, 121, 166, 189; *see supra* p.2.

The City offers no rational basis for barring TPPs from charging more than 5% on non-delivery services but allowing any other company to charge whatever it wants for those same services. The record only reflects the City's claim that Plaintiffs have significant revenues and its

---

[17] The City claims that it enacted the law after concluding that Plaintiffs' business model aims to put restaurants, *i.e.*, their *own customers and partners*, out of business. Mot. 18. But it never explains how it came to that irrational conclusion, which assumes TPPs operate against self-interest by trying to eliminate the source of their revenues.

hostility toward platforms that offer delivery services—neither is a rational basis to impose a price cap on some companies but not others that offer similar services to restaurants.[18]  ¶¶ 10, 52, 70, 111-13; *see also U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) ("[A] bare congressional desire to harm a politically unpopular group cannot constitute a legitimate government interest."); *Consol. Edison Co. of New York v. Pataki*, 117 F. Supp. 2d 257, 264 (N.D.N.Y. 2000), *aff'd on other grounds*, 292 F.3d 338 (2d Cir. 2002).[19]  In fact, nothing in the record suggests the City was even *aware* of the many types of services Plaintiffs offer, let alone that a 5% commission represented a fair price for these services.[20]  This is the definition of arbitrary.

## VI.   Plaintiffs State a Claim for Violation of the Dormant Commerce Clause

The dormant Commerce Clause ("DCC") protects against state regulations that discriminate against or burden interstate trade.  *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 102 (2d Cir. 2003).  To state a DCC claim, plaintiffs must allege that the law at issue: (1) "clearly discriminates against interstate commerce in favor of intrastate commerce," (2) "imposes a burden on interstate commerce incommensurate with the local benefits secured," *or* (3) "has the practical

---

[18]    Plaintiffs also allege that the Temporary Ordinance facially discriminated against them in violation of the Equal Protection Clause.  Because the City has not provided any basis for distinguishing between Plaintiffs and similarly situated TPPs other than its animus against Plaintiffs—and has not conducted any analysis of differences between TPPs that serve 20 or more restaurants and those that serve fewer—Plaintiffs have sufficiently stated a claim.  ¶ 190.

[19]    The City cites *Sensational Smiles, LLC v. Mullen*, 793 F.3d 281 (2d Cir. 2015), but that case drew a distinction between permissible and "improper economic protectionism," emphasizing that the latter is easy to find, particularly where, as here, a "competition-reducing measure" is designed to drive other industries "out of business." *Id.* at 286-87.  And the law there lacked the crucial second half of the equation present here: discriminatory animus against the group disfavored by the regulation and a direct transfer of money from one group to another.

[20]    Unlike the City, San Francisco did not impose a separate price cap on TPPs' non-delivery services, and so *DoorDash* did not consider this argument.  The court assumed it "is enough for the City to believe that 'platforms impose overall commission rates that restaurants have little choice but to pay to gain access to a large customer base that uses the platform to search restaurants, place orders, and obtain meal delivery' and therefore apply the Ordinance to the platforms only." 2022 WL 867254, at *22 n.10.  But that statement falsely assumes that TPPs require restaurants to purchase additional services to access their consumer base and delivery options.  Plaintiffs have pled that it is untrue: restaurants can contract for basic delivery services alone, or they can perform their own delivery and purchase separate services from TPPs.  ¶¶ 20-23, 25-27.  It makes no sense to preclude TPPs from profitably selling non-delivery services just because they are TPPs, and the *DoorDash* court's misunderstanding of TPPs' services illustrates why this action should not be decided in an evidentiary vacuum.

effect of 'extraterritorial' control of commerce occurring entirely outside the boundaries of the state in question." *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 90 (2d Cir. 2009) (citations omitted).  Plaintiffs have plausibly alleged violations under the first and second tests.

Courts analyze DCC claims under a two-tiered approach.  *First*, courts generally strike laws down "without further inquiry" when they: (1) facially discriminate against interstate commerce, (2) have a discriminatory purpose, or (3) have the clear effect of favoring in-state economic interests.  *Brown-Forman Distillers Corp. v. N.Y.S. Liquor Auth.*, 476 U.S. 573, 579 (1986); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 269 (1984).  For such "per se" violations to survive, they must be "demonstrably justified by a valid factor *unrelated to economic protectionism*."  *Selevan*, 584 F.3d at 94 (emphasis added).  A law need not facially discriminate to present a *per se* violation.  *Am. Booksellers Found.*, 342 F.3d at 104.  Courts apply the "strictest scrutiny," *Maine v. Taylor*, 477 U.S. 131, 144 (1986), and will only uphold discriminatory laws if the government demonstrates by "concrete" evidence that nondiscriminatory alternatives are unworkable, *Granholm v. Heald*, 544 U.S. 460, 492-93 (2005).  *Second*, even if a law appears to regulate evenhandedly and only incidentally burdens interstate commerce, courts examine whether that burden clearly exceeds the putative local benefits.  *Am. Booksellers Found.*, 342 F.3d at 102.

Both the Temporary and Permanent Ordinance reflect *per se* DCC violations.  "[E]conomic favoritism" for local business is *per se* invalid, even if well intentioned.  *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392 (1994); *see also Sensational Smiles*, 793 F.3d at 288. Plaintiffs are all headquartered out of state, ¶¶ 204-07, and the City claims that Plaintiffs are responsible for 99% of all sales subject to the Ordinance, Mot. 21.  Thus, the Ordinance regulates, almost exclusively, out-of-state actors (*i.e.*, Plaintiffs).  Plaintiffs allege—and the City admits, Mot. 21—the Ordinance's clear purpose and effect is to shift revenue from Plaintiffs' out-of-state

businesses to local businesses, *see* ¶¶ 9-10, 67-68, 93, 98, 113, 206-07.  The DCC prohibits this kind of economic protectionism, even if the Ordinance were facially neutral.[21]  And the legislative history leaves no doubt as to the Ordinance's aim.  As the law's sponsor explained: "[I]t's more important that [the City] protect [local restaurants] instead of . . . Grubhub or the other providers," to prevent tax revenues from "leaving our city and going to a different state." ¶ 206.  That is not only factually wrong, ¶ 10, but has clear discriminatory purpose.  Thus, the City must present concrete evidence that nondiscriminatory alternatives to the Ordinance are unworkable.  *Granholm*, 544 U.S. at 492-93.  The City had many nondiscriminatory means available to help local restaurants, such as local tax relief, grants, and loans, ¶¶ 8, 208, which it concedes, Mot. 10.  But it does not claim that it considered these alternatives, much less found them unworkable.

Even if the Ordinance were facially neutral, had a legitimate purpose, and had only an incidental effect on interstate commerce, the burden it places on interstate commerce clearly exceeds the putative local benefits.  *See Selevan*, 584 F.3d at 95; ¶ 207.  As discussed *supra* Parts I.B., III., commission caps on TPPs will not produce the local benefits that the City hoped for, rendering its burden on out-of-state Plaintiffs clearly excessive, *see, e.g.*, ¶ 148; *supra* Pt. II.

## <u>CONCLUSION</u>

This Court should deny Defendant's motion to dismiss.  If it grants any part, it should grant leave to amend.  Fed. R. Civ. P. 15(a)(2).

---

[21]   The Temporary Ordinance also facially discriminates against interstate commerce because it exempts TPPs that serve less than 20 restaurants, which Plaintiffs allege are local businesses and similarly situated.  ¶ 205; *see Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 428 (3d Cir. 2011).  Removing the facially discriminatory local exemption from the law does not save the Permanent Ordinance.  As Plaintiffs allege, both iterations have the purpose and effect of harming out-of-state Plaintiffs to benefit local restaurants; both are *per se* Commerce Clause violations.  ¶¶ 203-08.

Dated:   March 28, 2022
         New York, New York

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:  */s/ Anne Champion*
      Anne Champion
      Esther Lifshitz
      Andrew C. Bernstein
      200 Park Avenue, 47th Floor
      New York, NY 10166-0193
      Telephone:  (212) 351-4000
      AChampion@gibsondunn.com
      ELifshitz@gibsondunn.com
      ABernstein@gibsondunn.com

      Joshua S. Lipshutz (*pro hac vice*)
      1050 Connecticut Ave. NW
      Washington, DC 20036-5306
      Telephone:  (202) 955-8500
      JLipshutz@gibsondunn.com

      *Attorneys for Plaintiffs DoorDash, Inc.,*
      *Grubhub Inc., and Portier, LLC*