UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DOORDASH, INC., GRUBHUB, INC., and
PORTIER, LLC,

               Plaintiffs,

     v.

CITY OF NEW YORK,

               Defendant.

No.  21-cv-7564

---

**BRIEF OF *AMICUS CURIAE* CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA IN SUPPORT OF PLAINTIFFS**

Donald B. Verrilli, Jr.
Elaine J. Goldenberg (*pro hac vice* pending)
Brendan B. Gants (*pro hac vice* pending)
Munger, Tolles & Olson LLP
601 Massachusetts Avenue NW
Suite 500E
Washington, DC 20001
(202) 220-1100

Attorneys for *Amicus Curiae*
Chamber of Commerce of the United States
of America

## TABLE OF CONTENTS

**Page**

INTEREST OF *AMICUS CURIAE* ..................................................................................1

INTRODUCTION ...........................................................................................................1

I.     THE PRICE CONTROL ORDINANCE HARMS BOTH THE PUBLIC AND
THE RESTAURANTS IT PURPORTS TO HELP ...........................................................2

     A.    Government Price Controls Have Harmful, Counterproductive Effects .................2

     B.    This Ordinance Has The Harmful Effects Typical Of Government Price
Controls .....................................................................................................5

II.    THE ORDINANCE IS UNLAWFUL BECAUSE IT DOES NOT PROMOTE
THE GENERAL WELFARE .........................................................................................13

CONCLUSION...............................................................................................................16

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Ass'n of Equip. Manufacturers v. Burgum*,
  932 F.3d 727 (8th Cir. 2019) ................................................15

*Great Atl. & Pac. Tea Co. v. Town of E. Hampton*,
  997 F. Supp. 340 (E.D.N.Y. 1998) ........................................15

*Nat'l Soc'y of Pro. Engineers v. United States*,
  435 U.S. 679 (1978).................................................................3

*Standard Oil Co. v. FTC*,
  340 U.S. 231 (1951).................................................................5

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940).................................................................2

**STATE CASES**

*Grow Sys. Sch. by Garford Lab. v. Bd. of Regents of Univ. of State*,
  98 N.Y.S.2d 834 (App. Div. 1950) ........................................14

*People ex rel. Moskowitz v. Jenkins*,
  202 N.Y. 53 (1911) ................................................................14

*People v. Cohen*,
  272 N.Y. 319 (1936) ..............................................................13

*People v. Ringe*,
  197 N.Y. 143 (1910) .................................................13, 14, 15

*Trio Distrib. Corp. v. City of Albany*,
  2 N.Y.2d 690 (1957) ..............................................................14

**STATUTES**

New York City Administrative Code §§ 20-563.3(a) & (b)..............................1

**OTHER AUTHORITIES**

Birnbaum, Jeffrey H., *Keep Prices Out of Control*, Fortune, June 25, 2001, https://
  www.progressivepolicy.org/wp-content/uploads/2021/02/PPI_Price-Controls-
  Restaurant-Industry.pdf ..........................................................3

Block, Walter, Preface in *Rent Control:  Myths & Realities* (1981) ...............3

Boesch, Jordan, *Can Restaurants Make Delivery Efficient?  Employing Drivers
  vs. Not*, LinkedIn (June 17, 2020), https://www.linkedin.com/pulse/can-
  restaurants-make-delivery-efficient-jordan-boesch ..........................7

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

Brannon, Ike, *Price Caps on Food Delivery Apps Only Exacerbate Restaurant Revenue Problems in the Pandemic*, Forbes (Apr. 15, 2021), https://www.forbes.com/sites/ikebrannon/2021/04/15/price-caps-on-food-delivery-apps-only-exacerbate-restaurant-revenue-problems-in-the-pandemic/?sh=5af9bfc53312 ...................................................................................12

Deacon, Robert T., & Sonstelie, Jon, *The Welfare Costs of Rationing by Waiting*, 27 Econ. Inquiry 179 (1989) ...........................................................................4

Deliverect, *3 Reasons Why Food Delivery is a Must-Have For Your Restaurant*, https://www.deliverect.com/us/blog/online-food-delivery/3-reasons-why-food-delivery-is-a-must-have-for-your-restaurant .....................................................7

Diamond, Rebecca, McQuade, Tim & Qian, Franklin, *The Effects of Rent Control Expansion on Tenants, Landlords, and Inequality: Evidence from San Francisco*, 109 Am. Econ. Rev. 3365 (Sept. 2019) ....................................................4

Doyle, Terrence, *Will Permanent Fee Caps Actually Rein in Delivery Apps?*, Eater (June 28, 2021), https://www.eater.com/22554053/delivery-fee-caps-doordash-ubereats-grub-hub-san-francisco ...............................................................10

Fantozzi, Joanna, *Will Delivery Still be King in a Post-COVID World?*, Restaurant Hospitality (Feb. 10, 2021), https://www.restaurant-hospitality.com/limited-service/will-delivery-still-be-king-post-covid-world ..........................6

Forman, Laura, *Big Apple Takes Bite Out of Food Delivery*, Wall St. J., Aug. 2, 2021, https://www.wsj.com/articles/big-apple-takes-bite-out-of-food-delivery-11627910300 ...............................................................................................9

Forman, Laura, *Food-Delivery Regulation is a Drama Worth Watching*, Wall St. J., Mar. 4, 2021, https://www.wsj.com/articles/food-delivery-regulation-is-a-drama-worth-watching-11614859201 ...............................................................11

Fruits, Eric, *Uber/Grubhub: Pandemic Profiteering, Merger Moratoriums, and Rising Concentration . . . Or Not*, Truth on the Market (May 15, 2020), https://truthonthemarket.com/2020/05/15/uber-grubhub-pandemic-profiteering-merger-moratoriums-and-rising-concentration-or-not ..........................6

Harris, Jenn, *In Twist, Dozens of Los Angeles Restaurants Oppose Delivery App Fee Cap*, L.A. Times, May 18, 2020, https://www.latimes.com/food/story/2020-05-18/los-angeles-restaurants-oppose-delivery-app-fee-cap ...................................11, 12

Kelso, Alicia, *Uber Eats, Postmates Deploy Tiered Pricing Structures*, Restaurant Dive (Sept. 13, 2021), https://www.restaurantdive.com/news/uber-eats-postmates-deploy-tiered-pricing-structures/606427 .................................................8

<u>TABLE OF AUTHORITIES</u>
**(Continued)**

<u>Page(s)</u>

Lee, Dave, *Food Delivery Apps Stung by New York City Cap on Commissions*, Financial Times, Aug. 27, 2021 ..................................................................................9

Li, Zhuoxin & Wang, Gang, *Regulating Powerful Platforms: Evidence from Commission Fee Caps in On-Demand Services* (June 22, 2021) (manuscript), https://ssrn.com/abstract=3871514 ..............................................................12

Luna, Nancy, *Grubhub Says Independent Restaurants are Losing Delivery Orders Due to Mandated Caps on Commission Fees*, Nation's Restaurant News (May 7, 2020), https://www.nrn.com/delivery-takeout-solutions/grubhub-says-independent-restaurants-are-losing-delivery-orders-due ........................................11

Muth, Richard F., *Redistribution of Income Through Regulation in Housing*, 32 Emory L.J. 691 (1983) ..............................................................................5

National Restaurant Ass'n, *State of the Restaurant Industry* (2021), https://go.restaurant.org/rs/078-ZLA-461/images/2021-State-of-the-Restaurant-Industry.pdf ..............................................................................6

News, *The Impacts of Price Controls*, DoorDash (Apr. 8, 2021), https://doordash.news/2021/04/08/the-impacts-of-price-controls ........................................11

Rana, Preetika & Haddon, Heather, *DoorDash and Uber Eats are Hot.  They're Still Not Making Money*, Wall St. J., May 28, 2021, https://www.wsj.com/articles/doordash-and-uber-eats-are-hot-theyre-still-not-making-money-11622194203 ..............................................................9

*Rent Control Backfires Again in St. Paul*, Wall St. J., Nov. 10, 2021 ............................5

Rockoff, Hugh, *Price Controls*, Library of Economics and Liberty, https://www.econlib.org/library/Enc/PriceControls.html ........................................4

Scott Morton, Fiona M., *The Problems of Price Controls*, CATO Institute (June 20, 2001), https://www.cato.org/commentary/problems-price-controls ................................5

Sowell, Thomas, *Basic Economics: A Citizen's Guide to the Economy* (2000)............................3

Stapp, Alec, *Price Controls Won't Fix What's Ailing the Restaurant Industry*, Progressive Policy Institute (Feb. 2021)..............................................................3, 4

Survey, *New Study Shows What Consumers Crave in a Food Delivery Service*, US Foods, https://www.usfoods.com/our-services/business-trends/2019-food-delivery-statistics.html ..............................................................8

## INTEREST OF *AMICUS CURIAE*[1]

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation.  It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country.  An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts.  To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

## INTRODUCTION

In enacting a provision (the "Ordinance") permanently capping the fees that certain third-party delivery platforms can charge restaurants, the City of New York (the "City") has imposed an arbitrary price control that aims to serve narrow private interests but will in fact damage everyone involved:  platforms, restaurants, consumers, and workers.  *See* New York City Administrative Code §§ 20-563.3(a) & (b) (setting cap at 15 percent of an online order for making use of delivery services and at 5 percent of an online order for making use of all other services).

There has long been a consensus among economists that price caps have harmful, counterproductive effects—and that consensus has been borne out by empirical studies examining the actual effects of price caps in various sectors of the economy.  Such caps negatively affect the quantity and quality of the good or service as to which price is capped. They also drive uncapped prices higher, as businesses harmed by the cap try to recoup lost

---

[1] *Amicus* is not a subsidiary or affiliate of any publicly owned corporation.  *Amicus* affirms that no counsel for any party authored this brief in whole or in part, and no entity or person, aside from the *amicus*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

revenue and demand is pushed towards uncontrolled market sectors.

The Ordinance at issue here—which is directed at an extremely competitive and dynamic market—has already had (in its prior, temporary form) the harmful effects that are typical of price controls, and will continue to have those effects going forward. To stay viable, platforms will have to try to pass along costs to consumers in the form of higher fees, and users of the platforms may suffer reductions in service quality, such as longer wait times and a smaller delivery radius. Those changes will reduce consumer demand, leading to less revenue for restaurants and delivery drivers. Among restaurants, the hardest hit will be small, independent, local restaurants that cannot hire their own delivery staff and that depend on the enhanced services provided by the third-party platforms to reach customers. In short, the Ordinance will harm, rather than help, the very restaurants that the City purports to be protecting, while harming other market participants in the process.

Under New York law, cities may not use their police power to enact price-related measures that do not serve the general welfare—and the Ordinance decidedly does not do so. The motion to dismiss the First Amended Complaint should be denied.

## ARGUMENT

### I. THE PRICE CONTROL ORDINANCE HARMS BOTH THE PUBLIC AND THE RESTAURANTS IT PURPORTS TO HELP

#### A. Government Price Controls Have Harmful, Counterproductive Effects

At the heart of the American economic model is free choice for consumers and free competition among producers and service providers for consumers' business. The meeting point for those economic participants is price, "the central nervous system of the economy." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940).

In a competitive market, the market price conveys crucial information about the

intersection of supply and demand.  The market price represents the price at which consumers (*e.g.*, diners) are willing to buy; producers (*e.g.*, restaurants) are willing to sell; and service providers are willing to facilitate those sales (*e.g.*, by making deliveries).  When market participants can select freely among alternative offers, "all elements of a bargain," including not only price but also the quality of a product or service, "are favorably affected."  *Nat'l Soc'y of Pro. Engineers v. United States*, 435 U.S. 679, 695 (1978).

Government price controls distort that process, with predictably negative results for all involved.  One commentator has observed:  "Two words rarely appear in the same sentence: economists and consensus.  But on the issues of price controls, they belong together," because "[t]he famously divided profession agrees that government-imposed price caps generally don't work and, in fact, only make matters worse."  Jeffrey H. Birnbaum, *Keep Prices Out of Control*, Fortune, June 25, 2001 at 36; *see also, e.g.*, Alec Stapp, *Price Controls Won't Fix What's Ailing the Restaurant Industry* at 8, Progressive Policy Institute (Feb. 2021) ("[E]conomists dislike price controls and favor market clearing price mechanisms."), https://www.progressivepolicy.org/wp-content/uploads/2021/02/PPI_Price-Controls-Restaurant-Industry.pdf; Thomas Sowell, *Basic Economics:  A Citizen's Guide to the Economy* 29 (2000) (economists are in "virtually unanimous agreement that declines in product quantity and quality are the usual effects of price controls"); Walter Block, Preface in *Rent Control:  Myths & Realities* xiv (1981) ("[e]conomists who have researched [the] effects" of price controls for rent "are virtually unanimous" that such controls are bad policy).

As economists have long explained, when the government caps the price of a good or service below the market price, several negative consequences ensue.  The market responds by providing less of that good or service, thereby creating shortages.  Producers and service

providers also have less incentive to invest in innovation, improvements, and quality control.  At the same time, the entities whose revenue is depressed by the price cap generally (and rationally) attempt to recoup their lost revenue from consumers by whatever means possible—for instance, through separate charges that are not regulated by the price cap.  Eventually, those combined effects tend to push demand toward uncontrolled market sectors, forcing prices there to rise faster than they otherwise would.  *See* Hugh Rockoff, *Price Controls*, Library of Economics and Liberty, https://www.econlib.org/library/Enc/PriceControls.html.  Thus, regardless of how well intentioned price controls may be, they virtually always have harmful, counterproductive effects.  *See, e.g.*, Progressive Policy Institute 7-8.

That conclusion is borne out by a number of empirical studies evaluating the consequences of price-control measures imposed on various sectors of the economy.  For example, studies show that price controls on gasoline in the 1970s created shortages that resulted in long lines at the gas pump.  *See, e.g.*, Robert T. Deacon & Jon Sonstelie, *The Welfare Costs of Rationing by Waiting*, 27 Econ. Inquiry 179, 179 (1989).  Those controls also caused gas station owners to charge fees for previously free ancillary services, like window washing, to try to compensate for lost revenue.  *See id.*  In the end, price controls cost consumers more in wait time and other costs than consumers saved as a result of lower gas prices.  *See id.*

Similarly, one recent study looked at expanded rent-control measures adopted by San Francisco in the 1990s and found that those measures harmed everyone involved.  The city's expressed goal was to rein in rising housing costs and gentrification—but instead, expanded rent control *exacerbated* the problem, meaningfully contributing to the skyrocketing housing costs the city faced in the decades after adoption of the measures.  *See* Rebecca Diamond, Tim McQuade & Franklin Qian, *The Effects of Rent Control Expansion on Tenants, Landlords, and*

*Inequality:  Evidence from San Francisco*, 109 Am. Econ. Rev. 3365, 3393 (Sept. 2019); *see also, e.g.*, Fiona M. Scott Morton, *The Problems of Price Controls*, CATO Institute (June 20, 2001) ("If government prevents firms from competing over price, firms will compete on whatever dimensions are open to them."), https://www.cato.org/commentary/problems-price-controls.  Expanded rent control slowed new construction; caused some landlords to exit the rental market (for example, by converting to condominiums); and ultimately pushed long-term housing prices higher as a result of decreased housing supply.  *See, e.g.*, Richard F. Muth, *Redistribution of Income Through Regulation in Housing*, 32 Emory L.J. 691, 695 (1983).  Expanded rent control also encouraged the landlords who did continue to offer rentals to defer maintenance and repairs and to forgo improvements, thus decreasing the quality of rental housing, and incentivized those landlords to impose non-rent fees to recoup costs.  *See id.*; *Rent Control Backfires Again in St. Paul*, Wall St. J., Nov. 10, 2021.

Empirical evidence therefore confirms what economic theory teaches about government price controls:  far from serving the general welfare, such price controls ultimately harm everyone, including those they are intended to help.[2]  Price controls are therefore not rationally imposed in competitive markets.  *See generally Standard Oil Co. v. FTC*, 340 U.S. 231, 248 (1951) ("The heart of our national economic policy long has been faith in the value of competition.").

### B.  This Ordinance Has The Harmful Effects Typical Of Government Price Controls

As plaintiffs have explained, the City has now placed a permanent price cap on the commission charged to restaurants by third-party platforms, which operate in a fiercely

---

[2] That conclusion may not hold true in certain very limited circumstances involving "natural monopolies," as to which market-price mechanisms are effectively unavailable.  *See* Progressive Policy Institute 9.  But those circumstances are not pertinent to this case, which involves the highly competitive market for third-party food delivery services.

competitive, rapidly evolving market.  The Ordinance is harmful not only to the platforms the City has targeted but also to consumers, delivery drivers, and ultimately the very restaurants that the City appears to have intended to benefit.

1.  As an initial matter, it is important to recognize the role that third-party food delivery plays in the restaurant industry.  Restaurants obviously do not have to offer a delivery option to consumers, and many do not.  Even at the height of the COVID-19 pandemic, many restaurants offered pickup but not delivery.  *See* National Restaurant Ass'n, *State of the Restaurant Industry* 14-17 (2021), https://go.restaurant.org/rs/078-ZLA-461/images/2021-State-of-the-Restaurant-Industry.pdf; *see also* Joanna Fantozzi, *Will Delivery Still be King in a Post-COVID World?*, Restaurant Hospitality (Feb. 10, 2021), https://www.restaurant-hospitality.com/limited-service/will-delivery-still-be-king-post-covid-world.  Restaurants that do offer delivery are free to provide that service on their own—and, in fact, direct restaurant-to-consumer delivery accounts for about half of the food-service delivery market.  *See* Eric Fruits, *Uber/Grubhub:  Pandemic Profiteering, Merger Moratoriums, and Rising Concentration . . . Or Not*, Truth on the Market (May 15, 2020), https://truthonthemarket.com/2020/05/15/uber-grubhub-pandemic-profiteering-merger-moratoriums-and-rising-concentration-or-not.

Restaurants that want to provide customers with a delivery option but do not want to handle the entire delivery process themselves may contract with third parties to assist with deliveries in various ways.  And within the third-party market, restaurants have a variety of options.  The general public is most familiar with platforms that, like plaintiffs, offer a full-service (or "full-stack") model, handling everything from the customer's placement of the order to ensuring that the food is dropped off at the customer's door.[3]  Those platforms spend

---

[3] Plaintiffs (and other platforms offering a full-service model) also offer restaurants the ability to

significant sums on advertising to attract consumers.  The commission they charge to restaurants reflects the value of access to that customer base—which includes high-value consumers who might not have previously interacted with a restaurant but could become repeat customers after a first online order.  It also reflects the value of economies of scale that enable platforms to optimize routes for greater delivery speed and reliability.  And for restaurants, the convenience and simplicity of a partner that integrates smoothly into their existing operations can allow them to achieve additional revenue and profit while maintaining focus on their core business.  *See, e.g.*, Deliverect, *3 Reasons Why Food Delivery is a Must-Have For Your Restaurant*, https://www.deliverect.com/us/blog/online-food-delivery/3-reasons-why-food-delivery-is-a-must-have-for-your-restaurant.

Restaurants also have the option to partner with competing services offering a different value proposition at a different price point.  For example, some companies, like BentoBox, ChowNow, GoParrot, Lunchbox, Olo, and Tock, handle online orders for restaurants, but are not involved with the delivery.  If a restaurant wants support managing online-order data, it can partner with a customer relationship management provider, such as Bikky, that focuses on providing that service.  And if a restaurant is set up for online ordering and data management but does not want to make deliveries itself, it can partner with a company that supplies "last-mile" delivery couriers, including restaurant-focused companies like Jolt or Relay.  *See, e.g.*, Jordan Boesch, *Can Restaurants Make Delivery Efficient?  Employing Drivers vs. Not*, LinkedIn (June 17, 2020), https://www.linkedin.com/pulse/can-restaurants-make-delivery-efficient-jordan-boesch.

If a restaurant does decide that it wants full-service third-party delivery, the restaurant

---

choose certain individual services "a la carte" at a lower price point.

can choose whether to partner with one or more providers offering a broader range of options. Those providers operate in an intensely competitive market, vying for market share with a number of new and established market players.[4]  And each of those providers offers differential pricing, allowing a restaurant to partner with them at various price points depending on exactly what services the restaurant wishes to use.  For instance, a restaurant might pay a provider more to obtain various marketing services (including the ability to run custom advertisements and promotions), lower customer fees, and a larger delivery radius.  *See, e.g.*, Alicia Kelso, *Uber Eats, Postmates Deploy Tiered Pricing Structures*, Restaurant Dive (Sept. 13, 2021), https://www.restaurantdive.com/news/uber-eats-postmates-deploy-tiered-pricing-structures/606427.

Consumers who wish to use such a provider also have choices.  As was true before the pandemic, many consumers use more than one provider, selecting among them on an order-by-order basis, determined by restaurant availability and differences in price.  *See* Survey, *New Study Shows What Consumers Crave in a Food Delivery Service*, US Foods, https://www.usfoods.com/our-services/business-trends/2019-food-delivery-statistics.html.

In short, restaurants that have chosen to contract with platforms like plaintiffs at a commission rate greater than that allowed by the Ordinance are making a voluntary and conscious trade-off.  *See* First Am. Compl. ¶¶ 20-21, 46-49.  They have decided to give up some short-term margin for the greater visibility, customer exposure, and revenue that those pricing arrangements with those platforms can offer.

2.   The Ordinance distorts that market by imposing a permanent price cap on commissions.  Like other price caps, the Ordinance will have a significant negative impact on all participants in the market—here, platforms, restaurants, workers, and consumers.

---

[4] For example, some recent entrants such as HungryPanda—which focuses on Chinese food— have carved out a regional or category-specific niche within the full-service delivery market.

Most obviously, the Ordinance will harm its intended target of platforms that match restaurants with delivery drivers—likely to the point that some will decide to exit the market entirely.  Such platforms face significant costs.  In addition to paying delivery drivers, they must pay for advertising, customer refunds (when deliveries go wrong), credit card fees, insurance, security measures such as driver background checks, and a host of other operating expenses.  *See* Preetika Rana & Heather Haddon, *DoorDash and Uber Eats are Hot.  They're Still Not Making Money*, Wall St. J., May 28, 2021, https://www.wsj.com/articles/doordash-and-uber-eats-are-hot-theyre-still-not-making-money-11622194203.

Although those platforms have had sufficient capital to weather the losses imposed by temporary and so-called "emergency" commission caps during the pandemic, it is not clear that they can remain economically viable in markets that impose such caps on an indefinite basis.  The amount of revenue lost as a result of the caps is impressively high.  *See, e.g.*, First Amended Compl. ¶ 124 (providing statistics about plaintiffs' losses under the supposedly "temporary" caps that preceded the Ordinance).  Uber Eats, for example, has reported losing more than $60 million in the City alone during the pandemic due to the City's purportedly temporary commission caps.  *See* Laura Forman, *Big Apple Takes Bite Out of Food Delivery*, Wall St. J., Aug. 2, 2021, https://www.wsj.com/articles/big-apple-takes-bite-out-of-food-delivery-11627910300.    Commission caps cost GrubHub more than $100 million in the first half of last year and cost DoorDash $26 million in just the second quarter.  *See* Dave Lee, *Food Delivery Apps Stung by New York City Cap on Commissions*, Financial Times, Aug. 27, 2021, https://www.ft.com/content/d63d4453-62e0-40e8-a303-2ee483c1d792.   Even in the high-order-volume environment created by the pandemic, commission caps can make (and have made) the difference between profitability and large losses that are not indefinitely sustainable.  The losses imposed by such caps also are likely

to overwhelm smaller competitors and deter new entrants, thereby suppressing competition and innovation in the relevant market.

Of course, if providers do exit the market, restaurants and diners in the City could face a shortage or absence of full-service delivery options. But restaurants and diners can also expect to suffer a number of harms along the way as those providers react to a permanent price cap.

First, consumers can expect to pay higher prices. Third-party platforms understandably have already begun seeking to recoup at least some of the lost revenue directly from consumers in the form of fees. *See* Terrence Doyle, *Will Permanent Fee Caps Actually Rein in Delivery Apps?*, Eater (June 28, 2021), https://www.eater.com/22554053/delivery-fee-caps-doordash-ubereats-grub-hub-san-francisco. Even before pandemic-related commission caps were instituted, delivery was a low-margin, cost-intensive business—one in which the market leaders have not turned a profit. *See* Rana & Haddon, *supra.* Revenue lost due to price controls must be made up somewhere. And restaurants that save money on a per-order basis by paying lower commissions to third-party platforms as a result of the Ordinance are unlikely to pass those savings on to consumers.

Second, third-party platforms may well respond to the Ordinance by reducing service to both restaurants and customers, including by making delivery terms and availability more restrictive. Thus, restaurants that are not located in areas with a high density of other restaurants—and which generally pay higher commissions as a result—could be dropped from platforms entirely. Lower-cost restaurants could also be dropped (or have their use of platforms conditioned on a high minimum order), since expending effort and money to recoup a 15 percent or 20 percent commission on an affordable meal may not make economic sense for platforms. Meanwhile, customers located further from restaurants, who depend on expanded delivery

ranges, could find their delivery options reduced or eliminated on some platforms.  For example, after Jersey City imposed a restrictive commission cap during the pandemic, Uber Eats reduced its delivery radius in that city.  *See* Laura Forman, *Food-Delivery Regulation is a Drama Worth Watching*, Wall St. J., Mar. 4, 2021, https://www.wsj.com/articles/food-delivery-regulation-is-a-drama-worth-watching-11614859201.

Third, higher prices for consumers, along with likely service reductions, will translate to reduced order volumes according to basic principles of supply and demand.  Indeed, that has happened already in cities that imposed commission caps during the pandemic.  As a result of those caps and corresponding consumer price increases, GrubHub saw a ten percent decline in orders to independent local restaurants in San Francisco, and DoorDash saw four to seven percent declines in order volume in three other markets.  *See, e.g.*, Nancy Luna, *Grubhub Says Independent Restaurants are Losing Delivery Orders Due to Mandated Caps on Commission Fees*, Nation's Restaurant News (May 7, 2020), https://www.nrn.com/delivery-takeout-solutions/grubhub-says-independent-restaurants-are-losing-delivery-orders-due; News, *The Impacts of Price Controls*, DoorDash (Apr. 8, 2021), https://doordash.news/2021/04/08/the-impacts-of-price-controls.  Plaintiffs here allege that the Ordinance similarly has had, and will continue to have, a negative impact on order volume in the City.  *See* First Am. Compl. ¶¶ 122-124.

That decline in order volume means less revenue for the restaurants the Ordinance is purportedly intended to help—especially independent local restaurants.  *See* Progressive Policy Institute 13.  Indeed, even at the height of early-pandemic lockdowns, a group of local restaurant owners advocated against Los Angeles's temporary commission cap based on the likelihood that the cap would result in reduced order volume—and noted that small businesses could not afford to hire or contract for their own delivery people.  *See* Jenn Harris, *In Twist, Dozens of Los*

*Angeles Restaurants Oppose Delivery App Fee Cap*, L.A. Times, May 18, 2020, https://www.latimes.com/food/story/2020-05-18/los-angeles-restaurants-oppose-delivery-app-fee-cap.  At the same time, the Ordinance makes it difficult for third-party platforms to offer packages that help restaurants attract more customers—through, for example, substantial marketing services, lower customer fees, and a larger delivery radius.  If those offerings become unavailable, that will tend to favor larger, more established national restaurant brands with higher name recognition at the expense of local restaurants that rely on such offerings to get their brand in front of new customers.  Indeed, a recent analysis of commission caps found that independent local restaurants covered by those caps saw a meaningful decline in order volume. *See* Zhuoxin Li & Gang Wang, *Regulating Powerful Platforms: Evidence from Commission Fee Caps in On-Demand Services* (June 22, 2021) (manuscript at 11), https://ssrn.com/abstract=3871514.

Finally, the Ordinance is harmful to delivery drivers—and, by harming those drivers, harms other market players as well.  Drivers rely on the payments and tips that orders generate, *see* Rana & Haddon, *supra*, and so a decline in order volume necessarily decreases drivers' income.  The Ordinance also threatens to decrease the amount that drivers receive in payments and tips for the orders they do deliver.  By making third-party delivery less economical for the platforms with which the drivers contract and more expensive for customers, a price cap encourages those platforms to pay drivers less and encourages customers to tip smaller amounts (or no amount at all).  That may lead to fewer drivers on the streets, which in turn means fewer opportunities for route optimization and increased wait times and service disruptions.  *See id.*; Ike Brannon, *Price Caps on Food Delivery Apps Only Exacerbate Restaurant Revenue Problems in the Pandemic*, Forbes (Apr. 15, 2021),  https://www.forbes.com/sites/ikebrannon/

2021/04/15/price-caps-on-food-delivery-apps-only-exacerbate-restaurant-revenue-problems-in-the-pandemic/?sh=5af9bfc53312.  Those changes are all harmful to consumers, and are likely to have a compounding effect that decreases order volume still further and otherwise exacerbates the various negative effects described above.

## II.    THE ORDINANCE IS UNLAWFUL BECAUSE IT DOES NOT PROMOTE THE GENERAL WELFARE

For all the above reasons, it is clear that the Ordinance is harmful to the public interest.  It is designed to favor one sector of the economy over others, but in the end it will hurt the very business entities that it is intended to aid—and, along the way, will hurt many other individuals and entities.

Those extraordinary flaws in the Ordinance help demonstrate why it is contrary to law, along with the various reasons set forth in plaintiffs' First Amended Complaint and defended in plaintiffs' response to the motion to dismiss.  *See, e.g.*, First Am. Compl. ¶¶ 125-216.  For purposes of this brief, the Chamber will focus on one particular way in which the Ordinance's economic irrationality renders it legally impermissible:  The Ordinance exceeds the City's authority under the New York Constitution, which gives cities the right to exercise the police power of promoting "the welfare of the public."  *People v. Cohen*, 272 N.Y. 319, 322 (1936).

New York courts have interpreted the New York Constitution to limit the scope of cities' authority to use price-related mandates and other regulatory measures implicating the police power to benefit one segment of the public at the expense of other segments.  As the New York Court of Appeals has explained, "[a] statute passed pursuant to the police power should be reasonable," and "[i]ts real purpose must be to protect the public health, morals, or general welfare."  *People v. Ringe*, 197 N.Y. 143, 149 (1910).  "A statute cannot, under the guise of the police power, but really to affect some purpose not within such power, arbitrarily interfere with a

person or a property right." *Id.* In particular, "the police power is not designed to aid one group in a community against another." *Trio Distrib. Corp. v. City of Albany*, 2 N.Y.2d 690, 695 (1957); *see also People ex rel. Moskowitz v. Jenkins*, 202 N.Y. 53, 58 (1911) (the police power may not be used "to safeguard . . . local shopkeepers from competition").

New York courts have not hesitated to strike down statutes and municipal ordinances that contravene those principles. In one case, for example, a court struck down a statute giving the state education commissioner authority to approve or disapprove tuition prices at private trade schools, because the legislature had not adequately established or found that special circumstances existed to justify such regulation of private prices in the public interest. *See Grow Sys. Sch. by Garford Lab. v. Bd. of Regents of Univ. of State*, 98 N.Y.S.2d 834, 835-37 (App. Div. 1950). And in another case involving special burdens placed on "itinerant vending" (such as sales by ice-cream trucks), the court carefully evaluated the proffered justification for an ordinance and found "too attenuated a connection between this ordinance and any of the foundations of the police power to sustain its validity." *Trio Distrib. Corp.*, 2 N.Y.2d at 695. The court therefore struck down the ordinance as an unlawful attempt to benefit certain favored businesses while disadvantaging others. *See id.*

The Ordinance here, like other regulations that New York courts have invalidated, bears "too attenuated a connection" to "any of the foundations of the police power to sustain its validity." *Trio Distrib. Corp.*, 2 N.Y.2d at 695. And no general public interest is served by the arbitrary and irrational price cap the Ordinance imposes. Third-party restaurant delivery is a highly competitive market, not a monopoly, and it is a market for an optional bundle of services, not a necessity. At best, the Ordinance could benefit not the public but restaurant owners who choose to use certain third-party platforms. It does not benefit even those owners, however; it

harms both them and their customers.  *See* pp. 5-12, *supra*.[5]  Such a price control cannot possibly be said to promote the general welfare.  To the contrary, that price control, "under the guise of the police power," unreasonably and "arbitrarily interfere[s] with a person or a property right" and is therefore unlawful.  *Ringe*, 197 N.Y. at 149.

It is notable, although perhaps not surprising, that before enacting such a counterproductive measure the City apparently engaged in no meaningful economic analysis.  *See, e.g.*, First Am. Compl. ¶¶ 6, 16, 72, 112, 165; *see id.* ¶¶ 89-118.  The City did not study the effect of a price cap on consumers, delivery drivers, or even restaurants.  It did not analyze the characteristics of the market or consider whether the price control reflected in the Ordinance would be expected to have the drawbacks common to other price controls.  Rather, the City simply selected an arbitrary 15 percent number and an arbitrary 5 percent number, and then imposed them on the market permanently.

Because the City did not act to promote the welfare of the general public, the Ordinance cannot stand.  At this stage of the case, however, this Court need decide only that the allegations in the First Amended Complaint are sufficient for that complaint to survive a motion to dismiss.  Where, as here, Plaintiffs adequately allege that a measure in fact harms the general welfare by suppressing competition with the aim of advantaging one group of market participants over another, a motion to dismiss a claim for violation of the police powers should be denied.  *See Great Atl. & Pac. Tea Co. v. Town of E. Hampton*, 997 F. Supp. 340, 347-48 (E.D.N.Y. 1998).

---

[5] Of course, general statements by members of the City Council that they wished to benefit restaurants and workers do not mean that the Ordinance actually has that effect, or that benefiting that subset of the public would be sufficient to establish the Ordinance's legality.  *Cf. Ass'n of Equip. Manufacturers v. Burgum*, 932 F.3d 727, 733 (8th Cir. 2019).

## CONCLUSION

For the foregoing reasons, *amicus* respectfully submits that the Court should deny the motion to dismiss.

Dated: March 29, 2022

Respectfully submitted,

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
Elaine J. Goldenberg (*pro hac vice* pending)
Brendan B. Gants (*pro hac vice* pending)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500E
Washington, DC 20001
Telephone: (202) 220-1100

*Attorneys for Amicus Curiae*
*Chamber of Commerce of the United States of*
*America*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of March, 2022, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to all counsel of record.

/s/ *Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500E
Washington, DC 20001
Telephone:  (202) 220-1100

*Attorney for Amicus Curiae*
*Chamber of Commerce of the United States of*
*America*