Exhibit A

2023 WL 1830835

Only the Westlaw citation is currently available.

Supreme Court of Washington,

EN BANC.

WASHINGTON FOOD INDUSTRY ASSOCIATION & MAPLEBEAR, INC. d/b/a Instacart, Respondent,

v.

CITY OF SEATTLE, Petitioner.

NO. 99771-3

|

Argued February 17, 2022

|

Filed February 9, 2023

Appeal from King County Superior Court, Docket No: 20-2-10541-4, Honorable Michael R. Scott, Judge

**Attorneys and Law Firms**

Jeremiah Miller, Fair Work Center & Working Washington, 116 Warren Ave. N. Ste. A, Seattle, WA, 98109-4977, Derrick Anthony De Vera, Wash. State House of Representatives, P. O. Box 40600, Olympia, WA, 98504-0600, Stacey Leyton, P. Casey Pitts, Altshuler Berzon LLP, 177 Post Street, Suite 300, San Francisco, CA, 94108-4797, Jessica Lynn Zornes Leiser, Seattle City Attorney's Office, 701 5th Ave. Ste. 2050, Seattle, WA, 98104-7095, for Petitioner.

Robert M. McKenna, Daniel J. Dunne Jr., Orrick, Herrington & Sutcliffe LLP, 401 Union St. Ste. 3300, Seattle, WA, 98101, Daniel A. Rubens, Orrick, Herrington & Sutcliffe, 51 West 52nd Street, New York, NY, 10019, for Respondent.

Darin M. Dalmat, Barnard Iglitzin & Lavitt LLP, 18 W. Mercer St. Ste. 400, Seattle, WA, 98119-3971, for Amici Curiae on behalf of National Employment Law Project, Economic Policy Institute, Jobs With Justice Education Fund, National Council for Occupational Safety and Health, Public Rights Project.

Joseph Zachary Lell, Andrew Thomas Pollom, Ogden Murphy Wallace PLLC, 901 5th Ave. Ste. 3500, Seattle, WA, 98164, Sheila Marie Gall, Association of Washington Cities, 1076 Franklin St. Se, Olympia, WA, 98501-1346, for Amicus Curiae on behalf of Assoc. of Washington Counties.

William R. Maurer, Institute For Justice, 600 University St. Ste. 1730, Seattle, WA, 98101-2925, Robert Belden, Institute for Justice, 901 N. Glebe Road, Suite 900, Arlington, VA, 22203, for Amicus Curiae on behalf of Institute for Justice.

Alexander Seth Gorin, Department of Justice, 312 N. Spring St. Ste. 1200, Los Angeles, CA, 90012-2551, Donald B. Verrilli Jr., Elaine J. Goldenberg, Brendan B. Gants, Munger, Tolles & Olson LLP, 601 Massachusetts Ave. Nw, Suite 500 E, Washington, DC, 20001, for Amicus Curiae on behalf of Chamber of Commerce of the USA.

Ryan P. Hammond, Littler Mendelson, 600 University St. Ste. 3200, Seattle, WA, 98101-3122, Madhura Panjini, Attorney at Law, 1300 Sw 5th Ave. Ste. 2400, Portland, OR, 97201-5610, for Amicus Curiae on behalf of Northwest Grocery Association.

Jeffrey Todd Even, Alexia Diorio, Wash. Attorney General's Office, 1125 Washington St. Se, P. O. Box 40100, Olympia, WA, 98504-0100, for Amicus Curiae on behalf of State of Washington.

**Opinion**

MONTOYA-LEWIS, J.

**\*1**  ¶1 In early 2020, life in the state of Washington changed dramatically due to the public health emergency caused by the novel coronavirus (COVID-19). Six months after United States and global health authorities declared COVID-19 a public health emergency, the city of Seattle (City) passed an ordinance authorizing hazard pay for certain workers who deliver food to consumers' homes. By that time, Governor Inslee had issued stay-at-home orders requiring Washingtonians to leave home only for the most essential of trips. Many businesses were closed, and many employees working remotely. Those who could stayed home and stayed away from others as much as possible, compelled by the rapid spread of the deadly virus and the emergency it caused. But we had to eat. Given the rapid spread of COVID-19 and the risk of exposure, many were faced with a dilemma: How can we safely buy food?

¶2 Critically, some people were willing and able to perform the service of delivering food from restaurants and grocery stores. Deliveries skyrocketed—while some businesses operated their own delivery services, others contracted with third-party companies like Instacart that maintain networks of workers to complete on-demand shopping and delivery services. Using those delivery services, consumers were able to order food for delivery, from the safety of their own homes.

¶3 Concerned for the health, safety, and economic security of the delivery workers, the City passed Seattle Ordinance 126094, requiring hazard pay for gig workers [1] for food delivery network companies. The ordinance requires food delivery network companies to pay their workers an extra dollar and a quarter for each work-related stop in Seattle. It also imposes constraints. Food delivery network companies may not reduce workers' compensation or otherwise limit their earning capacity as a result of the ordinance. They are also prohibited from reducing the areas of the City they serve or passing on the cost of the premium pay to customers' charges for groceries.

[1]    *See infra* note 8.

¶4 The Washington Food Industry Association and Maplebear Inc., d/b/a Instacart, challenge the ordinance. The plaintiffs seek declaratory judgment invalidating the ordinance on statutory as well as Washington and United States constitutional grounds. They also seek an award of damages for violations of federal law. The trial court dismissed the statutory claim under chapter 82.84 RCW but permitted all remaining claims to proceed. At this early stage in the proceedings, no discovery has occurred, and the record is limited to the pleadings.

¶5 This court unanimously holds that the chapter 82.84 RCW claim and equal protection claim should be dismissed and that the takings clause, contracts clause, and federal damages claims should not be dismissed. A majority of the court also holds that the privileges and immunities claim should be dismissed. Although I would conclude that the police powers claim should be dismissed, a majority of the court holds that it should not be dismissed, and we therefore affirm on that issue. For the reasons stated below, we affirm in part and reverse in part as follows:

**\*2**  I. The chapter 82.84 RCW claim is dismissed; we affirm.

II. The equal protection claim is dismissed; we reverse.

III. The privileges and immunities claim is dismissed; we reverse.

IV. The takings clause claim is not dismissed; we affirm.

V. The contracts clause claim is not dismissed; we affirm.

VI. The 42 U.S.C. § 1983 damages claim is not dismissed; we affirm.

VII. The police powers claim is not dismissed; we affirm. [2]

[2]     The court's lead opinion of Justice Montoya-Lewis provides the majority holdings on all issues except for police powers. The concurrence of Justice Johnson provides the majority on the police powers claim.

BACKGROUND

A. Factual Background [3]

[3]     The facts are drawn from the complaint. *Becker v. Cmty. Health Sys., Inc.*, 184 Wash.2d 252, 257, 359 P.3d 746 (2015) (when reviewing a motion to dismiss, we accept all facts alleged in the complaint as true).

¶6 The COVID-19 pandemic first took hold in the winter of 2020. In January and February 2020, United States and global health authorities declared COVID-19 a public health emergency and began taking actions in response to the highly infectious virus. In Washington State, Governor Jay Inslee declared a state of emergency in February, and Seattle Mayor Jenny Durkan proclaimed a civil emergency in response to COVID-19 in March. Proclamation by Governor Jay Inslee, No. 20-05 (Wash. Feb. 29, 2020); [4] Proclamation by Mayor Jenny Durkan, Civil Emergency at 2 (Seattle, Mar. 3, 2020). [5]

[4]     https://www.governor.wa.gov/sites/default/files/proclamations/20-05% 20Coronavirus% 20% 28final% 29.pdf [https://perma.cc/TAF6-QNGB].

[5]     https://durkan.seattle.gov/wp-content/uploads/sites/9/2020/03/COVID-19-Mayoral-Proclamation-of-Civil-Emergency.pdf [http://perma.cc/8ZFH-DTE6].

¶7 COVID-19 can cause serious illness or death, and the virus spreads easily from person to person; thus, government and public health authorities advised taking distancing measures in order to minimize exposure and infection. In March 2020, Governor Inslee issued a "Stay Home – Stay Healthy" proclamation closing all nonessential workplaces and banning large gatherings in an effort to reduce the spread of the virus. Proclamation by Governor Jay Inslee, No. 20-25 (Wash. Mar. 23, 2020). [6] That proclamation directed all people in Washington State to stay at home unless engaging in essential activities or working in essential businesses. *Id.* at 3. "Essential activities" included obtaining necessary supplies like groceries and food for household consumption, and "essential business services" included grocery stores and restaurants with delivery and carry-out services. *Id.*; Proclamation 20-25 App., at 4 (Mar. 23, 2020). [7]

[6]     https://www.governor.wa.gov/sites/default/files/proclamations/20-25%  20Coronovirus%  20Stay%  20Safe-Stay% 20Healthy% 20% 28tmp% 29% 20% 28002% 29.pdf [https://perma.cc/PJ48-WAEY].

[7]     https://www.governor.wa.gov/sites/default/files/WA% 20Essential% 20Critical% 20Infrastructure% 20Workers% 20% 28Final% 29.pdf [https://perma.cc/3574-C4SB].

¶8 During these early months of the pandemic, demand for delivery food services increased significantly. While some restaurants and grocery stores provided in-house delivery services, food delivery network companies also facilitated orders of groceries and food from restaurants as a third party. Some members of the Washington Food Industry Association, like independent grocery stores, markets, and convenience stores, do not employ delivery workers but instead depend on those third-party delivery services. In turn, food delivery network companies like Instacart offer smartphone applications that allow consumers to shop for groceries or restaurant food using the online platform and then have their orders delivered directly to the consumer's home. Instacart's platform facilitates only grocery shopping and delivery. Instacart does not employ workers to shop for and deliver groceries; people who perform that work do so as independent contractors and are paid with a combination of service fees and customer tips.

  **\*3**  ¶9 By Instacart's estimate, the number of delivery workers contracting with it tripled between March and May 2020, as demand for food delivery services increased significantly at the same time. The upsurge in the number of orders also meant that drivers made more paid deliveries. Instacart estimates that its Seattle delivery workers earned approximately $20 per hour in

January and February 2020 and closer to $30 per hour by May 2020. Instacart does not provide any estimates on how many hours drivers worked or their total compensation. At this early stage in the litigation, the record does not include any evidence of the number of delivery workers Instacart contracts with, the number of stops they make, the method by which they are compensated, or the details of any of Instacart's contracts with delivery workers or grocery stores.

B. The Ordinance

¶10 In June 2020, the Seattle City Council passed Seattle Ordinance 126094, "Premium Pay for Gig Workers." The ordinance recognizes that food delivery network companies and their workers provide essential services during the COVID-19 emergency. Seattle Ordinance 126094, at 2 (June 26, 2020), https://www.seattle.legistar.com/View.ashx?M=F& ID=8656949& GUID=450BE067-D41F-4C49-A3C9-7A7D67A2DB9D [https://perma.cc/EK2L-TWEX]. It also acknowledges that those workers "face magnified risks of catching or spreading disease because the nature of their work can involve close contact with the public" when they pick up food from eating and drinking establishments or grocery stores and deliver it to consumers' homes. *Id.* at 1. Additionally, food delivery network companies rely on business models that hire independent contractors, or "gig workers," who do not have access to all of the workplace protections created by law for employees.[8] *Id.* The City determined that gig workers working for food delivery network companies should receive premium pay for work performed during the COVID-19 emergency. *Id.* It concluded that premium pay

> protects public health, supports stable incomes, and promotes job retention by ensuring that gig workers are compensated now and for the duration of the public health emergency for the substantial risks, efforts, and expenses they are undertaking to provide essential services in a safe and reliable manner during the COVID-19 emergency.

*Id.* at 6.

[8]    The terms "gig work" and "the gig economy" are used colloquially to describe a business model that pays workers by the task and depends on freelance workers or independent contractors who do not receive protections usually afforded employees, like the minimum wage, overtime, workers' compensation, unemployment insurance, and the right to collectively organize and bargain. Ride-hail companies and food delivery network companies typically operate using this model. The ordinance defines "gig worker" as any "food delivery network company worker." Seattle Ordinance 126094, at 9.

¶11 Therefore, the ordinance requires food delivery network companies to provide each gig worker with premium pay for each online order that results in the worker making a work-related stop in Seattle: $2.50 for the first pickup or drop-off point in Seattle and $1.25 for each additional pickup or drop-off point in Seattle. *Id.* at 13. It also includes "[g]ig worker and consumer protections" prohibiting food delivery network companies from taking any of the following actions "as a result of this ordinance going into effect":

1. Reduce or otherwise modify the areas of the City that are served by the [food delivery network company];

2. Reduce a gig worker's compensation; or

3. Limit a gig worker's earning capacity, including but not limited to restricting access to online orders.

4. Add customer charges to online orders for delivery of groceries.

*Id.* at 13-14. The ordinance can be enforced with investigations by the Office of Labor Standards, a private right of action, and civil penalties. *Id.* at 17-31.

**\*4** ¶12 Seattle Ordinance 126094 originally stated that it would be automatically repealed three years after the termination of the civil emergency proclaimed by the mayor on March 3, 2020. *Id.* at 35. In August 2020, the city council passed Seattle Ordinance 126122, "Technical Amendments to Premium Pay for Gig Workers," which limits the premium pay requirement and worker and consumer protections to the duration of the civil emergency. Seattle Ordinance 126122, at 7 (August 21, 2020). [9] We refer to Seattle Ordinance 126094, as modified by Seattle Ordinance 126122, as the ordinance.

[9]     Both the State of Washington and the City lifted the states of emergency on October 31, 2022.

### C. Instacart's Complaint

¶13 Washington Food Industry Association and Maplebear Inc., d/b/a Instacart (collectively Instacart), filed suit against the City, seeking invalidation of the ordinance and damages. Instacart alleges the city council passed the ordinance in consultation with labor unions "intent on increasing pay to food delivery persons and used the COVID-19 emergency as a pretext to do so." 1 Clerk's Papers (CP) at 76.

¶14 Instacart alleges seven causes of action in the complaint. First, Instacart alleges the ordinance violates Initiative 1634 (I-1634), codified at chapter 82.84 RCW, which states that local governments "may not impose or collect any tax, fee, or other assessment on groceries." RCW 82.84.040(1). Second, it alleges the ordinance exceeds the City's police powers. *See* WASH. CONST. art XI, § 11. Third, it alleges the ordinance takes private property for public use without just compensation, in violation of the takings clause of the Washington and United States Constitutions. *See* U.S. CONST. amend. V; WASH. CONST. art. I, § 16. Fourth, it alleges the ordinance impairs existing contractual obligations in violation of the contracts clauses of the Washington and United States Constitutions. *See* U.S. CONST. art. I, § 10, cl. 1; WASH. CONST. art. I, § 23. Fifth, it alleges the ordinance violates the equal protection clause of the United States Constitution. *See* U.S. CONST. amend. XIV, § 1. Sixth, Instacart alleges the ordinance violates the privileges and immunities clause of the Washington Constitution. *See* WASH. CONST. art. I, § 12. Seventh, Instacart alleges the City has, under the color of law, violated Instacart's rights protected by the U.S. Constitution and federal law, and Instacart should be entitled to recover damages and attorney fees. 42 U.S.C. § 1983.

### D. City's Motion To Dismiss

¶15 The City filed a CR 12(b)(6) motion to dismiss all of Instacart's causes of action for failure to state a claim on which relief can be granted. The superior court dismissed with prejudice Instacart's first cause of action regarding I-1634, codified at chapter 82.84 RCW. It declined to dismiss the remaining causes of action.

¶16 The City sought discretionary review in this court. Instacart opposed discretionary review but raised the contingent issue of the dismissed chapter 82.84 RCW claim. We granted review and retained the case for review of all issues. Numerous organizations filed briefs of amici curiae: the Association of Washington Cities; the State of Washington; the Chamber of Commerce of the United States of America; Northwest Grocery Association; Institute for Justice; and the National Employment Law Project, Economic Policy Institute, Jobs with Justice, National Council for Occupational Safety and Health, and Public Rights Project.

### ANALYSIS

¶17 We review a superior court's decision on a CR 12(b)(6) motion de novo. *Kinney v. Cook*, 159 Wash.2d 837, 842, 154 P.3d 206 (2007). Dismissal is proper only if the court concludes "the plaintiff cannot prove 'any set of facts which would justify recovery.' " *Id.* (quoting *Tenore v. AT&T Wireless Servs.*, 136 Wash.2d 322, 330, 962 P.2d 104 (1998)). We presume all facts alleged in the complaint to be true and may consider hypothetical facts supporting the plaintiff's claims. *Id.* The gravamen of our inquiry is whether the plaintiff's claim is legally sufficient: if the plaintiff's claim remains legally insufficient even under their proffered hypothetical facts, dismissal is appropriate. *Trujillo v. Nw. Tr. Servs., Inc.*, 183 Wash.2d 820, 830, 355 P.3d 1100 (2015).

### I. Chapter 82.84 RCW: Taxes, Fees, or Other Assessments on Groceries

**\*5** ¶18 First, Instacart alleges the ordinance violates RCW 82.84.040, a statute prohibiting local taxes on groceries. In 2018, Washington voters approved I-1634, which was codified as the "keep groceries affordable act of 2018," chapter 82.84 RCW. LAWS OF 2019, ch. 2 (I-1634). Chapter 82.84 RCW includes several findings and declarations:

(1) Whereas access to food is a basic human need of every Washingtonian; and

(2) Whereas keeping the price of groceries as low as possible improves the access to food for all Washingtonians; and

(3) Whereas taxing groceries is regressive and hurts low- and fixed-income Washingtonians the most; and

(4) Whereas working families in Washington pay a greater share of their family income in state and local taxes than their wealthier counterparts; now, therefore,

(5) The people of the state of Washington find and declare that no local governmental entity may impose any new tax, fee, or other assessment that targets grocery items.

RCW 82.84.020. Under RCW 82.84.040(1), a local governmental entity may not impose or collect any tax, fee, or other assessment on groceries. Such a "[t]ax, fee, or other assessment on groceries":

> includes, but is not limited to, a sales tax, gross receipts tax, business and occupation tax, business license tax, excise tax, privilege tax, or any other similar levy, charge, or exaction of any kind on groceries or the manufacture, distribution, sale, possession, ownership, transfer, transportation, container, use, or consumption thereof.

RCW 82.84.030(5). Instacart argues the ordinance's premium pay requirement imposes a " 'fee,' 'other assessment,' 'charge,' or 'exaction of any kind' " within this definition. 1 CP at 84.

¶19 Interpretation of a statute is a question of law we review de novo. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). Initiatives are passed as an exercise of the legislative power reserved by the people of Washington. WASH. CONST. art. II, § 1(a). Therefore, our task is "to ascertain the collective intent of the voters who, acting in their legislative capacity, enacted the measure." *Amalg. Transit Union Loc. 587 v. State*, 142 Wn.2d 183, 205, 11 P.3d 762 (2000) 27 P.3d 608 (2001). We interpret statutes created by initiatives according to the general rules of statutory construction. *City of Spokane v. Taxpayers of Spokane*, 111 Wn.2d 91, 97, 758 P.2d 480 (1988). We look to the language of the enactment as a whole to determine the plain meaning of the text. *Campbell & Gwinn*, 146 Wn.2d at 11, 43 P.3d 4. We must not interpret a statute in a way that renders any portion of it meaningless or superfluous. *State v. K.L.B.*, 180 Wn.2d 735, 742, 328 P.3d 886 (2014). "Statutory language must be given its usual and ordinary meaning, regardless of the policy behind the enactment." *Taxpayers*, 111 Wn.2d at 97, 758 P.2d 480. If the meaning is ambiguous, we may resort to aids to construction, including legislative history and statements in the voters' pamphlet. *Campbell & Gwinn*, 146 Wn.2d at 12, 43 P.3d 4; *Amalg. Transit Union*, 142 Wn.2d at 205-06, 11 P.3d 762. For statutes created by initiatives, we "focus on the voters' intent and the language of the initiative 'as the average informed lay voter would read it.' " *Taxpayers*, 111 Wn.2d at 97, 758 P.2d 480 (internal quotation marks omitted) (quoting *Est. of Turner v. Dep't of Revenue*, 106 Wn.2d 649, 654, 724 P.2d 1013 (1986)).

**\*6** ¶20 The meaning of RCW 82.84.030(5) is unambiguous. The statute prohibits taxes on groceries. We read the text of the statute in context and in its entirety as the average informed lay voter would read it, giving language its usual and ordinary meaning. *Id.*; *Campbell & Gwinn*, 146 Wash.2d at 11, 43 P.3d 4. The definition of a "[t]ax, fee, or other assessment on groceries" under the statute includes a nonexhaustive, illustrative list of six different kinds of "tax,"—"sales tax, gross receipts tax, business and occupation tax, business license tax, excise tax, privilege tax"—or "any other *similar* levy, charge, or exaction of any kind."

RCW 82.84.030(5) (emphasis added). The ballot title for I-1634 was "A[n act r]elating to the taxation of groceries; and adding a new chapter to Title 82 RCW." 2 CP at 284 (*State of Washington Voters' Pamphlet, General Election* (Nov. 6, 2018)). Title 82 RCW relates to "excise taxes." Thus, the average informed lay voter would read the statute to prohibit charges that are, or resemble, taxes on groceries.

¶21 The term "tax" has a common meaning as a burden or charge imposed by legislative authority to raise money for public purposes or for the public treasury. *King County Fire Prot. Dists. No. 16 v. Hous. Auth.*, 123 Wash.2d 819, 833, 872 P.2d 516 (1994). We have previously held that the average informed lay voter would understand this common meaning of "tax" in the initiative context:

> As a noun, the term "tax" has as its common meaning a "pecuniary charge imposed by legislative or other public authority upon persons or property *for public purposes*: a forced contribution of wealth *to meet the public needs of a government*." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2345 ([3d ed.] 1986). These definitions probably accord with the average informed voter's understanding of the term "tax," and are consistent with the State's argument that "tax" means a compulsory charge for the support of government. ... "Tax" means "an enforced contribution of money, assessed or charged by authority of sovereign government *for the benefit of the state or the legal taxing authorities*...." *State ex rel. City of Seattle v. Dep't of Public Utils.*, 33 Wn.2d 896, 902, 207 P.2d 712 (1949). "Tax" is a "pecuniary burden laid upon individuals or property *to support the government* ...." BLACK'S LAW DICTIONARY 1457 (6th ed. 1990).

*Amalg. Transit Union*, 142 Wash.2d at 219-20, 11 P.3d 762 (emphasis added).

¶22 In *Amalgamated Transit Union*, we held that an initiative that referred only to "taxes" in its title violated the constitutional subject-in-title requirement because it failed to provide notice that the tax provision would apply to fees and charges not traditionally considered taxes. *Id.* at 291-92, 11 P.3d 762; *see* WASH. CONST. art II, § 19. The ballot title of that initiative was " 'Shall voter approval be required for any tax increase, license tab fees be $30 per year for motor vehicles, and existing vehicle taxes be repealed.' " *Amalg. Transit Union*, 142 Wash.2d at 193, 11 P.3d 762 (quoting *State of Washington Voters' Pamphlet, General Election* (Nov. 2, 1999)). But the initiative's definition of "tax" not only included traditional taxes such as " 'sales and use taxes, property taxes, business and occupation taxes, excise taxes, [and] fuel taxes' "—it also included " 'impact fees, license fees, permit fees, and any monetary charge by government,' " while excluding tuition for higher education and civil and criminal fines and charges. *Id.* (quoting LAWS OF 2000, ch. 1, § 2(2), (3)).

¶23 In analyzing the subject-in-title rule, the court looked to the intent of the voters, construing the language of the initiative "as the average informed voter voting on the initiative would read it." *Id.* at 219, 11 P.3d 762. We held that the average informed voter's understanding of the term "tax" was probably consistent with the common meaning as a charge imposed by the government to support the public needs of a government. *Id.* In contrast, the initiative defined " 'tax' " as something that " 'includes, but is not necessarily limited to' " various taxes, as well as license fees that the average voter would *not* consider a tax in its traditional sense, plus " '*any* monetary charge by government.' " *Id.* (quoting LAWS OF 2000, ch. 1, § 2(2)). Further, it *excluded* things that are not compulsory charges for the support of the government, like higher education tuition and civil and criminal fines and charges. *Id.* (quoting LAWS OF 2000, ch. 1, § 2(3)). The initiative needed to specify that it excluded certain charges, like fines and tuition, because if it failed to do so, its extremely broad definition apparently encapsulated items other than traditional taxes under the common meaning. If a "tax" under the initiative was consistent with the traditional common understanding, the specific inclusions and exclusions in the definition would be "superfluous." *Id.* at 220, 11 P.3d 762 (citing *City of Bellevue v. Lorang*, 140 Wash.2d 19, 25, 992 P.2d 496 (2000) (legislation is to be construed so that all language is given effect and no part is rendered meaningless or superfluous)). Therefore, the initiative defined "tax" far more broadly than the traditional meaning as the average informed voter would read the term. *Id.* at 222, 11 P.3d 762.

**\*7** ¶24 In contrast, here, the statute created by I-1634 defines "tax" consistent with the traditional, common meaning of the term. We conclude that the average informed lay voter would read chapter 82.84 RCW to prohibit new local taxes on groceries that would increase the cost of groceries for the consumer in order to produce revenue for public purposes of the public treasury. As we have explained, the average informed lay voter would read the term "tax" to mean a compulsory charge to raise money

for the public purposes of the government. *Id.* at 219, 11 P.3d 762; *King County Fire Prot. Dist.*, 123 Wash.2d at 833, 872 P.2d 516. The title and structure of the act indicate that it relates to taxes. The definition of a "tax, fee, or other assessment on groceries" lists only illustrative *taxes*—such as a "sales tax, gross receipts tax, business and occupation tax, business license tax, excise tax, [or] privilege tax"—"or any other *similar* levy, charge, or exaction of any kind." RCW 82.84.030(5) (emphasis added). Further, the findings and declarations under RCW 82.84.020 emphasize access to food as "a basic human need," that keeping the price of groceries low improves access to food, and that "taxing groceries is regressive and hurts low- and fixed-income Washingtonians the most." RCW 82.84.020(1), (3). An average informed lay voter would read this law to prohibit taxes on groceries consistent with the common meaning as a compulsory charge for the support of the government.

¶25 The City's premium pay ordinance does not impose a tax on groceries. It requires food delivery network companies to pay their workers, and the money flows directly to those workers, not to the government or the general public. The ordinance commands food delivery network companies to "provide each gig worker with premium pay for each online order." Seattle Ordinance 126094, at 13; *see also id.* at 8, 10 (defining "compensation" as "the total payment *owed to a gig worker* by reason of working for the [food delivery network company]" and "premium pay" as "additional compensation *owed to a gig worker*" (emphasis added)). Whereas a tax is a forced contribution of money to the public treasury or for public purposes, *Amalg. Transit Union*, 142 Wash.2d at 219-21, 11 P.3d 762, the ordinance requires food delivery network companies to make a payment directly to their workers. Thus, the premium pay required by the ordinance is not a "tax, fee, or other assessment on groceries" as defined by RCW 82.84.030(5) because it does not raise money for the support of the government.

¶26 Instacart argues that the definition of a "tax, fee, or other assessment on groceries" should be read more broadly than the traditional common understanding of "tax" because the statute includes the phrase "or any other similar levy, charge, or exaction *of any kind.*" RCW 82.84.030(5) (emphasis added). Instacart argues that the presence of the word "any" broadens the definition to mean " 'something other than similar.' " Resp'ts' Br. at 23 (quoting *Amalg. Transit Union*, 142 Wash.2d at 193, 11 P.3d 762).

¶27 We disagree. As we have explained, the phrases "tax, fee, or other assessment on groceries" and "any other similar levy, charge, or exaction of any kind" do not appear in a vacuum. We must interpret the terms in the context of the statutory scheme and give the language of the definition provided by the voters its usual and ordinary meaning. *Taxpayers*, 111 Wash.2d at 97, 758 P.2d 480; *Campbell & Gwinn*, 146 Wash.2d at 11, 43 P.3d 4. Moreover, we must not interpret a statute in a way that renders any portion of it meaningless or superfluous, and such a reading would render the term "similar" superfluous. *K.L.B.*, 180 Wash.2d at 742, 328 P.3d 886; *Amalg. Transit Union*, 142 Wash.2d at 220, 11 P.3d 762. If the average informed voter would understand "tax" to be a compulsory charge for the support of government, then "any other *similar* levy, charge, or exaction of any kind" must be any kind of levy, charge, or exaction that is similar to the traditional taxes listed as examples in the definition. RCW 82.84.030(5) (emphasis added); *Amalg. Transit Union*, 142 Wash.2d at 220, 11 P.3d 762 ("similar" and "any" have contrasting meaning).

¶28 The ordinance does not violate RCW 82.84.040 because premium pay to workers is not a tax, as an average lay voter would understand the term. Therefore, the trial court did not err in dismissing Instacart's chapter 82.84 RCW claim. We affirm.

## II. Equal Protection

¶29 Second, Instacart alleges the ordinance violates the equal protection clause of the federal constitution. U.S. CONST. amend. XIV, § 1 ("No state shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws."). Instacart alleges there is no rational basis for differential treatment for food delivery workers because they face lower risks than people who work in grocery stores or restaurants, or who transport passengers in their vehicles.

**\*8** ¶30 "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Fed. Commc'ns Comm'n v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993). Social and economic policies that do not involve suspect classifications, such as a race or nationality, or fundamental constitutional rights "must be upheld against [an] equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.*; *see also Medina v. Pub. Util. Dist. No. 1 of Benton County*, 147 Wash.2d 303, 313, 53 P.3d 993

(2002). No suspect class exists here; therefore, the parties agree we review Instacart's equal protection claim under the rational basis standard. *Medina*, 147 Wash.2d at 313, 53 P.3d 993.

¶31 " 'Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made.' " *In re Det. of Dydasco*, 135 Wash.2d 943, 951, 959 P.2d 1111 (1998) (internal quotation marks omitted) (quoting *In re Pers. Restraint of Young*, 122 Wash.2d 1, 45, 857 P.2d 989 (1993)). On rational basis review, there is a "strong presumption" of the law's validity, and the challenger has the burden " 'to negative every conceivable basis which might support it.' " *Beach Commc'ns*, 508 U.S. at 314-15, 113 S.Ct. 2096 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S. Ct. 1001, 35 L. Ed. 2d 351 (1973)); *Aetna Life Ins. Co. v. Wash. Life & Disability Ins. Guar. Ass'n*, 83 Wash.2d 523, 528, 520 P.2d 162 (1974) ("A statute's alleged unconstitutionality must be proven 'beyond all reasonable doubt' before it may be struck down." (quoting *Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213, 270, 6 L. Ed. 606 (1827))). Instacart fails to do so here; thus, this claim must be dismissed.

¶32 Instacart argues this ordinance treats food delivery network drivers differently from other workers in restaurants or grocery stores or other gig economy workers like ride-hail drivers for transportation network companies. But the equal protection clause does not require the City to treat all gig workers the same. Under the deferential standard of rational basis, courts should not scrutinize "the wisdom, fairness, or logic of legislative choices" and should therefore uphold an ordinance as long as " 'plausible reasons' " exist for its enactment. *Beach Commc'ns*, 508 U.S. at 313-14, 113 S.Ct. 2096 (quoting *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179, 101 S. Ct. 453, 66 L. Ed. 2d 368 (1980)). Further, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Id.* at 315, 113 S. Ct. 2096.

¶33 Rational bases exist for the ordinance to provide protections for food delivery network companies and their workers, aside from other kinds of workers. The City recognized that the "availability of food delivery services is fundamental to the health of the community" and that food delivery network drivers work on the front lines in potentially hazardous conditions to provide the essential service of allowing consumers to obtain sustenance without personally visiting stores and restaurants, thereby promoting social distancing and minimizing the spread of the virus. Seattle Ordinance 126094, at 6. Though workers in restaurants and grocery stores face risks while providing a similarly essential service of making food available to customers, it is reasonable for the City to view the work of food delivery network drivers as serving a *different, additional* purpose of minimizing person-to-person contact in otherwise highly trafficked areas; it is likewise reasonable for the City to choose to incentivize that work by requiring premium pay. *Aetna Life Ins.*, 83 Wash.2d at 528-29, 520 P.2d 162 (Equal protection "forbids all invidious discrimination but does not require identical treatment for all without recognition of difference in relevant circumstances."). Further, the ordinance is aimed at providing protections for gig workers who do not receive the same workplace protections as employees. The City could have rationally concluded hazard pay was necessary for these gig workers because they work as independent contractors and are therefore more vulnerable than employees in the food and grocery industries.

**\*9** ¶34 While the parties may disagree *as a matter of policy* as to how the City should protect gig workers and workers in the food and grocery industry against COVID-19, this process of "line-drawing" is squarely within the ambit of the legislative branch. *Beach Commc'ns*, 508 U.S. at 315-16, 113 S.Ct. 2096 ("These restraints on judicial review have added force 'where the legislature must necessarily engage in a process of line-drawing' ... 'the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.' " (second alteration in original) (quoting *Fritz.*, 449 U.S. at 179, 101 S.Ct. 453)). Instacart has failed to show that there is no conceivable basis for this classification. As there is a rational basis for the legislature to treat this class of workers differently, the judicial inquiry is done. *Id.* at 313-14, 113 S. Ct. 2096 ("Where there are 'plausible reasons' for [the legislature's] action, 'our inquiry is at an end.' " (quoting *Fritz*, 449 U.S. at 179, 101 S.Ct. 453)); *Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 108-09, 123 S. Ct. 2156, 156 L. Ed. 2d 97 (2003). Therefore, the equal protection claim should be dismissed, and we reverse the trial court on this issue.

### III. Privileges and Immunities

¶35 Third, Instacart alleges the ordinance violates the privileges and immunities clause of the Washington Constitution. *See* WASH. CONST. art. I, § 12. Similar to its equal protection argument, Instacart argues the ordinance singles out food

delivery network companies for disfavored treatment. It further argues that the ordinance's gig worker and consumer protection provisions "implicate Instacart's fundamental right to carry on business" in Washington. 1 CP at 89. We have only held that this right is implicated in very narrow circumstances not alleged in the complaint. Therefore, we reverse the trial court on this issue and dismiss the privileges and immunities claim.

¶36 Washington's privileges and immunities clause states, "No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." WASH. CONST. art. I, § 12. We have often construed article I, section 12 of the Washington Constitution to be consistent with the equal protection clause of the Fourteenth Amendment. *Ockletree v. Franciscan Health Sys.*, 179 Wash.2d 769, 776, 317 P.3d 1009 (2014). We apply an independent state constitutional analysis only when the legislation implicates a fundamental right to state citizenship. *Id.* at 778, 317 P.3d 1009; *see also Martinez-Cuevas v. DeRuyter Bros. Dairy*, 196 Wash.2d 506, 514-19, 475 P.3d 164 (2020). We apply a two-step analysis. "First, we ask whether a challenged law grants a 'privilege' or 'immunity' for purposes of our state constitution." *Martinez-Cuevas*, 196 Wash.2d at 519, 475 P.3d 164 (quoting *Schroeder v. Weighall*, 179 Wash.2d 566, 573, 316 P.3d 482 (2014)). If the answer is no, then article I, section 12 is not implicated. *Ockletree*, 179 Wash.2d at 776, 317 P.3d 1009. "If the answer is yes, then we ask whether there is a 'reasonable ground' for granting that privilege or immunity." *Martinez-Cuevas*, 196 Wash.2d at 519, 475 P.3d 164 (quoting *Schroeder*, 179 Wash.2d at 573, 316 P.3d 482). For purposes of article I, section 12 analysis, "the terms 'privileges and immunities' " " 'pertain alone to those fundamental rights which belong to the citizens of the state by reason of such citizenship.' " *Am. Legion Post No. 149 v. Dep't of Health*, 164 Wash.2d 570, 607, 192 P.3d 306 (2008) (internal quotation marks omitted) (quoting *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 150 Wash.2d 791, 812-13, 83 P.3d 419 (2004)).

¶37 Instacart alleges the ordinance implicates the fundamental "right to remove to and carry on business therein." *State v. Vance*, 29 Wash. 435, 458, 70 P. 34 (1902); *see also Martinez-Cuevas*, 196 Wash.2d at 536, 475 P.3d 164. But we have found this right implicated only in very narrow circumstances. In *Ralph v. City of Wenatchee*, 34 Wash.2d 638, 209 P.2d 270 (1949), this court held that an ordinance requiring license fees of photographers who were not residents of Wenatchee violated article I, section 12 of the Washington Constitution because it prohibited a class of businesses to the benefit of another class of the same business. There, the ordinance required only "transient" or 'itinerant" photographers who were not "bona fide resident[s] of the city of Wenatchee or vicinity" to apply for a license to engage in the business of photography before they could engage in that business. *Id.* at 639, 209 P.2d 270. The ordinance required the license to be paid in advance and renewed upon expiration and made it unlawful for a nonresident photographer to do business in Wenatchee without a license, punishable by a fine and/or imprisonment. *Id.* at 639-40, 209 P.2d 270. This court concluded that the ordinance violated the state privileges and immunities clause because it "discriminates unreasonably" against a class of business—nonresident photographers—by prohibiting their business in favor of the business of another class of the same business—resident photographers. *Id.* at 641, 209 P.2d 270; *see also Ass'n of Wash. Spirits & Wine Distrib. v. Wash. State Liquor Control Bd.*, 182 Wash.2d 342, 360-62, 340 P.3d 849 (2015). The court also concluded that the ordinance's prohibition on solicitation for photographic work was designed "substantially to prohibit activity of nonresident photographers in the city of Wenatchee." *Ralph*, 34 Wash.2d at 642, 209 P.2d 270. That part of the ordinance "effectively prohibited nonresidents from engaging in the photography business." *Am. Legion Post*, 164 Wash.2d at 608, 192 P.3d 306.

 **\*10**  ¶38 Here, Instacart merely alleges that the ordinance implicates the fundamental right to carry on business because it treats food delivery network companies differently from taxis, transportation network companies, and other grocery and food providers. But the ordinance does not treat classes of the same business differently; as we have explained *supra*, food delivery network companies provide a different service, and the drivers and shoppers who work for them do so under different circumstances than those other businesses. *See Ass'n of Wash. Spirits & Wine Distrib.*, 182 Wash.2d at 362, 340 P.3d 849. They are not different classes of the same business but, rather, different businesses. *Cf. id.* (licensing fee structure did "not unfairly discriminate against a class of businesses to the benefit of another class of the same businesses; it merely assign[ed] a uniform fee to the class of individuals" who sell spirits under a particular kind of license). Additionally, Instacart does not allege that it is effectively prohibited from engaging in business as a result of the ordinance, only that it receives disfavored treatment.

¶39 Instacart has not met its burden to show that a fundamental right of state citizenship is implicated. Therefore, the Washington Constitution privileges and immunities claim should be dismissed, and we reverse the trial court on this issue.

### IV. Takings Clauses

¶40 Fourth, Instacart alleges the ordinance takes private property for public use without just compensation in violation of the takings clause of the United States and Washington Constitutions. U.S. CONST. amend. V; WASH. CONST. art. I, § 16. The trial court correctly declined to dismiss this claim, which requires factual development and assessment. We affirm.

¶41 Both the United States and the Washington Constitutions prohibit the taking of private property for public use without just compensation. U.S. CONST. amend. V; WASH. CONST. art. I, § 16; *see Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536-37, 125 S. Ct. 2074, 161 L. Ed. 2d 876 (2005) (characterizing the takings clause as placing a *condition* on the exercise of the power to take private property). Though "[t]he paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property," courts have also recognized regulatory takings that limit property owner's lawful uses without physically appropriating land. *Chevron*, 544 U.S. at 537, 125 S.Ct. 2074; *Cedar Point Nursery v. Hassid*, 594 U.S. ——, 141 S. Ct. 2063, 2071-72, 210 L. Ed. 2d 369 (2021). We apply the same definition of a regulatory taking under the Washington and United States Constitutions. *Chong Yim v. City of Seattle*, 194 Wn.2d 651, 658-59, 451 P.3d 675 (2019) (*Chong Yim* I).

¶42 A regulation that is otherwise a valid exercise of police power may go " 'too far' " in its impact on a property owner as to constitute a taking, requiring compensation. [10] *Id.* at 660, 451 P.3d 675 (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S. Ct. 158, 67 L. Ed. 322 (1922)); *Chevron*, 544 U.S. at 543, 125 S.Ct. 2074 (holding that an inquiry into a regulation's validity is "logically prior to and distinct from the question whether a regulation effects a taking, for the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose"). Here, Instacart has alleged a regulatory taking in the complaint, and the inquiry as to whether a regulation goes "too far" depends on the circumstances of the case.

[10]    The problem of an excessive regulation may implicate either the question of whether it exceeds the scope of police powers or whether it amounts to a taking, requiring just compensation. *See Orion Corp. v. State*, 109 Wash.2d 621, 648-49, 747 P.2d 1062 (1987), *abrogated on other grounds by Chong Yim v. City of Seattle*, 194 Wash.2d 682, 451 P.3d 694 (2019) (*Chong Yim* II). Though the doctrines have, at times, been blurred, *see, e.g.*, *id.* at 645-48, 747 P.2d 1062, the analyses—and, moreover, the remedies—are distinct. The remedy for an excessive police power regulation is invalidation, whereas the remedy for a taking is just compensation. *Id.* at 649, 747 P.2d 1062; *Chong Yim* I, 194 Wash.2d at 660, 451 P.3d 675. The takings clause " 'is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking.' " *Chevron*, 544 U.S. at 537, 125 S.Ct. 2074 (quoting *First Eng. Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 315, 107 S. Ct. 2378, 96 L. Ed. 2d 250 (1987)).

**\*11**   ¶43 As a preliminary matter, it is necessary to identify what "property" Instacart alleges the City has taken. Instacart acknowledges that the ordinance does not appropriate real or tangible property. Instacart describes itself as a "technology-based platform" without a storefront, whose "business consists of contracts" with independent contractors who shop for and deliver groceries. Wash. Sup. Ct. oral argument, *Wash. Food Indus. Assoc. v. City of Seattle*, No. 99771-3 (Feb. 17, 2022), at 30 min., 47 sec. to 30 min., 54 sec., *video recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org. It argues the ordinance renders those contracts commercially impracticable and appropriates Instacart's property rights in its business for the private benefit of the food delivery network workers receiving premium pay.

¶44 Though takings claims most often involve physical invasions on real property or land use regulations, they are not limited to those forms of property. Intangible property rights, including valid contracts, are protected by the takings clause. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003-04, 104 S. Ct. 2862, 81 L. Ed. 2d 815 (1984) (holding that trade secrets were property for purposes of takings analysis); *see also Omnia Com. Co. v. United States*, 261 U.S. 502, 508, 43 S. Ct. 437, 67 L. Ed. 773 (1923) ("The contract in question was property within the meaning of the Fifth Amendment."); *Lynch v. United States*, 292

U.S. 571, 579, 54 S. Ct. 840, 78 L. Ed. 1434 (1934) (same). Thus, Instacart's contracts with food delivery network workers are property for purposes of our analysis.

¶45 "Regulatory takings cases involve a 'remedial question of how compensation is measured once a regulatory taking is established.' " *Chong Yim* I, 194 Wash.2d at 668, 451 P.3d 675 (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 328, 122 S. Ct. 1465, 152 L. Ed. 2d 517 (2002)). When the government regulates the use of property, the takings clause requires compensation "only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation" unfairly imposes on the property owner "a burden that should be borne by the public as a whole." *Yee v. City of Escondido*, 503 U.S. 519, 522-23, 112 S. Ct. 1522, 118 L. Ed. 2d 153 (1992).

¶46 First, however, before reaching the question of compensation, it must be shown that the " 'regulation at issue had in fact constituted a taking.' " *Chong Yim* I, 194 Wash.2d at 668, 451 P.3d 675 (quoting *Tahoe-Sierra Pres. Council*, 535 U.S. at 328, 122 S.Ct. 1465). Though the government may impose some regulations on property, " 'if regulation goes too far it will be recognized as a taking.' " *Id.* at 660, 451 P.3d 675 (quoting *Pa. Coal Co.*, 260 U.S. at 415, 43 S.Ct. 158). Regulatory takings may be characterized as "per se" or "partial." *Id.* A per se regulatory taking occurs only when regulations require an owner to tolerate a permanent physical invasion of their property or " 'completely deprive an owner of *all* economically beneficial us[e] of [their] property.' " *Id.* at 672, 451 P.3d 675 (first alteration in original) (internal quotation marks omitted) (quoting *Chevron*, 544 U.S. at 538, 125 S.Ct. 2074). On the other hand, a partial taking is more nuanced and "must be analyzed on a case-by-case basis according to the *Penn Central* [*Transportation Co. v. New York City*, 438 U.S. 104, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978)] factors." *Id.* at 670, 451 P.3d 675; *Chevron*, 544 U.S. at 548, 125 S.Ct. 2074. [11]

[11]     The City argues that under *Omnia*, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773, a takings claim involving contract rights as property cannot be premised on mere impairment or frustration of its contract rights or expectations, but government must actually acquire or appropriate those rights to amount to a compensable taking. However, that case, involving a steel contract in 1917, predates by over half a century the multifactor test for regulatory takings announced in *Penn Central*. As this court and the United States Supreme Court has explained, aside from the "two relatively narrow categories" of *per se* takings, regulatory takings challenges are subject to the standards set forth in *Penn Central*. *Chevron*, 544 U.S. at 538, 125 S.Ct. 2074; *Chong Yim* I, 194 Wash.2d at 670, 451 P.3d 675.

**\*12**  ¶47 There is no "set formula" to determine when the impact of a regulation becomes a taking and requires compensation because the inquiry "depends largely 'upon the particular circumstances [in each] case.' " *Penn Cent.*, 438 U.S. at 124, 98 S.Ct. 2646 (quoting *United States v. Cent. Eureka Mining Co.*, 357 U.S. 155, 168, 78 S. Ct. 1097, 2 L. Ed. 2d 1228 (1958)). Nonetheless, in *Penn Central*, the United States Supreme Court announced a multifactor test for analyzing partial regulatory takings claims. *Id.* We consider the following factors on a case-by-case basis: (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." *Id.* In *Chevron*, the Court clarified that this inquiry "aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from [their] domain." 544 U.S. at 539, 125 S.Ct. 2074. [12]

[12]     We have explained,

         Those factors are intended to shed light on "the *magnitude or character of the burden* a particular regulation imposes upon private property rights" and to provide "information about how any regulatory burden is *distributed* among property owners." The factors explicitly do not ask "whether a regulation of private property is *effective* in achieving some legitimate public purpose."

         *Chong Yim* I, at 671-72, 451 P.3d 675 (citation omitted) (quoting *Chevron*, 544 U.S. at 542, 125 S.Ct. 2074).

¶48 This test involves "factual assessments" and "turns in large part, albeit not exclusively, upon the *magnitude* of a regulation's economic impact and the *degree* to which it interferes with legitimate property interests." *Yee*, 503 U.S. at 523, 112 S.Ct.

1522; *Chevron*, 544 U.S. at 540, 125 S.Ct. 2074 (emphasis added). "Consistent with this understanding, [courts] have described determinations of liability in regulatory takings cases as 'essentially ad hoc, factual inquiries,' requiring 'complex factual assessments of the purposes and economic effects of government actions.' " *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 720, 119 S. Ct. 1624, 143 L. Ed. 2d 882 (1999) (citation omitted) (internal quotation marks omitted) (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992); *Yee*, 503 U.S. at 523, 112 S.Ct. 1522).

¶49 We conclude that Instacart's takings claim should not be dismissed. Instacart may be able to prove a set of facts that demonstrates the ordinance interferes with its economic interests to a degree that amounts to a taking under the *Penn Central* test. *See Berst v. Snohomish County*, 114 Wn. App. 245, 257-58, 57 P.3d 273 (2002) (reversing a dismissal under CR 12(b)(6) when the complaint alleged the challenged law prevented the plaintiffs from making reasonable use of their property). Specifically, Instacart has alleged that the ordinance has a significant economic impact because the premium pay requirement and the limitations on how food delivery network companies can defray those costs are "unsustainable" and render its contracts with drivers "commercially impracticable." 1 CP at 85-86; *see Pa. Coal Co.*, 260 U.S. at 414, 43 S.Ct. 158 (statute that made it "commercially impracticable to mine certain coal" amounted to a taking). However, the economic impact, extent of interference with investment-backed expectations, and character of the regulation are highly factual inquiries. *Monterey*, 526 U.S. at 720, 119 S.Ct. 1624; *Chevron*, 544 U.S. at 540, 125 S.Ct. 2074. Absent more factual development, it is impossible to ascertain the economic impact of the ordinance on Instacart's business model—an inquiry that may require information about Instacart's contracts with the grocery stores and the pay structure with drivers. *See Penn Cent.*, 438 U.S. at 124, 98 S.Ct. 2646. This factual inquiry into the magnitude and degree to which the ordinance affects Instacart's contracts is appropriate for the trial court, not this court.

**\*13** ¶50 Dismissal upon a CR 12(b)(6) motion is proper only if the court concludes the plaintiff cannot prove any set of facts consistent with the complaint that would justify recovery. *Kinney*, 159 Wash.2d at 842, 154 P.3d 206. Instacart has sufficiently alleged that the ordinance amounts to a regulatory taking; Instacart may be able to show that the ordinance interferes with its investment-backed expectations to the degree that is "functionally equivalent to the classic taking." *Chevron*, 544 U.S. at 539, 125 S.Ct. 2074; *Berst*, 114 Wash. App. at 257-58, 57 P.3d 273. Therefore, the takings clause claim should not be dismissed, and we affirm the trial court on this issue.

### V. Contracts Clauses

¶51 Fifth, Instacart argues the ordinance impairs existing contractual rights in violation of the contracts clauses of the Washington and United States Constitutions. U.S. CONST. art. I, § 10, cl. 1; WASH. CONST. art. I, § 23. Instacart alleges the ordinance interferes with its "Independent Contractor Agreement" with food delivery network workers; Instacart references that document in the complaint, but the agreement is not part of the record before this court, as the parties have not yet engaged in discovery. Specifically, Instacart alleges the ordinance interferes with three provisions of the agreement: (a) Instacart's right to modify the terms of account access, (b) Instacart's right to limit availability of the platform, and (c) Instacart's right to "stop providing access to the Instacart Platform services" whenever it deems "necessary." 1 CP at 87. Instacart argues the ordinance alters obligations and deprives it of the benefit of these provisions.

¶52 Article 1, section 23 of Washington's constitution prohibits the State from passing a "law impairing the obligations of contracts." The federal constitution's language is substantially similar. U.S. CONST. art. I, § 10, cl. 1 ("No state shall... pass any... law impairing the obligation of contracts."). We have read our state contracts clause as coextensive with the federal constitution's contracts clause when neither party has argued to the contrary. *Tyrpak v. Daniels*, 124 Wash.2d 146, 151, 874 P.2d 1374 (1994). Despite the clauses' unqualified language, the prohibition against the impairment of contracts is not absolute. *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428, 54 S. Ct. 231, 236, 78 L. Ed. 413 (1934) (this "prohibition is not an absolute one and is not to be read with literal exactness"). The contracts clauses' prohibitions must accommodate "the inherent police power of the State 'to safeguard the vital interests of its people.' " *In re Est. of Hambleton*, 181 Wash.2d 802, 830, 335 P.3d 398 (2014) (internal quotation marks omitted) (quoting *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 410, 103 S. Ct. 697, 74 L. Ed. 2d 569 (1983)).

¶53 The threshold question is " 'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.' " *Id.* (internal quotation marks omitted) (quoting *Energy Rsrvs Grp.*, 459 U.S. at 411, 103 S.Ct. 697). We consider the "extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating [their] rights" when determining whether there has been a substantial impairment of a contract between private parties. *Sveen v. Melin*, 584 U.S. ——, 138 S. Ct. 1815, 1822, 201 L. Ed. 2d 180 (2018). If the contract has been substantially impaired, we then ask whether the law "is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.' " *Id.* (quoting *Energy Rsrvs. Grp.*, 459 U.S. at 411, 103 S.Ct. 697); *Tyrpak*, 124 Wash. 2d at 156, 874 P.2d 1374. The State may advance a legitimate purpose by remedying a general social or economic problem, and the law need not only be in response to an emergency. *See Energy Rsrvs. Grp.*, 459 U.S. at 412, 103 S.Ct. 697.

 **\*14** ¶54 Taking the factual allegations in the complaint to be true, Instacart has a contractual relationship with its drivers, governed by the Independent Contractor Agreement. Instacart argues the ordinance substantially impairs these contracts because the premium pay requirement and consumer protection provisions "broadly adjust[ ] the rights and responsibilities under existing contracts." 1 CP at 87. Instacart may be able to prove a set of facts that show a substantial impairment. However, the inquiry into the extent to which the law undermines the bargain, interferes with reasonable expectations, or prevents a party from safeguarding their rights involves factual assessment. *Sveen*, 138 S. Ct. at 1822; *see Tyrpak*, 124 Wash.2d at 153-55, 874 P.2d 1374 (relying on testimony to evaluate whether a statute substantially impaired a port district's obligations to its bondholders); *Energy Rsrvs. Grp.*, 459 U.S. at 414-16, 103 S.Ct. 697 (determining that the plaintiff's reasonable expectations had not been impaired in the context of the regulatory background and the text of statements of intent the parties included in drafting the contracts).

¶55 We therefore do not reach the second prong of the analysis to determine whether the impairment was a reasonable and necessary exercise of the City's power. *See Sveen*, 138 S. Ct. at 1822 n.3 (declining to abandon this two-step contracts clause analysis). Like the regulatory takings claim, the first step of the contracts clause claim involves questions of degree. The extent to which the ordinance impairs Instacart's contracts is a factual question we cannot resolve on the limited record before us. Instacart has sufficiently alleged a contracts clause claim and may be able to prove a set of facts showing the ordinance's premium pay requirement and consumer protection provisions interfere with reasonable expectations about the independent contractor agreements to a degree that rises to the level of substantial impairment. For that reason, the contracts clause claim should proceed to discovery to determine the degree to which Instacart's contracts have been impaired. Therefore, the contract clause claim should not be dismissed, and we affirm the trial court on this issue.

   VI. 42 U.S.C. § 1983 Damages

¶56 Next, Instacart alleges that it should be entitled to recover damages and attorney fees because the City has, under the color of law, violated Instacart's rights protected by the United States Constitution and federal law. 42 U.S.C. § 1983. This court concludes that Instacart's equal protection, takings clause, and contracts clause claims should not be dismissed. Therefore, the 42 U.S.C. § 1983 damages claim should also not be dismissed. The City may be liable for damages if the ordinance violates a clause of the United States Constitution. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) (local governing bodies can be sued for damages under 42 U.S.C. § 1983). Therefore, we affirm.


CONCLUSION

¶57 As we have sorted through the ways to deal with a major public health emergency like COVID-19, different communities have responded with their own requirements and ways to maintain public health and safety. Seattle's approach to protecting gig economy workers during this time raises several questions that we can answer prior to trial and several we cannot. The nature of this public health emergency is constantly changing, and this case as presented requires us to evaluate the claims based on no factual record. That said, we resolve these claims in the manner stated below.

¶58 The chapter 82.84 RCW claim, the equal protection claim, and the privileges and immunities claim should be dismissed. The regulatory takings claim, contracts clause claim, the 42 U.S.C. § 1983 damages claim, and the police powers claim (*see* concurrence (Johnson, J.) at 4-5) should not be dismissed. We affirm in part, reverse in part, and remand to the trial court for further proceedings consistent with this opinion.

WE CONCUR:

González, C.J.

JOHNSON, J. (concurring)

¶59 I concur in the lead opinion and write separately on the police power violations claim. The rule our cases have developed to date, i.e., for claims challenging enactments as exceeding the constitutional police power, requires that a law must promote the health, safety, peace, education, or welfare of the people. The law must also bear some reasonable relationship to the purpose underlying the law. *See Weden v. San Juan County*, 135 Wash.2d 678, 958 P.2d 273 (1998), *abrogated on other grounds by Chong Yim v. City of Seattle*, 194 Wash.2d 682, 451 P.3d 694 (2019). Importantly, the analysis focuses on the law being challenged, not on some law that might have been enacted. The police power is broad, but not unlimited.

 **\*15**  ¶60 Our cases establish that we presume all facts alleged in the complaint to be true and may consider hypothetical facts supporting the plaintiff's claims when reviewing the sufficiency of a claim under CR 12(b)(6). Reviewing a ruling under CR 12(b)(6) presents the situation where, at this stage of the case, we know no facts, just allegations, while our review is deferential to the plaintiff. And here, the Washington Food Industry Association and Maplebear Inc., d/b/a Instacart, have supported their claims with sufficient factual allegations. The trial court properly applied our rule and determined that dismissal of the police powers issue was not appropriate at this time.

¶61 First, the trial court noted the setting in which the motion was brought—a CR 12(b)(6) motion—which requires the court to give credit to all well-pleaded allegations. Those allegations must be accepted as true, with all reasonable inferences viewed in the light most favorable to the plaintiffs. Hypothetical facts may also be assumed to test the challenge to the complaint at this stage.

¶62 Second, the trial court pointed out the unique nature of the ordinance itself, which not only regulates compensation to drivers but precludes plaintiffs from adjusting their business model to offset the cost of the imposed regulatory expenses. The regulation imposed a hazard pay requirement, $2.50 per delivery, and prohibited Instacart from passing this surcharge on to consumers. Instacart also claims that the ordinance forbids food delivery network companies (FDNCs) from altering the areas they serve and forces them to continue providing access to their platform regardless of changes in demand, that it sets price controls, and that it prohibits them from changing their business model, essentially requiring FDNCs to operate like public utilities. 1 Clerk's Papers at 71-72.

¶63 Third, the complaint and Instacart's claim asserts that the ordinance and the city's justification is a mere pretext. Instacart states that the ordinance in question was a political favor to special interest groups to regulate the "gig economy" and to specifically target their operations. They claim that the city council had a close working relationship with Working Washington and other labor groups interested in regulating the gig economy. This was evidenced by the city's willingness to remove Transportation Network Company (TNC) drivers from the draft bill, as requested by the Teamsters, excluding them from the emergency relief that is supposedly critical for food delivery drivers. Since TNC drivers are members of the "essential workforce" declared by the governor, their exclusion from the ordinance appears arbitrary and undermines the legitimacy of the legislation since drivers transporting passengers are more vulnerable to COVID-19 than drivers transporting groceries. Instacart asserts that the purpose was not to respond to the emergency but to implement the wage goals of organized labor.

¶64 Fourth, the decision of the trial court was supported by allegations that there was no real need for the ordinance because delivery services were thriving, and compensation to drivers was at a record high. The city ordinance purported that the goal was to raise pay to ensure adequate supply of delivery persons, but Instacart points out that they had no trouble *tripling* the number of independent contractors to meet demand because delivery persons were already working and earning more as a result of the pandemic. Normal market forces had already balanced supply and demand for grocery delivery services. The council failed to consider the fact that actual driver compensation had already exceeded, by double, the city's target minimum wage. Instacart asserts that the oversight of this fact by the city council was arbitrary and unreasonable.

**\*16**  ¶65 Finally, implicit in the allegation is the argument that the ordinance fails to advance the public health goal. The drivers make, in essence, the same deliveries, coming into contact with the same people and in all respects operate in the same manner. The ordinance simply requires more pay. Perhaps if the ordinance imposed masking requirements, distancing restrictions, cleanliness practices, or any more typical public health suggestions, a stronger connection would exist. The ordinance adopts none of these protections—it primarily alters pay. At this stage, without knowing more facts or having discovery, the allegations must survive a CR 12(b)(6) motion.

¶66 Presuming all these facts and allegations are true, *as we must at this stage in the litigation*, Instacart has alleged sufficient facts that the ordinance does nothing to promote the health, safety, and welfare of people during the pandemic. Instacart may be able to establish, in a trial, that the imposition of hazard pay has no rational connection to protecting public health. Instacart should be allowed the opportunity to develop facts supporting this claim.


CONCLUSION

¶67 Further factual development is required before Instacart's police power claim can be answered appropriately. We affirm the trial court on this claim. On all other issues I concur with the lead opinion.


Owens, J.

Yu, J.


STEPHENS, J. (concurring in part, dissenting in part)

¶68 The Washington Food Industry Association and Maplebear Inc., d/b/a Instacart, challenge Seattle Ordinance 126094. The ordinance—enacted amid the COVID-19 pandemic and stay-at-home orders—authorizes hazard pay for gig workers [1] who deliver food to consumers' homes and regulates various other aspects of Instacart's business. Instacart raises seven potential grounds for invalidating the ordinance. I join the lead opinion with respect to Instacart's claims under RCW 82.84, the equal protection clause, takings clause, contracts clause, and 42 U.S.C. § 1983. I also join the partial dissent by Justice Montoya-Lewis because I would reverse the superior court and dismiss the police powers claim.

[1]        *See* lead opinion at —— n.8.

¶69 I write separately with respect to Instacart's privileges and immunities claim. I would affirm the decision below allowing this claim to go forward. Instacart has alleged facts sufficient to defeat a CR 12(b)(6) motion and it is therefore entitled to discovery on its privileges and immunities claim. On this issue, I respectfully dissent.


ANALYSIS

¶70 The Washington Constitution provides that "[n]o law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." WASH. CONST. art. I, § 12. If a challenged law implicates or encroaches on a fundamental right of state citizenship, we conduct an independent state constitutional analysis. *Martinez-Cuevas v. DeRuyter Bros. Dairy*, 196 Wash.2d 506, 518-19, 475 P.3d 164 (2020). We first ask whether the challenged law grants a "privilege" or "immunity" and, if so, whether there is a "reasonable ground" for granting that immunity. *Id.* at 519, 475 P.3d 164.

¶71 As the lead opinion acknowledges, the right to carry on business in Washington is a fundamental right of state citizenship that triggers an independent privileges and immunities analysis. *State v. Vance*, 29 Wash. 435, 458, 70 P. 34 (1902); *see also* lead opinion at ——. In this context, "a 'privilege' normally relates to an exemption from a regulatory law that has the effect of benefiting certain businesses at the expense of others." *Am. Legion Post No. 149 v. Dep't of Health*, 164 Wash.2d 570, 607, 192 P.3d 306 (2008) (upholding statutory prohibition on smoking in the workplace because it did not burden any entity's ability to engage in business and therefore no "privilege" was involved).

**\*17** ¶72 Instacart claims the Seattle ordinance burdens its fundamental right to carry on business and unfairly discriminates between similarly situated businesses. Specifically, Instacart attacks the hazard pay requirement and several provisions that prohibit it from restricting the geographic areas it chooses to serve, adding customer charges to online orders, and reducing compensation or otherwise limiting the earning capacity of workers. 1 Clerk's Papers (CP) at 79. Instacart argues that collectively, these provisions "intrude into [its] core business and operations decisions" and will prohibit it "from managing its business to profitability." *Id.* at 79, 83. Moreover, the ordinance "singles out [food delivery network companies] for uniquely disfavored treatment, placing no similar burdens on taxis, [transportation network companies], or any other businesses or service providers in the grocery and food industry." *Id.* at 89.

¶73 Instacart's factual allegations sufficiently implicate a right this court has long recognized as fundamental under our privileges and immunities clause: the right to carry on a business. The stated purpose of the ordinance is to protect gig workers who provide essential services during the COVID-19 pandemic and, as a result, "face magnified risks of catching or spreading disease" due to the nature of their work. Seattle Ordinance 126094, at 1 (June 26, 2020), https://www.seattle.legistar.com/View.ashx?M=F& ID=8656949& GUID=450BE067-D41F-4C49-A3C9-7A7D67A2DB9D [https://perma.cc/EK26-TWEX]. In doing so, however, it imposes significant burdens on Instacart that similarly situated businesses do not face, including increased operating costs and restrictions on internal management authority. The ordinance singles out food delivery network companies such as Instacart and it does not apply to transportation network companies such as Uber and Lyft—even though workers in both of these business are considered gig workers and they all face magnified health risks due to the nature of their work. 1 CP at 77. Instacart's allegations, which we accept as true at this stage of proceedings, indicate the city may lack a "reasonable ground" for distinguishing between food delivery network companies and transportation network companies. *Martinez-Cuevas*, 196 Wash.2d at 519, 475 P.3d 164.

¶74 Relying on *Ralph v. City of Wenatchee*, 34 Wash.2d 638, 209 P.2d 270 (1949), the lead opinion would dismiss Instacart's privileges and immunities claim partly because "Instacart does not allege that it is effectively *prohibited* from engaging in business as a result of the ordinance, only that it receives disfavored treatment." Lead opinion at —— (emphasis added). This reasoning erroneously interprets *Ralph* as limiting the fundamental right to carry on business to only those cases where a challenged law bars one from engaging in business altogether. But the privilege of conducting business in Washington is not so limited.

¶75 *Ralph* involved two separate provisions of one city ordinance: (1) a license requirement for nonresident photographers and (2) a ban on public and door-to-door solicitation of photographic work. *Ralph*, 34 Wash.2d at 641-42, 209 P.2d 270. We held the license requirement violated article I, section 12 of the Washington Constitution because it "discriminate[d] unreasonably" against nonresident photographers. *Id.* at 641, 209 P.2d 270. In contrast, the ban on solicitation constituted an abuse of the police power because its primary purpose was to "protect[ ] local photographers from lawful competition, and was thereby designed to serve private interests in contravention of common rights." *Id.* at 644, 209 P.2d 270. We further observed that the effect

Washington Food Industry Association & Maplebear, Inc. v. City..., --- P.3d ---- (2023)

of this second provision was "substantially to prohibit activity of nonresident photographers in the city of Wenatchee." *Id.* at 642, 209 P.2d 270. This effective bar on nonresident photographers was relevant to our police powers analysis, but not to our privileges and immunities analysis.

**\*18** ¶76 *Ralph* does not require Instacart to show that the ordinance bars it from engaging in business altogether in order to state a privileges and immunities claim. Under *Ralph*, Instacart must show only that the ordinance imposes unique burdens and thereby "discriminates unreasonably" against it. *Ralph*, 34 Wash.2d at 641, 209 P.2d 270. Instacart has pleaded sufficient facts of unreasonable discrimination to survive a motion to dismiss. Such motions should be granted only sparingly, *Kinney v. Cook*, 159 Wash.2d 837, 842, 154 P.3d 206 (2007), and the facts alleged here demonstrate that Instacart can prove a fundamental right and unreasonable discrimination, so dismissal is inappropriate.

CONCLUSION

¶77 The superior court properly held that Instacart has alleged facts sufficient to proceed with its privileges and immunities claim, and it is therefore entitled to discovery in support of that claim. I would affirm the superior court on this issue.

Whitener, J.

GORDON McCLOUD, J. (concurring in part/dissenting in part)

¶78 I agree with the bulk of the trial court's decisions in this case. Specifically, I agree with its decision to dismiss the RCW 82.84 claim and to deny the motion to dismiss the takings clause, contracts clause, and 42 U.S.C. § 1983, police power, and state privileges and immunities clause claims. The only decision on which I disagree with the trial court is that it denied dismissal of the federal equal protection clause claim; I would dismiss that claim.

¶79 As a result, I join the portions of the lead opinion that affirm the trial court's dismissal of the RCW 82.84 claim, affirm the trial court's denial of the motion to dismiss the takings clause claim, affirm the trial court's denial of the motion to dismiss the contracts clause claim, affirm the trial court's denial of the motion to dismiss the 42 U.S.C. § 1983 claim, and reverse the trial court's denial of the motion to dismiss the federal equal protection clause claim.

¶80 But I join the concurrence by Justice Johnson, to the extent that it would affirm the denial of the motion to dismiss the police powers claim.

¶81 And I join the concurrence/dissent by Justice Stephens, to the extent that it would affirm the denial of the motion to dismiss the state privileges and immunities clause claim.

Madsen, J.

MONTOYA-LEWIS, J. (dissenting in part)

¶82 The Washington Food Industry Association and Maplebear Inc., d/b/a Instacart (collectively Instacart), allege Seattle Ordinance 126094 exceeds the city of Seattle's (City's) police powers. Instacart argues that the ordinance "is an arbitrary and irrational response to the COVID-19 emergency, and the City Council's intention in passing the [o]rdinance was to promote labor organizations' goals to organize certain workers for higher pay by using the emergency as a pretext." 1 Clerk's Papers at 85. Instacart stresses that the ordinance applies to workers delivering groceries and items from eating and drinking establishments "while omitting many other workers who provide essential services and come into greater contact with the public, and thereby

are exposed to a greater risk of viral contraction." *Id.* A majority of the court concludes that Instacart has alleged sufficient facts that the ordinance does not promote the health, safety, and welfare of the people during the pandemic, and therefore that claim should not be dismissed, affirming the trial court. Concurrence (Johnson, J.) at 2; concurring in part/dissenting in part (Gordon McCloud, J.) at 1. Dismissal is appropriate under CR 12(b)(6) where, as here, the claim is legally insufficient even under the plaintiff's proffered hypothetical facts. In my view, Instacart has not raised a legally sufficient challenge to the City's exercise of police powers, and I would reverse the trial court and dismiss that claim. I respectfully dissent.

**\*19  ¶83** We review a ruling on a CR 12(b)(6) motion de novo. *Kinney v. Cook,* 159 Wash.2d 837, 842, 154 P.3d 206 (2007). We presume all facts alleged in the complaint to be true and may consider hypothetical facts supporting the plaintiff's claims. *Id.* Dismissal is proper only if the plaintiff's claim remains legally insufficient even under their proffered hypothetical facts and "the plaintiff cannot prove 'any set of facts which would justify recovery.' " *Id.* (quoting *Tenore v. AT&T Wireless Servs.,* 136 Wash.2d 322, 330, 962 P.2d 104 (1998)); *Trujillo v. Nw. Tr. Servs., Inc.,* 183 Wash.2d 820, 830, 355 P.3d 1100 (2015).

**¶84** The Washington Constitution grants every "county, city, town or township" the power to "make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws." WASH. CONST. art. XI, § 11. A city ordinance is valid under this provision " 'unless (1) the Ordinance conflicts with some general law; (2) the Ordinance is not a reasonable exercise of the [local government's] police power; or (3) the subject matter of the Ordinance is not local.' " *Cannabis Action Coal. v. City of Kent,* 183 Wash.2d 219, 226, 351 P.3d 151 (2015) (alteration in original) (quoting *Weden v. San Juan County,* 135 Wash.2d 678, 692-93, 958 P.2d 273 (1998), *abrogated on other grounds by Chong Yim v. City of Seattle,* 194 Wash.2d 682, 451 P.3d 694 (2019) (*Chong Yim* II)). The party challenging the ordinance's constitutionality—here, Instacart— holds " 'a heavy burden,' " and " '[e]very presumption will be in favor of constitutionality.' " *Id.* (alteration in original) (internal quotation marks omitted) (quoting *HJS Dev., Inc. v. Pierce County,* 148 Wash.2d 451, 477, 61 P.3d 1141 (2003)). Whether an ordinance is a valid exercise of this power under article XI, section 11 of the constitution is a question of law subject to de novo review. *Id.*

**¶85** In Washington, local governments have broad police powers to make and enforce laws to promote the "health, peace, morals, education, good order and welfare of the people." *Covell v. City of Seattle,* 127 Wash.2d 874, 881, 905 P.2d 324 (1995), *abrogated on other grounds by Chong Yim* II, 194 Wash.2d 682, 451 P.3d 694; WASH. CONST. art. XI, § 11.

> "Municipal police power is as extensive as that of the legislature, so long as the subject matter is local and the regulation does not conflict with general laws. ... The scope of police power is broad, encompassing all those measures which bear a reasonable and substantial relation to promotion of the general welfare of the people."

*Covell,* 127 Wash.2d at 878, 905 P.2d 324 (alteration in original) (quoting *Hillis Homes, Inc. v. Snohomish County,* 97 Wash.2d 804, 808, 650 P.2d 193 (1982)). We apply a two-part test in determining the validity of a law passed pursuant to the police power. *State ex rel. Faulk v. CSG Job Ctr.,* 117 Wash.2d 493, 504, 816 P.2d 725 (1991), *abrogated on other grounds by Chong Yim* II, 194 Wash.2d 682, 451 P.3d 694. First, the law must promote the health, safety, peace, education, or welfare of the people. *Id.*; *Weden,* 135 Wash.2d at 700, 958 P.2d 273. Second, the requirements of the law "must bear some reasonable relationship to accomplishing the purpose underlying" the law. *Weden,* 135 Wash.2d at 700, 958 P.2d 273; *see also Faulk,* 117 Wash.2d at 504, 816 P.2d 725.

**¶86** We apply the deferential rational basis standard of scrutiny to statutes and ordinances that do not affect fundamental rights or create suspect classifications. " '[L]egislation under the police power must be reasonably necessary in the interest of the public health, safety, morals, and the general welfare.' " *Cougar Bus. Owners Ass'n v. State,* 97 Wash.2d 466, 477, 647 P.2d 481 (1982) (quoting *Petstel, Inc. v. County of King,* 77 Wash.2d 144, 154-55, 459 P.2d 937 (1969)), *abrogated on other grounds by Chong Yim* II, 194 Wash.2d 682, 451 P.3d 694. We must uphold a law as long as it is not arbitrary and has " 'a reasonable relation to a proper legislative purpose.' " *W. Coast Hotel Co. v. Parrish,* 300 U.S. 379, 398, 57 S. Ct. 578, 81 L. Ed. 703 (1937) (quoting *Nebbia v. New York,* 291 U.S. 502, 537, 54 S. Ct. 505, 78 L. Ed. 940 (1934)). This test equates to rational basis, not any form of heightened scrutiny. *Chong Yim* II, 194 Wash.2d at 695, 451 P.3d 694. [1] "[I]n determining whether a particular statute is reasonable, we must conclude only that there is a rational connection between the purpose of the statute and the method the

statute uses to accomplish that purpose." *Faulk*, 117 Wash.2d at 506, 816 P.2d 725. Under this test, if a set of facts justifying the legislation can be conceived to exist, the existence of those facts must be presumed. *Cougar Bus. Owners*, 97 Wash.2d at 478, 647 P.2d 481. " '[E]very presumption' " will be in favor of upholding the law, and the party challenging the law has the " 'heavy burden' " to show that it is invalid. *Cannabis Action Coal.*, 183 Wash.2d at 226, 351 P.3d 151 (internal quotation marks omitted) (quoting *HJS Dev., Inc. v. Pierce County*, 148 Wash.2d at 477, 61 P.3d 1141).

[1]     In *Chong Yim* II, this court held that state substantive due process claims are subject to rational basis review. 194 Wash.2d at 701, 451 P.3d 694. In doing so, the court observed that tests variously labeled "the 'unduly oppressive' and 'substantial relation' tests," or "[t]he 'arbitrary or irrational' standard" correspond to rational basis review, not any form of heightened scrutiny. *Id.* at 693, 695-96, 451 P.3d 694. That decision included as an appendix a nonexclusive list of Washington Supreme Court cases that may no longer be interpreted as requiring heightened scrutiny. *Id.* at 702-04, 451 P.3d 694. Those cases, including cases cited in this opinion, are abrogated only to the extent they suggest that a heightened standard of scrutiny applies. *See State v. Blake*, 197 Wash.2d 170, 178 n.5, 481 P.3d 521 (2021).

**\*20**  ¶87 As the challenger to the ordinance, Instacart holds the burden to allege there is no rational basis for the ordinance —in other words, there is no reasonably conceivable set of facts creating a public need for it or the ordinance does not have a reasonable relation to a valid legislative purpose. *Id.*; *Cougar Bus. Owners*, 97 Wash.2d at 478, 647 P.2d 481. Instacart fails on both counts.

¶88 First, Instacart fails to allege that the law does not tend to promote proper legislative purpose in the interest of the health, safety, peace, education, or welfare of the people. *Faulk*, 117 Wash.2d at 504, 816 P.2d 725; *Weden*, 135 Wash.2d at 700, 958 P.2d 273. Instacart argues that "the problems [the ordinance] purports to address do not exist" and that the City's public safety purposes in passing the ordinance were pretextual. Resp'ts' Br. at 34. But Instacart does not dispute the existence or seriousness of the COVID-19 emergency; indeed, it emphasizes the public health benefit of food delivery services in promoting social distancing and reducing the spread of the virus. Rather, Instacart argues that food delivery network drivers face similar risks as other essential workers while seeing an increase in demand for their labor and corresponding increase in pay, which relates only to the reasonableness of the City's decision to address public safety and health in this manner.

¶89 Instacart is correct that upon a motion to dismiss, we presume all facts alleged in the complaint to be true and may consider hypothetical facts supporting the plaintiff's claims. *Kinney v. Cook*, 159 Wash.2d 837, 842, 154 P.3d 206 (2007). However, the party challenging an exercise of police powers must allege a legally sufficient claim that the challenged law cannot survive rational basis scrutiny. "[A]ny ordinance regularly enacted is presumed to be constitutional and valid" and the challenger must allege there is no reasonably conceivable state of facts creating a public need for the legislation. *Hass v. City of Kirkland*, 78 Wash.2d 929, 933, 481 P.2d 9 (1971), *abrogated on other grounds by Chong Yim* II, 194 Wash.2d 682, 451 P.3d 694; *Cougar Bus. Owners*, 97 Wash.2d at 478, 647 P.2d 481.

¶90 There is an obvious conceivable basis for the ordinance that would tend to promote the health, safety, and welfare of the people. The ordinance recognizes the rapid spread and significant health risk of the COVID-19 virus. It also acknowledges the risks food delivery network drivers face and the essential service they provide because "[t]he availability of food delivery services is fundamental to the health of the community." Seattle Ordinance 126094, at 6 (June 26, 2020), https://www.seattle.legistar.com/View.ashx?M=F&ID=8656949&GUID=450BE067-D41F-4C49-A3C9-7A7D67A2DB9D [http://perma.cc/EK2L-TWEX]. Instacart does not dispute the seriousness of the COVID-19 pandemic or the risk of the virus spreading from person to person; rather, Instacart asserts that hazard pay is not necessary or not a reasonable means to achieve the purpose of protecting public health. This goes to the second step of the inquiry—the reasonableness of the means the law uses to achieve that purpose. As to the first step of the inquiry, the City unquestionably has a "legitimate interest in protecting public health." *Am. Legion Post No. 149 v. Dep't of Health*, 164 Wash.2d 570, 604, 192 P.3d 306 (2008). The purpose of promoting the health, safety, and welfare of consumers and these essential workers falls squarely within the City's police powers. Instacart has not shown that the ordinance lacks a proper legislative purpose.

**\*21**  ¶91 Instacart alleges the true motive of the ordinance was to increase pay and workplace protections for certain classes of independent contractors, in cooperation with labor organizations. But we do not examine the motives of the legislative body or require it to provide factual justification for the legislation as long as rational basis can reasonably be presumed.[2] *Petstel*, 77 Wash.2d at 155, 459 P.2d 937. Even taking that allegation as true and presuming that the City wanted to raise pay for workers in the gig economy[3] more broadly, regulations on wages and working conditions are generally within the scope of a state or municipality's police power. *See Seattle Newspaper-Web Pressmen's Union Loc. No. 26 v. City of Seattle*, 24 Wash. App. 462, 604 P.2d 170 (1979) (employment discrimination); *Petstel*, 77 Wash.2d 144, 459 P.2d 937 (employment agencies); *County of Spokane v. Valu-Mart, Inc.*, 69 Wash.2d 712, 419 P.2d 993 (1966) (day of rest); *Parrish v. W. Coast Hotel Co.*, 185 Wash. 581, 55 P.2d 1083 (1936) (wages and unsanitary working conditions), *aff'd*, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703.

[2]   Instacart argues that courts may look past conceivable rational bases and examine actual legislative motive when there are well-pleaded allegations of pretext. To support this proposition, Instacart relies on several cases from the Ninth Circuit of the Court of Appeals involving equal protection challenges with either a class of one, where the plaintiff must establish that they were intentionally treated differently from others similarly situated, or an allegation of selective enforcement of the law, where the plaintiff must show that the defendant's proffered rational basis for selective enforcement is a pretext for an impermissible motive. *See Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir. 2004); *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 589-91 (9th Cir. 2008); *Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 992-93 (9th Cir. 2007), *aff'd*, 553 U.S. 591, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008). Instacart cites no authority importing this analysis to a claim that a regulation exceeds government police powers, and, as discussed, *see* lead opinion at Part II, Instacart's equal protection claim involves neither a class of one nor selective enforcement. I am unpersuaded that an allegation of pretext is cause to depart from our traditional assessment whether an exercise of police powers survives rational basis review.

[3]   *See* lead opinion at —— n.8.

¶92 Second, Instacart has not shown that the hazard pay and consumer protection provisions lack a "reasonable relationship to accomplishing the purpose underlying" the ordinance. *Weden*, 135 Wash.2d at 700, 958 P.2d 273; *see also City of Seattle v. Pullman*, 82 Wash.2d 794, 799-800, 514 P.2d 1059 (1973). The ordinance endeavors to "increase retention of these gig workers and compensate them for the hazards of working on the frontlines of a global pandemic." Seattle Ordinance 126094, at 2. If a set of facts justifying the legislation can be conceived to exist, the existence of those facts must be presumed. *Cougar Bus. Owners*, 97 Wash.2d at 478, 647 P.2d 481. Therefore, we must presume that food delivery network drivers do face magnified risks of catching or spreading COVID-19 when they come into contact with other people as they shop for groceries, pick up food from restaurants, or make deliveries to customers. Again, Instacart does not dispute this; it merely alleges that other essential workers face similar risk. But simply analogizing the risks of food delivery network drivers to other essential workers does not absolve Instacart of the burden to allege a lack of a reasonable relationship to the underlying purpose of increasing retention and public health and safety.

¶93 Indeed, it is not difficult to conceive how premium pay may achieve the goals of increasing retention of food delivery network workers and compensating them for these hazards. It is reasonable to conclude that drivers who receive premium pay for each delivery in Seattle may be able to earn a more livable wage while making fewer deliveries—thereby reducing their exposure risk on a daily basis and making their work more sustainable as the pandemic persists. Retaining a large number of food delivery network drivers could, in turn, ensure those services can keep up with the demand from customers who want to use these services and reduce their exposure to the virus, thereby reducing infection across the populace. Additionally, premium pay may compensate the workers for personal protective equipment they may need to purchase in order to protect themselves and others against the spread of the virus while they perform their work.

**\*22**  ¶94 Instacart counters that it is irrational to provide hazard pay to food delivery network drivers because their pay had already increased due to the rise in demand for their services during the COVID-19 pandemic. Though Instacart alleges that the number of delivery workers and their *hourly* pay increased during the first few months of the pandemic, it did not

proffer any facts—hypothetical or not—about the number of hours worked or the workers' total compensation. It is easily conceivable that the City would conclude that the increase in deliveries (and corresponding increase in exposure risk) would not result in an adequate increase in compensation for those hazards and therefore would choose not to rely on market forces to ensure adequate pay for these workers. *Cf. Petsel*, 77 Wash.2d at 152, 459 P.2d 937 (concluding that a law fixing employment agencies' maximum rates survived rational basis review because "it is easy to conceive of a situation where the rates charged by employment agencies may become abusive, and regulation of maximum rates charged by these agencies is a means substantially directed toward curbing this abuse").

¶95 Additionally, the ordinance also recognizes that "food delivery network companies rely on business models that hire gig workers as 'independent contractors' " who do not receive the same protections as employees. Seattle Ordinance 126094, at 1. The City could reasonably seek to protect this class of workers completing hazardous work during the pandemic, who may not receive protections otherwise afforded to employees due to their status. [4]

[4]    Instacart emphasizes that the ordinance does not cover other gig workers like transportation network drivers who also face the risk of exposure while working, as evidence that the ordinance is not a rational response to the COVID-19 emergency. As the court has explained, *see* lead opinion at Part II, there are rational bases to treat food delivery network workers different from other classes of workers, given that food is a necessity for basic survival.

¶96 Likewise, we can easily conceive of facts justifying the gig worker and consumer protection provisions of the ordinance. Prohibiting food delivery network companies from reducing workers' pay, reducing the areas they serve, or adding charges to customers' orders can help ensure that food delivery services are available and affordable to communities that rely on them for their safety and sustenance, even now when some conclude the pandemic is waning. Ensuring that communities in the City continue to be able to access these services is particularly important for areas that comprise food deserts, which disproportionately affect communities of color. *See* Sameer M. Siddiqi et al., *SNAP Participants and High Levels of Food Insecurity in the Early Stages of the COVID-19 Pandemic*, 136 PUB. HEALTH REPS. 457 (2021) (study finding food insecurity increased significantly between March and May 2020 for households experiencing poverty, particularly Black households and households located in food deserts) [5]; Sravani Singu et al., *Impact of Social Determinants of Health on the Emerging COVID-19 Pandemic in the United States*, 8 FRONTIERS IN PUB. HEALTH 406 (2020) (study finding the intersection of food deserts and COVID-19 related health complications has a disproportionate effect on communities of color). [6]

[5]    https://journals.sagepub.com/doi/pdf/10.1177/00333549211007152

[6]    https://www.frontiersin.org/articles/10.3389/fpubh.2020.00406/full [https://perma.cc/W8SK-QCFV]

¶97 The lead opinion notes that the ordinance does not adopt any protections such as masking requirements, distancing restrictions, or cleanliness practices but rather focuses on hazard pay. Consequently, the lead opinion concludes that the ordinance fails to advance the public health goal. While I agree with the lead opinion that requiring those more robust protections would strengthen the relationship to the public health goal, rational basis review does not require legislation to be that narrowly tailored to the purpose—only that it has a rational connection. *Weden*, 135 Wash.2d at 700, 958 P.2d 273; *Faulk*, 117 Wash.2d at 505-06, 816 P.2d 725. Though it might be more consistent for the City to provide even greater protections to essential workers, it is not this court's role to substitute our judgment for that of a legislative body. As the ordinance's premium pay and consumer protection provisions have a reasonable connection to the goals of retaining these essential workers and promoting public health and safety, I cannot agree that the ordinance lacks a rational basis simply because I would prefer additional details and protections that clarify the purpose of the ordinance.

**\*23**  ¶98 Judicial review is highly deferential in the police powers context because the necessity of the enactment is within the wisdom and expertise of the legislative branch. *Parrish*, 300 U.S. at 398, 57 S.Ct. 578; *Faulk*, 117 Wash.2d at 505, 816 P.2d 725. "The courts will not examine the motives of the legislative body; they will not require factual justification if it can reasonably be presumed; and the courts will not weigh the wisdom of the particular legislation enacted." *Petsel*, 77 Wash.2d at 155, 459 P.2d

937. " 'These rules are more than mere rules of judicial convenience. They mark the line of demarcation between legislative and judicial functions.' " *City of Seattle v. Webster*, 115 Wash.2d 635, 645, 802 P.2d 1333 (1990) (quoting *Lenci v. Seattle*, 63 Wash.2d 664, 667-68, 388 P.2d 926 (1964), *abrogated on other grounds by Chong Yim* II, 194 Wn.2d 682, 451 P.3d 694). It is not the role of the courts to " 'substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws.' " *Chong Yim* II, 194 Wash.2d at 698, 451 P.3d 694 (quoting *Ferguson v. Skrupa*, 372 U.S. 726, 730, 83 S. Ct. 1028, 10 L. Ed. 2d 93 (1963)). Rather, our task is to " 'assume the existence of any necessary state of facts which [we] can reasonably conceive in determining whether a rational relationship exists between the challenged law and a legitimate state interest.' " *Chong Yim v. City of Seattle*, 194 Wash.2d 651, 675, 451 P.3d 675 (2019) (*Chong Yim* I) (quoting *Amurud v. Bd. of Appeals*, 158 Wash.2d 208, 222, 143 P.3d 571 (2006), *abrogated on other grounds by Chong Yim* II, 194 Wash.2d 682, 451 P.3d 694).

¶99 Given the broad nature of police powers and the deferential standard of judicial review, I cannot conclude that the ordinance lacks a rational basis. Reducing the spread of COVID-19 is a rational basis for instituting hazard pay. We will invalidate a law under this test only if there is no reasonably conceivable set of facts creating a public need for the regulation. *Cougar Bus. Owners*, 97 Wash.2d at 478, 647 P.2d 481; *see, e.g.*, *Petstel*, 77 Wash.2d at 152, 459 P.2d 937. As noted, there are numerous reasonably conceivable sets of facts to support the ordinance. And under this standard, the means of achieving the purpose of promoting the health, safety, and welfare of the people does not need to be narrowly tailored to that purpose, as long as it bears a rational relationship to that purpose. The hazard pay here may incentivize drivers to engage in grocery and food delivery, increase the availability of delivery drivers, and decrease the number of people in grocery stores and restaurants. This benefits the community by reducing the number of possible transmissions of COVID-19, which most all agree is a reasonable goal consistent with the City's interest in promoting the health, safety, and welfare of the community. Thus, Instacart has not sufficiently alleged that the ordinance cannot survive rational basis scrutiny, and the police powers claim should be dismissed. I would reverse the trial court's decision not to dismiss that claim. I respectfully dissent.

González, C.J.

Stephens, J.

Whitener, J.

**All Citations**

--- P.3d ----, 2023 WL 1830835

**End of Document**                                           © 2023 Thomson Reuters. No claim to original U.S. Government Works.