UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/19/2023

---------------------------------------------------------------- X

DOORDASH, INC., *et al.,*                     :
                                              :
                              Plaintiffs,     :          1:21-cv-7564-GHW
                                              :
              -against-                        :          MEMORANDUM
                                              :          OPINION & ORDER
CITY OF NEW YORK,                             :
                                              :
                              Defendant.      :
                                              :
---------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

     Plaintiffs operate several popular food delivery platforms:  DoorDash, Caviar, Grubhub,
Seamless, Postmates, and Uber Eats.  As the reader likely knows, the platforms facilitate pick-up and
delivery services between customers and restaurants.  They also provide other services to
restaurants, including marketing and advertising services, payment and order processing, customer
support services, and data analysis.  Plaintiffs' platforms are popular with consumers and restaurants.
Plaintiffs allege that restaurants that use their services see increased demand and revenue.

     To pay for the costs of their operations, Plaintiffs charge restaurants a commission that is
calculated as a percentage of the orders that they facilitate.  The commission rate can range from 5%
to 30% depending on the package of services that restaurants want.  Those commissions are
provided for in contracts that Plaintiffs enter into with restaurants.

     Before COVID-19 arrived in New York City, two New York City Council Members
sponsored legislation to cap the commissions charged to restaurants by third-party delivery service
platforms, such as those operated by Plaintiffs.  Their efforts were successful:  The City Council
passed legislation to cap Plaintiffs' commissions.  The caps were first presented as a temporary
response to the COVID-19 pandemic, but they have since been made permanent.  The legislation

caps the amount that Plaintiffs can charge for deliveries at 15% of the order, and caps the amount that Plaintiffs can charge for any other type of service at 5%.  As a result of the caps, Plaintiffs are now operating at a loss in New York City.

Plaintiffs allege that the City Council did not engage in any economic study regarding the level or effects of those caps before they were implemented.  Instead, Plaintiffs assert, the legislation was designed to protect local industry by unfairly targeting Plaintiffs' companies, which are headquartered outside of New York State.  Because the legislation impairs Plaintiffs' rights under their contracts and have reduced their contracts' value, forcing Plaintiffs to operate at a loss in New York City, Plaintiffs have adequately stated a claim that the City's legislation violates the Constitution of the United States and the Constitution of the State of New York.  Therefore, Defendant's motion to dismiss the complaint is denied.

## I.      BACKGROUND

### A.      Facts[1]

#### 1.      Plaintiffs' Businesses

Plaintiffs operate several popular on-line food ordering and delivery services:  DoorDash, Caviar, Grubhub, Seamless, Postmates, and Uber Eats.  Dkt. No. 34 ("FAC") ¶ 1.  The platforms "connect restaurants, consumers, and independent delivery couriers."  *Id.*  As the reader likely knows, consumers can access the platforms on-line, either through websites or through mobile applications on a smartphone.  *Id.* ¶¶ 25, 26, 27, 32.  Plaintiffs operate in New York City and elsewhere.  *Id.* ¶ 33.  They are not the only players in the marketplace:  "Other platforms operating

---

[1] Unless otherwise noted, the facts are taken from the complaint and are accepted as true for the purposes of this motion.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

in New York City and elsewhere in the United States that provide similar services to restaurants include Deliver.com, Slice, Toast, and Ritual, among others." *Id.*

Of course, delivery service by restaurants is not new. Before the advent of the internet, restaurants offered delivery services. And "internet-based food delivery has been around since the mid-1990s . . . ." *Id.* Since its inception, Plaintiffs' businesses have operated "largely free of government regulation, and completely free of regulations setting price controls on the fees that restaurants can agree to pay to third-party platforms in exchange for the services provided." *Id.* ¶¶ 33, 50.

Plaintiffs allege that their platforms have been an economic boon to New York City restaurants for several reasons. *Id.* ¶ 34. First, Plaintiffs allege, the platforms have "resulted in the expansion of restaurants' consumer bases." *Id.* "One study reported that delivery sales through third-party platforms are approximately 80% incremental . . . ." *Id.* In other words, the platforms generate business that the restaurants "would not otherwise secure." *Id.* Second, the platforms boost restaurants' revenues by growing their delivery and pick-up orders. *Id.* ¶ 35. The positive economic impact of the platforms on restaurant business was supported by the results of one national survey in which 80–90% of single, independently owned businesses reported that "Uber Eats made them more profitable, increased their revenue, helped expose them to new customers, and has been beneficial to their bottom line." *Id.* ¶ 36. The restaurant industry has been "growing since Plaintiffs and other third-party platforms have begun offering their services . . . ." *Id.* ¶ 37.

Plaintiffs allege that their services have helped the restaurant industry weather other economic shocks. They note that the restaurant industry has been under pressure from "large rent hikes, a shortage of workers, and increasing wholesale food prices (all of which persist in New York and are completely unrelated to the third-party platforms)." *Id.* ¶ 38. "Plaintiffs have helped

mitigate these burdens for restaurants by expanding restaurants' customer base and increasing order volume and revenue." *Id.*

The platforms also helped restaurants survive the COVID-19 pandemic. "For example, the odds of staying in business during the pandemic were eight times better for restaurants on DoorDash compared to all U.S. restaurants." *Id.* ¶ 39.

It costs Plaintiffs money for them to run their businesses. Their operational costs run the gamut from the cost of developing and operating their on-line platforms, to marketing local restaurants to consumers, to the screening and payment of couriers. *Id.* ¶ 42.

Plaintiffs generate revenue to pay for the services that they provide "by collecting commissions from restaurants pursuant to agreed-upon contractual terms." *Id.* ¶ 41. These commission streams "are necessary for Plaintiffs to offer services that drive revenues for restaurants, provide meaningful earning opportunities for couriers, and delight consumers." *Id.* Plaintiffs offer a number of different types of contracts that have different commission structures. Restaurants have "significant choice" regarding the type of contract they enter into with Plaintiffs. *Id.* ¶ 44. "A typical contract between Plaintiffs and a restaurant includes a commission where the restaurant agrees to pay Plaintiff a fixed percentage of the price of the consumer's order in exchange for certain services." *Id.*

Plaintiffs charge restaurants with which they contract a commission for the orders that they facilitate. The pricing of Plaintiffs' contracts depends on the level of service that a restaurant wishes to obtain. For example, DoorDash offers a "Basic Partnership Plan" where DoorDash facilitates delivery of online orders. *Id.* ¶ 46. The company charges a 15% commission for that plan. "But, overwhelmingly, restaurants do not choose this option." *Id.* Instead, they choose plans at a higher commission rate—25% or 30%—for which the restaurants are provided more services. The "vast

majority" of New York City-based restaurants have elected to enter into contracts at these higher commission—and associated service—levels.

Grubhub also provides its services to restaurants pursuant to a commission-based payment structure. "Restaurants that opt to use the Grubhub Marketplace . . . select a negotiable marketing package that typically ranges from 5%-20% per order, based on the restaurant's desired level of marketing support and visibility." *Id.* ¶ 48. Uber Eats uses a similar commission-based model. *Id.* ¶ 49. The pricing packages "agreed to by Uber Eats's restaurant partners vary based on their individual business needs—with some percentages below and others above the current caps set by the City—and can include marketing and advertising services, payment and order processing, customer support services, data and insights to inform their operations, as well as the facilitation of food delivery." *Id.*

"DoorDash's and Grubhub's contracts with restaurants are terminable at will, and most of Uber Eats's contracts with restaurants are likewise terminable at will . . . ." *Id.* ¶ 45. Nonetheless, "restaurants choose to maintain these contracts . . . typically for several years because restaurants recognize the value that Plaintiffs provide. Indeed, the vast majority of restaurants in New York City that enter into contracts with Plaintiffs opt not to terminate but remain in multi-year contractual relationships." *Id.* Notwithstanding the commission caps imposed by the City that are the subject of this litigation, contracts that existed prior to the imposition of the caps remain in effect for a substantial number of restaurants. And a "large number of restaurants voluntarily enter into contracts with Plaintiffs with commissions greater than what the Ordinance allows so as to gain access to a broader suite of services . . . ." *Id.*

### 2. The Conception of the Commission Cap and the Subsequent Outbreak of COVID-19

The concept of capping Plaintiffs' commissions emerged before the outbreak of the COVID-19 pandemic. The bill that resulted in the first cap on Plaintiffs' commissions—Int. No.

1908—was first introduced to the City Council by Council Member Francisco Moya on February 27, 2020.  Its introduction came "well before New York State or New York City announced any state of emergency or restricted restaurant occupancy" as a result of what would become the COVID-19 pandemic.  *Id.* ¶ 65.  Int. No. 1908 was co-sponsored by Council Member Moya and his colleague, Mark Gjonaj.  *Id.*  When first introduced, the bill would have made it "'unlawful for third-party food delivery services to charge covered establishments a fee per online order for the use of their services that totals more than 10% of the purchase price of such online order.'  There was no time limit to the commission cap or distinction between delivery and other charges, and the bill made no mention of any emergency or temporary measures."  *Id.* ¶ 66.

When Int. No. 1908 was introduced, the 10% cap on commissions was "justified as a lifeline to local restaurants."  *Id.* ¶ 67.  But the City Council members who introduced the bill "cited no empirical evidence substantiating the fact that 'local restaurants' (however defined) needed a lifeline, nor that a 10% commission cap would provide such a lifeline."  *Id.* ¶ 67. The record provided no rationale for why 10% was selected as the proposed cap, and no study was presented to the Council analyzing the impact of the cap on restaurants or the platforms.  *Id.*  In introducing the bill, Council Member Moya argued "incorrectly, and with no evidence" that, in his words, "restaurants across the city and across the country [are] at the mercy of third party food delivery services like Grub Hub [*sic*] and Uber Eats," and that restaurants need "these food delivery apps to reach customers and stay in business . . . ."  *Id.*  He contended that the caps were required for restaurants' "survival."  *Id.*

Plaintiffs allege that the chronology of events, coupled with the statements by Council Member Moya show that the "original bill was not introduced as an emergency and temporary COVID-19 response, but rather as part of a targeted campaign against third-party platforms."  *Id.* ¶ 68.  That Council Member Moya's determination to cap the platforms' commissions did not stem from the outbreak of the pandemic was, Plaintiffs allege, again made clear in a tweet by Council

Member Moya on April 14, 2020—after the State and City had declared an emergency as a result of the COVID-19 pandemic—that "NYC local restaurants needed a 10% cap on delivery fees from third party services like GrubHub long before #COVID19 hit us.  They damn sure need it now."  *Id.* ¶ 68.

COVID-19 burst onto the scene in New York in March of 2020, after the introduction of Int. No. 1908.  *Id.* ¶ 54.  That month, Mayor Bill de Blasio declared a state of emergency in the City of New York and Governor Andrew Cuomo declared a "disaster emergency" for the State of New York.  *Id.* ¶¶ 54–55.  Governor Cuomo also ordered all nonessential businesses and retailers statewide to close.  *Id.* ¶ 55.  In March and April of 2020, the New York State Department of Economic Development issued updated guidance categorizing dine-in restaurants as "non-essential," but permitted restaurants to sell food by take-out and delivery.  *Id.* ¶ 56.  The government's response to the pandemic, caused take-out and deliveries—the services at the heart of Plaintiffs' businesses—to take off.

### 3.    The Adoption of the City's First Commission Cap

"Once the pandemic spread, a state of emergency was declared, and restrictions were placed on on-premises dining, the stated rationale for the commission cap bill shifted to providing temporary relief to restaurants during the pandemic, and the bill was amended to reflect that shift."  *Id.* ¶ 69.  After the onset of the pandemic, Int. No. 1908 was amended, and the amended commission cap bill—Int. No. 1908-B—was described as "a temporary measure tied to the duration of the emergency capacity restrictions placed on restaurants" as a result of the pandemic.  *Id.* ¶ 70.

But while the bill was framed as a response to the pandemic, Council Member Gjonaj emphasized that the primary relief afforded by the bill was not a limited response to the pandemic.  On the day that Int. No. 1908-B was passed, Council Member Gjonaj said that he "remain[ed] confident that we will pass the full set of bills that were introduced earlier this year on the primary

relief to small mom and pop shops just looking for their fair playing field and use the service of the venture capital backed Silicon Valley tech behemoths." *Id.* ¶ 70.

Neither City Council Member Moya nor Gjonaj cited data in support of their arguments in favor of the commission caps imposed by Int. No. 1908-B. *Id.* ¶ 72. Plaintiffs allege that the rhetoric presented in favor of adoption of the bill was not supported by data. The Council Members did not cite to "any studies, data, or other analyses supporting their claims that the commissions freely negotiated between restaurants and platforms were 'exorbitant' or 'sky-high'; nor did they cite any data supporting their determination of what fees would be reasonable; nor did they cite any data supporting their position that commission caps would save otherwise purportedly shuttered restaurants." *Id.*

Notwithstanding the lack of data supporting the premise and asserted effects of the legislation, Int. No. 1908-B was approved by the City Council on May 13, 2020. *Id.* ¶ 64. And on May 26, 2020, Mayor De Blasio signed the bill into law, enacting Local Law 2020/052, which added Subchapter 22 to Title 20, Chapter 5 of the Administrative Code of New York City, codified at N.Y.C. Admin. Code §§ 20-845–848 (the "Local Law"). *Id.* ¶ 73.

Subchapter 22, entitled "Third-Party Food Delivery Services" provided the following:

> (a) It shall be unlawful for a third-party food delivery service to charge a food service establishment a delivery fee that totals more than 15% of the purchase price of each online order.
>
> (b) It shall be unlawful for a third-party food delivery service to charge a food service establishment any fee or fees other than a delivery fee for the use of their service greater than 5% of the purchase price of each online order. Any fees or other charges from a third-party food delivery service to a food service establishment beyond such maximum 5% fee per order, and a delivery fee collected pursuant to subdivision a of this section, are unlawful.
>
> (c) The requirements of this section apply only during a declared emergency and for a period of 90 days after the end of a declared emergency.

*Id.* ¶ 74.  Violations of the Local Law could result in substantial penalties:  "a $1,000 fine per day, in addition to injunctive relief, restitution, and other costs."  *Id.* ¶ 75.

The bill defined a "third-party delivery service" as "any website, mobile application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, no fewer than 20 food service establishments located in the city that are owned and operated by different persons."  N.Y.C. Admin. Code § 20-845.  This definition sweeps all of Plaintiffs' platforms within the bill's scope. The bill applied broadly to all "food service establishments," defined as "a place where food is provided for individual portion service directly to the consumer whether such food is provided free of charge or sold, and whether consumption occurs on or off premises or is provided from a pushcart, stand or vehicle."  FAC ¶ 78.  Plaintiffs argue that the definition adopted by the City Council was "wildly over-inclusive," because it extended the economic protection afforded by the statute to all restaurants, not only to "mom and pop" restaurants that were struggling, but to the most profitable national chains.  *Id.* ¶ 79.

The Local Law established two different caps on two types of services:  a 15% cap on commissions for any "delivery fee" and a 5% cap on any other fee for any other services provided. Plaintiffs allege that these caps were determined arbitrarily.  *Id.* ¶¶ 80, 85.  "The City Council has not offered any . . . explanation for these specific figures or their bifurcation."  *Id.* ¶ 85.  Plaintiffs allege that the City Council did not "solicit or review any studies or data to understand the impact of these particular caps on New York City restaurants, couriers, and consumers."  *Id.*  And, in particular, the legislative history indicates that the City Council did not consider "any alternatives that might have been less burdensome or more tailored."  *Id.*

Plaintiffs highlight the broad array of services to which the 5% aggregate cap applies, and the fact that, under the law, other service providers can provide the same services to restaurants without

price constraints.  The 5% commission applies to every service provided by Plaintiffs that is not a

"delivery fee."  As defined in the Local Law, the term "delivery fee" "does not include any other fee

that may be charged by a third-party food delivery service to a food service establishment, such as

fees for listing or advertising the food service establishment on the third-party delivery service

platform or fees related to processing the online order."  *Id.* ¶ 81.  Thus, the 5% cap applies to

"marketing and promotional services, sales and consumer analytics, driver status and support

technology, brand management, menu consulting (e.g. food photography and menu design), and

pickup facilitation."  *Id.*

Plaintiffs contend that these caps are not tailored to the public interest because they sweep

so broadly.  *Id.* ¶ 82.  They allege that there are numerous other companies that provide services to

restaurants akin to those provided by the third-party platforms that are not subject to equivalent

price controls.  For example, media placement agencies, Google, Facebook, and others charge

restaurants to appear in search results.  *Id.* ¶ 84.  Those companies' fees are not capped, while

Plaintiffs' fees are capped at 5% even when Plaintiffs provide the same categories of services.  Other

vendors provide services to restaurants whose charges are not capped by the City "such as Sysco,

Resy, TapMango, Incentivo, and Otter—though, upon information and belief, such vendors

account for a large portion of restaurants' operating costs."  *Id.* ¶ 83.  Plaintiffs flag that the Local

Law does not acknowledge the "increasing costs of raw ingredients or supplies to restaurants or

take[] any steps to cap their prices."  *Id.*

As originally enacted, the Local Law was to remain in effect "only during a declared

emergency" and for a period of 90 days thereafter.  The law defined a "declared emergency" as "the

period during which a state disaster emergency has been declared by the governor of the state of

New York or a state of emergency has been declared by the mayor, such declaration is in effect in

the city, *and* all food service establishments in the city are prohibited from providing food for

consumption on-premises." *Id.* ¶ 76 (emphasis added). In August 2020, the City Council extended the duration of the caps until 90 days after full-capacity dining resumed in restaurants. *Id.* ¶ 77.

On or about May 19, 2021, Governor Cuomo "ended capacity restrictions on most businesses, including restaurants, which could resume 100% full-capacity indoor dining." *Id.* ¶ 86. Therefore, pursuant to the terms of the Local Law, the commission cap would expire on August 17, 2021. *Id.* ¶ 88. That did not happen.

### 4.    The Commission Caps Are Extended

On or about June 30, 2021, "Council Members Moya and Gjonaj introduced Int. No. 2359, a bill amending the Local Law to make ***permanent*** the previously temporary commission caps imposed on third-party platforms." *Id.* ¶ 89 (emphasis in original). The proposed bill would delete section (c) from the Local Law, which tethered commission caps to the continuance of the COVID-19 emergency. As a result, the proposed bill would impose the commission caps on a permanent basis—just as Council Members Reyes and Gjonaj had proposed prior to the outset of the pandemic. Plaintiffs argue that the extension marked "a departure from previous pretextual justifications for the imposition of commission caps. Instead, this bill targets out-of-state platforms for permanent price controls regardless of the costs those platforms incur for the services provided to restaurants under the terms of private contracts, irrespective of the financial state of particular restaurants, and untethered to any justifying rationale." *Id.* ¶ 90.

The bill was referred to the City Council's Committee on Small Business. *Id.* ¶ 91. That committee issued a report regarding the proposed bill on or about July 1, 2021. *Id.* Plaintiffs describe the report as containing "broad statements about how consumer preferences may harm restaurants in the long term and therefore government intervention and protection are required." *Id.* ¶ 102. And on July 1, 2021, the committee debated the bill that would make permanent the commission caps. *Id.* ¶ 92. The two City Council Members who sponsored the bill made statements

at the hearing that, Plaintiffs allege, support the view that the motivating force behind the legislation

was "to economically benefit one group of businesses at the expense of another." *Id.* Council

Member Moya explained the bill's purpose as follows:

> For far too long, these third-party food delivery services knowingly and willingly took advantage of small business, and the pandemic highlighted this abuse. As one of the greatest cities in the world, we need to stand by our small business owners every single day. We cannot allow these companies to choose their profit margins over those of mom-and-pop shops and especially struggling by charging them fees for services they may not even be providing. As our small businesses begin to recover, we must prevent abuse like this from happening again. These companies from the onset had the opportunity to do what is right, so here's their chance. We need to do everything we can to protect our mom-and-pop shops, the workers they employ, and our local economy. For these companies, it's just another restaurant, but for us, in our neighborhoods, these restaurants are an integral part of the character of our community, and that's why I introduced Intro 2359 to make these caps permanent. I will always stand by my small business owners over a billionaire-owned company any given day of the week . . . .

*Id.* (emphasis omitted).

And Council Member, and Committee Chairman Gjonaj focused on the relative profit of the

third-party platforms and local restaurants:

> The rise of third-party platforms is also apparent from their corporate strategies. Uber acquired delivery service Postmates in November 2020, and December 2020, Door Dash made its public market debut. Door Dash stock rose 86% during its initial public offering, one of the biggest IPOs of 2020 at a time when over [] 110,000 [restaurants] were closing across the country, including over 5000 in New York City. The platforms were experiencing a dramatic increase in business, while the restaurants were seeing a depletion of their business.

*Id.* ¶ 93.

Many voiced their objections to the proposed bill at the hearing. *Id.* ¶ 94. In response to

one commentator's remarks regarding the negative impact of the commission cap, Council Member

Gjonaj responded that "the reason we were looking [at] caps . . . is because there was a need to

protect a very vital industry to this city." *Id.* ¶ 95. And when a representative of Grubhub testified

that the commission caps would force the company to operate at a loss, "Chairman Gjonaj openly

justified the Ordinance as a measure to side with the local restaurants at the expense of out-of-state

service providers." *Id.* ¶ 97.  Chairman Gjonaj said the following:  "The restaurant and eatery industry is a very vital part of this city, not only for the cuisine and it's part of our actual culture, but they are actually a tax block, *they contribute to the tax base of this city and [are a] huge employer for New Yorkers, and they're an industry that we want to preserve and protect and ensure that they continue to thrive*." *Id.* ¶ 98 (emphasis in original).

Chairman Gjonaj "then emphasized that Grubhub's headquarters are in Chicago, Illinois, and asked Ms. Healy whether Grubhub paid New York taxes." *Id.* ¶ 98.  Chairman Gjonaj went on to say that because New York restaurants pay New York taxes, "it's more important that we protect them instead of . . . Grubhub or the other providers, I would hate [the] scenario of where a percentage of the sales transaction is leaving our city and going to a different state and not contributing to our tax base." *Id.* (emphasis omitted).

On or around July 22, 2021, the Committee on Small Business proposed a revision to Int. No. 2359 that would extend the Local Law to February 17, 2022—six months following what would have been the expiration date of the Local Law.  *Id.* ¶ 99.  That original expiration date was tethered to the cessation of the COVID-19 pandemic-related restrictions.  Plaintiffs assert that the extended date "has no stated or conceivable relationship to any public-health emergency and does not even purport to address public health concerns." *Id.*

The City Council voted in favor of Int. No. 2359 (the "Temporary Ordinance") on July 29, 2021.  *Id.* ¶ 100.  The Temporary Ordinance revised the Local Law by "among other things:  (1) changing the name of Section 20-846 from 'Fee limits during declared emergencies' to just 'Fees'; and (2) swapping the duration of the law from 'the period in which a state disaster emergency has been declared by the governor of the state of New York . . . and all food service establishments in the city are prohibited from operating at the maximum indoor occupancy and for a period of 90 days thereafter' to 'until February 17, 2022.'" *Id.* ¶ 101.

The committee issued a report regarding the proposed bill on July 29, 2021. *Id.* ¶ 102. The report cited to a 2019 article, predating the pandemic, to conclude that the use of delivery platforms might change consumer behavior—leading to fewer dine-in customers. *Id.* The report also cited to two hearings that pre-dated the pandemic regarding the impact of the platforms' business: in those hearings, the City Council "heard from small businesses and advocates who highlighted nonemergency-related concerns with platforms that allegedly existed long before the COVID-19 pandemic." *Id.* The July 29, 2021 report "makes no mention of public health or safety." *Id.*

The same day as the issuance of the report, the Small Business Committee held a hearing to consider the legislation. *Id.* ¶ 92. At the hearing, Council Member Moya again emphasized the importance of the legislation to protect a segment of the City's restaurant industry. *Id.* ¶ 104. He said that the City has "the opportunity and the responsibility to protect our mom-and-pop shops and ensure that they can survive, and not enable billion-dollar companies and their investors to continue getting richer at the expense of our restaurants." *Id.* And Chairman Gjonaj made comments that Plaintiffs interpret as reiterating that "even though restaurants now face fewer obstacles due to COVID-19, the City Council should intervene to protect the restaurant industry from changing consumer habits . . . ." *Id.* ¶ 105. This is what Chairman Gjonaj said:

> As the city has reopened and the dark days of the pandemic are hopefully behind us, the restaurant industry will begin to recover. Certain consumer habits may remain, however, that will make it more difficult for restaurants to succeed. Mainly consumers who become accustomed to ordering on third-party platforms that charge a substantial fee per order for the marketing and delivery service they provide, may continue to use these platforms. . . . The package of Bill[s] we're voting on today will ensure that restaurants have the tools that they need to succeed in the post-COVID world. . . . As the Chair of this committee, it has been my top priority to ensure that mom and pop shops, our micro-businesses remain the backbone of the city's economy.

*Id.*

The Small Business Committee voted in favor of the Temporary Ordinance on the same day as the hearing. *Id.* ¶ 106. Later that day, the full City Council voted to adopt it as well. *Id.* It did

not pass unanimously.  One Council Member—Kalman Yeger—explained a vote against the legislation because the justification for the bill no longer existed—the caps "were for purposes of saving restaurants from the pandemic." *Id.* ¶ 107.  Council Member Yeger raised the express concern that the Temporary Ordinance "interfere[s] with the constitutional obligations [and] contractual obligations of [ ] parties that have entered into arm's length transactions." *Id.* (alterations in original).

According to Plaintiffs, the City Council passed the Temporary Ordinance "without any of the research or analysis required and necessary for such sweeping legislation." *Id.* ¶ 108.  Plaintiffs allege that "the City Council did not conduct (or ask anyone else to conduct) research or analysis regarding the potential effects of continued commission caps on consumers, restaurants, delivery couriers, third-party platforms generally or DoorDash's, Grubhub's, or Uber Eats's platforms specifically, the local economy, or the relationship between the commissions paid by restaurants to third-party platforms and those restaurants' revenues or profitability." *Id.*  Moreover, "the City Council did not conduct (or ask anyone else to conduct) research or analysis that would support a uniform, industry-wide cap or the arbitrary bifurcation of fees that the Ordinance provides." *Id.* And similarly, Plaintiffs allege, "the City Council did not conduct (or ask anyone else to conduct) research or analysis regarding differences between third-party platforms that serve 20 or more restaurants and third-party platforms that serve fewer than 20 restaurants that would justify treating the two types of platforms differently." *Id.*

The Temporary Ordinance went into effect on August 29, 2021 as Local Law 2021/094.  *Id.* ¶ 109.  It was made retroactively effective as of August 17, 2023.  *Id.*

### 5.    The Commission Caps Are Made Permanent

On August 26, 2021, before the Temporary Ordinance came into effect, the Committee on Small Business—still chaired by Chairman Gjonaj—held a meeting in which it passed Int. 2390 (the

"Permanent Ordinance"). *Id.* ¶ 110. The Permanent Ordinance makes the commission caps permanent, just as, Plaintiffs allege, "its sponsors had long indicated they intended to do." *Id.* The Permanent Ordinance also requires a study in 2023 to describe the effects of the ordinance and to "make recommendations related to either the maintenance or adjustment of the [Permanent Ordinance]." *Id.* Plaintiffs refer to this as the City's "legislate first, study second" approach. *Id.* ¶ 6.

During that meeting, the Committee also passed Int. No. 1897-A, which imposed "a robust licensing and record-keeping scheme." *Id.* ¶ 110. Violations of the regulatory scheme can result in substantial penalties "including the possibility of a complete ban for platforms that commit merely two violations . . . ." *Id.*

In the committee report that accompanied the August 26, 2021 meeting, the committee repeated much of the same content as in its July report on the Temporary Ordinance. *Id.* ¶ 111. It too pointed to pre-pandemic articles and reports as justification for the commission caps, "such as a 2017 report claiming that increased online delivery orders 'pose[] the risk of cannibalization of dine-in customers.'" *Id.* (alteration in original). Plaintiffs contend that the "August 26 report also reflects the sponsors' animus towards large out-of-state businesses, expressly taking issue with 'venture capital firms [that] invested huge sums of money in food delivery companies.'" *Id.* The report cites to no studies showing that commission caps will protect restaurants from going out of business. *Id.* ¶ 112. It also provides "no justification for why a 15% cap on delivery fees and a 5% cap on all other fees are reasonable, connected to the public health or safety, would accomplish the Ordinance's purpose, and are targeted to achieve that purpose." *Id.*

The Committee on Small Business passed the Permanent Ordinance in eight minutes. *Id.* ¶ 113. Only Chairman Gjonaj spoke during the meeting. *Id.* Chairman Gjonaj justified the measure by claiming that "[w]ith competition from larger chains and other small businesses to the high cost of a modest pay in rent, labor, and inventory costs in government regulations, consumer behavior

changes in e-commerce, operating a restaurant at a profit is extremely challenging in this city." *Id.*
Chairman Gjonaj also singled two of the out-of-state Plaintiffs—DoorDash and Uber—and
"lamented that delivery companies were 'subsidized by Silicon Valley money.'" *Id.*  In passing the
legislation, Plaintiffs allege that the City Council disregarded the many voices who fought against the
legislation—including delivery couriers who stated that they would be "lost without these apps." *Id.*
¶ 114.

The full City Council approved the Permanent Ordinance, and the regulatory scheme
embodied in Int. No. 1897-A, during a meeting held on August 26, 2021.  Council Member Moya
spoke to justify the bill.  He said that "[w]e are not here to enable billion dollar companies and their
investors to get rich at the expense of restaurants." *Id.* ¶ 115.  "I'm proud . . . to protect the
restaurant industry and its workers" by "ensuring that mom and pop shops have a real opportunity
to . . . recover from this pandemic" through "limiting without expiration the fees charged to food
service establishments by third-party food  delivery services." *Id.*

### 6.      The Alleged Harm

In their complaint, Plaintiffs explain how the price controls imposed by the City Council
have harmed them and other economic actors in the City.  Plaintiffs' contracts with restaurants are
"a substantial source of revenue and a central piece of their business operations." *Id.* ¶ 119.
Plaintiffs assert that the commission caps have cost them "hundreds of millions of dollars through
December 2021." *Id.* ¶ 124.  As a result of the price controls imposed by the Permanent Ordinance
and its predecessors, "Plaintiffs have been operating at a loss in New York City and have not
recovered the revenue lost as a result of the commission cap." *Id.*  Plaintiffs have "permanently lost
revenue due to the commission cap." *Id.*

Plaintiffs allege that the commission cap impairs their contractual rights.  The price control
"will likely require Plaintiffs to renegotiate contracts with many restaurants (or be forced to abandon

their rights under those contracts), because many existing contracts contemplate prices for delivery services or marketing and other services that exceed the amounts permitted by the Ordinance, and for which the caps will not allow Plaintiffs to cover their costs." *Id.* Plaintiffs also assert that the legislation "will also likely require Plaintiffs to terminate contracts with existing restaurant partners [and] decline to enter into new contracts with prospective restaurant partners . . . ." *Id.*

Plaintiffs allege that the legislation does not give them reasonable alternatives to offset their losses, and that the legislation has forced Plaintiffs "to seek out alternative revenue streams to try and cover their operating costs, including, for some Plaintiffs, increasing consumer fees . . . ." *Id.* Plaintiffs allege that those increased fees have harmed their reputation and goodwill. *Id.* But significantly, they allege that raising "consumer fees will not allow Plaintiffs to recover their lost commissions to which they are contractually entitled." *Id.* Higher consumer fees, Plaintiffs allege, will result in fewer orders. "And fewer orders means additional revenue losses for not only Plaintiffs, but for restaurants and couriers who depend on Plaintiffs' platforms, not to mention reduced tax revenues for the City." *Id.*

## B.     Procedural History

Plaintiffs filed their original complaint against the City of New York on September 9, 2021. Dkt. No. 1. Plaintiffs amended their complaint on January 24, 2022. Dkt. No. 34. That is the operative complaint in this case. The complaint principally asserts that the Permanent Ordinance and its predecessors violate both the Constitution of the United States and the Constitution of the State of New York. *Id.*

The complaint asserts six causes of action: Count I claims that the City's legislation violates Article I, Section 10 of the United States Constitution—the so-called "Contracts Clause," which "limits . . . the power of a State to abridge existing contractual relationships, even in the exercise of

its otherwise legitimate police power." *Allied Structure Steel Co. v. Spannaus*, 438 U.S. 234, 242 (1978). *Id.* ¶¶ 125–142.

Count II claims that the legislation violates the "Takings Clause" of the Fifth and Fourteenth Amendments of the United States Constitution, as well as Article I, Section 7 of the New York State Constitution. *Id.* ¶¶ 143–157. Plaintiffs assert that the City has deprived them of their contractual property rights without prior and just compensation in violation of those fundamental constitutional protections.

Count III claims that the implementation of the legislation exceeded the City's police powers, and thus violated Article IX, Section 2(c) of the New York Constitution, New York Municipal Home Rule Law Section 10(ii)(a)(12), and New York General City Law Section 20(13). *Id.* ¶¶ 158–170. Plaintiffs' claim rests on the contention that the legislation "does not promote the public health, safety, or general welfare of the public at large." *Id.* ¶ 160. Instead, it is, they contend, biased economic protectionism that is not supported by "any type of analysis that would be expected of similar price-fixing legislation . . . ." *Id.* ¶ 165.

Count IV claims that the legislation violates the "Due Process Clause" of the Fourteenth Amendment to the United States Constitution and the "Due Process Clause" of Article I, Section 6 of the New York State Constitution. *Id.* ¶¶ 171–185. Plaintiffs assert that the commission cap was "irrational and arbitrary." They contend that the bill was "confiscatory in nature and intended to harm third-party platforms like Plaintiffs, essentially forcing them to subsidize certain restaurants' profit margins by continuing to cap their ability to charge reasonable and competitive commissions . . . ." *Id.* ¶ 175.

Count V asserts a violation of the "Equal Protection Clause" of the of the Fourteenth Amendment of the United States Constitution and the equivalent provision contained in Article I, Section 11 of the New York Constitution. *Id.* ¶¶ 186–200. Plaintiffs contend that the legislation

discriminated against the third-party platforms by treating them differently from other similarly situated businesses: "the Ordinance prohibits the ability of one class (third-party delivery platforms) to freely contract with restaurants with regard to facilitating the order and delivery of food and beverages from restaurants to consumers and providing marketing and other services, while it does not fix the prices of any other similarly situated businesses with which restaurants transact that offer the same services, such as raw ingredient suppliers, equipment suppliers, point-of-sale system vendors, online reservation platforms, or other advertising providers." *Id.* ¶ 189.

Finally, Count VI of the complaint asserts that the City's legislation violates the Dormant Commerce Clause of the United States Constitution. *Id.* ¶¶ 201–216.

On March 7, 2022, Defendant moved to dismiss Plaintiffs' amended complaint in full. Dkt. No. 38 (notice of motion); Dkt. No. 40 (memorandum in support or "Mem."); Dkt. No. 39 (Trotter Decl.). Plaintiffs filed their opposition on March 28, 2022. Dkt. No. 41 ("Opp'n"). The next day, on March 29, 2022, the Chamber of Commerce of the United States of America filed an *amicus brief.* Dkt. No. 45. Defendant filed its reply on April 11, 2022. Dkt. No. 51 ("Reply").

## II.   LEGAL STANDARD

A complaint need only contain "a short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a claim that does not meet this pleading standard for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). On a motion filed under Rule 12(b)(6), the court accepts as true the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are inadequate. *Iqbal*, 556 U.S. at 678 (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). And "[t]he tenet that a court

must accept as true" a complaint's factual allegations does not apply "to legal conclusions." *Iqbal*, 556 U.S. at 678 (alterations omitted).

To survive dismissal, a complaint must allege sufficient facts to state a plausible claim. *Twombly*, 550 U.S. at 570. A claim is plausible when the plaintiff pleads facts to support the reasonable inference that the defendant has acted unlawfully. *Iqbal*, 556 U.S. at 678 (*citing Twombly*, 550 U.S. at 556). The plaintiff's claim must be more than merely "speculative." *Twombly*, 550 U.S. at 545. And a reviewing court must "draw on its judicial experience and common sense" to determine plausibility. *Iqbal*, 556 U.S. at 679 (citation omitted).

On a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006) (quoting *Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)). "Generally, [courts] do not look beyond 'facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken.'" *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)). A court may consider "any 'written instrument' . . . attached to [the complaint] as 'an exhibit' or . . . incorporated in it by reference." *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020) (quoting Fed. R. Civ. P. 10(c) (other citations omitted)). A court may also consider a document "solely relie[d] on by the plaintiff if it "is integral to the complaint." *Id.* (quotation and brackets omitted). A document is "integral to the complaint" if the complaint "relies heavily" on the document's "terms and effect." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016).

III.    DISCUSSION

A.    Plaintiffs' Contracts Clause Claim Is Adequately Pleaded

Plaintiffs have adequately pleaded that the City's price-setting regulation violates the

Contracts Clause.  The Contracts Clause of the Constitution of the United States provides that "[n]o

state shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const., Art. I, § 10, cl.

1.  "The Contracts Clause restricts the power of States to disrupt contractual arrangements."  *Sveen v.*

*Melin*, 201 L. Ed. 2d 180, 138 S. Ct. 1815, 1821 (2018).  "Although facially absolute, the Contracts

Clause's prohibition 'is not the Draconian provision that its words might seem to imply.'"  *Buffalo*

*Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 367–68 (2d Cir. 2006) (quoting *Allied Structural Steel Co. v. Spannaus*,

438 U.S. 234, 240 (1978)).  "Rather, courts must accommodate the Contract Clause with the

inherent police power of the State 'to safeguard the vital interests of its people.'"  *Id.* (quoting *Home*

*Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934)).  "[T]o determine whether a law violates the

Contracts Clause, we ask (1) whether the contractual impairment is substantial, (2) whether the law

serves a legitimate public purpose such as remedying a general social or economic problem, and (3)

whether the means chosen to accomplish that purpose are reasonable and necessary."  *Connecticut*

*State Police Union v. Rovella*, 36 F.4th 54, 63 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 215 (2022).

1.    Substantial Impairment

The complaint adequately pleads that the City's legislation substantially impairs Plaintiffs'

contract rights.  To determine whether Plaintiffs plead a plausible Contracts Clause claim, the Court

must first examine whether the legislation substantially impairs Plaintiffs' contract rights.  "In

conducting that inquiry, we follow the Supreme Court's most recent Contracts Clause decision,

which instructs us to consider 'the extent to which the law undermines the contractual bargain,

interferes with a party's reasonable expectations, and prevents the party from safeguarding or

reinstating his rights.'" *Melendez v. City of New York*, 16 F.4th 992, 1033 (2d Cir. 2021) (quoting *Sveen*, 128 S. Ct. at 1822)).

The complaint pleads that the legislation undermines the contractual bargain between Plaintiffs and many of the restaurants with whom they have contracted. The legislation rewrites the payment terms of the contracts—"the central provision upon which . . . they reasonably rely." *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006). Plaintiffs' contracts included commissions that ranged up to 30% of the cost of a delivery order. At most, the City's legislation allows Plaintiffs to claim a 20% commission. And of that 20%, only 5% can be charged for services other than the delivery itself. As a result of the legislation, Plaintiffs allege that they are operating at a loss in New York City. Plaintiffs plausibly plead that by changing the payment provisions of Plaintiffs' contracts in a way that requires them to operate at a loss, Defendant has dramatically undermined Plaintiffs' contractual bargains.

Plaintiffs also plausibly plead that the City interfered with reasonable expectations that they had under their contracts. "[T]he reasonableness of expectations depends, in part, on whether legislative action was foreseeable, and this, in turn, is affected by whether the relevant party operates in a heavily regulated industry." *Sullivan v. Nassau Cnty. Interim Fin. Auth.*, 959 F.3d 54, 64 (2d Cir. 2020). The complaint plausibly pleads that the City's legislation "did not operate in an area already subject to state regulation at the time the company's contractual obligation were originally undertake, but invaded an area never before subject to regulation . . . ." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 250 (1978). Plaintiffs allege that internet-based delivery services have operated since the 1990s substantially without regulation. They allege that the City's price control legislation was the first of its kind in the nation. *See, e.g.,* FAC ¶¶ 9, 19, 51, 129. As pleaded, the City chose to intervene

in a marketplace that was previously unregulated in an unprecedented manner.[2]  Therefore, Plaintiffs plausibly plead that the legislation interfered with their reasonable expectations.

Finally, Plaintiffs plausibly plead that the City's legislation significantly prevents Plaintiffs from safeguarding or reinstating their rights.  Defendant presents no argument on this issue, which is reasonable, for the legislation is permanent:  it provides no opportunity to reinstate Plaintiffs' rights.  And Plaintiffs have plausibly alleged that they cannot safeguard their rights under the contract.  Indeed, they have alleged that the economic tools available to them do not even permit them to recapture the lost economic value of the contracts because consumer-facing fees will reduce aggregate demand.  FAC ¶ 124.

Defendant's argument that as a matter of law "there can be no substantial impairment where contracts are terminable at-will" has no merit.  Mem. at 4.  To start, the text of the Constitution applies to laws "impairing the Obligation of Contracts."  *See* U.S. Const. art. I, § 10, cl. 1.  The text does not carve out any category of contracts from its scope.  Defendant's argument that some contracts can be impaired without limitation finds no purchase there.

Nor does Defendant cite to any case with a holding supporting its position.  In support of its position, Defendant cites only to a single district court case from 1987:  *Lefrancois v. Rhode Island*, 669 F. Supp 1204 (D.R.I. 1987).  Mem. at 4.  That the sole opinion on which Defendant relies is nearly forty years old and comes from a district court outside of our Circuit is apparent from the case citation.  But more significantly, the opinion does not contain a holding that supports Defendant's position.  The discussion in the case upon which Defendant relies is dicta.  This is revealed by Defendant's description of the case as one "assuming a substantial impairment . . . , but nonetheless

---

[2] Defendant's argument that the legislation was foreseeable because certain Plaintiffs attended a hearing in June 2019 "where commission caps were discussed" lacks merit.  Mem. at 5.  Assuming that commission caps were discussed, a discussion regarding the possibility of the imposition of future caps does not establish that Plaintiffs operated in an area subject to state regulation at the time.

finding 'much force to defendant's contention' that the state law prohibiting a landfill form accepting out-of-state waste resulted in no substantial impairment as plaintiff's contract was terminable at will." *Id.* (quoting *Lefrancois*, 669 F. Supp at 1215). *Lefrancois* does not establish the rule of law for which Defendant advocates.

By contrast, the courts that have considered and ruled on this question have held that the impairment of an at-will contract can support a claim under the Contracts Clause. *See United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 628 (5th Cir. 2010) ("We conclude that its first reason—that the contracts were terminable at will . . . does not prevent a finding of contract impairment . . . [h]owever, neither the district court nor the parties point to any authority that supports the proposition that the power to terminate a contract enfolds the power to impair it for the purposes of the Contract Clause . . . the termination clauses do not save the State from Contract Clause scrutiny."); *DoorDash, Inc. v. City & Cnty. of San Francisco*, No. 21-CV-05502-EMC, 2022 WL 867254, at *8 (N.D. Cal. Mar. 23, 2022) (holding that the "existence of an at-will contract does not preclude a finding of substantial impairment").

Moreover, there is a factual issue regarding the extent to which the contracts are terminable at will. Not all of Uber Eats's contracts are terminable at will. FAC ¶ 45. And Plaintiffs allege that they reasonably expected the continuation of the contracts over an extended period notwithstanding the fact that the contracts permit their counterparties to terminate the contracts at will. *Id.* In sum, Plaintiffs have plausibly pleaded that the City's legislation substantially impairs their contracts.

## 2. Significant and Legitimate Public Purpose

The complaint plausibly pleads that the City's legislation did not further a significant and legitimate public purpose. Further development of the factual record is necessary with respect to this issue. "In general, a legitimate public purpose is one that is 'aimed at remedying an important general social or economic problem rather than providing a benefit to special interests.'" *Connecticut*

25

*State Police Union*, 36 F.4th at 63 (quoting *Buffalo Tchrs. Fed'n*, 464 F.3d at 368).  A legislature acts in the public interest when it passes a law "in the service of 'a broad societal goal, not the pursuit of the interests of a narrow class.'"  *Id.* (quoting *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 994 (2d Cir. 1997)).

When evaluating whether a law furthers a significant and legitimate public purpose, "'[t]he severity of the impairment measures the height of the hurdle the state legislation must clear.'  While an impairment causing only '[m]inimal alteration of contractual obligations may end the inquiry at its first stage,' *i.e.*, without consideration of purpose or means, '[s]evere impairment . . . will push the inquiry to a careful examination of the nature and purpose of the state legislation.'"  *Melendez*, 16 F.4th at 1035 (quoting *Allied Structural Steel Co.*, 438 U.S. at 245) (internal citations omitted). "Implicit in a 'careful examination,' is recognition that [the] factors can bear different weights in different circumstances."  *Id.*  "A purpose and means showing sufficient to support one contract impairment may be insufficient to support another coming closer to 'the repudiation of debts or the destruction of contracts or the denial of means to enforce them.'"  *Id.* (quoting *Home Bldg.,* 290 U.S. at 439).[3]

The impairment of Plaintiffs' contracts here is very severe:  as alleged, the City's legislation has deprived Plaintiffs of the benefit of their bargains and is causing them to lose money in their operations in New York City.  Thus, the justification for the City's legislation must withstand very careful examination.

The Court cannot conclude as a matter of law on this record that the legislation was enacted for a valid public purpose.  Plaintiffs' allegations plausibly plead that the motivations of Defendant

---

[3] Defendant argues that the Court should not follow the Second Circuit's holding in *Melendez* because the "sliding-scale approach" adopted in that decision is a "newfound approach [that] clashes with binding Supreme Court precedent." Mem. at 11.  The Court declines this invitation to err.  It is well established that district courts are "bound to follow controlling Second Circuit precedent unless that precedent is overruled or reversed."  *Unicorn Bulk Traders Ltd. v. Fortune Mar. Enters., Inc.*, No. 08-CV-9710, 2009 WL 125751, at *2 (S.D.N.Y. Jan. 20, 2009).  The Court must apply the rule established by the Second Circuit in *Melendez.*

were not in furtherance of a legitimate public purpose.  As in *Melendez*, the legislative history

indicates "a certain hostility" to Plaintiffs "and sympathy for small business owners."  *Melendez*, 16

F.4th at 1040.  The complaint cites to numerous comments by the two principal sponsors of the

legislation—Council Members Gjonaj and Moya—that suggest that the not-so-veiled purpose of the

legislation may have been economic protectionism for local "mom and pop" stores and antagonism

toward out-of-state, wealthy third-party platforms.  For example, Council Member Gjonaj remarked

that he "remained confident that we will pass the full set of bills that were introduced earlier this

year on the primary relief to small mom and pop shops just looking for their fair playing field and

use the service of these venture capital backed Silicon Valley Tech behemoths."  FAC ¶ 70.  Council

Member Gjonaj also stated that "it's more important that we protect [New York restaurants] instead

of . . . Grubhub or the other providers, I would hate [the] scenario of where a percentage of the

sales transaction is leaving our city and going to a different state and not contributing to our tax

base."  *Id.* ¶ 98.

The plausibility of Plaintiffs' allegations that the legislation was motivated by an improper

purpose are bolstered by their allegations regarding the lack of fit between the justification offered

for the legislation and its structure.  In its briefing, Defendant does not attempt to justify the

legislation as a response to the COVID-19 pandemic.  (It cannot because the caps are permanent.)

But when first adopted, they were justified as a temporary response to the COVID-19 pandemic.

The shifting rationale provided for the adoption of the legislation supports the contention that the

public purpose proffered by Defendant for the legislation now is pretextual.

The lack of fit between the legislation and the problem sought to be fixed, as alleged by

Plaintiffs, also supports the plausibility of their allegations.  As noted above, Council Member

Gjonaj described the purpose of the bill as protecting struggling "mom and pop" local restaurants.

But the City's legislation does not apply only to "mom and pop" restaurants, or to restaurants in

financial distress: it applies equally to all restaurants regardless of their profitability or ownership. Plaintiffs' contention that the legislation was implemented for an improper purpose also finds support in Plaintiffs' allegations that they were the singular target of regulated price caps while other restaurant vendors remained unregulated—even when those vendors were providing the same types of services as Plaintiffs.

Plaintiffs' contentions that the legislation was not made for a proper purpose are bolstered further by their allegations that the City's legislation has harmed, rather than helped, City restaurants. *See, e.g.*, FAC ¶¶ 20–21, 35, 38, 44–45, 59, 61. Plaintiffs allege that the legislation "threatens to restrict third-party platforms' ability to offer the full suite of services they provide at higher commissions, taking away valuable services restaurants have overwhelmingly selected when given a choice." *Id.* ¶ 123. Indeed, Plaintiffs allege that "65% of restaurants say they were able to increase their profits during COVID-19 because of DoorDash, and, in a survey, nearly nine out of ten independent restaurant operators agreed that Grubhub increases the volume of takeout and delivery orders." FAC ¶ 52. "And 95% of small businesses nationwide reported that working with Uber Eats has had a positive impact on their business . . . and nearly 90% of independent restaurant operators agreed that Grubhub increases the volume of takeout and deliver orders." *Id.* ¶ 39. Plaintiffs plausibly plead that New York City restaurants benefit from their services. Plaintiffs' allegations that the City Council failed to engage in meaningful study of the economic effect of its legislation prior to implementing it also enhances the plausibility of Plaintiffs' contention that the legislation was not implemented for a proper public purpose.

As in *Melendez,* here "the question of legitimate public purpose cannot now be decided as a matter of law for either party and would benefit from further record development." *Melendez,* 16 F.4th at 1037 (indicting that the question of legitimate public purpose should not be decided at that preliminary stage when "[v]arious Council hearing statements might be understood to support

relieving guarantors of personal liability for unpaid rents regardless of whether they ever reopen their businesses . . . [s]till others might suggest a certain hostility to landlords and sympathy for small business owners").

### 3.    Reasonable and Necessary Means

The Court cannot decide now whether the means chosen to accomplish the City's purposes were reasonable and necessary as a matter of law.  As described above, at the third step of its Contracts Clause analysis, the Court must evaluate "whether the means chosen to accomplish th[e] purpose are reasonable and necessary."  *Sullivan*, 959 F.3d at 64.  "Unless the state itself is a party to the contract, courts usually defer to a legislature's determination as to whether a particular law was reasonable and necessary."  *Buffalo Tchrs. Fed'n*, 464 F.3d at 369.  "When a law impairs a private contract, substantial deference is accorded to the legislature's 'judgment[s] as to the necessity and reasonableness of a particular measure.'"  *Id.* (quoting *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 23 (1977) (alteration in original)).

To evaluate this factor, the Second Circuit has applied "the principles identified in *Blaisdell* and its progeny."  *Melendez*, 16 F.4th at 1038 (pointing to *Home Bldg.*, 290 U.S. 398 (1934)).  *Blaisdell* "laid a new foundation for Contracts Clause analysis based on what Chief Justice Hughes described at the necessary location of a 'rational compromise between individual rights and public welfare.'"  *Id.* (quoting *Blaisdell*, 290 U.S. at 442).  The *Blaisdell* Court identified five relevant factors in concluding that the law at issue in that case achieved that compromise.  *Id.*

> First, a genuine economic "emergency existed in Minnesota which furnished a proper occasion for the exercise of the reserved power of the state to protect the vital interests of the community."  Second, the challenged legislation protected "a basic interest of society" and "was not for the mere advantage of particular individuals."  Third, the relief afforded was "appropriate" to the emergency.  Fourth, the relief was granted "upon reasonable conditions."  Fifth, the law was "temporary in operation."  Moreover, the time period within which the law operated could be reduced by a court based on changed circumstances, thus ensuring that it was "limited to the exigency which called it forth."

*Id.* at 1023 (internal citations omitted).  As the Second Circuit did in *Melendez*, the Court is guided by these principles in its evaluation of whether the means selected by the City was reasonable and necessary.  While the Court analyzes each of the following factors individually in turn, "it is the totality that precludes dismissal of the Contracts Clause claim."  *Id.* at 1038.

First, the City's legislation was not implemented in response to an emergency.  The permanent caps were proposed and adopted after the end of the emergency caused by the COVID-19 pandemic.  (The record raises substantial questions regarding whether even the Temporary Ordinance was justified by the COVID-19 pandemic, as it was introduced prior to the outset of the pandemic in New York City.).

Second, the City's legislation is not a "'temporary' or 'limited' impairment of contract, a factor critical to the Supreme Court's conclusion in *Blaisdell*."  *Id.*  Instead, it permanently alters the payment terms of Plaintiffs' contracts.  "[A] permanent and complete impairment of contract, by contrast to a temporary and limited one, will weigh heavily against a finding of reasonableness, particularly at the pleadings stage."  *Id.* at 1040.  It does so here.

Third, the Court cannot conclude as a matter of law that the City's legislation is an appropriate means of achieving its professed public purpose:  to help the New York City restaurant industry thrive.  Plaintiffs' allegations raise substantial questions regarding whether the commission cap is an appropriate means to that end.  Plaintiffs allege that their platforms increase restaurants' revenues and exposure.  Plaintiffs allege that there are other substantial burdens on restaurants' businesses, such as rent, raw ingredients, supplies, and other services that were not capped by the City Council.  As pleaded, those other cost centers do not generate offsetting revenue, as Plaintiffs' platforms do.  Thus, Plaintiffs have plausibly pleaded that the City's focus on capping their revenues, while leaving all other drivers of restaurants' costs intact, was neither reasonable nor necessary.

Fourth, as in *Melendez*, Plaintiffs have pointed to "the absence of some record basis to link purpose and means." *Melendez*, 16 F.4th at 1041. Plaintiffs allege that there the sponsors of the legislation provided no rationale for the amount of the caps that they imposed. The 15% and 5% caps, are, they plausibly plead, arbitrary. Plaintiffs allege that the City Council did not conduct a meaningful economic study of the effect of the commission caps prior to the adoption of the legislation at issue here. As pleaded, there was no substantial basis for the City Council to adopt commission caps in the amounts ultimately adopted. As a result of the alleged gap in the record supporting the adopting of the commission caps at issue here, "deference is not warranted" to the City Council's decision. *Id.*

Fifth, these concerns are heightened by the manner in which Plaintiffs allege the legislation has allocated its economic burden. In *Melendez*, the court ascribed weight to the fact that the legislation "comes not at City expense, (or, more precisely, that of the public that benefits from functioning neighborhoods) but, rather, at the expense of a discrete group of private persons: commercial landlords." *Id.* The *Melendez* Court also noted that the City did not afford relief "by appropriating existing funds or raising taxes so as to place the burden of preserving neighborhoods on the citizenry that would benefit therefrom. Instead, it transferred the burden to the 'few shoulders' of commercial landlords." *Id.* The allegations here are analogous. Instead of placing the burden on the public at large, Defendant allocated the burden to the "few shoulders" of Plaintiffs and other operators of third-party platforms.

Sixth, "adding to that reasonableness concern" is the fact that the legislation is not "conditioned on need." *Id.* at 1043. Here, Defendant purportedly passed this legislation to protect the restaurant industry from going out of business due to "predatory" commission fees charged by TPPs. The bill's sponsors touted its purpose as the protection of "mom and pop shops" and local

31

businesses.  But the legislation is not conditioned on need.  Profitable national chain restaurants

benefit from it to the same extent as struggling local "mom and pop" restaurants.  *See* FAC ¶ 79.

Seventh, the reasonableness of the City's legislation as a means to serve Defendant's stated

public purpose is also called into question by the City's failure to provide for Plaintiffs "to be

compensated for damages or losses sustained as a result of their [contracts'] impairment."  *Id.* at

1045.  Nothing in the legislation allows Plaintiffs to recover what they allege to be the extensive

losses that they have suffered and continue to suffer as a result of the commission caps.  As the

*Melendez* Court stated, "[t]his is not to suggest that compensation is always necessary to defeat a

Contracts Clause challenge."  But akin to *Melendez*, "where, as here, a law permanently deprives" a

party of its contractual terms, without regard to need, "the failure to condition such relief on some

compensation for, or mitigation of, tax and other obligations" is a "further reason to question the

reasonableness and appropriateness" of the Permanent Ordinance.  *Id.* at 1046.  Accordingly,

Defendant's motion to dismiss Plaintiffs' Contracts Clause claim is denied.

### B.     Plaintiffs' Takings Claim is Adequately Pleaded

Plaintiffs plausibly plead that the City's legislation violates the Takings Clauses of the

Constitutions of the United States and of the State of New York.  The "Takings Clause" of the Fifth

Amendment of the Constitution of the United States provides that private property shall not "be

taken for public use, without just compensation."  U.S. Const. Amend. V.  The New York

Constitution similarly provides that "[p]rivate property shall not be taken for public use without just

compensation."  N.Y. Const. art. I, § 7.  "The guarantee against Takings provided by the New York

Constitution is generally treated as coextensive to that of the U.S. Constitution."  *Heidel v. Hochul,*

No. 20-CV-10462 (PKC), 2021 WL 4942823, at *9 (S.D.N.Y. Oct. 21, 2021), *aff'd sub nom. Heidel v.*

*Governor of New York State,* No. 21-2860-CV, 2023 WL 1115926 (2d Cir. Jan. 31, 2023) (citing *Am.*

*Econ. Ins. Co. v. State*, 30 N.Y.3d 136, 155 (2017)).

"The Supreme Court has recognized two branches of Takings Clause cases:  physical takings and regulatory takings." *1256 Hertel Ave. Assocs., LLC v. Calloway,* 761 F.3d 252, 263–64 (2d Cir. 2014) (citing *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002)). "A physical taking occurs when there is either a condemnation or a physical appropriation of property." *Id.* "A regulatory taking, by contrast, occurs where even absent a direct physical appropriation, governmental regulation of private property 'goes too far' and is 'tantamount to a direct appropriation or ouster.'" *Id.* (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005)). Because the City's legislation "does not present the 'classi[c] taking' in which the government directly appropriates private property for its own use," any taking in this case would be regulatory in nature. *Id.* (quoting *E. Enters. v. Apfel,* 524 U.S. 498, 522 (1998)) (internal citation omitted).

"The Court has 'generally eschewed any set formula for determining how far is too far, choosing instead to engage in essentially ad hoc, factual inquiries . . . preferring to examine a number of factors rather than a simple mathematically precise formula.'" *74 Pinehurst LLC v. New York,* 59 F.4th 557, 564 (2d Cir. 2023) (quoting *Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 326 (internal quotation marks omitted)).  The Supreme Court's decision in *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978) "supplies the framework for considering regulatory takings claims.  The case instructs courts to engage in a flexible, ad hoc, factual inquiry focused on several factors that have particular significance." *Id.* at 556.

"'Primary among those factors are '[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations.'  Also telling, is the 'character of the governmental action,' particularly 'whether it amounts to a physical invasion' or appropriation of property or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.'" *1256 Hertel Ave. Assocs.*, 761 F.3d at 264 (quoting *Lingle*, 544 U.S. at

539); *see also 74 Pinehurst LLC*, 59 F.4th at 566 ("Three of these factors are:  (1) [t]he economic impact of the regulation on the claimant," (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the governmental action.").

Balancing the *Penn Central* factors, the Court concludes that Plaintiffs have stated a takings claim.  First, Plaintiffs plausibly plead that the economic impact of the legislation on them has been severe.  They allege that the legislation has caused them to operate at a loss, and that it has damaged their goodwill.  FAC ¶¶ 5, 13, 42, 97, 122–24, 128, 146, 148.  Defendant argues that "mere diminution" in value is "insufficient to demonstrate a taking."  Mem. at 14.  But this argument is inconsistent with the facts alleged in the complaint, and a basic understanding of economics.  The legislation permits Plaintiffs to receive some revenue.  But Plaintiffs allege that the revenue permitted is not sufficient to cover the cost of providing all of the services that they are required to provide under some contracts.  The City's argument ignores the concept of the cost of goods sold: if the legislation only permits Plaintiffs to receive commissions in an amount that does not cover their costs—as they allege—their net income is not merely diminished, it is entirely destroyed.

Second, Plaintiffs plausibly plead that the City's legislation has interfered with distinct investment-backed expectations.  Plaintiffs have alleged that their business model has existed for decades without government regulation of this type.  They allege that they made enormous investments into their businesses with the expectation that their investments would be recouped through the contractual arrangements that have been modified by the City.  *See, e.g.*, FAC ¶¶ 1, 19, 45–51, 57–60, 127–29, 145, 148.

Defendant's argument that one cannot have a reasonable investment-backed expectation in a an at-will contract is meritless.  "'[P]roperty interests . . . are not created by the Constitution.  Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'"  *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155,

161 (1980) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)). "But a mere unilateral expectation or an abstract need is not a property interest entitled to protection." *Id.* In its motion to dismiss the complaint, Defendant relies on the sentence quoted immediately above without regard for the two sentences that precede it in the Court's opinion in *Webb's* to argue that a contract that one party can terminate at will is a "mere . . . expectation" that the government can impair without restraint. *Id.* But an at-will contract cannot reasonably be described as merely a "unilateral expectation." If it was, it would not be a contract. For, as all first-year law students learn, the formation of a contract requires a "meeting of the minds" and the "manifestation of mutual assent." *See, e.g., Stonehill Cap. Mgmt., LLC v. Bank of the W.*, 28 N.Y.3d 439, 448 (2016). Parties to a contract have a property interest in their rights under that contract that is governed by state law. That a contract permits a party to terminate it at will may affect how one evaluates the investment-backed expectations of its parties. But there is no support for the City's position that a party's rights under such a contract can be impaired by government action without constraint.

Moreover, the facts alleged in the complaint plead that Plaintiffs reasonably expected the contracts to remain in effect for years notwithstanding the fact that they permitted termination at will. The Court cannot conclude as a matter of law that Plaintiffs did not have reasonable investment-backed expectations in their contracts.

Finally, the Court must consider the character of the legislation at issue. "The Supreme Court has instructed that in analyzing the 'character' of the governmental action, courts should focus on the extent to which a regulation was 'enacted solely for the benefit of private parties' as opposed to a legislative desire to serve 'important public interests.'" *74 Pinehurst LLC*, 59 F.4th at 568 (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485–86 (1987)). "The character of the government action in *Penn Central*, for example, cut against a finding of a taking because the law was part of a 'comprehensive plan to preserve structures of historic or aesthetic interest' and

applied to hundreds of sites." *Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 555 (2d Cir. 2023) (quoting *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 132 (1978)).  The unequal distribution of the burden of legislation by itself is not dispositive.  "As the *Penn Central* Court noted, '[l]egislation designed to promote the general welfare commonly burdens some more than others.'"  *74 Pinehurst LLC*, 59 F.4th at 568.

The Court cannot conclude as a matter of law that this factor weighs in favor of Defendant. As pleaded, the City's legislation benefits the owners of restaurants—private parties—at the expense of Plaintiffs without any compensation.  Plaintiffs plausibly plead that, unlike the rent stabilization legislation at issue in *74 Pinehurst LLC* or the landmark designations at issue in *Penn Central*, the City has imposed the burden of the permanent price caps on a small handful of companies—namely, Plaintiffs.  FAC ¶¶ 12, 14, 84, 91, 94(d), 111, 113.  And Plaintiffs plausibly plead that the City targeted them, rather than the multiple other alternative costs pressuring restaurants, because Plaintiffs were located outside of this state.  Given all of these facts, Plaintiffs have adequately pleaded their Takings claim.

### C. Plaintiffs Plausibly Plead That the Legislation Exceeds The City's Police Power

Defendant's motion to dismiss this claim is denied because Plaintiffs plausibly allege that the legislation was not reasonably calculated to achieve a legitimate public purpose.  Police powers repose with the states.  *See* U.S. Const. amend. X; *United States v. Morrison,* 529 U.S. 598, 618 (2000) (holding that "the Founders undeniably left" police powers "reposed in the States").  "New York State delegates certain of such powers—e.g., legislative authority relating to local safety, health and well-being—to its municipalities through the state constitution, the Municipal Home Rule Law and the General Cities Law."  *Ass'n of Home Appliance Manufacturers v. City of New York*, 36 F. Supp. 3d 366, 372–73 (S.D.N.Y. 2014).  "Municipal governments in New York have lawmaking powers only insofar as such powers are granted by the state."  *Id.*  "Municipalities are authorized to adopt laws

relating to, *inter alia,* the 'government, protection, order, conduct, safety, health and well-being of persons or property therein,' N.Y. Const. art. IX, § 2(c)(10); *accord* N.Y. Mun. Home Rule Law art. 2, § 10(1)(ii)(a)(12) and the 'maint[enance of] order, enforce[ment of] the laws, protect[ion of] property and preserv[ation] and care for the safety, health, comfort and general welfare of the inhabitants of the city and visitors thereto,' *id.* art. 2–A § 20(13)." *Id.* at 372 (alterations in original). "The New York constitution and the Municipal Home Rule Law require that these powers granted to local governments be 'liberally construed.'" *Id.* (citing N.Y. Const. art. IX § 3(c); N.Y. Mun. Home Rule Law art. 6 § 51).

"To be a valid exercise of police power, a municipal legislative act must bear a reasonable relationship to a legitimate purpose within the City's police powers—*e.g.*, the promotion of the health, safety, well-being or welfare of the community." *Id.* (citing *Good Humor Corp. v. City of N.Y.,* 49 N.E.2d 153, 155 (1943) and *People v. Cook,* 34 312 N.E.2d 452, 456 (1974)). "In order for a local law to come within the police power of a municipality . . . , it must bear a reasonable relationship to the objective sought to be promoted, *i.e.*, public safety, health or welfare." *Albany Area Builders Ass'n v. Town of Guilderland*, 534 N.Y.S.2d 791, 794 (N.Y. App. Div. 3d Dep't 1988), *aff'd*, 74 N.Y.2d 372. Fundamentally, a "municipality's purported exercise of its police powers must be reasonable." *Ass'n of Home Appliance Manufacturers,* 36 F. Supp. 3d at 372. *See also Good Humor Corp. v. City of New York*, 290 N.Y. 312, 318 (1943) ("The fundamental question remains whether [the local law in question] is reasonable.").

Plaintiffs have adequately pleaded that the mechanism adopted by the City to achieve its purported purpose was not reasonable.[4] Plaintiffs have pleaded that there was no study that

---

[4] Plaintiffs also contend that the legislation's true purpose was not a legitimate one. For the reasons described in Section III.A.2 above and III.F below, there are reasonable grounds to question whether the legislation was a legitimate exercise of the City's police power. *See People v. Cohen*, 272 N.Y. 319, 322 (1936) (holding that legislation "designed for the convenience and interest of a special class" is not a valid exercise of the City's police power); *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 883 (1985) (holding that statute "encouraging investment in Alabama assets and securities in this plainly

informed the size of the commission caps before they were established.  Plaintiffs have also pleaded

that there was no study of the economic impact of the commission caps prior to their imposition—

that, instead, the City adopted a "legislate first, study second" approach that resulted in the

imposition of arbitrary caps.  Plaintiffs have pleaded that while their services cost restaurants money,

their services increase restaurants' revenue and enhance their survival rates, rather than harm them.

Plaintiffs have pleaded that despite the economic benefits that they bring to the table, they were

targeted in the legislation to the exclusion of other cost centers for restaurants that are not alleged to

provide restaurants offsetting revenue boosts.  Plaintiffs have alleged that the City Council failed to

consider testimony by groups that opposed the legislation, and that the statements by the council

members who sponsored the legislation evinced a hostility toward them as out-of-state actors.

These allegations are sufficient to support Plaintiffs' claim.

### D.      Plaintiffs' Due Process Claim is Adequately Pleaded

Plaintiffs claim that the City's legislation violates the substantive guarantees of the Due

Process Clause of the Constitutions of the United States and of the State of New York.  U.S. Const.

amend. XIV; N.Y. Const. art. I, § 6.[5]  "To establish a substantive due process violation, a plaintiff

must show both (1) that she has an interest protected by the Fourteenth Amendment, and (2) that

the statute, ordinance, or regulation in question is not rationally related to a legitimate government

interest."  *Winston v. City of Syracuse*, 887 F.3d 553, 566 (2d Cir. 2018).

"The standard for determining whether a state price-control regulation is constitutional

under the Due Process Clause is well established:  'Price control is unconstitutional . . . if arbitrary,

discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt . . . .'"  *Pennell*

---

discriminatory manner serves no legitimate state purpose.").  But the Court need not reach this question here as
Plaintiffs have plausibly pleaded this claim on other grounds.

[5] "'New York courts have interpreted the due-process guarantees of the New York Constitution and the United States
Constitution to be coextensive . . . .'"  *Hernandez v. United States*, 939 F.3d 191, 205 (2d Cir. 2019) (quoting *Oneida Indian
Nation of N.Y. v. Madison Cty.*, 665 F.3d 408, 427 n.13 (2d Cir. 2011)).

*v. City of San Jose*, 485 U.S. 1, 11 (1988) (quoting *Permian Basin Area Rate Cases*, 390 U.S. 747, 769–70 (1968)). "The State may not, under the guise of regulation by zoning, deprive the owner of the reasonable income productive or other private use of his property and thus destroy all but a bare residue of its economic value. Such an exercise of the police power would be void as violative of the due process clauses of the State and Federal Constitutions." *Fred F. French Investing Co. v. City of New York*, 39 N.Y.2d 587, 591 (1976).

Plaintiffs have adequately pleaded that the City's price caps deprived them of a reasonable income-producing use of their property in certain of their contracts with restaurants. In *Pennell*, the Court found that the rent control statute at issue was valid, in part because landlords were "guaranteed a fair return on their investments." *Pennell*, 485 U.S. at 2. As pleaded here, the legislation does not guarantee Plaintiffs a fair return on their investments. To the contrary, they allege that the law forces them to operate at a loss—depriving them of the opportunity to obtain a reasonable income-productive use of their property.

Defendant's arguments regarding the alleged deficiencies in Plaintiffs' allegations are not supported by the well-pleaded facts in the complaint. Defendant argues that Plaintiffs' losses can be simply "offset with alternative income streams, namely, the fees plaintiffs charge users of their platforms." Mem. at 19. However, this argument flounders on the well-pleaded factual allegation that direct customer charges will not offset Plaintiff's losses. FAC ¶ 124.

Defendant similarly argues that "plaintiffs acknowledge that commission rates of fifteen percent or less were in fact offered prior to the enactment of any commission cap, undercutting any claims that such a rate is confiscatory." Mem. at 19. This argument again ignores the well-pleaded facts in the complaint regarding the large volume of contracts that had rates well in excess of 15%. *See, e.g.*, FAC ¶ 46 (alleging that "overwhelmingly" restaurants do not choose DoorDash's basic 15% commission plan).

### E.  Plaintiffs' Equal Protection Claim is Adequately Pleaded

Plaintiffs have adequately pleaded that the City's legislation violates the Equal Protection Clause.  "The Equal Protection Clause of the Fourteenth Amendment 'embodies a general rule that States must treat like cases alike, but may treat unlike cases accordingly.'"  *Winston v. City of Syracuse,* 887 F.3d 553, 560 (2d Cir. 2018) (quoting *Vacco v. Quill,* 521 U.S. 793, 799 (1997)).  "Whether a state law or policy satisfies this general principle, and what sort of review a court must apply, depends on the nature of the class of individuals the state or local government treats differently or the rights at issue." *Id.*  "[I]f a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Id.* (quoting *Romer v. Evans,* 517 U.S. 620, 631 (1996)).

The Court applies rational-basis review because Defendant has not targeted a suspect class and the legislation is not alleged to affect a fundamental right.  "This form of review is highly deferential." *Id.*  "Rational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* (quoting *Heller,* 509 U.S. at 319 (internal quotation marks omitted), and citing *Sensational Smiles, LLC v. Mullen,* 793 F.3d 281, 284 (2d Cir. 2015)).  "Moreover, '[a] State . . . has no obligation to produce evidence to sustain the rationality of a statutory classification.'" *Id.* (quoting *Heller,* 509 U.S. at 320).  "Rather, '[a] statute is presumed constitutional, . . .  and '[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" *Id.* (quoting *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364 (1973)).  Nevertheless, rational-basis review "is not meant to be 'toothless.'" *Windsor v. United States,* 699 F.3d 169, 180 (2d Cir. 2012).  "Instead, rational basis review 'imposes a requirement of some rationality in the nature of the class singled out.'" *Winston,* 887 F.3d at 560 (quoting *Rinaldi v. Yeager,* 384 U.S. 305, 308–09 (1966)).

Plaintiffs plead that because of the 5% commission cap on non-delivery services, they were subject to unconstitutional, unequal treatment.  The 5% commission cap applies to "marketing and promotional services, sales and consumer analytics, driver status and support technology, brand management, menu consulting (e.g. food photography and menu design), and pickup facilitation" when those services are provided by Plaintiffs.  FAC ¶ 81.  Plaintiffs allege that other companies provide the same services to restaurants but that their fees are not subject to price regulation of any type.  *Id.* ¶ 84 ("[A]dvertising businesses that provide similar marketing services to those that third-party platforms offer, such as media placement agencies, classified advertisers, Google, Facebook, ratings and review websites, reservation platforms, delivery logistics providers, and brand consultants.").  Plaintiffs' allegations that the legislation, which caps their fees for marketing services, but leaves the fees charged by Google and others for the same services untouched, state a claim under the Equal Protection Clause.

## F.    Plaintiffs' Dormant Commerce Clause Claim is Adequately Pleaded

Because the legislative history—in particular, remarks by Council Members Gjonaj and Moya—supports the inference that the legislation was intended to discriminate against out-of-state entities, Plaintiffs' dormant Commerce Clause claim also survives.  The Commerce Clause provides that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States."  U.S. Const. art. I, § 8, cl. 3.  "This express grant of power to Congress contains 'a further, negative command, known as the dormant Commerce Clause,' which limits the power of local governments to enact laws affecting interstate commerce."  *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 47 (2d Cir. 2007) (quoting *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995)).

"[T]his antidiscrimination principle lies at the 'very core' of our dormant Commerce Clause jurisprudence."  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (quoting *Camps*

*Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 581 (1997)).  The Supreme Court has said

that "the Commerce Clause prohibits the enforcement of state laws driven by economic

protectionism—that is, regulatory measures designed to benefit in-state economic interests by

burdening out-of-state competitors."  *Id.* (cleaned up).

"In analyzing a challenged local law under the dormant Commerce Clause, we first

determine whether it clearly discriminates against interstate commerce in favor of intrastate

commerce, or whether it regulates evenhandedly with only incidental effects on interstate

commerce."  *Id.*  "We then apply the appropriate level of scrutiny.  A law that clearly discriminates

against interstate commerce in favor of intrastate commerce is virtually invalid per se and will

survive only if it is 'demonstrably justified by a valid factor unrelated to economic protectionism.'"

*Id.* at 47 (quoting *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992)).  "That is, such a law is valid 'only

if it 'advances a legitimate local purpose that cannot be adequately served by reasonable

nondiscriminatory alternatives.'"  *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 102–03 (2d Cir. 2017) (quoting

*Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 at (2008)).  "A clearly discriminatory law may

operate in three ways:  (1) by discriminating against interstate commerce on its face; (2) by harboring

a discriminatory purpose; or (3) by discriminating in its effect."  *Town of Southold*, 477 F.3d at 48

(internal citations omitted).

Plaintiffs have plausibly pleaded that the City's legislation harbored a discriminatory purpose

and was, therefore, clearly discriminatory.  Council Member Gjonaj—chair of the Small Business

Committee, and a principal sponsor of the legislation from the time of its inception—made several

public comments that support the inference of a discriminatory purpose behind the bill.  In May

2020, one of the bill's sponsors made a hostile comment about entities established in California.

FAC ¶ 70 (Council Member Gjonaj stating that he "remained confident that we will pass the full set

of bills that were introduced earlier this year on the primary relief to small mom and pop shops just

looking for their fair playing field and use the service of these venture capital backed Silicon Valley Tech behemoths."). Later, Chairman Gjonaj made the following remark: "it's more important that we protect [New York restaurants] instead of . . . Grubhub or the other providers, I would hate [the] scenario of where a percentage of the sales transaction is leaving our city and going to a different state and not contributing to our tax base." *Id.* ¶ 98. The co-sponsor of the legislation, Council Member Moya, is alleged to have made similarly overt remarks that support the inference that the purpose of the legislation was discrimination against out-of-state actors in order to protect local businesses. *See* FAC ¶ 92 ("We need to do everything we can to protect our mom-and-pop shops, the workers they employ, and our local economy. . . . I will always stand by my small business owners over a billionaire-owned company any given day of the week . . . ."). These statements support the inference that the legislation—as reflected in the remarks of its sponsors—harbored a discriminatory purpose.

The plausibility of this allegation is enhanced by the legislative history of the bill. The Temporary Ordinance carved out entities that served fewer than 20 restaurants. N.Y.C. Admin. Code § 20-845. Plaintiffs plausibly allege that the carveout kept the bill from applying to any entity located in New York. It applied only to out-of-state platforms, including Plaintiffs'. Because Plaintiffs adequately plead that the legislation harbored a discriminatory purpose, Defendant's motion to dismiss their dormant Commerce Clause claim must be denied.

## IV.   CONCLUSION

For the reasons described above, Defendant's motion to dismiss is DENIED.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 38.

SO ORDERED.

Dated:  September 19, 2023
New York, New York

_____
GREGORY H. WOODS
United States District Judge