UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

DOORDASH, INC., GRUBHUB, INC., and
PORTIER, LLC,

       Plaintiffs,

   - against -

CITY OF NEW YORK,

       Defendant.

------------------------------------------------------------X

:
:
:
:
:
:
:
:
:
:
:
:

21 Civ. 7564 (GHW) (GS)

<u>OPINION & ORDER</u>

**GARY STEIN, United States Magistrate Judge:**

  Non-Parties New York City Hospitality Alliance (the "Alliance"), Andrew Rigie, Jeffrey Bank, and Robert S. Bookman (the "Individuals," and together with the Alliance, "Non-Parties") have moved to quash subpoenas issued to them by Plaintiffs DoorDash Inc., Grubhub, Inc., and Poitier, LLC ("Plaintiffs") pursuant to Rule 45 of the Federal Rules of Civil Procedure or, in the alternative, for a protective order pursuant to Rule 26(c)(1)(A). For the reasons set forth below, the Non-Parties' motion is **GRANTED IN PART** and **DENIED IN PART**.

BACKGROUND

### A. Plaintiffs' Allegations

  Plaintiffs commenced this action on September 9, 2021, challenging the constitutionality of an ordinance adopted by the New York City Council ("City Council") during the COVID-19 pandemic imposing price caps on the commissions charged to restaurants by third-party food delivery services platforms. (Dkt. No.

1).  Plaintiffs amended their complaint ("First Amended Complaint" or "FAC") on

January 24, 2022.  (Dkt. No. 34).

In brief, the FAC alleges that Plaintiffs operate several popular online food

delivery services, including DoorDash, Caviar, Grubhub, Seamless, Postmates, and

Uber Eats, all of which are based outside of New York.  (FAC ¶¶ 1, 25–27).

Plaintiffs enter into contracts with restaurants who sign up for their services and

charge the restaurants commissions calculated as a percentage of the customer

orders they facilitate.  (*Id.* ¶¶ 20–21, 25–27).

Beginning shortly before the outbreak of the COVID-19 pandemic in early

2020, two City Council members, Francisco Moya and Mark Gjonaj, introduced a

bill to cap the commissions charged by third-party food delivery services, such as

those operated by Plaintiffs, at 10%.  (*Id.* ¶¶ 65–66).  In introducing the bill, Council

Member Moya argued that local restaurants were "at the mercy of" the delivery

services and needed a cap on commissions in order to survive.  (*Id.* ¶ 67).  In May

2020, the City Council adopted, and Mayor De Blasio signed into law, an ordinance

establishing two different caps on services provided by third-party food delivery

services: (1) a 15% cap on commissions for delivery fees; and (2) a 5% cap on any

other fee for any other services provided.  (*Id.* ¶¶ 2, 64, 73–74).

Initially, these provisions were to remain in effect only during the COVID-19

emergency and for 90 days thereafter.  (*Id.* ¶¶ 2, 64).  However, they were

subsequently extended and then, in August 2021, made permanent.  (*Id.* ¶¶ 2, 106,

109, 110, 115, 117).  Plaintiff's original Complaint attacking the legislation followed

shortly afterwards.  (Dkt. No. 1).  The temporary and permanent laws enacted by the City Council in 2020 and 2021 are collectively referred to herein as the "Fee Cap Legislation."

The FAC attacks the Fee Cap Legislation as an unconstitutional "government overreach."  (FAC ¶¶ 3–4).  In Plaintiffs' view, the Fee Cap Legislation is "arbitrary," "irrational," and "unnecessary" (*id.* ¶¶ 3, 7, 11, 172); "harmful" to the interests of Plaintiffs and local restaurants alike (*id.* ¶ 5); a "price-fixing regime" that interferes with freedom of contract and property rights (*id.* ¶ 4, 6, 23); lacking any "legitimate" government purpose and unsupported by any data or empirical evidence (*id.* ¶¶ 13, 85, 131); and "economic protectionism" driven by "animosity" towards out-of-state businesses (*id.* ¶¶ 13, 85).  The FAC further alleges that the legislation's pandemic-related justification of helping small businesses during especially difficult economic times was "mere pretext" and that "the law was always intended to permanently harm out-of-state, large delivery platforms like Plaintiffs." (*Id.* ¶ 118).

Based on its detailed allegations of the Fee Cap Legislation's purported illegitimate motivation and lack of justification, the FAC asserts six causes of action.  These causes of action allege violations of: (1) the Contract Clause of the U.S. Constitution (*see* art. I, § 10); (2) the Takings Clause of the Fifth and Fourteenth Amendments of the U.S. Constitution as well as under Article I, Section 7 of the New York State Constitution; (3) the City's police powers under Article IX, Section 2(c) of the New York State Constitution, N.Y. MHR Section 10(ii)(a)(12),

3

and N.Y. Gen. City Law Section 20(13); (4) the Due Process Clause of the

Fourteenth Amendment and Article I, Section 6 of the New York State Constitution;

(5) the Equal Protection Clause of the Fourteenth Amendment and Article I, Section

11 of the New York State Constitution; and (6) the Dormant Commerce Clause of

the U.S. Constitution.  (FAC ¶¶ 125–216).  Plaintiffs seek declaratory and

injunctive relief invalidating the Fee Cap Legislation as well as monetary damages.

(*Id*. at 74).

### B. The Motion to Dismiss

The City moved to dismiss the FAC in its entirety on March 7, 2022.  (Dkt.

Nos. 38–40).  In a memorandum opinion and order dated September 19, 2023, the

Honorable Gregory H. Woods denied the City's motion and found that Plaintiffs had

adequately pled the requisite elements attendant to each of their causes of action.

(Dkt. No. 55, reported at *DoorDash, Inc. v. City of New York*, 692 F. Supp. 3d 268

(S.D.N.Y. 2023)).

As relevant to certain of the causes of action, Judge Woods found that the

FAC adequately alleged that the City Council acted with an unconstitutional

purpose or motivation in enacting the Fee Cap Legislation.  *See, e.g.*, 692 F. Supp.

3d at 292 ("Plaintiffs' allegations plausibly plead that the motivations of Defendant

were not in furtherance of a legitimate public purpose.") (Contracts Clause claim);

*id*. at 298 ("Plaintiffs plausibly plead that the City targeted them, rather than the

multiple other alternative costs pressuring restaurants, because Plaintiffs were

located outside of this state.") (Takings Clause claim); *id*. at 302 ("Plaintiffs have

plausibly pleaded that the City's legislation harbored a discriminatory purpose and was, therefore, clearly discriminatory.") (Dormant Commerce Clause claim).

In so doing, Judge Woods relied on, *inter alia*, comments quoted in the FAC from the law's two primary sponsors, Council Members Moya and Gjonaj, suggesting, as Judge Woods put it, that "the not-so-veiled purpose of the legislation may have been economic protectionism for local 'mom and pop' stores and antagonism toward out-of-state, wealthy third-party platforms." *Id*. at 292 (citing remarks by Council Member Gjonaj); *see also id*. at 302 (citing remarks by Council Member Moya that "support the inference that the purpose of the legislation was discrimination against out-of-state actors in order to protect local businesses"). "Further development of the factual record is necessary," Judge Woods stated, with respect to whether the law furthered a significant and legitimate public purpose. *Id*. at 291; *see also id*. at 293 ("the question of legitimate public purpose . . . would benefit from further record development") (citation omitted).

Following the memorandum opinion and order, Judge Woods held an initial pretrial conference and entered a case management plan and scheduling order on October 10, 2023. (Dkt. No. 62; Minute Entry dated October 10, 2023). Fact discovery has been ongoing since then and is currently set to be completed on January 10, 2025. (*See* Dkt. No. 120).

### C. The Subpoenas to the Non-Parties

Between January 30, 2024 and February 13, 2024, Plaintiffs served four separate subpoenas (the "Subpoenas") on the Non-Parties: (1) the Alliance, a

not-for-profit organization that advocates for the interests of restaurant and nightlife establishments in New York City; (2) Rigie, the Executive Director of the Alliance; (3) Bank, the President Emeritus of the Alliance and a member of its Board of Directors; and (4) Bookman, the Alliance's General and Legislative Counsel. (Dkt. No. 84 at 4–5).

Plaintiffs seek the production of documents from all of the Non-Parties and also seek to depose Rigie. (*See* Dkt. No. 80 (Declaration of Glenn S. Grindlinger, Esq.) Exs. A–C. The document requests to the Individuals are substantively identical to one another. (*Id.* Exs. B–C). They also largely overlap with those to the Alliance, except that the Subpoenas to the Individuals specifically seek text messages and omit one request found in the Alliance Subpoena. (*Compare* Dkt. No. 80 Ex. A at 12–13 *with id*. Ex. B at 11–12 & Ex. C at 13–14 and 27–28).

A chart submitted by the Non-Parties (Dkt. No. 84 at 6), recreated here, illustrates these commonalities and differences between the Subpoenas to the Alliance and the Individuals:

| Alliance Doc. Req. No. | Individual Doc. Req. No. | Requests (omitting "Including text messages" for the Individuals) |
|---|---|---|
| 1 | 1 | All Documents and Communications Concerning Your remarks, comments, notes, analyses, opinions, and meetings about the Ordinances and/or Commissions. |
| 2 | 2 | All Documents and Communications Concerning the Ordinances and/or Commissions transmitted between You and the City, Including members of the City Council and/or their staff. |
| 3 | 3 | All Documents and Communications, Concerning the Ordinances and/or Commissions |

|   |     |                                                                                                                                          |
|---|-----|------------------------------------------------------------------------------------------------------------------------------------------|
|   |     | transmitted between You and Other Parties, Including restaurant trade associations, Food Service Establishments, journalists, and/or lobbyists. |
| 4 | n/a | All Documents and Communications concerning the Ordinances and/or Commissions transmitted among the [New York City Hospitality Alliance]. |
| 5 | 4   | All Documents and Communications Concerning the goal(s) and/or objective(s) the Ordinances serve or are intended to serve. |
| 6 | 5   | All Documents and Communications Concerning the potential or actual effects, economic or otherwise, of the Ordinances on restaurants and/or the restaurant industry. |
| 7 | 6   | All Documents and Communications, Concerning the potential or actual effects, economic or otherwise, of the Ordinances on Third-Party Food Delivery Services. |
| 8 | 7   | All Documents and Communications, Concerning the potential or actual effects, economic or otherwise, of the Ordinances on Consumers. |
| 9 | 8   | All Documents and Communications, Concerning the profitability, margins, and/or operating costs of Food Service Establishments from January 1, 2019 to present. |

For purposes of analysis, these requests can be grouped into the following categories based on the nature of the document: (1) communications with the City; (2) communications with other third parties; and (3) documents internal to the Alliance.  In terms of subject matter, the documents can be grouped into the following categories: (1) the Fee Cap Legislation generally; (2) the intended goals

and objectives of the Fee Cap Legislation; (3) the potential or actual effects of the

Fee Cap Legislation; and (4) financial information concerning New York City

restaurants.

### D. The Motion to Quash

Following service of the Subpoenas, the Non-Parties served written objections

(Dkt. No. 80 Exs. D & E) and sought a pre-motion conference with the Court to

request leave to file a motion to quash (Dkt. No. 67). At the pre-motion conference,

held on March 28, 2024, the Court granted the Non-Parties leave, and the

Non-Parties filed their motion to quash on April 18, 2024. (*See* Dkt. Nos. 79–83, 84

("Motion" or "Mot.")).

Plaintiffs filed their opposition to the Motion on May 2, 2024. (Dkt. Nos. 87

("Opposition" or "Opp.") & 88 (Declaration of Esther Lifshitz ("Lifshitz Decl."))). The

Non-Parties submitted a reply brief on May 9, 2024. (Dkt. No. 89 ("Reply"); *see also*

Dkt. Nos. 90 & 91 (supplemental letters from Plaintiffs and the Non-Parties)). At

the pre-motion conference, the Court invited the City to submit a brief setting forth

its position on the instant dispute, but the City declined to so. (*See* Dkt. No. 85 at

20:1–25). The Court held oral argument on the Motion on June 13, 2024. (*See* Dkt.

No. 103 (Transcript of Proceedings on June 13, 2024 or "Tr.")).

## LEGAL STANDARDS

### A. Motion to Quash Under Rule 45

Federal Rule of Civil Procedure 45 governs discovery subpoenas issued to

non-parties. It "provides that: '[o]n timely motion, the court for the district where

8

compliance is required must quash or modify a subpoena that: (i) fails to allow a reasonable time to comply; (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c); (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or (iv) subjects a person to undue burden.'" *Somaxon Pharms., Inc. v. Actavis Elizabeth LLC*, No. 22 Misc. 162 (KPF), 2022 WL 3577904, at *2 (S.D.N.Y. Aug. 18, 2022) (quoting Fed. R. Civ. P. 45(d)(3)(A)).

On a motion to quash, "the party issuing the subpoena must demonstrate that the information sought is relevant and material to the allegations and claims at issue in the proceedings." *Shaw v. Arena*, No. 17 Misc. 448 (AJN), 2018 WL 324896, at *1 (S.D.N.Y. Jan. 3, 2018) (cleaned up). Subpoenas issued under Rule 45 "are subject to the relevance requirement of Rule 26(b)(1)."[1] *Malibu Media, LLC v. Doe*, No. 15 Civ. 3147 (AJN), 2016 WL 5478433, at *2 (S.D.N.Y. Sept. 29, 2016) (cleaned up). "'Relevance' is construed 'broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'" *Kiss Nail Prods., Inc. v. Lashify, Inc.*, No. 24 Misc. 25 (AT), 2024 WL 1466815, at *2 (S.D.N.Y. Apr. 4, 2024) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)). "To satisfy this standard, the moving party must articulate a concrete linkage between the discovery sought and the

---

[1] Fed. R. Civ. P. 26(b)(1) provides: "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."

claims or defenses asserted in the case." *Ekstein v. Poito Assoc.*, No. 20 Civ. 1878 (JCM), 2022 WL 783000, at *3 (S.D.N.Y. Mar. 15, 2022) (cleaned up).

Once relevance is established, "the movant bears the burden of demonstrating an undue burden." *Shaw*, 2018 WL 324896, at *1 (citation omitted). "Determining whether a subpoena imposes an undue burden 'requires a court to balance the interests served by demanding compliance with the subpoena against the interests furthered by quashing it,' which 'calls upon the trial court to consider whether the information is necessary and whether it is available from any other source.'" *Kiss Nail Products*, 2024 WL 1466815, at *2 (quoting *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Ams.*, 262 F.R.D. 293, 300 (S.D.N.Y. 2009)).

B. **Motion for Protective Order**

Under Rule 26(c), "[a] party or any person from whom discovery is sought may move for a protective order," which the Court may issue, for good cause shown, "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). "Ordinarily, good cause exists when a party shows that disclosure will result in a clearly defined, specific and serious injury." *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 298 F.R.D. 184, 186 (S.D.N.Y. 2014) (citation omitted). "The party seeking a protective order has the burden of showing that good cause exists for issuance of that order." *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 142 (2d Cir. 2004) (cleaned up).

## DISCUSSION

The Non-Parties' Motion sets forth four main arguments: (1) the information sought by the Subpoenas is not relevant to the lawsuit; (2) the Subpoenas seek documents and communications that are protected by a First Amendment privilege; (3) compliance with the Subpoenas is unduly burdensome to the Non-Parties; and (4) the Non-Parties should not have to produce documents until the City makes its document production. (*See* Mot. at 9–25). The Court addresses each in turn.

### A. Non-Parties' Relevance Objection

The parties to this Motion principally dispute whether the requested discovery is relevant to Plaintiffs' constitutional claims. The Non-Parties argue that their documents concerning the Fee Cap Legislation are not relevant to the constitutional claims because "documents within a subject law's legislative record are the only documents relevant in assessing if the subject law is constitutional." (Mot. at 10–11). Plaintiffs counter that "many courts . . . have permitted discovery outside the legislative record when a party challenges government conduct as unconstitutional," and argue that the Non-Parties are particularly likely to possess non-public evidence "reflecting the City Council's motivations" in enacting the Fee Cap Legislation. (Opp. at 1–2, 9).

#### 1. Legislative Privilege

At the outset, it is important to highlight that, as framed by the parties, the issue here is one of relevance *simpliciter*. Some of the parties' arguments find footing in another legal doctrine, that of "legislative privilege." Under the

legislative privilege doctrine, "state and local lawmakers are entitled to protection against discovery into their legislative acts in civil cases," a protection deemed necessary to "'shield legislators from civil proceedings which disrupt and question their performance of legislative duties to enable them to devote their best efforts and full attention to the public good.'" *Noel v. City of N.Y.*, No. 15 Civ. 5236 (LTS) (KHP), 2018 WL 6649969, at *5 (S.D.N.Y. Dec. 18, 2018) (quoting *Searingtown Corp. v. Inc. Vill. of N. Hills*, 575 F. Supp. 1295, 1299 (E.D.N.Y. 1981)).  "[T]he legislative privilege is qualified," however, and disclosure may be ordered depending on consideration of various factors; one of those factors is relevance.  *Id*. at *6.[2]

Nevertheless, the Non-Parties concede that, "[a]s non-governmental actors," they "are unable to assert the legislative privilege," and cite a line of district court decisions in this Circuit holding that "'communication with outsiders—even knowledgeable outsiders like lobbyists—are not covered by the legislative privilege.'"  (Mot. at 25 n.14 (quoting *Nat'l Ass'n for Advancement of Colored People v. E. Ramapo Cent. Sch. Dist.*, No. 17 Civ. 8943 (CS) (JCM), 2018 WL 11260468, at *6 (S.D.N.Y. Apr. 27, 2018)); *accord, e.g., Favors v. Cuomo*, No. 11 Civ. 5632, 2013 WL 11319831, at *5 (E.D.N.Y. Feb. 8, 2013) ("Although the privilege extends to legislative staffs and experts, communications with knowledgeable outsiders—e.g., lobbyists—fall outside the privilege.") (citation omitted); *compare Mi Familia Vota*

---

[2] *Rodriguez v. Pataki*, 280 F. Supp. 2d 89 (S.D.N.Y. 2003), sets forth a widely-cited five-factor balancing test: "(i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the 'seriousness' of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable."  *Id*. at 100–01 (citation omitted).

*v. Hobbs*, 682 F. Supp. 3d 769, 778 (D. Ariz. 2023) (noting that "federal courts have come to different conclusions" on the issue of whether "the state legislative privilege extends to communications between state legislators and third parties outside the legislative branch").

In response to the Court's inquiries at oral argument, the City agreed with the Non-Parties that legislative privilege is "[not] something that the Alliance can assert themselves on this motion." (Tr. at 56:1–2). The City further declined to invoke legislative privilege itself as a ground for blocking or limiting any of the discovery sought by Plaintiffs from the Non-Parties. (*Id*. at 57:1–7).

Because neither the Non-Parties nor the City asserts legislative privilege in connection with this Motion, the Court analyzes the Non-Parties' objection under traditional Rule 26(b)(1) relevancy principles and not through the lens of the legislative privilege doctrine.

### 2. Communications Between the Non-Parties and the City

The Non-Parties argue that communications between the Non-Parties and the City (*see, e.g.*, Dkt. No. 80 Ex. A (Request No. 2)) are not relevant to the constitutional analysis, relying heavily on the decision in *Citizens Union of City of N.Y. v. Att'y Gen. of N.Y.*, 269 F. Supp. 3d 124 (S.D.N.Y. 2017). (Mot. at 10–14).

*Citizens Union* involved a First Amendment free speech challenge to donor disclosure requirements for non-profit organizations imposed as part of ethics and campaign finance reform legislation adopted by New York State. 269 F. Supp. 3d at 134–35. The plaintiff non-profit organizations served a subpoena on the Governor's

office for documents concerning the government's interest in enacting the legislation and the degree to which it was tailored to address that interest. *Id*. at 133. Judge Parker granted the Governor's motion to quash, finding, *inter alia*, that non-public documents sought by the plaintiffs were not relevant to plaintiffs' First Amendment claims, *id*. at 141–48, and, furthermore, that many of the documents were also protected by the legislative and deliberative process privileges, *id*. at 166–70.

In support of its relevance argument, the Non-Parties cite several aspects of the reasoning in *Citizens Union*. These include the court's statements that "numerous courts have recognized that the bill text, legislative record and other public materials are the primary source for discerning the governmental interest in the legislation," *id*. at 140; that even where the public legislative record is sparse, that "does not justify turning discovery into a fishing expedition into non-public information that may or may not have been considered important by individual legislators and the Governor in connection with passage of the [legislation]," *id*. at 141; and that plaintiffs' argument "fails to appreciate that there is a distinction between what factual information may have been before the Governor's Office 'concerning' the government's interests in [the legislation] and what facts ultimately prompted the New York State government acting as whole to enact [the legislation]," *id*. at 146. (*See* Mot. at 11–14). The Non-Parties argue that, just as in *Citizens Union*, "Plaintiffs' purported attempt here to use documents and communications between Non-Parties and the City to determine if the City had a

sufficient factual basis to justify enacting the [Fee Cap Legislation] must be denied." (Mot. at 14).

Plaintiffs distinguish *Citizens Union* on the ground that it arose under the First Amendment, whereas Plaintiffs have brought Equal Protection and Dormant Commerce Clause challenges to the Fee Cap Legislation. (Opp. at 9–10). In lawsuits challenging "whether state action has violated the Equal Protection or Dormant Commerce Clauses," Plaintiffs argue, courts "frequently hold that non-public materials outside the legislative record are relevant and discoverable." (*Id*. at 10). The Court agrees with Plaintiffs that, in evaluating the issue of relevance in the context of a lawsuit claiming a law is unconstitutional, a "one size fits all" approach is unwarranted. Instead, the answer depends upon the nature of the constitutional challenge at issue.

*Citizens Union* itself recognizes this very principle. The court distinguished "redistricting or other Equal Protection cases" where "[j]udicial inquiry into legislative intent is [] 'specifically contemplated as part of the resolution of the core issue'" raised by Equal Protection claims. *Citizens Union*, 269 F. Supp. 3d at 145 (quoting *Bethune-Hill v. Va. St. Bd. of Elections*, 114 F. Supp. 3d 323, 337 (E.D. Va. 2015)). In such cases, the court explained, "courts have been willing to permit some discovery into the legislative process when the discovery might 'shed light on' whether the legislature acted with a constitutionally impermissible purpose in adopting the challenged provision." *Id*. at 145–46 (quoting *Puente Ariz. v. Arpaio*, 314 F.R.D. 664, 668 (D. Ariz. 2016)).

By contrast, Judge Parker noted, "a First Amendment challenge to a statute does not require inquiry into biased motives or potential self-dealing." *Id.* at 146. In *Citizens Union*, the parties agreed that the applicable First Amendment test was whether "there is a 'substantial relationship' between the [challenged donor disclosure provisions] and a 'sufficiently important' governmental interest." *Id.* at 139 (citation omitted). That standard did not call into question whether the government acted with an impermissible purpose or intent—rather, it required an assessment of the government's *interest*. As Judge Parker explained, the Supreme Court has made clear that "inquiries into legislative purpose have no place in deciding the merits of a First Amendment challenge." *Id.* at 146 (citing *United States v. O'Brien*, 391 U.S. 367, 383 (1968)); *see also id.* (noting that courts applying *O'Brien* have recognized that allowing discovery into legislative motives would be "'inconsistent with basic analysis under the First Amendment which has not turned on the motives of the legislators, but on the effect of the regulation'") (quoting *City of Las Vegas v. Foley*, 747 F.2d 1294, 1297 (9th Cir. 1984)).

Thus, the Non-Parties' argument that non-public evidence of legislative intent is irrelevant in *all* constitutional challenges does not withstand scrutiny, and its reliance on *Citizens Union* for that proposition is misplaced. The Court proceeds to examine whether the particular constitutional challenges advanced by Plaintiffs here require an assessment of whether the City Council acted with a constitutionally impermissible purpose or intent.

16

### a. Equal Protection Claim

In some Equal Protection cases, the plaintiff must prove that the legislature acted with an illicit purpose. That is true in cases asserting that a law or other official action discriminates on the basis of race, gender or another protected characteristic. *See, e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (holding, in context of challenge to municipality's allegedly racially discriminatory zoning denial, that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause"); *Collier v. Barnhart*, 473 F.3d 444, 448 (2d Cir. 2007) (holding, in context of claim that federal statute discriminated against women, that the "petitioner must prove discriminatory purpose"); *Velasquez v. N.Y. Dep't of Buildings*, No. 19 Civ. 9687 (PKC), 2020 WL 2614826, at *4 (S.D.N.Y. May 22, 2020) ("Plaintiffs challenging . . . facially neutral laws on equal protection grounds bear the burden of making out a prima facie case of discriminatory purpose.") (quoting *Pyke v. Cuomo*, 567 F.3d 74, 78 (2d Cir. 2009) (citation omitted).

But that is not true in all cases, and it is not true in this case. Plaintiffs do not contend that the Fee Cap Legislation violates the Equal Protection Clause because it targets a suspect class. Rather, Plaintiffs allege that the 5% commission cap on non-delivery services such as marketing and promotional services treats them unequally and unconstitutionally because other companies that provide the same services, such as Google, Facebook, and ratings and review websites, are not subject to any price regulation. (FAC ¶¶ 81, 84; Dkt. No. 41 at 22–23 (Plaintiffs'

brief in opposition to City's motion to dismiss)).  For this reason, in his ruling on the City's motion to dismiss, Judge Woods applied "rational-basis review" to Plaintiffs' Equal Protection claim.  *DoorDash*, 692 F. Supp. 3d at 300–01; *see also* Dkt. No. 41 at 22–23 (arguing solely for application of rational-basis review).

Rational-basis review "demands only that the classification be rationally related to a legitimate governmental interest."  *United States v. Amalfi*, 47 F.4th 114, 124 (2d Cir. 2022); *see also Hayden v. Paterson*, 594 F.3d 150, 169 (2d Cir. 2010) ("[W]e will uphold forms of state action under the Equal Protection Clause so long as the classification at issue bears some rational relationship to a legitimate state interest.").  This standard is more akin to the First Amendment test applicable in *Citizens Union*, *see* 269 F. Supp. 3d at 139, than it is to the test for Equal Protection claims requiring proof of discriminatory purpose.  Indeed, when rational-basis review applies, "'[t]he actual motivations of the enacting governmental body are irrelevant.'"  *Margiotta v. Kaye*, 283 F. Supp. 2d 857, 864 (E.D.N.Y. 2003) (quoting *Mulroe v. N.Y.S. Thruway Auth.*, 234 F. Supp. 2d 446, 448 (S.D.N.Y. 2002)); *see also Amalfi*, 47 F.4th at 124 ("on rational basis review, 'it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature'") (quoting *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)).

Thus, Plaintiffs' assertion that their claim under the Equal Protection Clause "*require*[s] inquiry into the City's intent" (Opp. at 2; emphasis in original) is incorrect.  Nor do the Equal Protection cases they cite—which required proof of

discriminatory intent—support their argument for discovery on their very different Equal Protection claim. (*See id.* at 10 (citing *Rodriguez v. Pataki*, 280 F. Supp. 2d 89, 102 (S.D.N.Y. 2003) (challenge to redistricting plan that allegedly discriminated against Hispanic voters); *Favors v. Cuomo*, 285 F.R.D. 187, 218 (E.D.N.Y. 2012) (challenge to redistricting plan that allegedly discriminated against African American, Asian American, and Hispanic voters)). To the extent the requested discovery from the Non-Parties would bear on the City Council's intent or motivation for enacting the Fee Cap Legislation, such evidence would not be relevant for purposes of Plaintiff's Equal Protection claim, because that claim triggers rational-basis review only.[3]

### b. Dormant Commerce Clause Claim

Plaintiffs' claim under the Dormant Commerce Clause stands on a different footing. That claim is firmly anchored in Plaintiffs' allegations that the Fee Cap Legislation was intended to discriminate against out-of-state companies like Plaintiffs and amounts to unlawful economic protectionism. (FAC ¶¶ 8–11, 203–06). As Judge Woods noted in his motion to dismiss ruling, a law that "'clearly discriminates'" against interstate commerce is "'virtually invalid per se'" under the

---

[3] One case cited by Plaintiffs, *Wal-Mart Stores, Inc. v. Texas Alcoholic Bev. Comm'n*, A-15-CV-134-RP, 2016 WL 5922315 (W.D. Tex. Oct. 11, 2016), did involve an Equal Protection claim subject to rational-basis review. *See id.* at *2–3. However, the plaintiffs also claimed (as do Plaintiffs here) that the law in question unconstitutionally discriminated against out-of-state companies in violation of the Dormant Commerce Clause. *Id.* at *1. In finding that communications between the movants and legislators were relevant, the court relied on redistricting cases such as *Rodriguez v. Pataki* and other decisions permitting "discovery of lobbying communications . . . when a statute's purposes are in issue." *Id.* at *5. That was true in *Wal-Mart* given the plaintiffs' Dormant Commerce Clause claim. The court did not separately analyze whether discovery of the communications would have been relevant on the basis of the Equal Protection claim alone. The Court therefore does not view *Wal-Mart* as persuasive authority for allowing Plaintiffs discovery on their Equal Protection claim.

Dormant Commerce Clause. *DoorDash*, 692 F. Supp. 3d at 302 (quoting *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 47 (2d Cir. 2007)). "'A clearly discriminatory law may operate in three ways: (1) by discriminating against interstate commerce on its face; (2) by harboring a discriminatory purpose; or (3) by discriminating in its effects.'" *Id*. (quoting *Town of Southold*, 477 F.3d at 48). In denying the City's motion to dismiss this claim, Judge Woods found that "Plaintiffs have plausibly pleaded that the City's legislation harbored a discriminatory purpose and was, therefore, clearly discriminatory." *Id*.

As indicated above, ample case law supports the proposition that discovery into the legislative process is relevant where it "might shed light on whether the legislature acted with a constitutionally impermissible purpose in adopting the challenged provision." *Citizens Union*, 269 F. Supp. 3d at 145–46 (citation omitted); *see also, e.g.*, *Favors*, 285 F.R.D. at 217–18 (finding discovery relating to legislators' "purpose or intent" relevant where applicable legal standard required legislators to engage in an "honest and good faith effort" to construct fair voting districts and refrain from "racial and ethnic discrimination"); *ACORN v. Cnty. of Nassau*, No. 05 Civ. 2301 (JFB) (WDW), 2007 WL 2815810, at *3 (E.D.N.Y. Sept. 25, 2007) (finding discovery sought from municipal entities and consultants to be "clearly relevant" where plaintiffs claimed that zoning decision "was motivated by discriminatory animus"); *Rodriguez*, 280 F. Supp. 2d at 102 (finding "evidence of discriminatory animus" relevant to challenge to legislature's redistricting plan); *Bethune-Hill*, 114 F. Supp. 3d at 340 (finding the evidence sought to be "clearly relevant" given "the

centrality of the 'legislative purpose' inquiry to" plaintiffs' unlawful racial gerrymandering claim); *Sol v. Whiting*, No. CV-10-01061-PHX-SRB, 2013 WL 12098752, at *3 (D. Ariz. Dec. 11, 2013) (finding that plaintiffs' subpoenas "seek evidence that is relevant" where they sought "communications between Arizona legislators and the people advising them through the process of drafting the legislation" at issue and plaintiffs needed to show "proof of racially discriminatory intent or purpose" to succeed on claim); *Baldus v. Members of the Wis. Govt. Accountability Bd.*, Nos. 11-CV-562, 11-CV-1011, 2011 WL 6122542, at *1 (E.D. Wis. Dec. 8, 2011) ("proof of a legislative body's discriminatory intent is relevant and extremely important as direct evidence").

That these cases involved Equal Protection challenges does not diminish their value as precedent here, for the underlying principle is the same. Just as evidence of a legislature's racially discriminatory intent may be relevant to an Equal Protection challenge, so too may evidence of its intent to discriminate against out-of-state firms be relevant to a Dormant Commerce Clause challenge. And at least one court has allowed discovery into discriminatory intent in a Dormant Commerce Clause case, applying the "weight of authority" recognizing that "legislators' statements to lobbyists or constituents are relevant to determining legislative purpose." *Wal-Mart Stores, Inc. v. Texas Alcoholic Bev. Comm'n*, A-15-CV-134-RP, 2016 WL 5922315, at *1, 6 (W.D. Tex. Oct. 11, 2016).

Likewise, in *Am. Trucking Assocs., Inc. v. Alviti*, 496 F. Supp. 3d 699 (D.R.I. 2020), the district court denied motions to quash subpoenas seeking documents and

deposition testimony from the Rhode Island governor and two state legislators in a case where the plaintiffs alleged a state law regarding tolls on large commercial trucks violated the Dormant Commerce Clause. In analyzing the relevance prong of the multi-factor test for applying legislative privilege, the district court found that, because "[legislative] intent is relevant to the dormant Commerce Clause," evidence of a discriminatory purpose obtained through the subpoenas "[would] be relevant" to plaintiffs' claims. *Id*. at 712. The district court's ruling denying the motion to quash was, however, subsequently overturned by the First Circuit on mandamus review. *Am. Trucking Assocs., Inc. v. Alviti*, 14 F.4th 76 (1st Cir. 2021). The First Circuit held that the legislative privilege barred the requested discovery, reasoning, in part, that "proof of the subjective intent of state lawmakers is unlikely to be significant enough in this case to warrant setting aside the privilege." *Id*. at 88–89.

The Court does not believe that the First Circuit's ruling alters the conclusion above. Unlike the movants in *Am. Trucking*—who were public officials—the Non-Parties have not invoked legislative privilege. The First Circuit did not hold that the requested discovery was irrelevant under Rule 26 principles and, on the contrary, agreed with the district court that such discovery "could shed light on and provide context concerning [the officials'] subjective motivations and public comments." *Id*. at 89. Instead, the First Circuit held that whatever relevance the requested discovery did have was insufficient to outweigh the comity concerns underlying the legislative privilege doctrine, *id*. at 88–89—concerns that do not serve as counterweights on the motion to quash here. And indeed, the First Circuit

left undisturbed the district court's order permitting discovery from a state consultant that had prepared a report on the toll caps, noting that "concerns of comity and federalism"—*i.e.*, those animating the legislative privilege—"are less pointed when the discovery is aimed in the first instance at a private party." *Id.* at 85.[4]

Thus, the Court concludes that Plaintiffs' Dormant Commerce Clause claim provides a basis for Plaintiffs to contend that communications between the City Council and the Non-Parties are relevant to this action.

### c. Other Constitutional Claims

In their brief, Plaintiffs' relevance argument hinges on their Equal Protection and Dormant Commerce Clause claims; they do not explicitly argue that the requested discovery is relevant to any of their other constitutional claims. (*See* Opp. at 9–13). At oral argument, Plaintiffs took the position that the requested discovery is relevant to all their claims because "Judge Woods directed us to develop the factual record with respect to whether there was a legitimate public purpose which touches on all the claims." (Tr. at 34:19–25). Plaintiffs did not develop this

---

[4] The First Circuit's disagreement with the district court's reasoning also reflected its skepticism that discriminatory intent plays a significant role in Dormant Commerce Clause analysis. *See id.* at 89–90 (citing, *inter alia*, the First's Circuit's decision in *All. of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 36 n.3 (1st Cir. 2005) ("[T]here is some reason to question whether a showing of discriminatory purpose alone will invariably suffice to support a finding of constitutional invalidity under the dormant Commerce Clause.")). In the Second Circuit, however, a law discriminates against interstate commerce if it "*either* 'discriminate[s] on its face, harbor[s] a discriminatory purpose, *or* discriminate[s] in its effect.'" *Restaurant Law Ctr. v. City of N.Y.*, 90 F.4th 101, 118 (2d Cir. 2024) (quoting *N.Y. Pet Welfare Ass'n, Inc. v. City of N.Y.*, 850 F.3d 79, 89 (2d Cir. 2017)) (emphasis added); *see also Town of Southold*, 477 F.3d at 308. Further, Judge Woods upheld Plaintiffs' Dormant Commerce Clause claim squarely (and indeed exclusively) on Plaintiffs' allegations that the Fee Cap Legislation "harbored a discriminatory purpose." *DoorDash*, 692 F. Supp. 3d at 302.

argument further and have not cited any cases permitting discovery into legislative motive for a law challenged under any of their other constitutional theories.

Because relevance is adequately shown with respect to at least one of Plaintiffs' claims—the Dormant Commerce Clause claim—the Court need not and does not decide whether Plaintiffs would also be entitled to discovery on their Contracts Clause, Takings Clause, police powers, or due process claims.

### d. Rule 26(b)(1) Standard

While the Court thus rejects the Non-Parties' argument that non-public evidence as to the City Council's intent or purpose is irrelevant as a matter of law, it remains to be determined whether, as a factual matter, Plaintiffs' requested discovery meets Rule 26(b)(1)'s standard of relevance and proportionality. The Court finds that standard satisfied here.

It is undisputed that the Fee Cap Legislation was designed to benefit restaurants in New York City and that the Alliance is the main advocacy group representing the interests of those restaurants. (*See* Mot. at 4) (describing Alliance as an organization that "serves and represents restaurants and nightlife venues throughout the City of New York" and "represents the hospitality industry's perspective on" (among other things) "proposed laws [and] regulations"); NYC Hospitality Alliance, www.thenycalliance.org (last visited October 23, 2024) (describing Alliance as "the leading voice for NYC's restaurant and nightlife industry"). Plaintiffs have submitted evidence on this Motion demonstrating the Alliance's extensive lobbying efforts on behalf of the Fee Cap Legislation. (Opp. at

3–5; Lifshitz Decl. Exs. A–N). In news alerts posted on its website, the Alliance stated that it "led the fight" to enact the commission caps. (Opp. at 3; Lifshitz Decl. Exs. A–B).

Plaintiffs also have presented evidence detailing the involvement of each of the subpoenaed Individuals—Rigie, Bank, and Bookman—in advocating for the Fee Cap Legislation. (Opp. at 3–6; Lifshitz Exs. C, D, E, H; Dkt. No. 39-8). This evidence includes examples of the Individuals working together with the two main sponsors of the Fee Cap Legislation, Council Members Moya and Gjonaj. (Opp. at 3, 5; Lifshitz Ex. C (noting that Rigie and Moya led a demonstration at City Hall in favor of commission caps); Dkt. No. 39 Ex. H at 144, 148 (statements by Gjonaj that he wanted to "stay in touch" with Rigie and "follow up" with Bookman)). Under these circumstances, there is ample reason to believe that the Non-Parties engaged in communications with representatives of the City Council that could "shed light on whether the legislature acted with a constitutionally impermissible purpose." *Citizens Union*, 269 F. Supp. 3d at 145–46 (citation omitted).

The Non-Parties argue that such evidence cannot be relevant because "'it is the motivation of an entire legislature, not the motivation of a handful of voluble members[] that is relevant.'" (Mot. at 13–14 (quoting *Citizens Union*, 269 F. Supp. 3d at 147)). But that argument stands in direct tension with Judge Woods' ruling on the City's motion to dismiss. In upholding the sufficiency of the FAC, Judge Woods attached significant weight to comments made by Council Members Moya and Gjonaj that Plaintiffs claim evince purposeful economic protectionism. *See*

25

*DoorDash*, 692 F. Supp. 3d at 279–80, 283–86, 292, 301–02.  Moreover, as Plaintiffs point out, a 2020 lobbying report filed by the Alliance indicates that its lobbying activities with regard to the then-proposed fee cap legislation targeted all 51 City Council Members.[5]  (Opp. at 5; Lifshitz Ex. I at 8–10).

The Non-Parties also challenge relevance on the grounds that the Non-Parties "are not legislators, their staff, or legislative consultants" and "did not draft the [Fee Cap Legislation]."  (Reply at 5–6).  But in the relatively limited circumstances where evidence of legislative intent is relevant to a constitutional challenge, courts have upheld subpoenas seeking communications between legislators and advocacy organizations, lobbyists, and other outsiders to the legislative process.  *See, e.g.*, *Wal-Mart*, 2016 WL 5922315, at *4 ("the Court's research has located many cases where non-parties have been compelled to produce lobbying conversations"); *Bethune-Hill*, 114 F. Supp. 3d at 329, 343 (directing production of communications between state legislators and "any individual or organization outside the employ of the legislature," including lobbyists); *Puente Arizona*, 314 F.R.D. at 668 (requiring production of emails between cosponsor of legislation and "various third party attorneys, lobbyists, and constituents"); *Rodriguez*, 280 F. Supp. 2d at 101–02 (allowing discovery of materials from advisory

---

[5] *See also Bethune-Hill*, 114 F. Supp. 3d at 340 (while "it may be true" that individual motivations of particular legislators are neither necessary nor sufficient for plaintiffs to prevail, "that does not mean the evidence cannot constitute an important part of the case") (citation omitted).

committee whose workings were "more akin to a conversation between legislators and knowledgeable outsiders, such as lobbyists").[6]

Ultimately, the Non-Parties' objections go to the weight and admissibility of their communications with the City Council. But as the court noted in *Favors v. Cuomo*, "[i]t is not the function of this Court, in assessing relevance for purposes of discovery, to decide issues of admissibility or resolve potentially dispositive disputes," because "'[r]elevant information need not be admissible.'" 285 F.R.D. at 218 (quoting Fed. R. Civ. P. 26(b)(1)). Questions as to the admissibility and significance of the Non-Parties' communications with the City will be decided by Judge Woods at a later date. The only question before me is whether those communications are relevant under Rule 26(b)(1), and for the reasons set forth above, I conclude that they are.

Accordingly, the Non-Parties' relevance objections are overruled to the extent they are directed at communications between the Non-Parties and the City. This is also true with regard to documents that reflect communications (including verbal communications) between the Non-Parties and the City, even if those documents were not themselves transmitted between the Non-Parties and the City.

---

[6] In their Reply and in a subsequent letter, the Non-Parties contend that *Rodriguez* was "abrogated" by the Second Circuit's ruling in *Almonte v. City of Long Beach*, 478 F.3d 100 (2d Cir. 2007). (Reply at 2, 4; Dkt. No. 91). As the Court explained at oral argument, this is incorrect. (Tr. at 3:3–25 to 4:1–12). *Almonte* addressed a question of legislative *immunity*, not legislative privilege or the scope of discovery, and it did not discuss or even mention *Rodriguez*. *See Almonte*, 478 F.3d at 107. As noted above, *Rodriguez* has continued, post-*Almonte*, to be cited for the proposition that communications with lobbyists and other outsiders are not covered by the legislative privilege (Section A.1, *supra*) and, indeed, the Non-Parties' moving brief takes that same position, citing a post-*Almonte* case (*see* Mot. at 25 n.14).

### 3.   Communications with Other Third Parties

The Non-Parties also dispute the relevance of Plaintiffs' other document requests, including those for communications concerning the Fee Cap Legislation between the Non-Parties and third parties other than the City, such as restaurants, restaurant trade associations, journalists, and lobbyists.  (Mot. at 15–17; *see, e.g.*, Dkt. No. 80 Ex. A (Request No. 3)).  These requests are not limited to any specific topics concerning the Fee Cap Legislation; rather, Plaintiffs seek *all* such communications with third parties.

Plaintiffs, who focus almost their entire relevance argument on legislative intent and discriminatory purpose (Opp. at 9–15), make no real effort to explain the relevance of the Non-Parties' communications with other third parties.  By definition, City representatives were not parties to these communications, and so it is difficult to see how the communications could shed light on the City Council's purposes in enacting the Fee Cap Legislation or decision to craft the legislation in the manner it did.  Communications between the Non-Parties and its member restaurants, other trade associations, lobbyists, and journalists may reveal the strategies deployed in the lobbying campaign that led to the Fee Cap Legislation and the progress of the lobbying campaign, but those matters are not at issue in this litigation.  To the extent the communications may relate to the merits of the Fee Cap Legislation, the privately expressed views and positions of these different constituencies have no discernible relationship to Plaintiffs' constitutional challenges unless they were shared with representatives of the City.

Accordingly, Plaintiffs have failed to show how the Non-Parties'
communications with third parties other than the City are relevant and
proportionate to the claims in this action.  *See Wal-Mart*, 2016 WL 5922315, at *9
(sustaining relevance objections to requested discovery of movants' communications
with state actors other than those "involve[d] in the legislative process").

### 4.  Internal Alliance Documents

Beyond communications with others, Plaintiffs' document requests
encompass virtually *all* documents in the Alliance's possession pertaining to the Fee
Cap Legislation.  (*See* Dkt. No. 80 Ex. A (Request No. 1 (seeking all documents
concerning Alliance's "remarks, comments, notes, analyses, opinions, and meetings
about the" Fee Cap Legislation), Request No. 4 (seeking all documents "transmitted
among the [Alliance]" concerning the Fee Cap Legislation), and Request No. 5
(seeking all document concerning the "goal(s) and objective(s)" of the Fee Cap
Legislation))).  Here too, when measured against the Rule 26(b)(1) standard,
Plaintiffs have cast their net too widely.

Asserting that "the legislative record shows that the City relied on [the
Alliance's] testimony and other public statements (including opinion articles)
regarding the [Fee Cap Legislation's] purpose and intended effects," Plaintiffs argue
that the Alliance's "statements on these topics"—evidently referring to statements
made in internal documents—"are also relevant."  (Opp. at 15).  The Court fails to
see how.  Even if internal documents revealed evidence of discriminatory animus on
the part of *the Alliance* towards out-of-state food delivery service companies, that

would not help Plaintiffs prove that *the City Council* harbored a discriminatory purpose. *See All. of Auto. Mfrs., Inc. v. Jones*, No. 4:08cv555-MCR/CAS, 2013 WL 4838764, at *1, 5 (N.D. Fla. Sept. 11, 2013) (trade association's "understanding of the purposes" of challenged legislation for which it advocated was "not relevant").

Plaintiffs cite the *Wal-Mart* court's finding that "statements by permit holders regarding their views of the effects of the statutes" were relevant to the constitutional challenges in that case. 2016 WL 5922315, at *6. But the subpoenas in *Wal-Mart* were limited to "communications" between the permit holders and Texas state actors and thus did not encompass statements made in the permit holders' internal documents. *See id.* at *1–2. Equally unavailing is Plaintiffs' reliance on the First Circuit's observation that "statements by a law's private-sector proponents sometimes can shed light on its purpose." *All. of Auto Mfrs. v. Gwadosky*, 430 F.3d 30, 39 (1st Cir. 2005). As in *Wal-Mart*, the statements by the private party in *All. of Auto Mfrs.* (which the First Circuit found irrelevant to the constitutional analysis in any event) were made "[i]n communications with members of the legislature." *Id.* at 36–37.

For similar reasons, the Court finds unavailing Plaintiffs' argument that the Alliance's records "assessing the health of the restaurant industry" would be relevant to show the "'lack of fit'" between the Fee Cap Legislation's "means and ends, suggesting the law was motivated by an 'improper purpose.'" (Opp. at 15) (quoting *DoorDash*, 692 F. Supp. 3d at 292); (*see* Dkt. No. 80 Ex. A (Request No. 9)). Unless information about the health of the restaurant industry was communicated

to the City—and if it was, Plaintiffs will receive it based on their requests for communications between the Non-Parties and the City—that information would not shed light on the City Council's purpose or help show that the City Council was aware of a "lack of fit" between the legislation's goals and the means it chose to advance those goals.

Certain of Plaintiffs' requests are geared to documents showing the potential or actual effects of the Fee Cap Legislation on restaurants, food delivery service companies, and consumers. (*See, e.g.*, Dkt. No. 80 Ex. A (Request Nos. 6, 7, 8)). The effects of the Fee Cap Legislation on these constituencies are a relevant issue in this case. As noted above, a law is deemed clearly discriminatory for Dormant Commerce Clause purposes if it "discriminate[s] in its effect." *DoorDash*, 692 F. Supp. 3d at 302 (citation omitted); *see also Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 534 (2019) (when a state law's "effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry") (cleaned up). Further, even when a law regulates evenhandedly, it still may violate the Dormant Commerce Clause under the *Pike* balancing test if the "burden" it places on interstate commerce clearly exceeds the "putative local benefits." *Town of Southold*, 477 F.3d at 47, 49–50 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

Under both tests, a law's effects on both out-of-state and in-state actors is an appropriate subject for discovery in a Dormant Commerce Clause case. *See Colon*

*Health Centers of Am., LLC v. Hazel*, 733 F.3d 535, 546–47 (4th Cir. 2013) (directing

that discovery investigate "the differential burdens imposed on out-of-state and

in-state firms" affected by law and noting that "the factual material relevant to the

*Pike* standard largely overlaps with evidence germane to the discrimination test").

And Plaintiffs specifically allege that the Fee Cap Legislation has an impermissible

discriminatory effect (as well as purpose) and flunks the *Pike* balancing test. (*See*

FAC ¶¶ 203, 207; Dkt. No. 41 at 24–25 (brief in opposition to motion to dismiss)).[7]

As the principal organization representing the New York City restaurant

industry, and a primary advocate for the Fee Cap Legislation, the Alliance is a

likely source of relevant information about the law's effects. Plaintiffs also point to

a 2023 study concerning the effects of the law by the City's Department of

Consumer and Worker Protection, which includes the results of a survey conducted

by the Alliance during which it received responses from 431 restaurants located

across the five boroughs. (Opp. at 15; Lifshitz Decl. Ex. M at 5–6, 13–16). The

Court thus finds that Plaintiffs' requests for documents concerning the potential

and actual effects of the Fee Cap Legislation satisfy the Rule 26(b)(1) relevance test.

*See Turtle Island Foods, SPC v. Thompson*, No. 2:18-CV-04173, 2022 WL 18599789,

at *3–4 (W.D. Mo. Dec. 14, 2022) (upholding subpoena directed to trade association

representing in-state economic interests benefited by Missouri law challenged under

---

[7] While, as noted above, Judge Woods' decision sustaining Plaintiffs' claim focused on the
"discriminatory purpose" prong of the analysis, that decision cannot reasonably be read as rejecting
Plaintiffs' other legal theories or as deeming evidence of the law's effects to be irrelevant.

Dormant Commerce Clause and finding discovery requests regarding the law's "effects" to be relevant).

**B. Non-Parties' First Amendment Objection**

The Non-Parties next argue that the Subpoenas violate their First Amendment rights to associate and lobby the government. (Mot. at 18–23). Plaintiffs respond that the Non-Parties have failed to meet their burden under Second Circuit precedent to assert the First Amendment privilege. (Opp. at 17–22). The Court agrees that the Non-Parties have failed to meet their burden.

At the outset, the parties agree that a third party may resist a subpoena where compliance therewith chills First Amendment rights to the point of outweighing the need for disclosure. (Mot. at 19; *see* Opp. at 17). The Supreme Court has long noted that the "[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *NAACP v. Alabama,* 357 U.S. 449, 462 (1958) (citation omitted). It is thus "well-settled law that the First Amendment creates a qualified associational privilege from disclosure of certain information." *Sherwin-Williams Co. v. Spitzer*, No. 1:04CV185 (DNH/RFT), 2005 WL 2128938, at *4 (N.D.N.Y. Aug. 24, 2005). "If the discovery request adversely affects an organization's and/or its members' mission of advocacy and chills their ability to freely speak or to associate, the associational privilege may attach." *Id.*

The parties also agree that under *New York State NOW v. Terry*, 886 F.2d 1339 (2d Cir. 1989), the party asserting the privilege must make "a *prima facie*

showing that disclosure would infringe on its First Amendment rights." *Id.* at 1355. While the *Terry* court described this burden as "light," it is not negligible, and non-parties "must at least articulate some resulting encroachment on their liberties." *Id.* In a later case, the Second Circuit found that "to be cognizable, the interference with associational rights must be 'direct and substantial' or 'significant.'" *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996) (quoting *Lyng v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UWA*, 485 U.S. 360, 367 n.5 (1988)).

To make their *prima facie* showing, the Non-Parties submitted separate declarations from Rigie, Bank, and Bookman. (Dkt. Nos. 81 ("Rigie Decl."), 82 ("Bank Decl."), 83 ("Bookman Decl.")). These declarations all assert that the Non-Parties "wish to keep our communications and documents regarding the [Fee Cap Legislation] private" and express concern that compelled disclosure of such communications and documents will, *inter alia*: (1) "chill Non-Parties from exercising their constitutional rights to petition the government, speak about public matter, and associate freely"; (2) cause Alliance members to stop and/or limit contributing to the Alliance or withdraw from the Alliance; (3) prohibit the Non-Parties from engaging in "open and honest discussions with Alliance members"; and (4) lead Alliance members and Non-Parties to fear reprisals from Plaintiffs due to the power Plaintiffs have over members' businesses. (*See* Rigie Decl. ¶¶ 25–38; Bank Decl. ¶¶ 19–32; Bookman Decl. ¶¶ 25, 28–31).[8]

---

[8] The Non-Parties also express concern that compelling disclosure of Bookman's communications would "jeopardize" the Alliance's attorney-client privilege and work product protection. (Mot. at 22;

These averments are insufficient to carry the Non-Parties' burden. First, to the extent the Non-Parties contend that disclosure of their communications with the City could impermissibly "chill" their right to petition the government, that contention is without merit. To be sure, the Non-Parties have a First Amendment right to lobby the City Council and other government actors. *See, e.g.*, *In re Johns-Manville Corp.*, 32 B.R. 728, 733 n.7 (S.D.N.Y. 1983) ("Lobbying for proposed legislation is quintessential First Amendment-protected activity[.]"). But they have no First Amendment right to lobby *in secret*, and disclosure of their communications with City officials does not impinge upon their legitimate First Amendment interests. *See, e.g.*, *Wal-Mart*, 2016 WL 5922315, at *7 ("while citizens plainly have a right to communicate with public officials on a matter of public concern, that does not mean they have a right to protect these communications from public view") (cleaned up); *Sol*, 2013 WL 12098752, at *2 ("Movants do not cite, and the Court is unaware of, any law that protects from public view communications with public officials in their official capacity about a matter of public concern.").[9]

The Non-Parties' assertions that disclosure will result in its members ending or limiting their association with the Alliance are entirely speculative and conclusory. The Non-Parties do not submit a sworn statement from any individual

Bookman Decl. ¶ 23). But the Subpoenas do not purport to seek privileged materials and contain standard language acknowledging the possibility that documents could be withheld on privilege grounds. (*See, e.g.*, Dkt. 81 Ex. A, Instructions ¶ 13 ("If You withhold any Document, or any portion of any Document, under a claim of attorney-client, work product, or other privilege, You shall produce . . . a written privilege log[.]").

[9] Indeed, at oral argument, the Non-Parties acknowledged that the Alliance's communications with the City Council would be available to the public through a request under New York's Freedom of Information Law. (Tr. 23:5–19). *See Sol*, 2013 WL 12098752, at *2.

restaurant member, or any other evidence, substantiating these concerns.  This is insufficient to meet their burden.  *See In re Am. Resort Dev. Ass'n*, No. 3:24-MC-11-DCLC-DCP, 2024 WL 1401332, at *7 (E.D. Tenn. Apr. 1, 2024) (finding declaration "too conclusory" to find that disclosure would discourage member participation; "the party relying on the associational privilege must go beyond conclusory statements and demonstrate through proofs a basis for the assertions made") (citations omitted); *Hispanic Leadership Fund, Inc. v. Walsh*, No. 1:12-CV-1337 (MAD/TWD), 2014 WL 12586844, at *4 (N.D.N.Y. June 9, 2014) (rejecting as "speculative and remote" organization president's unsupported claim that disclosure would chill organization's ability to raise funds and engage in "open and honest" discussions with contributors); *Sherwin-Williams*, 2005 WL 2128938, at *5 ("Speculating that the document demands may cause a withdrawal of membership does not bolster [movant trade association's] claim of a First Amendment infringement.").

Finally, the Non-Parties likewise provide no facts justifying their fears of retaliation from Plaintiffs based on the Non-Parties' document production. Although Rigie claims he has been "personally harassed" due to his support of the Fee Cap Legislation, the only example he provides is a single social media post by a senior executive of Plaintiff Grubhub.  (Rigie Decl ¶¶ 39–40).  In response to a question posted by Rigie about favorite small talk topics, the Grubhub executive responded, "So, about that pesky fee cap…," accompanied by a winky-face emoji. (Rigie Decl Ex. D).  As Plaintiffs aptly state: "This innocuous exchange does not constitute harassment by any stretch of the imagination."  (Opp. at 19).  Equally

unavailing is the Non-Parties' argument that "Alliance members reasonably fear that they will be targets of subpoenas and depositions from Plaintiffs." (Mot. at 22). "[U]sing the judicial process" does not constitute "'reprisal' within the meaning of the First Amendment associational privilege." *In re Am. Resort*, 2024 WL 1401332, at *7 (citation omitted).

In short, the Non-Parties' fear of retaliation claim rests on mere speculation and not on what is required: "an evidentiary showing of a reasonable probability through objective and articulable facts 'that disclosure will deter membership due to fears of threats, harassment or reprisal from either government officials or private parties which may affect members' physical well-being, political activities or economic interests.'" *A&R Body Specialty & Collision Works, Inc., v. Progressive Cas. Ins. Co.*, No. 3:07CV929 (WWE), 2013 WL 6044333, at *7 (D. Conn. Nov. 14, 2013) (quoting *In re Motor Fuel Temperature Sales Practices Litig.*, 641 F.3d 470, 489 (10th Cir. 2011)); *accord Hispanic Leadership Fund*, 2014 WL 12586844, at *4; *see also, e.g.*, *Doyle v. N.Y.S. Div. of Housing & Commun. Renewal*, No. 98 Civ. 2161 (JGK), 1999 WL 177441, at *8 (S.D.N.Y. Mar. 30, 1999) ("Any allegation of future harassment in this case is purely speculative and insufficient to substantiate a substantial infringement on the right of association.").[10]

---

[10] This case thus stands in sharp contrast to those where the record was "clear and uncontroverted," *ETSI Pipeline Project v. Burlington Northern, Inc.*, 674 F. Supp. 1489, 1490 (D.D.C. 1987), that disclosure of requested information would have resulted in harassment or reprisal to the targets of the subpoena or its members. *See also Bates v. City of Little Rock*, 361 U.S. 516, 524 (1960) (finding "substantial uncontroverted evidence that public identification of persons . . . as members . . . had been followed by harassment and threats of bodily harm.").

At bottom, the Non-Parties' First Amendment argument rests on their "wish" to keep their documents and communications "private." (Mot. at 21). As the court in *A&R Body* explained in denying a motion to quash by a non-party trade association that made many of the same First Amendment arguments the Non-Parties make here:

> Injury must extend beyond one's implicit desire for privacy. Mere general opposition to or aggravation from mandated discovery is not enough to demonstrate the chilling effects that the First Amendment seeks to avoid. Rather, parties fighting disclosure under privacy of association grounds must articulate facts that demonstrate injury to their ability to associate[.]

*A&R Body*, 2013 WL 6044333, at *7.

The Non-Parties have failed to articulate such facts. Accordingly, the Non-Parties have not met their *prima facie* burden, and "the subpoenas . . . will not be quashed on First Amendment grounds." *Id.*; *see also Sherwin-Williams*, 2005 WL 2128938, at *5 (rejecting invocation of associational privilege where party "failed to make [] a showing of reasonable probability of a chill or threat to [the Association] or its members").

## C. Non-Parties' Undue Burden Objection

The Non-Parties further argue that the Subpoenas are unduly burdensome both because of the costs of compliance and because of the threat of commercial harm and competitive disadvantage to the Alliance's members. (Mot. at 23–24). They invoke the principles that courts should give "special weight" to the burdens on non-parties in producing documents, *Arista Records LLC v. Lime Group LLC*, No. 06 Civ. 5936 (KMW), 2011 WL 781198, at *2 (S.D.N.Y. Mar. 4, 2011) (citation

omitted), and be "particularly sensitive to any prejudice to non-litigants drawn against their will into the legal disputes of others," *Jack Frost Labs., Inc., v. Physicians & Nurses Mfg. Corp.*, No. 92 Civ. 9263 (MGC), 1994 WL 9690, at *2 (S.D.N.Y. Jan. 13, 1994).  (Mot. at 23).

In response, Plaintiffs cite *Morelli v. Alters*, No. 19 Civ. 10707 (GHW), 2020 WL 6508858 (S.D.N.Y. Nov. 5, 2020), for the proposition that the Court should weigh four non-exclusive factors to determine whether the Subpoenas impose an undue burden.  (Opp. at 22).  These are: (1) whether the subpoena requests relevant information; (2) whether the subpoena is sufficiently particular and not overbroad; (3) the degree to which the documents are needed; and (4) the degree of any burden.  (*Id.* (citing *Morelli*, 2020 WL 6508858, at *5)).  Plaintiffs argue that each of these factors weigh in their favor.  They also assert they have repeatedly offered to limit the scope of the Subpoenas through a meet and confer process that counsel for the Non-Parties has rejected.  (*Id.* at 24–25).

"[A]ssessing undue burden" in the context of a Rule 45 subpoena is "'a highly case specific inquiry.'" *In re Novartis & Par Antitrust Litig.*, No. 18 Civ. 4361 (AKH), 2020 WL 3317203, at *5 (S.D.N.Y. June 18, 2020) (quoting Wright & Miller, *Federal Practice and Procedure* § 2463.1 (3d ed. 2008)).  Here, taking the Subpoenas as they were served on the Non-Parties, the Court has already noted the ways in which they are overbroad and would sweep in certain non-relevant communications and internal documents of the Non-Parties.  However, the Court's relevance rulings above substantially narrow the scope of the Subpoenas, limiting them to documents

reflecting communications between the Non-Parties and the City and documents pertaining to the potential and actual effects of the Fee Cap Legislation.

In light of the narrowed scope of the Subpoenas, the Non-Parties' burden argument based on the costs of compliance is substantially less cogent. It is doubtful that Plaintiffs in fact will need to review documents from "over 75 potential email custodians" (Bookman Decl. ¶ 39), and in any event Plaintiffs represent that they stand willing to seek agreement on a more limited set of custodians. (Opp. at 24.) Further, as Plaintiffs correctly point out, despite the Non-Parties' claim to have "limited resources" as a not-for-profit organization, they have not made any evidentiary showing as to the financial detriment that compliance with the Subpoenas would cause. *See Samsung Elecs. Co., Ltd. v. Microchip Tech. Inc.*, No. 24 Misc. 269 (GHW) (SDA), 2024 WL 3907250, at *9 (S.D.N.Y. Aug. 23, 2024) ("The mere assertion that a subpoena is burdensome, without evidence to prove the claim, cannot form the basis for an 'undue burden' finding.") (citation omitted).[11]

Turning to their claim of commercial harm and competitive disadvantage, the Non-Parties contend that Plaintiffs could "very well retaliate" against Alliance members whom they learn through discovery supported the Fee Cap Legislation. (Mot. at 24.) But the Non-Parties cite no authority for this argument. Nor, as discussed in Section B, *supra*, do they provide any evidence to substantiate their conjecture about possible retaliation. Further, Plaintiffs represent that the

---

[11] The Non-Parties state that they reserve their right to make a cost-shifting application in the future. (Mot. at 24.) The Court expresses no opinion as to the merits of any such application.

Non-Parties' concerns can be addressed by a protective order that prescribes limits on who can access discovery materials designated as confidential. (Opp. at 25).

In short, the Non-Parties have failed to meet their burden of demonstrating that compliance with the Subpoenas would be unduly burdensome. The Court thus declines to quash the Subpoenas on that ground. That said, the Court anticipates that the parties will, as Plaintiffs represented both in their briefing and at oral argument they are willing to do, work cooperatively to mitigate the burden of compliance on the Non-Parties by reaching reasonable agreements regarding such matters as custodians, search terms, and the scope of Plaintiffs' document requests. (Opp. at 24; Tr. at 27:21–28:3).

As an example, the Court notes that, taken literally, Plaintiffs' requests for documents and communications concerning the potential or actual effects of the Fee Cap Legislation could potentially result in a large volume of responsive but extraneous material.[12] As another example, the Court notes the legitimate concern expressed by Bookman, who in addition to his position as the Alliance's General and Legislative Counsel is a partner in a law firm, that the Subpoena directed to him will require him to search for and produce documents concerning his work for clients other than the Alliance. (Bookman Decl. ¶¶ 22, 24). The Court also notes and endorses Plaintiffs' suggestion that Plaintiffs could revise or completely

---

[12] These requests encompass the legislation's effects, "economic or otherwise." (*See, e.g.*, Dkt. No. 80 Ex. A (Request Nos. 6, 7, 8). The Court is unsure what non-economic effects could be relevant to Plaintiffs' constitutional challenges.

withdraw requests in the Subpoenas to the Individuals depending on whether the requested documents are within the Alliance's control.  (Opp. at 24).

### D. Non-Parties' Request for a Stay Pending the City's Production

Finally, the Non-Parties urge that its obligation to respond to Plaintiffs' discovery demands be deferred pending the City's production of documents, as the City's production "may contain documents that Plaintiffs seek from Non-Parties." (Mot. at 25; *see also* Reply at 9 (arguing that "before burdening Non-Parties, Plaintiffs should first attempt to obtain from the City the communications between Non-Parties and the City that the Subpoenas seek")).

Undoubtedly, there may be some overlap between the communications Plaintiffs are seeking from the Non-Parties and the communications Plaintiffs have obtained or will obtain from the City.  But "this fact alone is an insufficient ground on which to quash the subpoena."  *Kingsway Fin. Servs., Inc. v. Pricewaterhouse-Coopers LLP*, No. 03 Civ. 5560 (RMB) (HBP), 2008 WL 4452134, at *5 (S.D.N.Y. Oct. 2, 2008); *see also Frazier v. Morgan Stanley & Co.*, LLC, No. 16 Civ. 804 (RJS), 2021 WL 2709250, at *5 (S.D.N.Y. July 1, 2021) ("the potential for duplicative discovery does not by itself make a subpoena improper").  The Non-Parties may have communications with City Council representatives that the City did not retain, failed to locate, or does not possess (for example, emails or texts sent to or from a personal email address or cellphone).  *See In re BM Brazil 1 Fundo de Investimento em Participacoes Multistrategia*, No. 23 Misc. 208 (JGLC) (GS), 2024 WL 555780, at *17 (S.D.N.Y. Jan. 18, 2024).  Moreover, the Non-Parties may have

documents reflecting verbal communications with the City that will not be in the City's document production. Further, the internal documents the Court has found relevant, such as the Non-Parties' documents relating to the effects of the Fee Cap Legislation, will not be located in the City's files.

Accordingly, the Court declines to stay or defer the Non-Parties' document production pending completion of the City's document production.

\*          \*          \*

Based on the foregoing, the Non-Parties are directed to produce documents and communications concerning the Fee Cap Legislation transmitted between them and the City, as sought under Request No. 2 in each of the Subpoenas. This includes internal documents and communications with third parties reflecting communications with the City concerning the Fee Cap Legislation. In addition, the Non-Parties are directed to produce documents and communications concerning the potential and actual effects of the Fee Cap Legislation, as sought under Request Nos. 6, 7, and 8 of the Alliance Subpoena and Request Nos. 5, 6, and 7 of the Individual Subpoenas. The Non-Parties' motion to quash is denied with respect to the foregoing document requests as well as with respect to Plaintiffs' deposition subpoenas. In all other respects, the motion to quash is granted.

## CONCLUSION

For the reasons stated herein, the Non-Parties' motion to quash is **GRANTED IN PART** and **DENIED IN PART**. Counsel for Plaintiffs and the

Non-Parties are directed to meet and confer regarding the production of relevant, non-privileged documents and communications in the Non-Parties' possession in a manner consistent with this opinion.

**SO ORDERED.**

DATED:    New York, New York
          October 25, 2024

GARY STEIN
United States Magistrate Judge