UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

DOORDASH, INC., GRUBHUB, INC., and
PORTIER, LLC,

                     Plaintiffs,

       - against -

CITY OF NEW YORK,

                   Defendant.

-------------------------------------------------------------X

21 Civ. 7564 (GHW) (GS)

<u>OPINION & ORDER</u>

**GARY STEIN, United States Magistrate Judge:**

Plaintiffs DoorDash Inc., Grubhub, Inc., and Portier, LLC ("Plaintiffs")
move to compel Defendant City of New York ("the City") to produce witnesses in
response to Plaintiffs' deposition notices. Specifically, Plaintiffs seek to compel:
(1) Fed. R. Civ. P. 30(b)(1) depositions of one current member of the New York
City Council ("City Council"), one former City Council member, and a former
chief of staff to one of those members; and (2) testimony pursuant to a Fed. R.
Civ. P. 30(b)(6) deposition notice. The City opposes the motion to compel
primarily on the basis of legislative privilege. For the reasons set forth below,
Plaintiffs' motion is **DENIED.**

## BACKGROUND

### A. Factual Background

Plaintiffs commenced this action on September 9, 2021, challenging the
constitutionality of an ordinance passed by the City Council during the COVID-19
pandemic that imposes price caps on the commissions charged to restaurants by

Plaintiffs. (Dkt. No. 1). Plaintiffs amended their complaint ("First Amended Complaint" or "FAC") on January 24, 2022. (Dkt. No. 34).

The FAC alleges that Plaintiffs operate several popular online food delivery services, including DoorDash, Caviar, Grubhub, Seamless, Postmates, and Uber Eats, all of which are based outside of New York. (FAC ¶¶ 1, 25–27). Plaintiffs enter into contracts with restaurants who sign up for their services and charge the restaurants commissions calculated as a percentage of the customer orders they facilitate. (*Id.* ¶¶ 20–21, 25–27).

In early 2020, shortly before the COVID-19 pandemic, two City Council Members—Francisco Moya ("Moya") and Mark Gjonaj ("Gjonaj")—co-sponsored a bill to cap the commissions charged by third-party food delivery services, such as those operated by Plaintiffs. (*Id.* ¶¶ 65–66). The FAC cites to multiple public statements made by Moya and Gjonaj that Plaintiffs contend show animus towards out-of-state firms such as Plaintiffs and an intent to protect local economic interests at Plaintiffs' expense. (*See, e.g.*, *id.* ¶¶ 9–10, 52, 67, 70, 92, 97–98, 113, 190, 206).

In May 2020, the City Council adopted, and Mayor Bill de Blasio signed into law, a temporary ordinance establishing two different fee caps on services provided by third-party food delivery services. (*Id.* ¶¶ 2, 64, 73–74). A permanent ordinance was subsequently enacted in August 2021, and it took effect in January 2022. (*Id.* ¶¶ 115, 117). Plaintiffs' original complaint challenging the legislation followed shortly thereafter. (Dkt. No. 1). The temporary and permanent ordinances are collectively referred to herein as the "Fee Cap Legislation."

The FAC attacks the Fee Cap Legislation as an unconstitutional "government overreach" (FAC ¶¶ 3–4), and asserts six causes of action alleging violations of: (1) the Contract Clause of the U.S. Constitution; (2) the Takings Clauses under the Fifth and Fourteenth Amendments of the U.S. Constitution as well as under Article I, Section 7 of the New York State Constitution; (3) the City's police powers under Article IX, Section 2(c) of the New York State Constitution, N.Y. Mun. Home Rule Law § 10(ii)(a)(12), and N.Y. Gen. City Law § 20(13); (4) the Due Process Clause of the Fourteenth Amendment and Article I, Section 6 of the New York State Constitution; (5) the Equal Protection Clause of the Fourteenth Amendment and Article I, Section 11 of the New York State Constitution; and (6) the Dormant Commerce Clause of the U.S. Constitution. (FAC ¶¶ 125–216). Plaintiffs seek declaratory and injunctive relief invalidating the Fee Cap Legislation as well as monetary damages. (*Id*. at 74).

### B. Procedural History

On March 7, 2022, the City moved to dismiss the FAC in its entirety. (Dkt. No. 38). In a Memorandum Opinion and Order dated September 19, 2023, the Honorable Gregory H. Woods denied the motion, holding that Plaintiffs had adequately pled the requisite elements of each cause of action. *DoorDash, Inc. v. City of N.Y.*, 692 F. Supp. 3d 268 (S.D.N.Y. 2023) ("*DoorDash I*"). In his decision, Judge Woods highlighted the allegedly discriminatory statements made by Council Members Moya and Gjonaj and emphasized the need to further develop the factual

record with respect to whether the legislation "further[ed] a significant and legitimate public purpose." *Id.* at 291–92, 302.

The case proceeded to discovery.[1]  On April 18, 2024, non-parties New York City Hospitality Alliance ("NYCHA")—which represents the interests of New York City's restaurant industry and lobbied for the Fee Cap Legislation—and three of its directors and officers (collectively "Non-Parties") moved to quash discovery subpoenas served on them by Plaintiffs between January 30 and February 13, 2024. (Dkt. Nos. 79–84).  Plaintiffs sought the production of documents from all Non-Parties and to depose Andrew Rigie, NYCHA's Executive Director.  (*Id.*).

On October 25, 2024, the undersigned issued an Opinion and Order granting in part and denying in part the Non-Parties' motion to quash.  *DoorDash, Inc. v. City of N.Y.*, 754 F. Supp. 3d 556 (S.D.N.Y. 2024) ("*DoorDash II*").  As a result, the Non-Parties were ordered to produce: (1) documents and communications concerning the Fee Cap Legislation transmitted between them and the City, including internal documents and communications with third parties reflecting communications with the City concerning the Fee Cap Legislation; (2) documents and communications concerning the potential and actual effects of the Fee Cap Legislation; and (3) Rigie as a witness for deposition.  *Id.* at 581.  The motion to quash was otherwise granted.  *Id.*

In that ruling, the Court did not have occasion to pass upon the applicability of the legislative privilege to this case.  Although the discovery sought included

---

[1] In March 2024, the action was referred to the undersigned magistrate judge for general pretrial supervision.  (Dkt. No. 68; Dkt. Entry on March 19, 2024).

communications between the Non-Parties and the City, including City Council members, neither the Non-Parties nor the City asserted legislative privilege as a basis for objecting to the subpoenas. *Id*. at 565–66. Thus, the Court proceeded to determine the Non-Parties' relevance objections solely under Rule 26(b)(1) relevancy principles, as a matter of "relevance *simpliciter*." *Id*. at 565. Applying those principles, the Court found that communications between the Non-Parties and the City Council were relevant, at the very least, to Plaintiffs' Dormant Commerce Clause claim because they could shed light on whether the City Council acted with a constitutionally impermissible purpose in enacting the Fee Cap Legislation. *Id*. at 569–71. The Court noted, *inter alia*, that Judge Woods' ruling on the City's motion to dismiss attached significant weight to Council Members Moya and Gjonaj's public statements in finding that the FAC adequately pled that the law was intended to discriminate against out-of-state firms such as Plaintiffs. *Id*. at 561, 572.

## C. Plaintiffs' Instant Motion to Compel

On May 20, 2024, Plaintiffs served individual deposition notices under Rule 30(b)(1) on Council Member Moya; Gjonaj, a former Council Member; and Reginald Johnson, Gjonaj's former chief of staff. (Dkt. No. 125 at 6; Dkt No. 126 ("Lifshitz Decl.") ¶¶ 3–5, Exs. B–D). On August 14, 2024, the City sent a letter to Plaintiffs objecting to the 30(b)(1) notices and asking Plaintiffs to identify topics for questioning. (Lifshitz Decl. ¶ 6, Ex. E). Plaintiffs sent a preview of topics to the City on August 19, 2024. (*Id.* at Ex. F; Dkt. No. 127 ("Ciapetta Decl.") Ex. N). The

City ultimately refused to produce Moya, Gjonaj, and Johnson for depositions. (Dkt. No. 128 at 12–24).

On September 24, 2024, Plaintiffs served the City with a Rule 30(b)(6) deposition notice with twenty topics. (Lifshitz Decl. ¶ 9, Ex. H; Ciapetta Decl. Ex. A). On October 16, 2024, the parties met and conferred regarding the City's objections to the notice. (Lifshitz Decl. ¶ 16). Plaintiffs then served an amended notice on October 29, 2024, removing two of the topics. (*Id.* ¶ 13, Ex. K; Ciapetta Decl. Ex. C). The City continued to object to providing a witness for all but one of the noticed topics. (Dkt. No. 125 at 8).

After the Court granted the parties' motion for an expedited briefing schedule (Dkt. No. 123), Plaintiffs moved to compel all noticed depositions on December 9, 2024 (Dkt. No. 124). In particular, Plaintiffs seek to compel the City to produce a Rule 30(b)(6) designated witness or witnesses for fourteen of the noticed topics, Topics 1, 3–12, and 14–16 (Dkt. No. 125 at 13–14), and the three Rule 30(b)(1) witnesses. (*See* Dkt. Nos. 124, 125 ("Motion" or "Mot."), 126). The City filed its Opposition on December 18, 2024 (Dkt. Nos. 127, 128 ("Opposition" or "Opp.")), and Plaintiffs replied on December 27, 2024 (Dkt. Nos. 129 ("Reply" or "Rep."), 130). On February 21, 2025, the Court held oral argument on the Motion. (*See* Dkt. No. 140 ("Transcript" or "Tr.")).

## LEGAL STANDARDS

### A. Motion to Compel Depositions

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1).  Under Rule 30, "a party to litigation may be compelled to give testimony pursuant to a notice of deposition." *In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570 (GBD) (SN), 2020 WL 8611024, at *3 (S.D.N.Y. Aug. 27, 2024).  "Parties under Rule 30 may be noticed pursuant to Rule 30(b)(6), or Plaintiffs 'may identify a specific officer, director, or managing agent to be deposed and notice that person under Rule 30(b)(1).'" *Id.* (quoting *United States v. Afram Lines (USA), Ltd.*, 159 F.R.D. 408, 413 (S.D.N.Y. 1994)).  Normally, the party seeking to bar a deposition noticed under Rule 30 bears the burden of demonstrating that the proposed deposition would not lead to relevant information. *Speadmark, Inc. v. Federated Dept. Stores, Inc.*, 176 F.R.D. 116, 118 (S.D.N.Y. 1997); *see also Scott v. Chipotle Mexican Grill, Inc.*, 306 F.R.D. 120, 122 (S.D.N.Y. 2015) ("[P]laintiffs have no burden to show that the deponents have any relevant knowledge.") (citation omitted).

But "even if 'a witness might have discoverable information, a party is not always entitled to depose that individual.'" *Brunckhorst v. Bischoff*, No. 21 Civ. 4362 (JPC), 2022 WL 6991285, at *2 (S.D.N.Y. Oct. 12, 2022) (quoting *CFTC v. Commodity Inv. Grp., Inc.*, No. 05 Civ. 5741 (HB), 2005 WL 3030816, at *1 (S.D.N.Y. Nov. 10, 2005)).  One reason for denying a deposition is that the requested

testimony would intrude upon an applicable privilege. *See, e.g., Shawmut Woodworking & Supply, Inc. v. Amwest Sur. Ins. Co.*, No. M8-85 (LMM), 1999 WL 76807 (S.D.N.Y. Feb. 17, 1999) (denying motion to compel deposition of attorney on subjects covered by attorney-client privilege and/or work product doctrine). The party resisting the deposition bears the burden of establishing that the privilege applies. *See, e.g., United States v. 111 E. 88th Partners*, No. 16 Civ. 9446 (PGG) (KHP), 2018 WL 4519203, at *2 (S.D.N.Y. Sept. 20, 2018); *see also Luv N' Care, Ltd. v. Eazy-PZ, LLC,* No. 18 Misc. 491 (JPO), 2018 WL 6067231, at *1 (S.D.N.Y. Nov. 20, 2018) ("'[T]he party withholding discovery on the grounds of burden, expense, privilege, or work product bears the burden of proving the discovery is in fact privileged or work product, unduly burdensome and/or expensive.'") (citation omitted).

### B. Legislative Privilege

"The concept of legislative privilege, and the parallel doctrine of legislative immunity, 'developed in sixteenth- and seventeenth-century England as a means of curbing monarchical overreach, through judicial proceedings, in Parliamentary affairs.'" *Citizens Union of City of N.Y. v. Att'y Gen. of N.Y.*, 269 F. Supp. 3d 124, 149 (S.D.N.Y. 2017) (quoting *Favors v. Cuomo*, 285 F.R.D. 187, 207 (E.D.N.Y. 2012) ("*Favors I*")). This principle of legislative autonomy became so fundamental that it was codified in Article I of the U.S. Constitution as the Speech or Debate Clause. The Speech or Debate Clause provides in relevant part that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in

any other Place." U.S. Const. art. I, § 6, cl. 1. The Clause provides "two distinct, but related, absolute protections [to members of Congress]: (1) immunity from suit for their legislative acts and (2) protection from being compelled to testify in court and produce information about acts that fall within the 'legitimate legislative sphere.'" *Citizens Union*, 269 F. Supp. 3d at 150 (citations omitted).

While these protections are limited to Congress and its staff, "many state constitutions, including New York's, contain a Speech or Debate Clause that mirrors the one in the U.S. Constitution." *Id.*; *see* N.Y. Const. art. III, § 11. The New York City Charter contains its own speech or debate clause protecting City Council members. *See* N.Y.C. Charter § 49 ("For any speech or debate in the council and any committee or subcommittee thereof, the members shall not be questioned in any other place."). Based on principles of comity, and applying federal common law, federal courts, including the U.S. Supreme Court, have extended the doctrines of legislative immunity and legislative privilege to state and local lawmakers as well. *See Citizens Union*, 269 F. Supp. 3d at 152; *Morris v. Katz*, No. 11 Civ. 3556 (JG), 2011 WL 3918965, at *4 (E.D.N.Y. Sept. 4, 2011); *see also Favors I*, 285 F.R.D. at 209 ("The legislative privilege is governed by federal common law, as applied through Rule 501 of the Federal Rules of Evidence.").

Thus, courts in this Circuit "have repeatedly held that state and local lawmakers are entitled to protection against discovery into their legislative acts in civil cases, explaining that such protection is needed to 'shield legislators from civil proceedings which disrupt and question their performance of legislative duties to

enable them to devote their best efforts and full attention to the public good.'" *Noel v. City of N.Y.*, No. 15 Civ. 5236 (LTS) (KHP), 2018 WL 6649969, at *5 (S.D.N.Y. Dec. 18, 2018) (quoting *Searingtown Corp. v. Inc. Vill. of N. Hills*, 575 F. Supp. 1295, 1299 (E.D.N.Y. 1981)); *see also Citizens Union*, 269 F. Supp. 3d at 154 ("[D]istrict courts within the Second Circuit have interpreted the Supreme Court case law discussed above to provide state lawmakers with protection against discovery into their legislative acts in civil cases[.]").  The privilege protects both legislators and their staffs "'from compelled disclosure of both documentary and testimonial evidence with respect to actions within the scope of legitimate legislative activity.'" *Nat'l Ass'n for Advancement of Colored People v. E. Ramapo Cent. Sch. Dist.*, No. 17 Civ. 8943 (CS) (JCM), 2018 WL 11260468, at *4 (S.D.N.Y. Apr. 27, 2018) (quoting *Favors I*, 285 F.R.D. at 209).

"[T]he protections of the legislative privilege are at their zenith" when "testimony as to [the] thoughts and motivations" of lawmakers is sought. *McDonough v. City of Portland*, No. 2:15-CV-153-JDL, 2015 WL 12683663, at *8 (D. Me. Dec. 31, 2015).  The Supreme Court has long recognized that compelling the testimony of a lawmaker is "usually to be avoided" because "judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977).  Thus, "[i]n only the rarest of circumstances will courts compel testimony from legislators asserting legislative privilege." *Favors v. Cuomo*, No. 11 Civ. 5632 (DLI) (RR) (GEL), 2013 WL

11319831, at *15 (E.D.N.Y. Feb. 8, 2013) ("*Favors II*") (citing *Arlington Heights*, 429 U.S. at 268).

However, the privilege is not absolute. *Citizens Union*, 269 F. Supp. 3d at 154–55. "[I]n some extraordinary instances, some discovery may be warranted." *Id.* at 155. The privilege must be affirmatively asserted by individual lawmakers and staff seeking to invoke its protections. *Id.* at 154.[2] "As with other privileges, the party seeking protection on the basis of legislative privilege bears the burden of establishing entitlement to it." *Favors II*, 2013 WL 11319831, at *4; *see Almonte v. City of Long Beach*, No. 04 Civ. 4192 (JS) (JO), 2005 WL 1796118, at *3 (E.D.N.Y. July 27, 2005) (noting that the city manager seeking protections of the legislative privilege bore the burden of "establish[ing] his legislative role").

"To determine whether the legislative privilege precludes disclosure, a court must balance the interests of the party seeking the evidence against the interests of the individual claiming the privilege." *Favors I*, 285 F.R.D. at 209. "[D]istrict courts within this Circuit apply five balancing factors, as originally set out in" *Rodriguez v. Pataki*, 280 F. Supp. 2d 89, 100–01 (S.D.N.Y.), *aff'd,* 293 F. Supp. 2d 302 (S.D.N.Y. 2003). *Citizens Union*, 269 F. Supp. 3d at 155. The five factors considered under the *Rodriguez* balancing test are:

> (i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the "seriousness" of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government

---

[2] "It is well settled that the legislative privilege is a personal one and may be waived or asserted by each individual legislator." *Favors I*, 285 F.R.D. at 211 (citations omitted). Here, the City states that for the purposes of this motion it represents the legislators, who have affirmatively invoked the privilege. (Tr. at 56–57.) Plaintiffs do not dispute that assertion.

> employees who will be forced to recognize that their secrets are
> violable.

*Rodriguez*, 280 F. Supp. 2d at 101 (citations omitted); *see Nat'l Ass'n for*

*Advancement of Colored People*, 2018 WL 11260468, at *4; *Citizens Union*, 296 F.

Supp. 3d at 155; *Favors II*, 2013 WL 11319831, at *11–12; *Favors I*, 285 F.R.D. at

209–10; *see also Carver v. Nassau Cnty. Interim Fin. Auth.*, No. 11 Civ. 1614 (LDW)

(GRB), 2012 WL 12266891, at *3 (E.D.N.Y. Aug. 9, 2012) (noting that the *Rodriguez*

factors are "widely accepted as authoritative").

In essence, as one court has described it, the court considers "whether the

private parties' interest in exploring the motivations and fact-finding efforts of

individual legislators (1) rises to a level of public need for full development of

relevant facts that is sufficient to overcome the competing public interests in

ensuring that legislators devote their full efforts and attention to legislative duties;

(2) outweighs the threat of chilling legislative deliberations; and (3) warrants

federal intrusion into the independence of state lawmakers." *Citizens Union*, 269 F.

Supp. 3d at 155–56.

## DISCUSSION

### A. Rule 30(b)(1) Depositions of City Council Members and Staff

The Court first addresses Plaintiffs' motion to compel Rule 30(b)(1)

depositions of Moya, Gjonaj, and Johnson (collectively referred to below as "the City

Council witnesses").

Plaintiffs primarily assert that it is premature to consider whether the

testimony of these witnesses would be protected by legislative privilege under the

*Rodriguez* factors. (Mot. at 16–22). Claiming that much if not all of the testimony sought would not implicate legislative privilege, Plaintiffs contend the proper course would be for the depositions to proceed, for the City to object on legislative privilege grounds if and when necessary during the deposition, and for the parties to return to the Court for a ruling if they are unable to resolve any dispute on their own. (*Id.* at 2–3, 14–15). According to Plaintiffs, numerous courts "have recognized that 'a blanket assertion of [legislative] privilege is not [an] appropriate' response to deposition notices" and "courts should, instead, rule based on 'specific questions and refusals to answer grounded in privilege.'" (*Id.* at 3 (quoting *Fair Hous. in Huntington Comm. v. Town of Huntington*, No. 02 Civ. 2787 (DRH) (WDW), 2010 WL 11629264, at *1 (S.D.N.Y. Mar. 31, 2010)). In the alternative, Plaintiffs argue that the *Rodriguez* factors weigh in favor of disclosure and granting the motion to compel the Rule 30(b)(1) depositions. (*Id.* at 22–25).

The City agrees that the legislative privilege is qualified but contends that the depositions are nonetheless barred by privilege. (Opp. at 17–24). The City argues that the *Rodriguez* factors must be applied at the outset as compelled depositions of lawmakers and their staff distract from legislative duties and inquire into motives for legislation, which are the exact harms the privilege is meant to protect against. (Opp. at 3, 14–19). In response, Plaintiffs reassert that the *Rodriguez* factors do not apply to initial attempts to prevent testimonial inquiry because, they contend, in this Circuit legislative privilege objections are resolved "only *after* depositions [take] place." (Rep. at 2) (emphasis in original).

### 1.  Pre-Deposition Assertion of Legislative Privilege

The Court finds unconvincing Plaintiffs' argument that legislative privilege cannot bar the requested depositions in their entirety but instead can only bar particular questions asked in those depositions that intrude upon privileged matters.  This argument rests on an overly narrow conception of the legislative privilege doctrine that is at odds with the applicable case law.

In making this argument, Plaintiffs challenge the City's contention that "a major purpose underlying the privilege is to shield legislators from proceedings that interfere with their duties."  (Mot. at 16).  But the City has it right.  A fundamental purpose of the legislative privilege *is* to "'shield legislators from civil proceedings which disrupt and question their performance of legislative duties to enable them to devote their best efforts and full attention to the public good.'"  *Noel*, 2018 WL 6649969, at *5 (quoting *Searingtown*, 575 F. Supp. at 1299); *accord, e.g.*, *Citizens Union*, 269 F. Supp. 3d at 154; *ACORN v. Cnty. of Nassau*, No. 05 Civ. 2301 (JFB) (WDW), 2007 WL 2815810, at *2 (E.D.N.Y. Sept. 25, 2007); *see also In re Hubbard*, 803 F.3d 1298, 1310 (11th Cir. 2015) (a principal purpose of the legislative privilege is to "ensure that lawmakers are allowed to 'focus on their public duties,'" free from the distraction of discovery requests that force them "'to divert time, energy, and attention from their legislative tasks'" (quoting *E.E.O.C. v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 181 (4th Cir. 2011))); *Citizens Union*, 269 F. Supp. 3d at 168 (echoing *Hubbard*).

"Unlike other recognized privileges, such as the attorney-client privilege, the maintenance of confidentiality is not the fundamental concern of the legislative privilege." *Pulte Home Corp. v. Montgomery Cnty., Md.*, No. GJH-14-3955, 2017 WL 2361167, at *8 (D. Md. May 31, 2017). Rather, "[t]he legislative privilege is principally framed to ensure that legislators are free to make difficult decisions on controversial issues without fear that their decision-making process will be later scrutinized or that their time will be consumed with responding to discovery requests in litigation." *Id.* That underlying policy explains why, as the Supreme Court has emphasized, calling legislators to the stand to testify concerning the purpose of legislative acts "represent[s] a substantial intrusion into the workings" of another branch of government that is "'usually to be avoided'" and reserved for "extraordinary instances." *Arlington Heights*, 429 U.S. at 268 & n.18 (citation omitted).

Set against this backdrop, Plaintiffs' protestations that they are not seeking to pierce the legislative privilege on this motion—because they will be pursuing areas of questioning that purportedly do not implicate the privilege (Mot. at 18–20; Tr. at 6:4–6)—are unavailing. Plaintiffs' proposed lines of questioning do implicate the privilege because they relate to the City Council witnesses' performance of legislative duties. For example, Plaintiffs contend that they should be permitted to depose the City Council witnesses about their communications with lobbyists, citing case law in this Circuit recognizing that "communications with 'knowledgeable outsiders'—e.g., lobbyists—fall outside the privilege." (Mot. at 18 (quoting *Favors I*,

285 F.R.D. at 212)).[3]  But even if legislative privilege may not bar *production* of communications between legislators and lobbyists—such as those this Court directed NYCHA to produce, *see DoorDash II*, 754 F. Supp. 3d at 572—it does not follow that City Council members necessarily may, consistent with the privilege, be *deposed* about those communications.  *See Texas v. Holder*, No. 12-128 (DST, RMC, RLW), 2012 WL 13070060, at *2 (D.D.C. June 5, 2012) ("Although the communications must be produced, questioning a legislator or staff about the communication, to the extent it would require the legislator to reveal his subjective motivations about SB 14 or any legislative activity with respect to the law, are covered by the privilege.").

At oral argument, Plaintiffs claimed they should at least be allowed to depose the City Council witnesses to discover their oral communications with NYCHA and other lobbyists that were not reduced to writing.  (Tr. at 8:3–7).  The question at this stage of the analysis, however, is whether Plaintiffs are entitled to depose legislators on this basis without consideration of the *Rodriguez* factors.  The Court does not agree they are.  "Meeting with persons outside the legislature . . . to discuss issues that bear on potential legislation" is "a routine and legitimate part of the modern-day legislative process."  *Almonte v. City of Long Beach*, 478 F.3d 100,

---

[3] The Court recognized this case law in its earlier decision on the motion to quash Plaintiffs' subpoenas to the Non-Parties.  *Doordash II*, 754 F. Supp. 3d at 566.  It bears noting that the Second Circuit has not yet addressed this issue and that a number of other courts outside the Second Circuit have held that communications with lobbyists and other third parties can fall within the legislative privilege if part of the formulation of legislation.  *See Mi Familia Vota v. Hobbs*, 682 F. Supp. 3d 769, 777–82 (D. Ariz. 2023) (noting that "federal courts have come to differing conclusions on this issue" and that the published decisions from federal circuit courts agree the privilege may apply to communications with outsiders).

107 (2d Cir. 2007).  If legislators could be deposed about their communications with lobbyists in any case challenging whether a law was enacted for a constitutionally impermissible purpose, irrespective of such factors as relevance, the availability of other evidence, and the potential chilling effect of providing such testimony, the core protection of the legislative privilege—to shield legislators from such intrusions—would be severely diminished.

Further, when courts in this Circuit have invoked the principle that communications with outsiders are unprotected by the legislative privilege, they have done so in order to compel the production of documents—not depositions.  *See Nat'l Ass'n for Advancement of Colored People*, 2018 WL 11260468, at *6; *Favors II*, 2013 WL 11319831, at *10; *Rodriguez*, 280 F. Supp. 2d at 101–03.  In fact, these same courts recognize that questioning of legislators and their staff requires greater justification than document requests.  *See Favors II*, 2013 WL 11319831, at *15 (recognizing that because interrogatories "are more akin to testimony than to disclosure of pre-existing documents," interrogatories served on legislators "should, at a minimum, be subject to an even more exacting balancing test than are document demands"); *Rodriguez*, 280 F. Supp. 2d at 103 (favorably citing case that "allow[ed] document discovery, but not depositions of legislators or their aides"); *see also Favors I*, 285 F.R.D. at 216 (noting that, "[a]s for depositions," Judge Maas later ruled in *Rodriguez* that "legislators and their staffs . . . were protected by the qualified privilege," while outsiders were potentially subject to questioning).[4]

---

[4] In *Almonte*, the court did compel a non-legislator defendant to answer certain questions that he had refused to answer based on legislative privilege regarding a meeting with three City Council

For similar reasons, Plaintiffs fare no better with their argument that testimony about Gjonaj and Moya's public statements, newsletters, and speeches "would not be privileged" and hence should be allowed.  (Mot. at 19).  While the statements may not be privileged, questioning the City Council members about them clearly implicates the privilege.  In *Hum. Res. Rsch. & Mgmt. Grp., Inc. v. Cnty. of Suffolk*, No. 03 Civ. 3777 (JFB) (WDW), 2008 WL 11449404 (E.D.N.Y. Apr. 17, 2008), a plaintiff challenging a county law as discriminatory similarly sought to depose county legislators about the justification they had publicly offered in support of the law.  The court rejected that argument and precluded the depositions on the basis of legislative privilege, explaining: "A rule that allowed the questioning of a legislator anytime that he or she 'opened the door' by making a statement on the record would undoubtedly result in the decline in such statements to the detriment of the public in general."  *Id*. at *1.[5]

---

members at which "outsiders," including a private citizen, were also present.  2005 WL 1796118, at *2–3.  However, the court emphasized that the deponent, the City Manager, was "not a legislator" and "not a member of the City Council," and there was no evidence to suggest he "had a legislative role" nor "that the meetings were legislative in nature."  *Id*. at *2–4.  Similarly, in *ACORN*, the deponent in question was not a legislator, but a representative of an outside consulting firm retained by the municipality as a land use/zoning specialist.  2007 WL 2815810, at *1, *4.  The court noted that the firm was retained to provide information that served as "the necessary starting point" of legislative deliberations but was not a part of the "actual [legislative] deliberations," which are subject to more protections.  *Id*. at *5–6.

[5] This is true for statements concerning proposed legislation that are made "outside of the [legislative body]" (Mot. at 19), as well as those made within the legislative record.  Plaintiffs tacitly concede, as they must, that the privilege would protect a legislator from questions regarding statements made about a proposed law during legislative proceedings.  Yet they apparently contend that if the legislator makes the same statement in a speech given, or an article published, outside the legislative chamber, the legislator then may automatically be questioned about that statement.  That position is contrary to reason and is not the law.  *See Gravel v. United States*, 408 U.S. 606, 625 (1972) (noting that courts have extended the privilege to matters beyond speech in Congress "when necessary to protect indirect impairment of [legislative] deliberations"); *Texas v. Holder*, 2012 WL 13070060, at *3 ("The Attorney General is correct that public statements and press releases by legislators are not protected by a legislative privilege because those acts are not essentially

Lastly, Plaintiffs argue that another line of inquiry that "lies outside the privilege" is "information 'regarding the materials and information available to [legislators] at the time a decision was made.'" (Mot. at 20 (quoting *ACORN*, 2007 WL 2815810, at *3)). Not so. "The legislative privilege also protects formal and informal fact and information-gathering activities about the subject of potential legislation[.]" *Noel*, 2018 WL 6649969, at *5; *see also Citizens Union*, 269 F. Supp. 3d at 161 ("[F]act-finding, information-gathering, and other types of research concerning the subjects of potential legislation are entitled to protection under the legislative privilege."); *SEC v. Comm. on Ways & Means of the U.S. House of Reps.*, 161 F. Supp. 3d 199, 236-37 (S.D.N.Y. 2015) (noting that the protections of the Speech or Debate Clause "extend to a legislator's gathering of information from federal agencies and from lobbyists"); *Bethune-Hill v. Va. State Bd. of Elections*, 114 F. Supp. 3d 323, 338 (E.D. Va. 2015) ("To advance legislators' interest in avoiding the distraction of compulsory process, the privilege should therefore extend to factual information relied upon in the legislative process and be subject to a balancing of interest rather than wholesale exclusion."). The *ACORN* decision, upon which Plaintiffs rely, did not forgo applying the *Rodriguez* balancing test in determining whether to allow discovery in that case. To the contrary, the court rejected the plaintiffs' "threshold" argument that the legislative privilege had no application and analyzed their discovery requests under the *Rodriguez* factors. *ACORN*, 2007 WL 2815810, at *2–3.

---

'legislative.' The Attorney General is incorrect, however, that questioning a legislator about the statements cannot be privileged.") (citation omitted).

Thus, Plaintiffs' lines of questioning that purportedly fall "outside the privilege" actually fall within it. So too do several other proposed deposition topics that Plaintiff's counsel identified at oral argument, such as "where can [Plaintiffs] find evidence of the City Council's intent in the legislative record," "what information [the City Council members] relied upon in passing this law," "what information was particularly important to them," "the circumstances under which [their allegedly discriminatory statements] arose," and "why [those statements] were made." (Tr. at 7:2–3, 7:16–18, 8:14–15). These lines of inquiry all concern actions "within the scope of legitimate legislative activity," *Nat'l Ass'n for Advancement of Colored People*, 2018 WL 11260468, at *4 (quoting *Favors I*, 285 F.R.D. at 209), which even Plaintiffs acknowledge are protected by the legislative privilege. (Mot. at 15).

Moreover, Plaintiffs acknowledge the possibility that at the depositions, they may ask questions that fall within the scope of the privilege and draw an objection. (Mot. at 3, 18; Rep. at 8; Tr. at 6:4–17, 11:12–14, 14:2–6). This poses the very real likelihood that the City will object and the parties will ask the Court to resolve the City's objections under the *Rodriguez* framework. Should the Court overrule any of the City's objections, the witnesses would need to return for a *second* deposition, thus magnifying the very intrusion that the privilege is intended to minimize.

For all these reasons, Plaintiffs' proposed course of action—requiring the City Council witnesses to sit for depositions and addressing questions of legislative privilege only if, as, and when they arise during the depositions—is incompatible

with the privilege's scope and rationale.  Plaintiffs need to make a sufficient showing *prior* to depositions of the City Council witnesses that the depositions are warranted under the *Rodriguez* balancing test.

Plaintiffs' authorities do not dictate a different approach.  Within this Circuit, Plaintiffs primarily rely on *E. End Ventures, LLC v. Inc. Vill. of Sag Harbor*, No. 09 Civ. 3967 (LDW) (AKT), 2011 WL 6337708 (E.D.N.Y. Dec. 19, 2011), and *Fair Hous. in Huntington Comm.*, 2010 WL 11629264.  (Mot. at 3, 16–18; Rep. at 1–2).  In both cases, it is true, local municipal officials (a former village trustee in *E. End Ventures*, and the town supervisor and a town councilmember in *Fair Hous.*) were deposed; objections on the ground of legislative privilege were raised during the depositions; and the parties returned to the court for rulings on these objections. *E. End Ventures*, 2011 WL 6337708, at *1–2; *Fair Hous.*, 2010 WL 11629264, at *1– 2.  But in neither case, so far as appears from the decisions, did the defendants object to proceeding with the original deposition, as the City does here.  Thus, neither court addressed the issue of whether legislative privilege may be invoked to bar a deposition before it takes place, let alone endorsed Plaintiffs' position that such an invocation is premature and that legislative privilege objections should be deferred to the deposition itself.[6]

---

[6] The same goes for another case cited by Plaintiffs, *Orange v. Cnty. of Suffolk*, 855 F. Supp. 620 (E.D.N.Y. 1994); the court there specifically noted that it was "not faced with a claim that [the legislator] may not be deposed at all."  *Id.* at 623 n.2.  (*See* Rep. at 2–3).

Further, Plaintiffs' claim that *Fair Hous.* "recognized that 'a blanket assertion of [legislative] privilege is not [an] appropriate' response to deposition notices" (Mot. at 3) misstates the holding of that case.  *Fair Hous.* did not address the defendant-town's "response to deposition notices"; as noted above, the depositions in that case had already gone forward and the case addressed the town's objections to questions during the depositions.  The court's statement that "a blanket assertion of privilege is not appropriate" came in the context of noting that the legislative privilege is qualified,

Plaintiffs also point to out-of-circuit cases that they assert support their "depose now, assert privilege later" proposal, including *Texas v. Holder*, 2012 WL 13070060, and *Nashville Student Org. Comm. v. Hargett*, 123 F. Supp. 3d 967 (M.D. Tenn. 2015). (Rep. at 3; Tr. at 23:11-14). In *Texas v. Holder*, the State of Texas, the plaintiff in the litigation, sought to compel the U.S. Department of Justice to grant preclearance of a voter-ID law pursuant to Section 5 of the Voting Rights Act in time for the changes to take effect for elections later that year. While invoking legislative privilege, the State agreed to produce certain legislators for depositions without a subpoena in the interests of expediting discovery and preserving the scheduled trial date. (*See Texas v. Holder*, No. 12 Civ. 128, at Dkt. No. 89 (D.D.C. Apr. 24, 2012)). The fact that "the parties extensively briefed specific privilege objections *after* the depositions" (Rep. at 3 (emphasis in original)) thus does not mean the court required legislators to be deposed over their objections or without determining whether depositions would be appropriate in the first place.[7]

In *Nashville Student Org. Comm.*, the court agreed with the plaintiffs' proposal that "the court should permit the depositions to proceed, permit the

---

not absolute, and thus needs to be evaluated in the context of the *Rodriguez* factors and the "specific questions and refusals to answer" that took place in the depositions. *Fair Hous.*, 2010 WL 11629264, at *1.

[7] Texas had previously moved for a "blanket protective order" to preemptively shield all Texas legislators and their staffs from discovery requests, including depositions. (*Texas v. Holder*, No. 12 Civ. 128, Dkt. No. 84, at 2 (D.D.C. Apr. 20, 2012)). The court denied that motion on the grounds that it had no indication which, if any, legislators would invoke legislative privilege, noting that some legislators "may choose to waive the privilege, as they have in other preclearance lawsuits." (*Id*. at 2). The court further noted that application of the privilege might also depend on "whether Texas chooses to rely on legislative testimony on the merits." (*Id*. at 2–3). But that order did not compel any legislators to appear for deposition and in fact provided that "[i]f any legislators assert the privilege in response to specific requests for depositions," the defendants could then move to compel the deposition, and Texas could oppose the motion. (*Id*. at 3).

deponent legislators to invoke the privilege, order that the legislators answer the questions posed, accept the deposition transcripts under seal for review *in camera*, and address issues of admissibility at a later stage." *Nashville Student Org. Comm.*, 123 F. Supp. 3d at 970. While that approach bears an apparent similarity to Plaintiffs' proposal here, it is critically different in that the court did not defer deciding whether to compel answers based on legislative privilege; rather, it ordered the legislators to answer the questions posed and only deferred the question of admissibility. *See id.* at 971 ("Although the depositions will proceed, the court specifically reserves decision as to which, if any, of the topics covered in the deposition will result in admissible testimony.").

More importantly, the court compelled the legislators to testify only *after* considering and applying the *Rodriguez* balancing test. *Id.* at 970–71. Specifically, the court analyzed each of the *Rodriguez* factors and found them to weigh in favor of allowing the depositions to proceed. *See id.* (finding that (i) the legislators could provide "relevant information" on the issue of discriminatory intent; (ii) there was a "dearth of available documentary evidence outside of the legislative history"; (iii) the litigation involved a "serious constitutional issue" (voting rights); (iv) government conduct was "squarely at issue"; and (v) "it does not appear that conducting the depositions would have a chilling effect on frank deliberations on public policy matters").[8] In fact, the court specifically noted that it was "hesita[nt]

---

[8] The court noted that whereas the plaintiffs addressed the five-factor *Rodriguez* test in detail, the legislators did not address any element other than relevance, and thus "there is, to this point, no indication that the Legislators believe that deposing them would somehow chill frank public debate."

to find that legislative privilege cannot be invoked without forcing a legislator to testify, because a rule that broad could substantially burden legislators without justification." *Id.* at 970.  Thus, *Nashville Student Org. Comm.* undermines rather than supports Plaintiffs' position that the City Council witnesses should be forced to testify in order to invoke the privilege.

Accordingly, the Court rejects Plaintiffs' argument that they should be permitted to proceed with depositions of the City Council witnesses without consideration of whether an adequate justification for the depositions exists under the *Rodriguez* balancing test.

### 2.  Application of the *Rodriguez* Factors

Having determined that the balancing test does indeed apply to this motion, the Court next applies the *Rodriguez* factors and concludes that Plaintiffs' motion to compel Rule 30(b)(1) depositions from the City Council witnesses must be denied.

### a.  Relevance of Evidence

The first factor, "the relevance of the information sought to be protected," *Rodriguez*, 280 F. Supp. 2d at 101, weighs in favor of disclosure, but not heavily. The City argues that the topics noted for depositions are "generally irrelevant to [Plaintiffs'] claims" and this factor thus weighs in favor of the legislators.  (Opp. at 19).  Plaintiffs contend that the City Council witnesses "are likely to have highly relevant information."  (Mot. at 10).

---

*Nashville Student Org. Comm.*, 123 F. Supp. 3d at 971 n.7.  Thus, the court had very little to consider for the argument against disclosure.

As this Court previously noted, "ample case law supports the proposition that discovery into the legislative process is relevant where it 'might shed light on whether the legislature acted with a constitutionally impermissible purpose in adopting the challenged provision.'" *DoorDash II*, 754 F. Supp. 3d at 569 (quoting *Citizens Union*, 269 F. Supp. 3d at 145–46). Thus, the Court found that evidence of the City Council's intent in enacting the Fee Cap Legislation was relevant, at a minimum, to Plaintiffs' Dormant Commerce Clause claim, which, as explained in Judge Woods' ruling on the City's motion to dismiss, hinges at least in part on proof of discriminatory intent. *Id.* at 571; *see DoorDash I*, 692 F. Supp. 3d at 301–02. Moreover, it was primarily the comments of Council Members Gjonaj and Moya, as alleged in the FAC, that led Judge Woods to conclude that Plaintiffs had adequately pled that the Fee Cap Legislation has a discriminatory, protectionist purpose. *See DoorDash I*, 692 F. Supp. 3d at 301–02.

The City argues that a law's "'text, legislative record and other public materials are the primary source for discerning governmental interest in the legislation'" and that the testimony of individual legislators "cannot [be] impute[d]" to "the entire City Council." (Opp. at 3, 19 (quoting *Citizens Union*, 269 F. Supp. 3d at 140)). But the Court rejected substantially the same arguments when made by the Non-Parties in moving to quash the discovery subpoenas served upon them. *See DoorDash II*, 754 F. Supp. 3d at 566–67, 572–73. The City offers no reason why the Court should adopt a different view now, and the Court declines to do so. The

information sought from the City Council witnesses is relevant to the claims in this case under Rule 26(b)(1) relevancy principles.

Nonetheless, given that the constitutionality of the Fee Cap Legislation must be assessed on the basis of the intent of the 51–member City Council as a whole, the importance of testimony from individual legislators, even the bill's sponsors, is somewhat limited.  *See League of Women Voters of Fla., Inc. v. Lee*, 340 F.R.D. 446, 456–57 (N.D. Fla. 2021) (finding "some truth" in the argument that the motivations of individual legislators, even the bill's sponsor, is of limited relevance in determining "overall legislative motive" and concluding that the first *Rodriguez* factor weighs only "slightly" in favor of disclosure); *Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, No. 11 C 5065, 2011 WL 4837508, at *4, *8 (N.D. Ill. Oct. 12, 2011) (concluding that "[t]he deliberations of individual lawmakers" while relevant, "are less probative of the totality of the circumstances," and thus, the evidence sought was "relevant, although . . . not central to the outcome of this case").  Moreover, Plaintiffs state that they do *not* intend to ask the City Council witnesses direct questions about their motive and intent and that they will instead focus on "factual" material "like [what] information [was] available to the council." (Tr. 12:18–21, 16:6-20).  This further diminishes the relevance of the requested disclosure, since such factual questions are more readily and reliably answered through documentary evidence.  *See League of Women Voters of Fla.,* 340 F.R.D. at 458 (granting motion to quash depositions of legislators where legislators already

agreed to provide "materials and information available" during the decision-making process "in the form of document production") (citation omitted).

### b.  Availability of Other Evidence

The second factor, "the availability of other evidence," *Rodriguez*, 280 F. Supp. 2d at 101, weighs in favor of the City.  Plaintiffs have access to a considerable amount of evidence bearing on the intent and purpose underlying the Fee Cap Legislation.  The FAC quotes no fewer than seventeen separate public statements by Council Members Gjonaj and Moya, both within and outside the legislative record, that Plaintiffs contend evince the legislation's protectionist and discriminatory purpose.  (FAC ¶¶ 9–10, 52, 67, 70–71, 92–93, 95, 97–98, 104–105, 113, 115; *see also* Mot. at 1 (noting that Judge Woods' ruling on the City's motion to dismiss "referenc[ed] Moya and Gjonaj 14 and 26 times, respectively")).  The proposed legislation was the subject of several City Council hearings and committee reports, and the City has produced the entire legislative record of those proceedings, amounting to 6,000 pages.  (Opp. at 1, 20; Tr. at 7:9–10).

In addition, Plaintiffs have received an extensive amount of non-public information during discovery in this case, including communications with lobbyists. The City's brief states the City has "produced tens of thousands of documents and communications, and productions are continuing on a rolling basis."  (Opp. at 20). At the time of oral argument, the City stated it had produced around "a hundred thousand pages."  (Tr. at 38:5–7).  The City's production includes all communications with lobbyists.  (Opp. at 21).  What's more, Plaintiffs have also

received documents from third parties, such as NYCHA and its representatives, including over 100 pages of text messages between NYCHA's Executive Director and Gjonaj, Moya, and Johnson. *DoorDash II*, 754 F. Supp. 3d at 562–63, 581; Tr. at 5:5–8). They also have deposed NYCHA's Executive Director. (Tr. at 5:12–14).

Plaintiffs acknowledge they have "obtained significant amount[s] of discovery from [NYCHA], as well as from the City" (*id.* at 4:24–5:3), but argue that "access to many relevant documents . . . is not a substitute for the ability to depose a witness and obtain direct evidence, including of motive and intent." (Rep. at 9 (citation omitted)). But that argument could be made in any case. To accept it as sufficient justification for depositions would fail to heed the courts' admonitions that compelling testimony from legislators is appropriate only in "extraordinary instances," *Arlington Heights*, 429 U.S. at 268, and should be reserved for "the rarest of circumstances," *Favors II*, 2013 WL 11319831, at *15.

Further, Plaintiffs' attempt to analogize this case to redistricting and voting rights cases where the written record contains only "circumstantial evidence of discriminatory intent," because "officials seldom, if ever, announce" they are discriminating against a racial minority (Mot. at 23–24), falls short. According to Plaintiffs' own characterization, Gjonaj's and Moya's public statements constitute "admi[ssions]" that make it "evident," "ma[k]e clear," and "leave no doubt" that the City Council acted with an unconstitutional motive. (FAC ¶¶ 9–10, 206; Dkt. No. 41 at 25; *see also* Mot. at 6 (noting that in his motion-to-dismiss ruling, Judge Woods "referenced well over a dozen statements by Moya and Gjonaj" including "overt

remarks" and "not-so-veiled" suggestions that the Fee Cap Legislation had a discriminatory purpose)).  Plaintiffs' cited cases are also inapposite because, in two of them, the plaintiffs only sought documents, not deposition testimony, *see Favors I*, 285 F.R.D. at 220–21; *Bethune-Hill*, 114 F. Supp. 3d at 342–45, and in the third, there was a "dearth" of other available evidence, *see Nashville Student Org. Comm.*, 123 F. Supp. 3d at 971.

Given the plethora of other evidence available to Plaintiffs, the second factor weighs in favor of the City.  *See ACORN v. Cnty. of Nassau*, No. 05 Civ. 2301 (JFB) (WDW), 2009 WL 2923435, at *2 (E.D.N.Y. Sept. 10, 2009) (affirming magistrate judge's finding that second factor weighed against deposing legislators because "plaintiffs could access 'the materials and information available [to the Board] at the time a decision was made,' and indeed, had already obtained '[s]ubstantial documentary evidence'") (citation omitted); *McDonough*, 2015 WL 12683663, at *6 (finding that the second factor weighed against compelling testimony given the "substantial documentary evidence" available to plaintiff and emphasizing that "while the plaintiff demonstrates that the Donoghue evidence that he seeks is relevant, he does not show that it is essential").

### c.  Seriousness of Litigation

The third factor, "seriousness of the litigation and issues involved," *Rodriguez*, 280 F. Supp. 2d at 101, asks the Court to consider "whether the litigation and the issues therein are of a *serious type,* not whether the claims will ultimately prevail."  *Favors I*, 285 F.R.D. at 219 (emphasis in original); *see Citizens*

*Union*, 269 F. Supp. 3d at 168 ("The third *Rodriguez* factor, the seriousness of the case and issues involved, goes to the nature of the claim itself."). As Judge Parker noted in *Citizens Union*, "[e]very constitutional challenge to a law enacted by a state legislature is serious." 269 F. Supp. 3d at 168. Thus, "[f]or this factor to be meaningful, there must be a rule or sliding scale for distinguishing among those cases that are, and are not, serious enough to warrant" piercing the legislative privilege. *Id.*; *see also Kay v. City of Rancho Palos Verdes*, No. CV 02-03922 MMM RZ, 2003 WL 25294710, at *19 (C.D. Cal. Oct. 10, 2003) ("All lawsuits are serious in the eyes of the parties . . ., but, as this factor recognizes, some suits are more serious than others.").

As the City points out (Opp. at 23), most cases where courts have found the seriousness factor tips in favor of disclosure involve race-based discrimination or voting rights. *See, e.g.*, *Favors I*, F.R.D. at 219 ("[I]t is indisputable that racial and malapportionment claims in redistricting cases 'raise serious charges about the fairness and impartiality of some of the central institutions of our state government,' and thus counsel in favor of allowing discovery." (quoting *Rodriguez*, 280 F. Supp. 2d at 102)); *Turtle Mountain Band of Chippewa Indians v. Jaeger*, 344 F.R.D. 89, 101 (D.N.D. 2022) ("'All litigation is serious. But . . . voting-rights litigation is especially serious.'" (quoting *League of Women Voters of Fla.,* 340 F.R.D. at 457)); *Bethune-Hill*, 114 F. Supp. 3d at 341 ("Courts have readily recognized the 'seriousness of the litigation' in racial gerrymandering cases."); *Comm. for a Fair & Balanced Map*, 2011 WL 4837508, at *8 ("There can be little doubt that plaintiffs'

allegations are serious. Plaintiffs raise profound questions about the legitimacy of the redistricting process and the viability of the 2011 Map."). Plaintiffs do not assert such a claim here. As the Court previously noted, Plaintiffs' Equal Protection claim does not allege that the Fee Cap Legislation targets any suspect class and does not depend on proof of discriminatory intent; rather, it invokes the form of rational-basis review generally applicable to economic legislation under the Equal Protection Clause. *DoorDash II*, 754 F. Supp. 3d at 568–69.

Here, the claim most relevant to the discovery sought is Plaintiffs' Dormant Commerce Clause claim, which is "firmly anchored in Plaintiffs' allegations that the Fee Cap Legislation was intended to discriminate against out-of-state companies like Plaintiffs and amounts to unlawful economic protectionism." *Id.* at 569. The Dormant Commerce Clause "reflect[s] a central concern of the Framers that was an immediate reason for calling the Constitutional Convention." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 517 (2019) (cleaned up). Unquestionably, Plaintiffs' Dormant Commerce claim raises important and serious issues. But it does not present an especially compelling justification for overriding the important interests protected by the legislative privilege. As the First Circuit reasoned in applying the legislative privilege to deny depositions of state legislators sought by the plaintiff in a Dormant Commerce Clause case: "Were we to find the mere assertion of a federal claim sufficient, even one that addresses a central concern of the Framers, the privilege would be pretty much unavailable largely whenever it is needed." *Am. Trucking Ass'ns, Inc. v. Alviti*, 14 F.4th 76, 88 (1st Cir. 2021).

Ultimately, the "outcome of this factor hinges on the interest of the public." *Citizens Union*, 269 F. Supp. 3d at 168. And "[i]n evaluating this factor, courts must be mindful that permitting discovery . . . threatens to undermine not only legislative independence, but also contravenes a princip[al] purpose of the legislative privilege—'to ensure that lawmakers are allowed to focus on their public duties.'" *Id.* (quoting *In re Hubbard*, 803 F.3d at 1310). Although this case implicates the interests of thousands of restaurants and the prices members of the public will pay for food delivery in New York City, at bottom this is a case about Plaintiffs' economic rights. The Court is not convinced that the public's interest in ferreting out possible evidence of economic protectionism or an infringement of Plaintiffs' property rights outweighs the public's interest in preserving the ability of lawmakers to focus on their public duties. Thus, the Court finds that in evaluating seriousness, the interest of the public leans towards nondisclosure. *See Citizens Union*, 269 F. Supp. 3d at 169 ("A First Amendment challenge to a law typically will not implicate legislative self-dealing or raise issues such that the public's need for full development of the facts outweighs its interest in ensuring that lawmakers and governors are not pulled away from their official responsibilities to respond to discovery requests or to give testimony. Thus, while this case clearly involves serious First Amendment claims, the third *Rodriguez* factor does not tip in favor of disclosure."); *Searingtown*, 575 F. Supp. at 1299 ("I cannot find that this interest [in discovering the motivation of local legislators in rezoning plaintiffs' property] rises to a level of public need for the full development of relevant facts sufficient to

warrant threatening the interest in protecting the legislative process . . . .
Accordingly, I must allow defendants' assertion of privilege and deny plaintiffs'
motion to compel them to answer questions relating to their motivations and
deliberations regarding legislation they enacted.").[9]

### d. Role of Government

The fourth factor, "the role of government in the litigation," *Rodriguez*, 280 F.
Supp. 2d at 101, "considers the role played by the legislature and its members in the
allegedly unlawful conduct." *Citizens Union*, 269 F. Supp. 3d at 169; *see Favors II*,
2013 WL 11319831, at *12 ("Factor four . . . does not turn on whether the
legislature as an entity is a party to the action; rather, it considers the role played
by that body and its members in the allegedly unlawful conduct."). "When the role
of the legislators in the unlawful conduct is 'direct,' the fourth factor weighs in favor
of disclosure." *Citizens Union*, 269 F. Supp. 3d at 169 (quoting *Favors II*, 2013 WL
11319831, at *12).

Plaintiffs argue that this fourth factor supports disclosure because the
"government's role in this suit is direct, and the motives and considerations . . . to a
large degree, [are] the case." (Mot. at 24–25 (quoting *Favors I*, 285 F.R.D. at 219)
(cleaned up)). The City counters that "a single element of [Plaintiffs'] Dormant

---

[9] Plaintiffs' cited cases are inapposite. (*See* Mot. at 24). *Kay v. City of Rancho Palos Verdes* involved
allegations that the defendant-city engaged in "retributive targeting" of the plaintiffs amounting to
an unlawful bill of attainder and a violation of the ex post facto clause. 2003 WL 25294710, at *2,
*18. *Hobart v. City of Stafford*, 784 F. Supp. 2d 732 (S.D. Tex. 2011), did not involve a challenge to a
legislative enactment at all: it involved claims against the defendant-city under federal civil rights
statutes arising from a police shooting, and depositions of city council members were sought only
with respect to their review of the police department's policies and practices. *Id*. at 765–66.

Commerce Clause" claim is insufficient "to justify the extreme measure of deposing City legislators and their staff," and that "Plaintiffs do not allege sufficient 'direct' conduct by these legislators to weigh in favor of disclosure." (Opp. at 23).

"[M]erely voting for a law or signing a bill does not render a legislator's role 'direct.'" *Citizens Union*, 269 F. Supp. 3d at 169. However, as described in the FAC, Moya and Gjonaj were the co-sponsors and driving force of the Fee Cap Legislation and its most active boosters within the City Council. (*See, e.g.*, FAC ¶¶ 65, 72, 89, 92-93). It is their public statements that Plaintiffs point to as evidence of the City Council's discriminatory and protectionist intent in adopting the Fee Cap Legislation. Given that Gjonaj and Moya played a far greater role in the allegedly unlawful conduct than that of a legislator who simply voted for the bill, this factor weighs in favor of Plaintiffs.

### e. Chilling Effect

The final factor, "the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable," *Rodriguez*, 280 F. Supp. 2d. at 101, examines "the chilling effect on the legislative process" from granting the requested discovery. *Favors II*, 2013 WL 11319831, at *12.

The City argues that allowing "Plaintiffs to depose legislators based on individual comments made during the legislative process will certainly have the chilling effect of preventing legislators from 'engag[ing] in robust deliberation about, and analysis of, proposed legislation that is essential to our republican form of government.'" (Opp. at 23–24 (quoting *Citizens Union*, 269 F. Supp. 3d at 169)).

The City asserts that disclosure would have "potentially far-reaching" implications and "would dramatically alter how legislators and their staff conduct business." (*Id.* at 24). The City further argues that "[i]f such comments alone were the basis for a deposition, councilmembers would be wary of explaining the rationale for their vote/sponsorship of legislation and likely refrain from providing comments to the press, or, at the very least, carefully measure their remarks." (*Id.*).

Plaintiffs' argument as to the fifth factor echoes their argument, examined above, as to why the *Rodriguez* factors should not be applied at all on this motion: that Plaintiffs' "underlying goal is to seek testimony to which they are entitled and to which the legislative privilege does *not* apply." (Mot. at 25 (emphasis in original)). According to Plaintiffs, allowing the depositions to proceed, with the City retaining its right to object to particular questions, "would not 'inhibit full and frank deliberations in analogous legislative activity'" in a significant manner. (*Id.* (quoting *Favors I*, 285 F.R.D. at 220)). For the reasons explained above, however, the Court has already rejected this argument.

"In performing th[e] balancing [required under the *Rodriguez* test], it is important to bear in mind that the legislative privilege protects a *process*." *Favors I*, 285 F.R.D. at 210 (emphasis in original). There is no question that Plaintiffs' proposed lines of inquiry relate directly to the legislative process and to "legitimate legislative activities." *Nat'l Ass'n for Advancement of Colored People*, 2018 WL 11260468, at *4. And even if Plaintiffs refrain from specifically asking the City Council witnesses what their motive or intent was in proposing the Fee Cap

Legislation, the questions they do intend to ask are designed to get at that very issue. Indeed, that is the primary reason why Plaintiffs contend the depositions of the City Council witnesses would be relevant in the first place. (*See* Mot. at 19 (arguing that Plaintiffs should be permitted to depose the City Council witnesses to seek evidence to support the inference that the Fee Cap Legislation "harbored a discriminatory purpose" (citation omitted)); *id.* at 23 (arguing that depositions are relevant because "Plaintiffs seek testimony . . . regarding the law's purpose," among other things); Rep. at 9 (arguing that testimonial evidence is relevant to Plaintiffs' Dormant Commerce Clause claim because it "may reflect discriminatory intent" (citation omitted))).

Thus, compelling testimony from legislators here could certainly have a "chilling effect on the legislative process," *Favors II*, 2013 WL 11319831, at *12, and chill open legislative debate and deliberations. New York City is one of the most populous cities in the country, and the New York City Council considers significant amounts of impactful and oftentimes controversial legislation.[10] Requiring councilmembers to give testimony when they are accused in a private lawsuit of acting in a discriminatory manner would tend to engender timidity in the performance of their legislative duties, resulting in the harms the legislative privilege is meant to protect against. *See Kay*, 2003 WL 25294710, at *21 (noting risk that if "the kind of inquiry sought by Plaintiffs could be repeated dozens of

---

[10] According to the City, Moya has sponsored 874 pieces of legislation, and Gjonaj sponsored 244 during his time as a councilmember. (Opp. at 3 n.1). The Court also takes judicial notice of the fact that service on the New York City Council is a full-time position.

times per year or more," local legislative activity "could well be hampered"). The fifth factor therefore weighs in favor of the City.

*       *       *

Considering the *Rodriguez* factors in their totality, the Court finds that Plaintiffs' interest in disclosure in this private civil lawsuit does not rise to a level sufficient to overcome the competing public interests in ensuring that legislators devote their full attention to their legislative duties and in avoiding chilling legislative deliberations. The City has carried its burden of demonstrating that the privilege applies, and Plaintiffs have not shown sufficient justification for piercing the privilege, particularly in light of the limited relevance of the evidence sought, the extensive other evidence available to Plaintiffs, and the special intrusiveness associated with compelling testimony from legislators in connection with the exercise of their legislative duties. This is not one of the "extraordinary instances," *Arlington Heights*, 429 U.S. at 268, in which testimony from a legislator or legislative aide should be compelled.

The Court notes that if the City intended to call Gjonaj, Moya, or Johnson as witnesses at trial to attempt to explain the statements cited in the FAC or otherwise rebut Plaintiffs' evidence as to the assertedly unconstitutional purpose of the Fee Cap Legislation, the matter would stand on a different footing. *See Favors I*, 285 F.R.D. at 212 (noting that "courts have been loath to allow a legislator to invoke the privilege at the discovery stage, only to selectively waive it thereafter in order to offer evidence to support the legislator's claims or defenses"). At oral

argument, however, the City represented that it would not be eliciting testimony from any of these witnesses, either by calling them at trial or by submitting affidavits from them.  (Tr. at 53:23–56:9).  Should that promise not be fulfilled, the Court would certainly entertain a renewed application from Plaintiffs to depose the City Council witnesses, even if that application came after the close of fact discovery.

Accordingly, Plaintiffs' motion to compel Rule 30(b)(1) depositions of the City Council witnesses is denied.

## B. Rule 30(b)(6) Deposition

Federal Rule of Civil Procedure 30(b)(6) permits a party to depose "a public or private corporation, a partnership, an association, a governmental agency, or other entity."  Fed. R. Civ. P. 30(b)(6).  "The party seeking the deposition 'must describe with reasonable particularity the matters for examination.'"  *Winfield v. City of N.Y.*, No. 15 Civ. 05236 (LTS) (KHP), 2018 WL 840085, at *4 (S.D.N.Y. Feb. 12, 2018) (quoting Fed. R. Civ. P. 30(b)(6)).  The organization then "must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf. . . . The persons designated must testify about information known or reasonably available to the organization."  Fed. R. Civ. P. 30(b)(6).  However, "topics inquiring into the mental processes and strategies of the noticed party or seeking to access privileged information are improper."  *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, No. 19 Civ. 226 (ILG) (CLP), 2022 WL 2702378, at *2 (E.D.N.Y. Feb. 11, 2022).

Plaintiffs seek to compel the City to designate a Rule 30(b)(6) witness or witnesses on fourteen of the eighteen topics in its amended deposition notice (Topics 1, 3–12, and 14–16).[11]  (Mot. at 13; Ciapetta Decl. Ex. C).  These topics relate to, *inter alia*, (i) the "purpose(s)," "objective(s)," and "likely and/or expected effects" of the Fee Cap Legislation, including "the extent to which the Ordinances were intended to and/or do impose burdens on out-of-state Third-Party Food Delivery Services and provide benefits to in-state Food Services Establishments" (Topic No. 14; *see also* Topic Nos. 3–4, 9 and 15); (ii) the City's "study, analysis, or evidence" concerning the Fee Cap Legislation's purposes and potential impact, as well as "the factual materials and information the City Council reviewed" in enacting the legislation (Topics 7–8, 10); (iii) whether "the City considered any alternative or narrower approaches [and] the rationale for rejecting such alternatives" (Topic No. 6); and (iv) communications with nonparties and communications concerning the Fee Cap Legislation's purposes or potential impact (Topic Nos. 11–12).  (Ciapetta Decl. Ex. C).

It is apparent from these deposition topics that Plaintiffs are focused on the City Council's deliberations, motivations, and fact-finding regarding the Fee Cap Legislation.  These matters lie at the heart of the legislative privilege, as discussed above.  *See, e.g.*, *E. End Ventures*, 2011 WL 6337708, at *3 ("[I]t is well-settled" that

---

[11] There is no dispute with regard to Topic 2, which pertains to a report about the Fee Cap Legislation issued in November 2023 by the Department of Consumer and Worker Protection ("DCWP").  The City has agreed to designate a witness from DCWP to testify on this topic.  (Mot. at 8; Lifshitz Decl. ¶ 14).  Plaintiffs are not moving to compel 30(b)(6) testimony as to the three other topics in its amended notice (Topics 13, 17, and 18).  (Mot. 8).

legislative privilege "protects legislators from 'discovery aimed at delving into their thought processes, motivations, and deliberations regarding the legislation they enacted and of which plaintiffs complain.'" (quoting *Searingtown*, 575 F. Supp. at 1298)); *Citizens Union*, 269 F. Supp. 3d at 151 (fact-gathering and fact-finding "is protected because '[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change'" (quoting *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975))).  Accordingly, the City objects to the noticed topics on the ground, *inter alia*, that Plaintiffs seek information protected by the legislative privilege, arguing that Plaintiffs' Rule 30(b)(6) notice "constitutes a backdoor attempt to obtain otherwise privileged information and to accomplish indirectly what Plaintiffs cannot do directly—question New York City Councilmembers about their thought processes in connection with the enactment of the fee cap legislation."  (Opp. at 3).[12]

The Court agrees.  Plaintiffs do not seriously dispute that the 30(b)(6) deposition topics seek information covered by the legislative privilege; instead, Plaintiffs emphasize that "the City can designate a non-lawmaker witness" on the topics.  (Reply at 5; *see also* Tr. at 26:17–22 (arguing that the witness does not "need[] to be a lawmaker" and "a staff member would make a lot of sense")).  But the identity of the witness is not the core problem here.  Rule 30(b)(6) requires that

---

[12] The City makes several additional arguments, including that the topics also infringe upon the attorney-client privilege and attorney work product protection.  (Opp. at 5).  The City also argues that Plaintiffs failed to describe the noticed topics with "reasonably particularity," as required by Fed. R. Civ. P. 30(b)(6) (*id*. at 5–10), and that the noticed topics are not relevant (*id*. at 19–20) (an argument that the Court has already rejected).  Because the Court denies the motion to compel the 30(b)(6) deposition on other grounds, it need not consider these alternative arguments.

the deponent prepare for the deposition so he or she can testify as to all information "known or reasonably available to" the organization as a whole. In the circumstances of this case, the relevant organization is the City Council. Thus, regardless of who the 30(b)(6) witness is, he or she necessarily would need to prepare by speaking with City Council members about their motivations and deliberations and fact-gathering in connection with the Fee Cap Legislation, and then relay that information to Plaintiffs at the deposition. This would subvert the privilege no less than 30(b)(1) depositions of individual lawmakers.

A 30(b)(6) deposition of a legislative body presents seemingly insuperable workability problems as well. "Even in cases where legislative motive is relevant to the merits of a claim, courts have observed that 'it is the motivation of the entire legislature, not the motivation of a handful of voluble members[] that is relevant.'" *Citizens Union*, 269 F. Supp. 3d at 147 (quoting *S.C. Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1262 (4th Cir. 1989)). This does not mean, as the Non-Parties previously argued and the City suggests here (Opp. at 10, 19), that evidence of nonpublic, nonprivileged statements by individual legislators is irrelevant for discovery purposes. *See DoorDash II*, 754 F. Supp. 3d at 571–74. But it does mean that, to adequately present testimony about the City Council's intent and purposes in enacting the Fee Cap Legislation, and the factual basis for the legislation, the 30(b)(6) deponent logically would need to interview (and perhaps review documents in the possession of) all 51 Councilmembers—and then somehow distill the results

into a representative position on behalf of the City Council as a whole.  This is not the proper province of a Rule 30(b)(6) deposition.

Not surprisingly, Plaintiffs cite no case authorizing a Rule 30(b)(6) deposition for a legislative body, and at oral argument, Plaintiffs' counsel conceded they had been unable to find such a case.  (Tr. at 30:11–16).  Counsel also acknowledged that Plaintiffs' request was "novel."  (*Id*.).  It is not unique, however.  At least two other courts have considered similar requests for Rule 30(b)(6) depositions of a legislative body.  Both roundly rejected the request as an impermissible intrusion on the interests protected by the legislative privilege.

In *All. for Glob. Just. v. D.C.*, 437 F. Supp. 2d 32 (D.D.C. 2006), the plaintiffs served a 30(b)(6) deposition notice seeking testimony about an investigation conducted by the District of Columbia Council, as well as the Council's understanding and interpretation of its own statutes.  *Id*. at 34, 37.  The court held that "[b]oth areas of testimony clearly fall within the 'legislative sphere' and are shielded by the District's speech and debate statute."  *Id*. at 37.  The court explained:

> [T]o the extent that plaintiffs are arguing that the 'collective knowledge' . . . includes the knowledge and views of the Council, plaintiffs are not entitled to such testimony. The fact that plaintiffs seek to obtain the Council's knowledge and views via a Rule 30(b)(6) deponent and disclaim any intention of directly questioning any Council member or staff is irrelevant. By its very nature, a Rule 30(b)(6) deposition notice requires the responding party to prepare a designated representative so that he or she can testify on matters not only within his or her personal knowledge, but also on matters reasonably known by the responding entity. That preparation would require the very type of intrusion into the Council's legislative activities that the [legislative privilege is] intended to prevent.

> Accordingly, I will not compel the District to produce a Rule 30(b)(6) deponent to testify about the Council's knowledge and views.

*Id.* (citations omitted).

More recently, in *Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1105 (D. Ariz. 2023), the court likewise denied the plaintiffs' motion to compel a Rule 30(b)(6) deposition of the Arizona Legislature concerning "the Legislature's objectives, motives, and information considered when drafting and passing" the voting laws at issue, as well as individual legislators' communications with other legislators and third parties. *Id.* at 1111. Citing the Legislature's argument that a 30(b)(6) deposition would be "unworkable" in terms of preparing a witness "who can present binding testimony on behalf of the Arizona Legislature," the court agreed with the Legislature that compelling a Rule 30(b)(6) deposition "would effectively force a waiver of every single legislator's individual legislative privilege." *Id.* (citation omitted). As in *All. for Glob. Just.*, the court found, the plaintiffs were seeking to compel testimony "as to the collective knowledge" of the Legislature on topics that "concern legitimate legislative activities." *Id.* at 1111–12 (citing *All. for Glob. Just.*, 437 F. Supp. 2d at 37, then *Tenney v. Brandhove*, 341 U.S. 367 (1951)). The court therefore denied plaintiffs' request to compel the Legislature to prepare a witness to testify as to those topics "because doing so would intrude upon the protections afforded by the legislative privilege." *Id.* at 1112.

This Court agrees with the reasoning and the conclusions of the courts in *All. for Glob. Just.* and *Mi Familia Vota*. Here, as in those cases, Plaintiffs seek testimony as to the "collective knowledge" of the City Council, and Plaintiffs'

30(b)(6) deposition topics plainly encompass "legitimate legislative activities" protected by the privilege. Accordingly, Plaintiffs' request for a Rule 30(b)(6) deposition must be denied as it represents an impermissible intrusion on the legislative privilege.

In support of their motion, Plaintiffs also complain that their interrogatories mirroring certain of its 30(b)(6) topics were met with unilluminating responses by the City that "pointed indiscriminately to the *entire* legislative record." (Rep. at 5 (emphasis in original); *see also* Mot. at 20–21). But even if Plaintiffs are justifiably dissatisfied with the City's interrogatory responses (a matter as to which the Court expresses no opinion),[13] that is not a justification for overriding legislative privilege. Nor is it appropriate to use a Rule 30(b)(6) deposition, as Plaintiffs' counsel suggested at oral argument, to "give [Plaintiffs] a little guidance as to what the City's case is," such as "what facts are you relying on, where in the record are you relying on to make this contention." (Tr. at 25:19–24). Rule 30(b)(6) depositions "'are designed to discover facts, not contentions or legal theories, which, to the extent discoverable at all prior to trial, must be discovered by other means.'" *LivePerson, Inc. v. 24/7 Customer, Inc.*, No. 14 Civ. 15519 (RWS), 2015 WL 4597546, at *7 (S.D.N.Y. July 30, 2015) (quoting *JPMorgan Chase Bank v. Liberty*

---

[13] The City acknowledged during oral argument that it did initially "point to the entire legislative record" in response to interrogatories but claims that following a meet and confer, the City "narrow[ed]" its responses and provided more specifics in response to contention interrogatories. (Tr. at 43:2–22).

*Mut. Ins. Co.*, 209 F.R.D. 361, 362 (S.D.N.Y. 2002)); *see also DDK Hotels*, 2022 WL 2702378, at *14 (asking 30(b)(6) designee to "marshal the evidence" is "improper").[14]

Accordingly, the Court denies Plaintiffs' motion to compel the City to produce a witness for a Rule 30(b)(6) deposition on the fourteen topics in question.

## CONCLUSION

For the reasons stated herein, Plaintiffs' motion to compel depositions is **DENIED** in all respects. The Clerk of Court is respectfully directed to terminate the pending motion at Dkt. No. 124.

**SO ORDERED.**

DATED:    New York, New York
          April 25, 2025

_____
GARY STEIN
United States Magistrate Judge

---

[14] Plaintiffs cite a ruling by Magistrate Judge Cave in an unrelated lawsuit they brought against the City, in which, in response to a motion by Plaintiffs, she declined to order the City to supplement its interrogatory responses with long narrative explanations and stated that Plaintiffs could have sought such explanations "through a deposition of a representative of the City pursuant to" Rule 30(b)(6). (Discovery Order, *DoorDash v. City of N.Y.*, No. 21 Civ. 7695 (AT) (SLC), Dkt. No. 114 at 7 (S.D.N.Y. May 22, 2023)). But Plaintiffs did not seek, and Judge Cave did not direct, a Rule 30(b)(6) deposition on that motion. Rather, Plaintiffs moved to compel the City to supplement its responses to Plaintiffs' contention interrogatories, and Judge Cave granted that relief in part (without requiring "long narrative explanations"). *Id.* Nor was any issue of legislative privilege raised on that motion. That ruling thus does not support Plaintiffs' requested relief here.